ACCEPTED
14-15-00463-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
11/18/2015 7:33:39 PM
CHRISTOPHER PRINE
CLERK

14-15-00463-CV

_____

COURT OF APPEALS FOR THE
FOURTEENTH DISTRICT OF TEXAS
Houston, Texas

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
11/18/2015 7:33:39 PM
CHRISTOPHER A. PRINE
Clerk

_____

**CROSSLAND ACQUISITION, INC.,**

*Plaintiff - Appellant,*

**V.**

**HNTB CORPORATION,**

*Defendant - Appellee.*

_____

**APPELLANT'S BRIEF**

_____

**Bryant S. Banes**
  State Bar No. 24035950
**Sean D. Forbes**
  State Bar No. 24040916
**Stormy N. Mayfield**
  State Bar No. 24067656

**Neel, Hooper & Banes, P.C**.
1800 West Loop South, Suite 1750
Houston, Texas 77027
713-629-1800
713-629-1812 (Fax)
Email: bbanes@nhblaw.com
Email: sforbes@nhblaw.com
Email: smayfield@nhblaw.com

*Attorneys for Crossland Acquisition, Inc.*

**_ORAL ARGUMENT REQUESTED_**

# IDENTITY OF COUNSEL

The following parties and counsel listed are involved in this matter. *See* TEX. R. APP. P. 38.1(a).

**Plaintiff/Appellant:**

Crossland Acquisition, Inc.

**Defendant/Appellee:**

HNTB Corporation

**Counsel for Plaintiff/Appellant:**

Bryant S. Banes
Sean D. Forbes
Stormy N. Mayfield
Neel, Hooper & Banes, P.C.
1800 West Loop South, Suite 1750
Houston, Texas 77027

**Counsel for Defendant/Appellee:**

P. Randall Crump
Shook Hardy & Bacon, L.L.P.
600 Travis, Suite 3400
Houston, Texas 77002-2926

# TABLE OF CONTENTS

**PAGE NO.**

IDENTITY OF COUNSEL ................................................................................. ii

TABLE OF CONTENTS ................................................................................. iii

TABLE OF AUTHORITIES ............................................................................. v

STATEMENT OF THE CASE .......................................................................... vii

STATEMENT REGARDING ORAL ARGUMENT ........................................... viii

ISSUES PRESENTED ..................................................................................... ix

STATEMENT OF THE FACTS ......................................................................... 2

SUMMARY OF THE ARGUMENT ................................................................... 7

STANDARD OF REVIEW ................................................................................ 8

ARGUMENT .................................................................................................... 12

   I. The trial court erred in ruling that the parties' contract required
      Crossland's completion of all services for all land parcels for a
      firm, fixed price, despite plain contract language to the contrary ................. 12

PRAYER ........................................................................................................... 17

CERTIFICATE OF SERVICE .......................................................................... 18

CERTIFICATE OF COMPLIANCE .................................................................. 18

## APPENDIX

Order on Defendant HNTB Corporation's Traditional Motion for Summary Judgment
Signed on January 20, 2015 ............................................................................. A

Amended Order on Summary Judgment Signed on February 16, 2015......................B

Final Judgment Signed on May 1, 2015...................................................................C

Master Agreement between HNTB Corporation and Consultation ..........................D

Task Order 3.............................................................................................................E

Supplemental Agreement 1 to Task Order 3 ............................................................ F

Supplemental Agreement 2 to Task Order 3 ............................................................G

Supplemental Agreement 3 to Task Order 3 ............................................................H

Task Order 4.............................................................................................................. I

Supplemental Agreement 1 to Task Order 4 ............................................................J

# TABLE OF AUTHORITIES

**CASES:**                                                              **PAGE NO:**

*Beverick v. Koch Power, Inc.*, 186 S.W.3d 145 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ................................................................................................12

*Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80 (Tex.1976), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex.1989) ..............................................................................................................11

*Bluelinx Corp. v. Texas Const. Sys., Inc.*, 363 S.W.3d 623 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ...............................................................................11, 12

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex.2005) .............................................9

*Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d  167 (Tex. 2003) ............8, 9

*Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310 (Tex. 2005) .................11

*Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41 (Tex.1965).................................................................................................................9

*Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929 (Tex.1952) .............................9

*Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118 (Tex. 1996)..........................10

*In Re Polybutelene Plumbing Litig. v. Hoechst Celanese Corp.*, 23 S.W.3d 428 (Tex.App.-Houston [1st Dist.] 2000, no pet.) .........................................................12

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844 (Tex.2009)................................................................................................................9

*MMP, Ltd. v. Jones*, 710 S.W.2d 59 (Tex.1986).......................................................9

*Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517 (Tex. 1994)............11

*Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640 (Tex.1995) ....................9

*S. Cnty. Mut. Ins. v. Sur. Bank, N.A.*, 270 S.W.3d 684 (Tex. App.—Fort Worth 2008, no pet.)......................................................................................................passim

*Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342 (Tex. 2006)....10

*Taylor–Made Hose, Inc. v. Wilkerson*, 21 S.W.3d 484 (Tex.App.-San Antonio 2000, pet. denied) ..............................................................................................9

*Valence Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex.2005) ...............................9

## STATUTES AND RULES:              PAGE NO:

TEX. R. APP. P. 38.1 ..................................................................................... ii

TEX. R. APP. P. 39 ...................................................................................... viii

TEX. R. CIV. P. 166a .......................................................................................9

# STATEMENT OF THE CASE

*Nature of the Case:*                                Breach of contract and *quantum meruit* arising from HNTB Corporation's ("HNTB") requiring Crossland Acquisition, Inc. ("Crossland") to continue providing right-of-way acquisition and relocation services in connection a State government contract without payment. (CR 36-63)[1].

*Style of the Case:*                                   Cause No. 2013-63341; *Crossland Acquisition, Inc. vs. HNTB Corporation.*

*Trial Court:*                                            The 190th District Court of Harris County, Texas, the Honorable Patricia J. Kerrigan.

*Trial Court's Disposition:*             Both parties moved for summary judgment on Crossland's breach of contract claims. (CR 66-1095). Subsequently, HNTB also filed a motion for summary judgment on Crossland's *quantum meruit* claims. (CR 1801-2048). Ultimately, the trial court granted summary judgment in HNTB's favor as to Crossland's breach of contract and *quantum meruit* claims. (CR 1790; CR 2737).

---

1 "CR __" refers to a page number from the Clerk's Record in this case.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant/Plaintiff does believe oral argument would be helpful to the Court. The judgment appealed from is based on omissions of facts and legal matters in connection with a complex commercial contract and, given such, the matters presented herein require amplification for the court to understand the precise nature of the dispute.  *See* TEX. R. APP. P. 39.

## ISSUES PRESENTED

I.    Whether the trial court erred in ruling that the parties' contract required Crossland Acquisition, Inc.'s completion of all services for all land parcels for a firm fixed price, despite plain contract language to the contrary.

14-15-00463-CV

_____

COURT OF APPEALS FOR THE
FOURTEENTH DISTRICT OF TEXAS
Houston, Texas

_____

**CROSSLAND ACQUISITION, INC.,**

*Plaintiff - Appellant,*

**V.**

**HNTB CORPORATION,**

*Defendant - Appellee.*

_____

**APPELLANT'S BRIEF**
_____

**To The Honorable Fourteenth Court of Appeals:**

Crossland requests that this Court reverse the trial court's grant of summary judgment on its breach of contract and *quantum meruit* claims and render judgment on the contract interpretation issue presented herein. Alternatively, Crossland requests reverse and remand for further proceedings. In support thereof, Crossland would show the following:

1

On June 12, 2006, HNTB entered into a contract with the Texas Department of Transportation ("TxDOT") in connection with the construction of transportation improvements along the US 290/Hempstead corridor, which extends from IH 610 to FM 2920. (CR 389-523). According to TxDOT, the construction of transportation improvements along the US 290/Hempstead corridor was a high-profile project. (CR 646; CR 799 at 233:9-233:18; *see also* CR 1007 at 78:20-79:21 and 80:9-80:20). This was also an extremely complex and unique project for TxDOT. (CR 653; CR 664 at 35:18-35:21; CR 710 at 218:19-220:24). Right-of-way acquisition and relocation services were a key component of HNTB's contract with TxDOT. (CR 390). However, HNTB did not have the expertise in the State of Texas to handle those types of services. (CR 799 at 233:9-233:18; CR 1007 at 78:20-79:21 and 80:9-80:20). Consequently, and because Crossland had expertise in right-of-way acquisition and relocation within the State of Texas, HNTB contracted with Crossland to provide those services. (*Id.*).

HNTB's contract with Crossland actually consisted of a master contract and multiple supplemental agreements thereto. (*See* CR 381-616). The master contract is the July 5, 2006 agreement between HNTB and Crossland (the "Master Agreement"), which incorporated all portions of HNTB's contract with TxDOT that were "pertinent to [Crossland's] responsibilities, compensation, and timing of Services and not in

2

conflict with any provision" of the Master Agreement. (CR 381-548). The supplemental agreements referred to by the parties as "Task Orders" provided authority for Crossland to perform right-of-way acquisition and relocation services along the US 290/Hempstead corridor. (CR 381 ("Task orders shall be used to describe the parties' mutual agreement on the scope of the Services, schedule, compensation and other particulars as stated therein."); *see also* CR 550 and CR 595). While there were several Task Orders, those at issue in this appeal are the ones referred to by the parties as "Task Order 3" and "Task Order 4." (*See* CR 550-616).

Task Orders 3 and 4 contained specific time limitations, *i.e.*, they had termination dates. (CR 553-54; CR 556-57; CR 559; CR 561-62; CR 564-65; CR 569; CR 597; CR 600; CR 602; CR 605-06; CR 610; CR 613). The first line of Exhibit B to Task Order 3 states: "This task order is for the initial period from execution through September 30, 2011." (CR 553). Exhibit B then repeats 11 times that the scope of services applied during "the initial period of this Task Order." (CR 553-54; CR 556-57; CR 559; CR 561-62; CR 564-65; CR 569). Likewise, Task Order 4 was from execution through June 30, 2012 (CR 613; *see also* CR 618), and Exhibit B thereto repeats 7 times that the scope of services applied during the "initial period of this Task Order." (CR 597; CR 600; CR 602; CR 605-06; CR 610). Moreover, there was a supplemental agreement executed solely for the purpose of extending Task Order 3's termination date. (CR 577).

During the time limitations of Task Orders 3 and 4, Crossland was contractually obligated to provide "deliverables." (CR 381 at "Article 4 – Scope of Services;" CR 550; CR 570; CR 595; CR 611; CR 851-52 at 48:6-48:21, 49:3-49:7 and 49:20-50:8). A "deliverable" is "a unit or increment of work required by the contract, including such items as goods, services, reports or documents." (CR 1474). Crossland's "deliverables" were monthly status reports and "**budget projections and anticipated funding requirements** every thirty (30) days and more frequently as requested by the State during this Task Order." (CR 570; CR 611) (emphasis added).[2] These "deliverables" were the "foregoing obligations" Crossland had to perform in order to get paid under the contract. (CR 550; CR 595; CR 851 at 49:3-49:7 ("Yeah. I'm not sure. I know that the total – all the deliverables would have to be completed within that total dollar amount, the total scope – the total fee. But I'm not sure if it was --")).

With respect to payment, Crossland was to be paid an hourly rate for each hour

---

[2] The exception to this lies in Supplement 1 to Task Order 4. (CR 618-26; *see also* CR 1444-46). Supplement 1 to Task Order 4, which was the subject of the duress portion of Crossland's claims (CR 46 at ¶ 26; CR 57-58 at ¶ 57), contains different "deliverables" and a different method of payment. (*Compare* CR 550, 570 and 575 *with* CR 618, 621, and 625; *see also* CR 1444-46). Due to these different "deliverables' and different method of payment, for work under Supplement 1 to Task Order 4 (and only that supplement to that task order), Crossland was contractually required to complete all listed services for all parcels listed therein for the maximum amount set forth therein. (CR 509 at "Unit Cost;" CR 1510 at "Firm Fixed Price;" CR 618-26; *see also* CR 1444-46). While HNTB may try to suggest otherwise, this supplement: does not apply to Task Order 3 (CR 618); only applies to Task Order 4 after the date of its execution (*id.*); and its only relevance to this appeal is to help illustrate that, for the relevant portions of Task Orders 3 and 4, the parties' contract did not require Crossland to complete all services for all parcels for the maximum amount set forth in the task orders. (*Compare* CR 550, 570 and 575 *with* CR 618, 621, and 625; *see also* CR 1444-46).

4

worked.[3]  (CR 511; CR 540; CR 550; CR 575; CR 587-88; CR 592-93; CR 595; CR 615-16).  Task Order 3 stated:

> In return for the performance of the foregoing obligations, HNTB shall pay to [Crossland] the maximum amount of $1,988,636.46, payable in accordance with Attachment E and E-1 of the Master Agreement and the attachment Exhibit D – Fee Schedule.

(CR 550).  Task Order 4 was identical except for the amount of compensation.  (CR 595).  Exhibit D to the Task Orders and Attachment E to the Master Agreement each identified "specified rate" as the method of payment.  (CR 511; CR 540; CR 550; CR 575; CR 587-88; CR 592-93; CR 595; CR 615-16).  "Specified Rate" was defined as follows:

> Payment shall be based on the actual hours worked multiplied by the specified rate for each type of labor plus other agreed to special direct cost items. The specified rate includes direct labor and indirect cost and fixed fee.

(CR 509).

While the task orders set forth a "maximum amount" to be received by Crossland in return for the "deliverables," nothing contractually required Crossland to complete all services for all land parcels for that "maximum amount."  (*See* CR 381-

---

[3] As indicated in note 1, the exception to this is Supplement 1 to Task Order 4.  (CR 618-26; *see also* CR 1444-46).  For work performed in connection with Supplement 1 to Task Order 4, Crossland was to be paid a firm fixed price for each indicated milestone it reached ("unit cost").  (*Id.*; CR 509).

616).[4] Nowhere does the parties' agreement state that Crossland had to complete all services for all land parcels for the task orders' "maximum amount." (*Id*.). Rather, the contract explicitly states and contemplates that Crossland need not complete all services for all land parcels for the task orders' "maximum amount." (*See* CR 550; CR 554-55; CR 570; CR 595; CR 611; CR 851 at 49:3-49:7; *see also* CR 2453 at ¶¶ 6-7; CR 2456-64).

As set forth above, completion of all services for all land parcels was not a "deliverable." (CR 550; CR 570; CR 595; CR 611; CR 851 at 49:3-49:7). In fact, there were no specific parcels identified in the "deliverables" or the fee schedules for the Task Orders.[5] (*Id.*; CR 575; CR 615-16; *see also* CR 2453 at ¶¶ 6-7; CR 2456-64). Further, the contract's express language stated that Crossland need not complete all services for a task order within the specified time limits. (CR 554-55). For example, Task Order 3 stated:

> The Services on this Task Order are generally for major elements during Preliminary and Final Design Development and **many of these services have started in the previous Task Orders** (Crossland Acquisition Task Order #1 and

---

[4] Again, this is where Supplement 1 to Task Order 4 differs. Due to the changed language in Supplement 1 to Task Order 4 regarding deliverables and payment method, Supplement 1 to Task Order 4 set forth that, for the work performed under that supplement (and only that work), the "maximum amount" was the total amount due Crossland for all services for all land parcels listed therein. (CR 509 at "Unit Cost;" CR 618-26; CR 1510 at "Firm Fixed Price;" *see also* CR 1444-46).

[5] By way of comparison, Supplement 1 to Task Order 4 did list specific land parcels in the "deliverables" and fee schedule. (CR 621; CR 625).

6

Crossland Acquisition Task Order #2) **and/or will be completed or continued in subsequent Task Orders** as deemed necessary by the State.

(*Id.*) (emphasis added). This is consistent with Crossland's method of payment under the Task Orders. (CR 1511 at description of "Time and Material"). It is also consistent with the parties' course of dealing whereby supplements were executed adding to the "maximum amount." (CR 581; CR 590).

## SUMMARY OF THE ARGUMENT

Did the parties' contract require Crossland to complete all services for all land parcels for a firm fixed price? That was the central question before the trial court on HNTB's motions for summary judgment, and it is the central question in this appeal. (*See* CR 66-77; CR 1790; CR 1801-1811; CR 2737). If the answer to this question is no, reversal and/or remand is required.

In its motion for summary judgment regarding Crossland's breach of contract claims, HNTB alleged that the language of the parties' agreement required Crossland to complete all services for all land parcels (*i.e.*, the alleged "foregoing obligations") for a fixed sum (*i.e.*, the "maximum amount") that could not be increased (*i.e.*, the changes clauses incorporated into the Master Agreement were not applicable to Crossland). (CR 66-77).[6] In its motion for summary judgment regarding Crossland's

---

[6] Crossland also filed for summary judgment on its breach of contract claims. (CR 335-1095). In that motion and its response to HNTB's initial motion for summary judgment, Crossland argued that (CONT.)

7

*quantum meruit* claims, HNTB alleged that *quantum meruit* was unavailable because the services were covered by the parties' contract (*i.e.*, Crossland had to complete all services for all land parcels for the "maximum amount"). (CR 1801-11). Thus, in order to grant summary judgment as it did, the trial court's answer to this central question was in the affirmative.[7] However, as set forth in more detail below, this is wholly based on an incomplete reading of the parties' contract and renders multiple provisions in same meaningless. It also constitutes a redrafting of the terms of the parties' agreement. This was improper.

## STANDARD OF REVIEW

The appellate court must review the trial court's grant of summary judgment *de novo*. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848

---

the sums claimed were within the scope of the contract because of the contract's changes clauses. (*Id.*; CR 1440-1709). In response, HNTB alleged that the changes clauses were not applicable to Crossland's contract despite same being incorporated therein and previously utilized by the parties. (CR 66-323; CR 1162-1437). In order to grant summary judgment in HNTB's favor on the contract claims, the trial court had to incorrectly find the changes clauses inapplicable to Crossland's contract. (*Id.*; CR1790). Therefore, under the trial court's ruling, once Crossland was outside of the contract's time limits or maximum amount, it was outside the scope of the contract. Hence, Crossland's *quantum meruit* claims. (*See* CR 2051-2661).

[7] HNTB also brought a no evidence motion for summary judgment in response to Crossland's *quantum meruit* claims. However, despite Crossland's production of significantly more than a scintilla of evidence (*see* CR 2051-2661), HNTB did not provide a response that could overcome all of that evidence in a way that would justify the grant of a no evidence summary judgment motion. (*See* CR 2663-2729); *accord Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). Consequently, the trial court's *quantum meruit* judgment was clearly based on HNTB's claim that the services were within the scope of the contract. To the extent it was not, as can be seen from this brief and Crossland's brief below, any grant of a no evidence summary judgment would have been improper. *See Taylor–Made Hose, Inc. v. Wilkerson*, 21 S.W.3d 484, 488 (Tex.App.-San (CONT.)

8

(Tex.2009); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). To prevail on a motion for summary judgment, a party must conclusively establish the absence of any genuine question of material fact, and that he is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a. A movant must either negate at least one essential element of the nonmovant's cause of action or prove all essential elements of an affirmative defense. *See Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995); *see also MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex.1986). Since the burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant, a court must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *See Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965); *see also Fielding*, 289 S.W.3d at 848; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). The court is not required to ascertain the credibility of affiants or to determine the weight of evidence in the affidavits, depositions, exhibits, and other summary judgment proof. *See Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 932 (Tex.1952). The only question is whether or not an issue of material fact is presented. *See* TEX. R. CIV. P. 166a(c).

The court's primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as expressed in the contract. *Seagull Energy E & P,*

<hr>

Antonio 2000, pet. denied); *accord Forbes, Inc.*, 124 S.W.3d at 172.

9

*Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). When construing a written contract, the court ascertains the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The court presumes that the parties intended for every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). Put another way, "[t]o achieve this objective, courts should examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker*, 650 S.W.2d at 393 (emphasis in original). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.* And courts will not construe contracts to produce an absurd result when a reasonable alternative construction exists. *S. Cnty. Mut. Ins. v. Sur. Bank, N.A.*, 270 S.W.3d 684, 689 (Tex. App.—Fort Worth 2008, no pet.).

Whether a contract is ambiguous is a question of law to be determined "by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker*, 650 S.W.2d at 394. If the written instrument is so worded that it can be given a definite or certain legal meaning, then the contract may be construed as a matter of law. *Seagull Energy*, 207 S.W.3d at 345.

A contract is ambiguous when its meaning is susceptible to more than one reasonable interpretation. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310,

312 (Tex. 2005). Only when a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1994). A patent ambiguity is evident on the face of the contract, while a latent ambiguity arises when a contract, unambiguous on its face, is applied to the subject matter with which it deals, and an ambiguity appears by reason of some collateral matter. *Id*. When a contract is found to be ambiguous, the parties' intent is a determination for the fact finder. *Coker*, 650 S.W.2d at 395. "When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Id*. at 394.

The right to recover in *quantum meruit* is based upon a promise implied by law to pay for beneficial services rendered and knowingly accepted. *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 86 (Tex.1976), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex.1989). A party may recover in *quantum meruit* when there is no express contract covering the services furnished. *Id*.; *Bluelinx Corp. v. Texas Const. Sys., Inc.*, 363 S.W.3d 623, 627 (Tex. App.—Houston [14th Dist.] 2011, no pet.). However, the existence of an express contract does not preclude recovery in *quantum meruit* for the reasonable value of services rendered and accepted which are not covered by the contract. *Black Lake*, 538 S.W.2d at 86; *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 154 (Tex. App.—Houston [1st Dist.]

11

2005, pet. denied); *Bluelinx*, 363 S.W.3d at 627.

## ARGUMENT

**I.    The trial court erred in ruling that the parties' contract required Crossland's completion of all services for all land parcels for a firm, fixed price, despite plain contract language to the contrary.**

As a reading of the entirety of Crossland's contract with HNTB makes clear, Crossland was not required to complete all services under Task Orders 3 and 4 for all parcels for the "maximum amount." (*See* CR 381-616). To find otherwise impermissibly ignores multiple provisions in the parties' agreement and renders them meaningless. *Coker*, 650 S.W.2d at 393; *S. Cnty. Mut. Ins.*, 270 S.W.3d at 689. Moreover, finding otherwise constitutes an impermissible redrafting and/or variance of the contract's explicit terms. *In Re Polybutelene Plumbing Litig. v. Hoechst Celanese Corp.*, 23 S.W.3d 428, 437 (Tex.App.-Houston [1st Dist.] 2000, no pet.); *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).

As the contract makes clear, Crossland's "deliverables" under Task Orders 3 and 4 consisted of monthly status reports and "**budget projections and anticipated funding requirements** every thirty (30) days and more frequently as requested by the State during this Task Order." (CR 570; CR 611) (emphasis added). These "deliverables" were Crossland's "foregoing obligations" under the contract. (CR 381 at "Article 4 – Scope of Services;" CR 550; CR 570; CR 595; CR 611; CR 851-52 at 48:6-48:21, 49:3-49:7 and 49:20-50:8; *see also* CR 1474). HNTB's own officers agree

12

with this fact.  (CR 851-52 at 48:6-48:21, 49:3-49:7 and 49:20-50:8).  Nothing herein suggests that the completion of all services for all parcels within the "maximum amount" was a requirement.  (CR 570; CR 611).  To the contrary, the primary "deliverable" of delivering "budget projections and anticipated funding requirements" counsels squarely against such a reading.  *Accord Coker*, 650 S.W.2d at 393; *S. Cnty. Mut. Ins.*, 270 S.W.3d at 689.

If HNTB wanted to require the completion of all services for all parcels as the "foregoing obligations," it would have done so because that is what it did in instances where such was required.  (*Compare* CR 550, 570 and 575 *with* CR 618, 621, and 625; *see also* CR 1444-46).  More specifically, HNTB would have removed the references to budget projections and anticipated funding requirements as a "deliverable."  (*Id.*). HNTB would have also made specific reference to the land parcels at issue as part of the "deliverables."  (*Id.*).  As set forth below, other language in the contract similarly (and explicitly) demonstrates this fact even further.

The task orders make clear that specific services and parcels would be assigned at a later date and were subject to change.  (*See* CR 550; CR 554-55; CR 570; CR 595; CR 611; CR 851 at 49:3-49:7; *see also* CR 2453 at ¶¶ 6-7; CR 2456-64).  For example, they say that "[t]he State, *at its option, may elect to expand*, reduce or delete the extent of each work element . . . ." (CR 554; CR 597) (emphasis added).  Exhibit B to Task Order 3 repeats 10 times that the services only apply to "select limited parcels *as*

13

*assigned along US 290*." (CR 562-65; CR 567; CR 569) (emphasis added). It also says that "[t]here is no guarantee that any or all of the services described in this Task Order will be *assigned* by the State and/or HNTB during the term of this Task Order." (CR 555) (emphasis added). Moreover, Task Order 3 specifically states that "**many of these services have started in previous Task Orders**" and/or they "**will be completed or continued in subsequent Task Orders**." (CR 554-55) (emphasis added). To hold that Crossland has to complete all services for all land parcels in return for a fixed sum that cannot be increased, as the trial court did here, utterly ignores these provisions and impermissibly renders them meaningless. *Accord Coker*, 650 S.W.2d at 393. It also leads to an absurd result. *Accord S. Cnty. Mut. Ins.*, 270 S.W.3d at 689.

Again, the task orders did not specify the number or type (commercial, residential, land-only, multi-family dwelling, etc.) of parcels on which Crossland was required to perform right-of-way and relocation services. (CR 550; CR 570; CR 575; CR 595; CR 611; CR 615-16; CR 851 at 49:3-49:7; *see also* CR 2453 at ¶¶ 6-7; CR 2456-64). Rather, they only say that parcels may be assigned by the State or HNTB at their discretion, and the work may be expanded. (*Id.*). Indeed, HNTB did just this, *i.e.*, assigned parcels separate from, and after execution, of the task orders. (CR 2453 at ¶¶ 6-7; CR 2456-58). The task orders had set time limits, *i.e.*, termination dates. (CR 553-54; CR 556-57; CR 559; CR 561-62; CR 564-65; CR 569; CR 597; CR 600;

14

CR 602; CR 605-06; CR 610; CR 613). Further, HNTB alleged (and the trial court presumably accepted) that, despite being incorporated into Crossland's Master Agreement and same having been utilized in other supplements, the changes clauses were not applicable to Crossland's contract. (*See supra* at n.6) Therefore, under the trial court's interpretation, HNTB could assign an indefinite number of parcels to Crossland, and Crossland would have to complete the services for all of the parcels at its own cost, and perhaps beyond the termination date. This is an absurd result. *See S. Cnty. Mut. Ins.*, 270 S.W.3d at 689.

Finally, the trial court's interpretation renders the payment terms in Crossland's contract with HNTB meaningless. The task orders specifically provided that the "maximum amount" was "payable in accordance with" Attachment E to the Master Agreement Exhibit D to the task orders. (CR 550; CR 595). Attachment E to the Master Agreement and Exhibit D to the task orders identified "specified rate" as the method of payment. (CR 511; CR 540; CR 550; CR 575; CR 587-88; CR 592-93; CR 595; CR 615-16). "Specified Rate" was defined in Attachment E to the Master Agreement as follows:

> Payment shall be based on the actual hours worked multiplied by the specified rate for each type of labor plus other agreed to special direct cost items. The specified rate includes direct labor and indirect cost and fixed fee.

(CR 509). It also provided that "Contract Rates are to be billed" and that the rates are

15

not subject to audit. (*Id.*). Yet, under the trial court's interpretation, Crossland would only be paid the contract rates up to the "maximum amount," and, afterwards, Crossland must complete the remaining services for all parcels for free.

Crossland cannot be paid "in accordance with" Attachment E or Exhibit D to the task orders if it is to work for free after reaching the "maximum amount." Thus, the trial court's interpretation also renders the "specified rate" provisions in Crossland's contract meaningless and, again, leads to an absurd result. *Accord Coker*, 650 S.W.2d at 393; *S. Cnty. Mut. Ins.*, 270 S.W.3d at 689. This is especially true given that, where Crossland was required to complete all services for all parcels within the "maximum amount," the Master Agreement allowed for alternative payment methods meant to achieve same, and the parties' actually utilized them. (*Compare* CR 550, 570 and 575 *with* CR 618, 621, and 625; *see also* CR 1444-46).

In sum, all of the foregoing demonstrates that the trial court's interpretation impermissibly rendered numerous contractual provisions meaningless, rewrites the parties' agreement and produces absurd results. Alternatively, and at a minimum, the foregoing demonstrates that Crossland's interpretation of the agreement is reasonable. This is especially true given that same is in line with the general interpretation of other contracts containing similar "deliverables" and methods of payment. (CR 1511 at description of "Time and Material"). Either way, it was improper for the trial court to grant summary judgment. *Accord Coker*, 650 S.W.2d at 393-94; *S. Cnty. Mut. Ins.*,

16

270 S.W.3d at 689.

## PRAYER

For the foregoing reasons, the Appellant respectfully requests that this Court reverse the trial court's judgment and render all questions of law in its favor and/or remand this matter back to the trial court for further proceedings.

Respectfully submitted,

_____

Bryant S. Banes
State Bar No. 24035950
Sean D. Forbes
State Bar No. 24040916
Stormy N. Mayfield
State Bar No. 24067656
Neel, Hooper & Banes, P.C.
1800 West Loop South, Suite 1750
Houston, Texas 77027
713-629-1800
713-629-1812 (Fax)

**Attorneys for Crossland Acquisition, Inc.**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of *Appellant's Brief* has been forwarded to counsel of record for HNTB Corporation, Appellee/Defendant, via email, on this 18th day of November, 2015.

P. Randall Crump
PCRUMP@shb.com

_____
Bryant S. Banes

## CERTIFICATE OF COMPLIANCE

This is to certify that Appellant's Brief contains 4,313 words.

_____
Bryant S. Banes

## APPENDIX

Order on Defendant HNTB Corporation's Traditional Motion for Summary Judgment Signed on January 20, 2015 ........................................................A

Amended Order on Summary Judgment Signed on February 16, 2015...................B

Final Judgment Signed on May 1, 2015 ..................................................C

Master Agreement between HNTB Corporation and Consultation .........................D

Task Order 3..............................................................................E

Supplemental Agreement 1 to Task Order 3 ..............................................F

Supplemental Agreement 2 to Task Order 3 ..............................................G

Supplemental Agreement 3 to Task Order 3 ..............................................H

Task Order 4.............................................................................. I

Supplemental Agreement 1 to Task Order 4 ..............................................J



CAUSE NO. 2013-63341

| | | |
|---|---|---|
| CROSSLAND ACQUISTION, INC. | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| HNTB CORPORATION | § | 190TH JUDICIAL DISTRICT |

## ORDER ON
## DEFENDANT HNTB CORPORATION'S
## TRADITIONAL MOTION FOR SUMMARY JUDGMENT

The Court, having considered Defendant HNTB Corporation's Traditional Motion for Summary Judgment, after reviewing the pleadings on file, and the Plaintiff's response, if any, is of the opinion that the Motion should be granted. It is therefore:

ORDERED that Defendant HNTB Corporation's Traditional Motion for Summary Judgment is granted.

SIGNED this 20 day of January, 2015.

_____
JUDGE PRESIDING

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

FILED
Chris Daniel
District Clerk

JAN 2 1 2015

Time:_____
Harris County, Texas
By_____
Deputy

437768 v1

1769

**B**

CAUSE NO. 2013-63341

| | | |
|---|---|---|
| CROSSLAND ACQUISITION, INC. | )( | IN THE DISTRICT COURT OF |
| | )( | |
| vs. | )( | HARRIS COUNTY, T E X A S |
| | )( | |
| HNTB CORPORATION | )( | 190TH JUDICIAL DISTRICT |

## AMENDED ORDER ON SUMMARY JUDGMENT

On this day, the Court having considered Defendant HNTB Corporation's Traditional Motion for Summary Judgment, after reviewing the pleadings on file, and the Plaintiff's response, if any, is of the opinion that the Motion should be granted.

It is therefore ORDERED that Defendant HNTB Corporation's Traditional Motion for Summary Judgment is granted. This is a partial not final judgment.

FILED
Chris Daniel
District Clerk

FEB 16 2015

Harris County, Texas
By_____
Deputy

SIGNED this 16 day of February, 2015.

_____
JUDGE PATRICIA J. KERRIGAN

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.

1790

C

4/6/2015 4:23:14 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 4777537
By: MCNEAL, ARIONNE
Filed: 4/6/2015 4:23:14 PM

CAUSE NO. 2013-63341

| | | |
|---|---|---|
| CROSSLAND ACQUISTION, INC. | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| HNTB CORPORATION | § | 190TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

On this day the Court considered HNTB Corporation's Traditional and No-Evidence Motion for Summary Judgment on Crossland's Quantum Meruit Claim. In reaching its decisions on these motions, the Court also took into consideration the earlier motions for summary judgment filed by Crossland and HNTB and the Court's rulings, which were signed on January 20, 2015 and February 16, 2015. After considering these things, reading the motions and responses filed by the parties and having heard the arguments of the parties, the Court is of the opinion that a final judgment should be entered in favor of HNTB. It is therefore:

ORDERED, ADJUDGED AND DECREED that Plaintiff Crossland Acquisition. Inc. takes nothing on its claims against Defendant HNTB Corporation; and it is further

ORDERED, ADJUDGED AND DECREED that HNTB shall recover from Crossland its costs of Court.

This Final Judgment disposes of all claims of all parties and is a final, appealable Order.

SIGNED this _____1_____ day of ___May_____, 2015.

_____
JUDGE PRESIDING

445531 v2

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

2737

# D

# MASTER AGREEMENT BETWEEN HNTB AND CONSULTANT

RECEIVED

JUL · /006

HNTB
HOUSTON, TX

THIS AGREEMENT is entered into between HNTB CORPORATION (HNTB) and Crossland Acquisition (Consultant), for the following reasons:

1. HNTB has entered into an agreement dated June 12, 2006, (Prime Agreement), with the State of Texas acting by and through the Texas Department of Transportation (Owner), to perform or provide engineering services generally described as the program management of the US 290/Hempstead corridor extending from IH 610 to FM 2920, a distance of approximately 33.5 miles which shall include services such as project/financial planning, right of way surveying/mapping, scheduling, utility coordination, locating and designating services, right of way acquisition support, geotechnical services, design support, and construction oversight, identified as HNTB's Project Number 38861 (the Project); and,

2. HNTB requires certain services in connection with the Project (the Services); and,

3. Consultant is prepared to provide the Services.

RECEIVED

JUL 2 0 2006

HNTB
HOUSTON, TX

In consideration of the promises contained in this Agreement, HNTB and Consultant agree as follows:

## ARTICLE 1 - EFFECTIVE DATE
The effective date of this Agreement shall be July 5, 2006

## ARTICLE 2 - GOVERNING LAW
This Agreement shall be governed by the laws of the State set forth in the Prime Agreement.

## ARTICLE 3 - TASK ORDERS
Task Orders shall be used to describe the parties' mutual agreement on the scope of the Services, schedule, compensation and other particulars as stated therein. Task Orders shall be in the general form shown in attached Exhibit "A". Task Orders are binding only after acceptance and execution by duly authorized representatives of both parties. Each Task Order shall govern the parties' rights and obligations with respect to each assignment, but all within the framework of this Agreement.

## ARTICLE 4 - SCOPE OF SERVICES
Consultant shall provide the Services described in Section A (Scope of Services) of each Task Order. HNTB shall be the general administrator and coordinator of Consultants' services and shall facilitate the exchange of information among the other independent consultants (if any) engaged by HNTB as necessary for the coordination of their services. All Project communications shall be made through or with the prior written approval of HNTB. Owner and HNTB shall have the right to observe performance of the Services and to review Consultant's files and records relating to the Project.

## ARTICLE 5 - SCHEDULE
Consultant shall perform the Services pursuant to the time frame set forth in Section B (Schedule) of each Task Order. Consultant recognizes that the services of HNTB and others involved in the Project are dependent upon the complete, accurate and timely performance of Consultant's Services. Unless otherwise provided in this Agreement, Consultant shall perform such Services in the same character, timing, and sequence as HNTB is required to perform the services under the Prime Agreement. Consultant's failure to so perform shall be considered a material breach of this Agreement.

## ARTICLE 6A - COMPENSATION
HNTB shall pay Consultant in accordance with Section C (Compensation) of each Task Order and in accordance with all applicable provisions of the Prime Agreement.

There is no guarantee, either expressed or implied, as to the actual dollar amount that will be authorized under this Agreement through Task Orders. In no event shall Task Orders be issued that will exceed the maximum amount authorized by the Owner.

Consultant shall submit periodic statements for Services rendered. If HNTB objects to any statement submitted by Consultant, HNTB shall so advise Consultant in writing giving reasons therefor within fourteen days of receipt of such statement. If no such objection is made, the statement will be considered acceptable to HNTB.

HNTB shall invoice Owner on account of Consultant's Services and shall pay Consultant within ten days of the time HNTB receives payment from Owner on account thereof. It is a condition precedent to HNTB's payment to Consultant that HNTB have received corresponding payment from Owner. Payments to Consultant will be reduced by any amounts withheld by Owner. Upon the release to HNTB of any amount which includes payments due Consultant, HNTB will forward to Consultant its portion of such payment.

## ARTICLE 6B – PROJECT OFFICE
Consultant and HNTB have agreed to a cost sharing principle for co-location in the project office space. Costs associated with such co-located space will be allocated proportionately based on the number of Consultant's employees assigned to work in the co-located space to the total number of assigned

CR000246

HNTB.000144

381

employees working in the space. Monthly, HNTB will compute the total space costs, including rent and operating expenses for the space, furniture, fixtures, supplies, computers, servers, printers, plotters, and other costs normally associated with office space overhead, and invoice Consultant it's proportionate share. HNTB will provide Consultant a monthly invoice for these costs at the beginning of each month, and subsequent payment will be due upon receipt. At the end of each quarter, HNTB will re-compute Consultant's proportion of the space costs based on changes in proportion of Consultant's assigned employees to total assigned employees working in the space, if any, and will notify Consultant in writing of said change in proportion. This new proportion will be used for invoicing Consultant the proportionate costs for months in the subsequent quarter. Upon co-locating, no expenses or other direct costs will be allowed under the Agreement other than as specifically approved in writing by HNTB and TxDOT. Consultant will treat the invoiced space costs as overhead.

## ARTICLE 7 - PRIME AGREEMENT

A copy of the Prime Agreement is attached as Exhibit "B". All portions thereof pertinent to Consultant's responsibilities, compensation, and timing of Services and not in conflict with any provision of this Agreement are incorporated herein and made binding on Consultant. In the event of a conflict between the terms and conditions of this Agreement and those of the Prime Agreement, the terms and conditions of this Agreement shall prevail.

## ARTICLE 8 - INDEMNIFICATION

Consultant shall indemnify and hold harmless HNTB and Owner from and against all claims, liability, and expenses (including attorney fees and defense costs) due to activities of itself, its agents, or employees, performed under this Agreement and which are caused by or result from error, or omission, or negligent act of Consultant or any person employed by Consultant.

Without limiting the generality of the foregoing, this indemnification obligation shall extend to and include any actions brought by, or in the name of, any employee of Consultant or others for whom the Consultant is legally liable.

The terms and conditions of this Article shall survive completion of all Services, obligations, and duties provided for in this Agreement, or the termination of this Agreement for any reason.

## ARTICLE 9 - INSURANCE

During the performance of the Services under this Agreement, Consultant shall maintain the following insurance with carriers having a Best's rating of at least B+ and authorized to do business in the state in which the Services are being performed:

(a) General Liability Insurance on a coverage form equal to ISO CG 00 01, on an occurrence basis, with a limit of not less than $1,000,000 per occurrence and $2,000,000 general aggregate, including a per-project endorsement.

(b) Automobile Liability Insurance to include coverage for all hired, owned and non-owned vehicles, with a combined single limit of not less than $1,000,000.

(c) Workers' Compensation Insurance, in accordance with the laws of the state in which the Services are being performed, and Employers' Liability Insurance with limits according to such statutory requirements, or $500,000 for each accident, whichever is greater. Where Services fall within the authority of the United States Longshoreman's and Harbor Workers Compensation Act, or the Jones Act, Consultant's insurance shall include such Acts.

(d) Professional Liability Insurance with limits of not less than $1,000,000 per claim and annual aggregate.

(e) If operations related to the Services hereunder will involve subsurface investigation (such as soil samples, core drilling, test wells, etc.), Consultant, or its subcontractor(s) as applicable, shall maintain Contractor's Pollution Liability insurance, including bodily injury, property damage and cleanup costs, with limits of not less than $1,000,000 per occurrence and annual aggregate.

The policies shall provide, or be endorsed to provide, that: (1) at least thirty (30) days' advance written notice shall be given to HNTB prior to cancellation or non-renewal, (2) HNTB, its parent company, affiliated and subsidiary entities, directors, officers and employees, and the Owner shall be added as additional insureds under (a), (b) and (e) above, (3) on those policies where HNTB and the Owner are additional insureds, such insurance shall be primary and any insurance maintained by HNTB or the Owner shall be excess and not contribute with it, and (4) Consultant and its insurer(s) waive their rights of subrogation against HNTB and Owner.

Consultant shall furnish HNTB certificates of insurance which evidence the requirements of this Article prior to performing any Services under this Agreement. Consultant further agrees to file new certificates showing renewal of coverage and limits at least thirty (30) days prior to the expiration of the current policies. Certificates shall include reference to HNTB's Project Number as first stated above.

## ARTICLE 10 - INDEPENDENT CONTRACTOR

Consultant undertakes performance of the Services as an independent contractor and shall be wholly responsible for the methods of performance. Consultant has complete and sole responsibility for its employees, agents, subcontractors or any other

CR000247

HNTB.000145

persons or entity that Consultant hires to perform or assist in performing the Services hereunder. Consultant is solely responsible for (a) payment of wages, benefits, and other compensation to or for its employees, (b) payment of applicable payroll, unemployment, and other taxes and withholding of applicable social security (FICA) and income taxes with respect to its employees, and (c) compliance with applicable Workers' Compensation laws with respect to maintenance of worker's compensation and employer's liability insurance coverages.

## ARTICLE 11 - COMPLIANCE WITH LAWS
In performance of the Services, Consultant shall comply with applicable regulatory requirements including federal, state, and local laws, rules, regulations, orders, codes, criteria, and standards. Consultant shall procure the permits, certificates, and licenses necessary to allow Consultant to perform the Services. Consultant shall not be responsible for procuring permits, certificates, and licenses required for any construction unless such responsibilities are specifically assigned to Consultant in a Task Order.

## ARTICLE 12 - HNTB'S RESPONSIBILITIES
HNTB shall be responsible for all matters described in Section D (HNTB's Responsibilities), of each Task Order. In addition, HNTB shall perform and provide the following in a timely manner so as not to delay the Services of Consultant:

(a) Provide criteria and information pertinent to Consultant's Services as to Owner's and HNTB's requirements for the Project, including design objectives and constraints, space, capacity, and performance requirements, flexibility and expandability, and any budgetary limitations; and furnish copies of all design and construction standards which Owner and HNTB will require to be included in the drawings and specifications to be furnished by Consultant under this Agreement, if any.
(b) Make available to Consultant drawings, specifications, schedules, and other information, interpretations, and data which are prepared by HNTB, or by others, which HNTB knows are reasonably available to HNTB, and which HNTB and Consultant consider pertinent to Consultant's responsibilities hereunder.
(c) Request Owner to arrange for access to and to make provisions for Consultant to enter upon public and private property as required for Consultant to perform the Services.
(d) Give prompt notice to Consultant whenever HNTB observes or otherwise becomes aware of any development that affects the scope or timing of Consultant's Services.

Unless otherwise provided in the Agreement, the information and services to be provided by HNTB under this Article will be without cost to Consultant.

## ARTICLE 13 - OWNERSHIP OF DOCUMENTS
All documents, including, but not limited to, drawings, specifications, computer software and other such instruments of service prepared by Consultant pursuant to this Agreement, whether completed or in progress, are the property of HNTB. Ownership shall transfer to Owner if or as required by the Prime Agreement. Any use except for the specific purpose intended by this Agreement will be at the user's sole risk and without liability or legal exposure to Consultant.

## ARTICLE 14 - TERMINATION AND SUSPENSION
This Agreement will terminate automatically upon termination of the Prime Agreement. HNTB will promptly notify Consultant of such termination.

HNTB may terminate or suspend performance of all or any part of this Agreement for HNTB's convenience upon written notice to Consultant. Upon receipt of notice, Consultant shall terminate or suspend performance of the Services on a schedule acceptable to HNTB. Consultant's sole remedy shall be payment for Services performed in accordance with this Agreement up to the effective date of termination or suspension.

HNTB may terminate this Agreement upon written notice in the event of substantial failure by Consultant to perform in accordance with this Agreement; provided, however, the Consultant shall have 14 calendar days from receipt of the termination notice to cure or to submit a plan for cure reasonably acceptable to HNTB. In the event of such termination, HNTB may complete the Services as HNTB deems appropriate, withholding any further payment to Consultant until the Services have been completed. If the unpaid balance of Consultant's compensation earned to the date of termination exceeds all costs, losses, and damages (direct, indirect, and consequential) sustained by HNTB arising out of or resulting from Consultant's termination and HNTB's completion of the Services, such excess will be paid to Consultant. If such costs, losses, and damages exceed such unpaid balance, Consultant shall pay the difference to HNTB.

Consultant may terminate this Agreement upon written notice in the event of substantial failure by HNTB to perform in accordance with this Agreements; provided, however, HNTB shall have fourteen (14) calendar days from receipt of the termination notice to cure or to submit a plan for cure reasonably acceptable to Consultant. In the event of termination, HNTB will pay Consultant for Services performed in accordance with this Agreement to the date of termination.

Throughout the term of this Agreement, Consultant shall maintain, in legible and organized form, all information, work papers, and design calculations

CR000248                                              HNTB.000146

383

relating to the Services. Upon termination of this Agreement for any reason, Consultant will promptly provide same to HNTB, along with all documents or other instruments of service, whether completed or in progress, that have been prepared or furnished by Consultant in the performance of the Services hereunder, and will reasonably cooperate with HNTB and/or any replacement consultant to facilitate transfer of Consultant's responsibilities.

The provisions of this Article shall also apply to each individual Task Order, separate and apart from any other Task Orders, and without terminating or otherwise affecting this Agreement as a whole.

## ARTICLE 15 - PROPRIETARY INFORMATION

Consultant shall treat as proprietary all information provided by HNTB and Owner and all drawings, reports, studies, design calculations, specifications, and other documents or information, in any form or media, resulting from the Consultant's performance of the Services. Consultant shall not publish or disclose proprietary information for any purpose other than the performance of the Services without the prior written authorization of HNTB.

The preceding restriction shall not apply to information which is in the public domain, was previously known to Consultant, was acquired by Consultant from others who have no confidential relationship to HNTB with respect to same, or which, through no fault of Consultant, comes into the public domain. Consultant shall not be restricted from releasing information, including proprietary information, in response to a subpoena, court order, or other legal process. Consultant shall not be required to resist such legal process, but shall promptly notify HNTB in writing of the demand for information before Consultant responds to such demand. HNTB may, at its sole discretion, seek to quash such demand.

## ARTICLE 16 - NOTICES

Any notices required by this Agreement shall be made in writing to the address specified below:

HNTB:  Mr. Thomas O. O'Grady, P.E.
       Associate Vice President
       HNTB Corporation
       2 Northpoint Drive, Suite 650
       Houston, TX 77060

Consultant:  Mr. Ken Harrison
             President
             Crossland Acquisition, Inc.
             9800 N.W. Freeway, Suite 516
             Houston, Texas 77092

Nothing contained in this Article shall be construed to restrict the transmission of routine communications between representatives of HNTB and Consultant.

## ARTICLE 17 - DELAY IN PERFORMANCE

Neither HNTB nor Consultant shall be considered in default of this Agreement or any Task Order for delays in performance caused by circumstances beyond the reasonable control of the nonperforming party. For purposes of this Agreement, such circumstances include, but are not limited to, abnormal weather conditions; floods; earthquakes; fire; epidemics; war, riots, and other civil disturbances; strikes, lockouts, work slowdowns, and other labor disturbances; sabotage; judicial restraint; and delay in or inability to procure permits, licenses, or authorizations from any local, state or federal agency for any of the supplies, materials, accesses, or services required to be provided by either HNTB or Consultant under this Agreement.

Should such circumstances occur, the nonperforming party shall, within a reasonable time of being prevented from performing, give written notice to the other party, describing the circumstances preventing continued performance and the efforts being made to resume performance.

## ARTICLE 18 - DISPUTES

In the event of a dispute between HNTB and Consultant arising out of or related to this Agreement or any Task Order, the aggrieved party shall notify the other party of the dispute within a reasonable time after such dispute arises. If the parties cannot thereafter resolve the dispute, each party shall nominate a senior officer of its management to meet to resolve the dispute by direct negotiation or mediation.

Should such negotiation or mediation fail to resolve the dispute, either party may pursue resolution by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association; provided, however, in the event the parties are unable to reach agreement to arbitrate under terms reasonably acceptable to both parties, either party may pursue resolution in any court having jurisdiction.

During the pendency of any dispute, the parties shall continue diligently to fulfill their respective obligations hereunder.

## ARTICLE 19 - RECORDS

Consultant's records pertaining to compensation and payments under this Agreement shall be kept in accordance with generally accepted accounting principles. Such records shall be subject to audit by HNTB, during normal business hours at Consultant's place of business, or Consultant shall provide a copy of same to HNTB at HNTB's expense. Consultant shall not dispose of the originals of such records until after sixty (60) days prior written notice to HNTB.

CR000249
HNTB.000147

384

## ARTICLE 20 - EQUAL EMPLOYMENT OPPORTUNITY

The Consultant hereby affirms its support of affirmative action and that it abides by the provisions of the "Equal Opportunity Clause" of Section 202 of Executive Order 11246 and other applicable regulations.

Consultant affirms its policy to recruit and hire employees without regard to race, age, color, religion, sex, sexual preference/orientation, marital status, citizen status, national origin or ancestry, presence of a disability or status as a Veteran of the Vietnam era or any other legally protected status. It is Consultant's policy to treat employees equally with respect to compensation, advancement, promotions, transfers and all other terms and conditions of employment.

Consultant further affirms completion of applicable governmental employer information reports including the EEO-1 and VETS-100 reports, and maintenance of a current Affirmative Action Plan if required by Federal regulations.

## ARTICLE 21 - WAIVER

A waiver by either HNTB or Consultant of any breach of this Agreement shall be in writing. Such a waiver shall not affect the waiving party's rights with respect to any other or further breach.

## ARTICLE 22 - SEVERABILITY

The invalidity, illegality, or unenforceability of any provision of this Agreement or the occurrence of any event rendering any portion or provision of this Agreement void shall in no way affect the validity or enforceability of any other portion or provision of this Agreement. Any void provision shall be deemed severed from this Agreement, and the balance of this Agreement shall be construed and enforced as if it did not contain the particular portion or provision held to be void. HNTB and Consultant further agree to amend this Agreement to replace any stricken provision with a valid provision that comes as close as possible to the intent of the stricken provision. The provisions of this Article shall not prevent this entire Agreement from being void should a provision which is of the essence of this Agreement be determined void.

## ARTICLE 23 - INTEGRATION

This Agreement, including Exhibits "A" and "B" (incorporated by this reference), and subsequently issued Task Orders (and their respective attachments, if any), represents the entire and integrated agreement between HNTB and Consultant. It supersedes all prior and contemporaneous communications, representations, and agreements, whether oral or written, relating to the subject matter of this Agreement. This Agreement may be amended only by a written instrument signed by both HNTB and Consultant.

## ARTICLE 24 - SUBCONTRACTING

Consultant shall not engage independent consultants, associates, or subcontractors to assist in the performance of Consultant's Services without the prior written consent of HNTB.

## ARTICLE 25 - SUCCESSORS AND ASSIGNS

HNTB and Consultant each binds itself and its successors, executors, administrators, permitted assigns, legal representatives, and, in the case of a partnership, its partners, to the other party to this Agreement and to the successors, executors, administrators, permitted assigns, legal representatives, and partners of such other party, in respect to all provisions of this Agreement.

## ARTICLE 26 - ASSIGNMENTS

Neither HNTB nor Consultant shall assign any rights or duties under this Agreement without the prior written consent of the other party; provided, however, Consultant may assign its rights to payment without HNTB's consent. Unless otherwise stated in the written consent to an assignment, no assignment will release or discharge the assignor from any obligation under this Agreement.

## ARTICLE 27 - THIRD PARTY RIGHTS

The Services provided for in this Agreement are for the sole use and benefit of, and nothing in this Agreement shall be construed to give any rights or benefits to anyone other than Owner, HNTB, and Consultant.

CR000250

HNTB.000148

385

IN WITNESS WHEREOF, HNTB and Consultant have executed this Agreement. The individuals signing this Agreement represent and warrant that they have the power and authority to enter into this Agreement and bind the parties for whom they sign.

HNTB CORPORATION
(HNTB)

Signature: _____

Name: Thomas D. O'Grady, P.E.

Title: Vice President

Date 7/21/06

CROSSLAND ACQUISITION, INC.
(Consultant)

Signature: _____

Name: John K. Harrison

Title PRESIDENT

Date 7-20-06

Fed. Tax I.D. No. _____

CR000251

HNTB.000149

386

# Exhibit "A" - Sample Task Order

## TASK ORDER NUMBER _____

This Task Order is made as of this _____ day of _____, 20 ___, under the terms and conditions established in the MASTER AGREEMENT BETWEEN HNTB AND CONSULTANT, dated _____ (the Agreement), between HNTB Corporation (HNTB) and Crossland Acquisition, Inc. (Consultant). This Task Order is made for the following purpose, consistent with the Project defined in the Agreement:

*[Insert a brief description of the Project elements to which the Task Order applies]*

### Section A. - Scope of Services

Consultant shall perform the following Services:

### Section B. - Schedule

Consultant shall perform the Services and deliver the related Documents (if any) according to the work schedule attached as Exhibit C, attached hereto and made a part of this Task Order.

### Section C. - Compensation

In return for the performance of the foregoing obligations, the maximum amount payable by HNTB to Consultant under this work authorization is $_____, payable according to the terms of Article 3 and Attachment E, both of the Prime Agreement, as incorporated into the Master Agreement between HNTB and Consultant. This amount is based upon fees set forth in Attachment E, Fee Schedule, of the Prime Agreement and the Consultant's estimated Task Order costs included in Exhibit D, Fee Schedule, which is attached hereto and made a part of this Task Order.

CR000252

HNTB.000150

387

## Section D. - HNTB's Responsibilities

HNTB shall perform and/or provide the following in a timely manner. Unless otherwise provided in this Task Order or the Master Agreement between HNTB and Consultant, HNTB shall bear all costs incident to compliance with the following:

## Section E. - Other Provisions

The parties agree to the following provisions with respect to this specific Task Order:

Except to the extent modified herein, all terms and conditions of the Agreement shall continue in full force and effect.

HNTB CORPORATION:                              CROSSLAND ACQUISITION, INC.

Signature: _____            Signature: _____

Name: _____            Name: _____

Title: _____            Title: _____

Date: _____                          Date: _____

CR000253

HNTB.000151

388

# Exhibit "B" – PRIME AGREEMENT

To
## MASTER AGREEMENT BETWEEN HNTB AND CONSULTANT
## (CROSSLAND ACQUISITION, INC.)

For

Program Management Services on the US 290/Hempstead Corridor

CR000254

HNTB.000152

THE STATE OF TEXAS            §

COUNTY OF TRAVIS             §

## CONTRACT FOR ENGINEERING SERVICES
### Cost Plus Fixed Fee,
### Unit Cost, Lump Sum, or Specified Rate
### Specific Deliverable with Work Authorizations

THIS CONTRACT FOR ENGINEERING SERVICES is made by and between the State of Texas acting by and through the Texas Department of Transportation, 125 E. 11th St., Austin, Texas 78701, hereinafter called "State," and HNTB Corporation, having its principal business address at 2 Northpoint Drive, Suite 650 Houston, Texas 77060, hereinafter called "Engineer," for the purpose of contracting for engineering services.

## WITNESSETH

WHEREAS, Government Code, Chapter 2254, Subchapter A, "Professional Services Procurement Act," provides for the procurement of engineering services; and

WHEREAS, 43 Texas Administrative Code §9.30 et seq. establishes the Texas Department of Transportation's policies and procedures for contracting for engineering services; and,

WHEREAS, the State desires to contract for engineering services generally described as the **program management of the US 290/Hempstead corridor extending from IH 610 to FM 2920, a distance of approximately 33.5 miles which shall include services such as project/financial planning, right of way surveying/mapping, scheduling, utility coordination, locating and designating services, right of way acquisition support, geotechnical services, design support, and construction oversight;** and,

WHEREAS, the State has selected the Engineer to provide the needed services and the Engineer has agreed to provide the services subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, the State and the Engineer, in consideration of the mutual covenants and agreements herein contained, do hereby mutually agree as follows.

## AGREEMENT

ARTICLE 1. SCOPE OF SERVICES. The State and the Engineer will furnish items and perform those services for fulfillment of the contract as identified in Attachment B, Services to be Provided by the State and Attachment C, Services to be Provided by the Engineer. All services provided by the Engineer will conform to standard engineering practices and applicable rules and regulations of the Texas Engineering Practices Act and the rules of the Texas Board of Professional Engineers.

ARTICLE 2. CONTRACT PERIOD. This contract becomes effective when fully executed by all parties hereto and it shall terminate at the close of business on June 30, 2016 unless the contract period is: (1) modified by written supplemental agreement prior to the date of termination as set forth in Attachment A, General Provisions, Article 6, Supplemental Agreements; (2) extended due to a work suspension as provided for in Attachment A, Article 3, Paragraph C; or (3) otherwise terminated in accordance with Attachment A, General Provisions, Article 15, Termination. Any work performed or cost incurred before or after the contract period shall be ineligible for reimbursement.

ARTICLE 3. COMPENSATION.
A. **Maximum Amount Payable.** The maximum amount payable under this contract without modification is shown in Attachment E, Fee Schedule. All payments are contingent upon the availability of appropriated funds.

B. **Basis of Payment.** The basis of payment is identified in Attachment E, Fee Schedule. Reimbursement of costs incurred under a work authorization shall be in accordance with Attachment E, Fee Schedule.

C. **Reimbursement of Eligible Costs.** To be eligible for reimbursement, the Engineer's costs must (1) be incurred in accordance with the terms of a valid work authorization; (2) be in accordance with Attachment E, Fee

Eng-Eng_SpecDelwWA.doc                          Page 1 of 3                          Rev. 10/21/05

Schedule; and (3) comply with cost principles set forth at 48 CFR Part 31, Federal Acquisition Regulation (FAR 31). Satisfactory progress of work shall be maintained as a condition of payment.

**D. Engineer Payment of Subproviders.** No later than ten (10) days after receiving payment from the State, the Engineer shall pay all subproviders for work performed under a subcontract authorized hereunder. The State may withhold all payments that have or may become due if the Engineer fails to comply with the ten-day payment requirement. The State may also suspend the work under this contract or any work authorization until subproviders are paid. This requirement also applies to all lower tier subproviders, and this provision must be incorporated into all subcontracts.

## ARTICLE 4. PAYMENT REQUIREMENTS

**A. Monthly Billing Statements.** The Engineer shall request reimbursement of costs incurred by submitting the original and one copy of an itemized billing statement in a form acceptable to the State. The Engineer is authorized to submit requests for reimbursement no more frequently than monthly and no later than ninety (90) days after costs are incurred.

**B. Billing Statement.** The billing statement shall show the work authorization number for each work authorization included in the billing, the total amount earned to the date of submission, and the amount due and payable as of the date of the current billing statement for each work authorization. The billing statement shall indicate if the work has been completed or if the billing is for partial completion of the work. The fixed fee will be paid in proportion to the percentage of work completed per work authorization.

**C. Overhead Rates.** The Engineer shall use the provisional overhead rate indicated in Attachment E. If a periodic escalation of the provisional overhead rate is specified in Attachment E, the effective date of the revised provisional overhead rate must be included. For lump sum contracts, the overhead rate remains unchanged for the entire contract period.

**D. Thirty Day Payments.** Upon receipt of a billing statement that complies with all invoice requirements set forth in this Article, the State shall make a good faith effort to pay the amount which is due and payable within thirty (30) days.

**E. Withholding Payments.** The State reserves the right to withhold payment of the Engineer's billing statement in the event of any of the following: (1) If a dispute over the work or costs thereof is not resolved within a thirty day period; (2) pending verification of satisfactory work performed; (3) the Engineer becomes a delinquent obligor as set forth in Section 231.006 of the Family Code; (4) required reports are not received; or (5) the State Comptroller of Public Accounts will not issue a warrant to the Engineer. In the event that payment is withheld, the State shall notify the Engineer and give a remedy that would allow the State to release the payment.

**F. Required Reports.**

(1) As required in Attachment H, Disadvantaged Business Enterprise or Historically Underutilized Business Program Requirements, the Engineer shall submit Progress Assessment Reports to report actual payments made to Disadvantaged Business Enterprises or Historically Underutilized Businesses. One copy shall be submitted with each billing statement and one copy shall be submitted to the address included in Attachment H, Disadvantaged Business Enterprise or Historically Underutilized Business Program Requirements.

(2) Prior to contract closeout, the Engineer shall submit a Final Report (Exhibit H-4) to the address set forth in Attachment H.

(3) The Engineer shall submit a separate report with each billing statement showing the percent completion of the work accomplished during the billing period and the percent completion to date, and any additional written report requested by the State to document the progress of the work.

**G. Subproviders and Suppliers List.** Pursuant to requirements of 43 Texas Administrative Code §9.50 et seq., the Engineer must provide the State a list (Exhibit H-5/DBE or Exhibit H-6/HUB) of all Subproviders and suppliers that submitted quotes or proposals for subcontracts. This list shall include subproviders and suppliers names, addresses, telephone numbers, and type of work desired.

**H. Debt to the State.** If the State Comptroller of Public Accounts is prohibited from issuing a warrant to the Engineer because of a debt owed to the State, the State shall apply all payment due the Engineer to the debt or delinquent tax until the debt or delinquent tax is paid in full.

CR000256

HNTB.000154

**I. Audit.** The state auditor may conduct an audit or investigation of any entity receiving funds from the state directly under the contract or indirectly through a subcontract under the contract. Acceptance of funds directly under the contract or indirectly through a subcontract under this contract acts as acceptance of the authority of the state auditor, under the direction of the legislative audit committee, to conduct an audit or investigation in connection with those funds. An entity that is the subject of an audit or investigation must provide the state auditor with access to any information the state auditor considers relevant to the investigation or audit.

**ARTICLE 5. WORK AUTHORIZATIONS.** The State will issue work authorizations using the form included in Attachment D (Work Authorizations and Supplemental Work Authorizations) to authorize all work under this contract. The Engineer must sign and return a work authorization within seven (7) working days after receipt. Refusal to accept a work authorization may be grounds for termination of the contract. The State shall not be responsible for actions by the Engineer or any costs incurred by the Engineer relating to work not directly associated with or prior to the execution of a work authorization. Terms and conditions governing the use of work authorizations are set forth in Attachment A, General Provisions, Article 1.

**ARTICLE 6. SIGNATORY WARRANTY.** The undersigned signatory for the Engineer hereby represents and warrants that he or she is an officer of the organization for which he or she has executed this contract and that he or she has full and complete authority to enter into this contract on behalf of the firm. These representations and warranties are made for the purpose of inducing the State to enter into this contract.

**ARTICLE 7.** All notices to either party by the other required under this agreement shall be delivered personally or sent by certified or U.S. mail, postage prepaid, addressed to such party at the following addresses:

| Engineer: | State: |
|---|---|
| Mr. Tom Maki, P.E. | Ms. Elvia R. Cardinal, P.E. |
| HNTB Corporation | Texas Department of Transportation |
| 2 Northpoint Drive, Suite 650 | 7721 Washington Avenue |
| Houston, Texas 77060 | Houston, Texas 77007 |

All notices shall be deemed given on the date so delivered or so deposited in the mail, unless otherwise provided herein. Either party may change the above address by sending written notice of the change to the other party. Either party may request in writing that such notices shall be delivered personally or by certified U.S. mail and such request shall be honored and carried out by the other party.

**ARTICLE 8. INCORPORATION OF PROVISIONS.** Attachments A through H are attached hereto and incorporated into this contract as if fully set forth herein.

**IN WITNESS WHEREOF**, the State and the Engineer have executed this contract in duplicate.

| THE ENGINEER | THE STATE OF TEXAS |
|---|---|
| | Executed for the Executive Director and approved for the Texas Transportation Commission for the purpose and effect of activating and/or carrying out the orders, established policies or work programs heretofore approved and authorized by the Texas Transportation Commission. |

(Signature)
Thomas D. O'Grady, P.E.
(Printed Name)
**Vice President**
(Title)
May 31, 2006
(Date)
Eng-Eng_SpecDelwWA.doc

(Signature)
Michael W. Behrens, P.E.
(Printed Name)
**Executive Director**
(Title)
6-12-06
(Date)
Page 3 of 3

Rev. 10/21/05

CR000257

## Attachments and Exhibits to Contract for Engineering Services
## Incorporated into the Contract by Reference

| Attachments | Title |
|---|---|
| A | General Provisions |
| B | Services to Be Provided by the State |
| C | Services to Be Provided by the Engineer |
| D | Work Authorization and Supplemental Work Authorization |
| E | Fee Schedule |
| F | **Work Schedule** |
| G | Computer Graphics Files for Document and Information Exchange, if applicable |
| H-FG | Disadvantaged Business Enterprise (DBE) for Federal Funded Professional or Technical Services Contracts – See Attachment H Instructions   N/A |
| H – FN | Disadvantaged Business Enterprise (DBE) for Race-Neutral Professional or Technical Services Contracts – See Attachment H Instructions   N/A |
| H – SG | Historically Underutilized Business (HUB) Requirements for State Funded Professional or Technical Services Contracts – State of Texas HUB. Subcontracting plan required – See Attachment H Instructions |
| H – SN | Historically Underutilized Business (HUB) Requirements for State Funded Professional or Technical Services Contracts – No State of Texas HUB   N/A |
| **Exhibits** | **Title** |
| H – 1 | Subprovider Monitoring System Commitment Worksheet |
| H – 2 | Subprovider Monitoring System Commitment Agreement |
| H – 3 | Monthly Progress Assessment Report |
| H – 4 | Subprovider Monitoring System Final Report |
| H - 5 | Federal Subproviders and Supplier Information |
| H - 6 | HUB Subcontracting Plan (HSP) Prime Contractor Progress Assessment Report |

CR000258

HNTB.000156

393

## ATTACHMENT A

### GENERAL PROVISIONS

### INDEX TO PROVISIONS

| Article | Title |
|---------|-------|
| 1 | Work Authorizations |
| 2 | Progress |
| 3 | Suspension of Work |
| 4 | Additional Work |
| 5 | Changes in Work |
| 6 | Supplemental Agreements |
| 7 | Ownership of Data |
| 8 | Public Information |
| 9 | Personnel, Equipment and Material |
| 10 | Not Applicable |
| 11 | Subcontracting |
| 12 | Inspection of Work |
| 13 | Submission of Reports |
| 14 | Violation of Contract Terms |
| 15 | Termination |
| 16 | Compliance with Laws |
| 17 | Indemnification |
| 18 | Engineer's Responsibility |
| 19 | Non-collusion |
| 20 | Insurance |
| 21 | Gratuities |
| 22 | DBE/HUB Requirements |
| 23 | Maintenance, Retention and Audit of Records |
| 24 | Not Applicable |
| 25 | Civil Rights Compliance |
| 26 | Patent Rights |
| 27 | Computer Graphics Files |
| 28 | Child Support Statement |
| 29 | Disputes |
| 30 | Successors and Assigns |
| 31 | Severability |
| 32 | Prior Contracts Superseded |
| 33 | Conflict of Interest |

CR000259

HNTB.000157
394

# ATTACHMENT A

## GENERAL PROVISIONS

### ARTICLE 1. WORK AUTHORIZATIONS

**A. Use.** The Engineer shall not begin any work until the State and the Engineer have signed a work authorization. Costs incurred by the Engineer before a work authorization is fully executed or after the completion date specified in the work authorization are not eligible for reimbursement. All work must be completed on or before the completion date specified in the work authorization, and no work authorization completion date shall extend beyond the contract period set forth in Article 2 of the contract (Contract Period).

**B. Contents.** Each work authorization will specify the types of services to be performed and will include (1) a period of performance with a beginning and ending date; (2) a full description of the work to be performed; (3) a work schedule with milestones; (4) a cost not to exceed amount, (5) the basis of payment whether cost plus fixed fee, unit cost, lump sum, or specified rate; and (6) a work authorization budget calculated using fees set forth in Attachment E, Fee Schedule. The Engineer is not to include additional contract terms and conditions in the work authorization. In the event of any conflicting terms and conditions between the work authorization and the contract, the terms and conditions of the contract shall prevail and govern the work and costs incurred.

**C. Work Authorization Budget.** A work authorization budget shall set forth in detail (1) the computation of the estimated cost of the work as described in the work authorization, (2) the estimated time (hours/days) required to complete the work at the hourly rates established in Attachment E, Fee Schedule; (3) a work plan that includes a list of the work to be performed, (4) a stated maximum number of calendar days to complete the work, and (5) a cost-not-to-exceed-amount or unit or lump sum cost and the total cost or price of the work authorization. The State will not pay items of cost that are not included in or rates that exceed those approved in Attachment E.

**D. No Guaranteed Work.** Work authorizations are issued at the discretion of the State. While it is the State's intent to issue work authorizations hereunder, the Engineer shall have no cause of action conditioned upon the lack or number of work authorizations issued.

**E. Incorporation into Contract.** Each work authorization shall be signed by both parties and become a part of the contract. No work authorization will waive the State's or the Engineer's responsibilities and obligations established in this contract. The Engineer shall promptly notify the State of any event that will affect completion of the work authorization.

**F. Supplemental Work Authorizations.** Before additional work may be performed or additional costs incurred, a change in a work authorization shall be enacted by a written supplemental work authorization in the form identified and attached hereto as Attachment D. Both parties must execute a supplemental work authorization within the period of performance specified in the work authorization. The State shall not be responsible for actions by the Engineer or any costs incurred by the Engineer relating to additional work not directly associated with the performance or prior to the execution of the work authorization. The Engineer shall allow adequate time for review and approval of the supplemental work authorization by the State prior to expiration of the work authorization. Any supplemental work authorization must be executed by both parties within the time period established in Article 2 of the contract, (Contract Period). Under no circumstances will a work authorization be allowed to extend beyond the contract's expiration date or will the total amount of funds exceed the maximum amount payable set forth in Article 3A of the contract (Compensation).

**F-1. More Time Needed.** If the Engineer determines or reasonably anticipates that the work authorized in a work authorization cannot be completed before the specified completion date; the Engineer shall promptly notify the State. The State may, at its sole discretion, extend the work authorization period by execution of supplemental authorization, using the form attached hereto as Attachment D.

**F-2. Changes in Scope.** Changes that would modify the scope of the work authorized in a work authorization must be enacted by a written supplemental work authorization. The Engineer must allow adequate time for the State to review and approve any request for a time extension prior to expiration of the work authorization. If the change in scope affects the amount payable under the work authorization, the Engineer shall prepare a revised work authorization budget for the State's approval.

CR000260                                                      HNTB.000158

**G. New Work Authorization.** If the Engineer does not complete the services authorized in a work authorization before the specified completion date and has not requested a supplemental work authorization, the work authorization shall terminate on the completion date. At the sole discretion of the State, it may issue a new work authorization to the Engineer for the incomplete work using the unexpended balance of the preceding work authorization for the project. If approved by the State, the Engineer may calculate any additional cost for the incomplete work using the rates set forth in the preceding work authorization and in accordance with Attachment E, Fee Schedule.

**H. Emergency Work Authorizations.** The State, at its sole discretion, may accept the Engineer's signature on a faxed copy of the work authorization as satisfying the requirements for executing the work authorization, provided that the signed original is received by the State within five business days from the date on the faxed copy.

**I. Deliverables.** Upon satisfactory completion of the work authorization, the Engineer shall submit the deliverables as specified in the executed work authorization to the State for review and acceptance.

## ARTICLE 2. PROGRESS

**A. Progress meetings.** The Engineer shall from time to time during the progress of the work confer with the State. The Engineer shall prepare and present such information as may be pertinent and necessary or as may be requested by the State in order to evaluate features of the work.

**B. Conferences.** At the request of the State or the Engineer, conferences shall be provided at the Engineer's office, the office of the State, or at other locations designated by the State. These conferences shall also include evaluation of the Engineer's services and work when requested by the State.

**C. Inspections.** If federal funds are used to reimburse costs incurred under this contract, the work and all reimbursements will be subject to periodic review by the U. S. Department of Transportation.

**D. Reports.** The Engineer shall promptly advise the State in writing of events that have a significant impact upon the progress of a work authorization, including:
1.  problems, delays, adverse conditions that will materially affect the ability to meet the time schedules and goals, or preclude the attainment of project work units by established time periods; this disclosure will be accompanied by statement of the action taken or contemplated, and any State or federal assistance needed to resolve the situation; and
2.  favorable developments or events which enable meeting the work schedule goals sooner than anticipated.

**E. Corrective Action.** Should the State determine that the progress of work does not satisfy the milestone schedule set forth in a work authorization, the State shall review the work schedule with the Engineer to determine the nature of corrective action needed.

## ARTICLE 3. SUSPENSION OF WORK AUTHORIZATION

**A. Notice.** Should the State desire to suspend a work authorization but not terminate the contract, the State may verbally notify the Engineer followed by written confirmation, giving (30) thirty days notice. Both parties may waive the thirty-day notice in writing.

**B. Reinstatement.** A work authorization may be reinstated and resumed in full force and effect within sixty (60) business days of receipt of written notice from the State to resume the work. Both parties may waive the sixty-day notice in writing.

**C. Contract Period Not Affected.** If the State suspends a work authorization, the contract period as determined in Article 2 of the contract (Contract Period) is not affected and the contract and the work authorization will terminate on the date specified unless the contract or work authorization is amended to authorize additional time.

**D. Limitation of Liability.** The State shall have no liability for work performed or costs incurred prior to the date authorized by the State to begin work, during periods when work is suspended, or after the completion date of the contract or work authorization.

Eng-Eng_SpecDelWA                      Page 2 of 9                      Attachment A

CR000261

## ARTICLE 4. ADDITIONAL WORK

**A. Notice.** If the Engineer is of the opinion that any assigned work is beyond the scope of this contract and constitutes additional work, it shall promptly notify the State in writing, presenting the facts of the work authorization and showing how the work authorization constitutes additional work.

**B. Supplemental Agreement.** If the State finds that the work does constitute additional work, the State shall so advise the Engineer and a written supplemental agreement will be executed as provided in General Provisions, Article 6, Supplemental Agreements.

**C. Limitation of Liability.** The State shall not be responsible for actions by the Engineer or any costs incurred by the Engineer relating to additional work not directly associated with or prior to the execution of a supplemental agreement.

## ARTICLE 5. CHANGES IN WORK

**A. Work Previously Submitted as Satisfactory.** If the Engineer has submitted work in accordance with the terms of this contract but the State requests changes to the completed work or parts thereof which involve changes to the original scope of services or character of work under the contract, the Engineer shall make such revisions as requested and as directed by the State. This will be considered as additional work and paid for as specified under Article 4, Additional Work.

**B. Work Does Not Comply with Contract.** If the Engineer submits work that does not comply with the terms of this contract, the State shall instruct the Engineer to make such revision as is necessary to bring the work into compliance with the contract. No additional compensation shall be paid for this work.

**C. Errors/Omissions.** The Engineer shall make revisions to the work authorized in this contract which are necessary to correct errors or omissions appearing therein, when required to do so by the State. No additional compensation shall be paid for this work.

## ARTICLE 6. SUPPLEMENTAL AGREEMENTS

**A. Need.** The terms of this contract may be modified if the State determines that there has been a significant increase or decrease in the duration, scope, cost, complexity or character of the services to be performed. A supplemental agreement will be executed to authorize such significant increases or decreases. Significant is defined to mean a cost increase of any amount and a cost decrease of twenty percent (20%) or more of the original estimated project cost.

**B. Compensation.** Additional compensation, if appropriate, shall be calculated as set forth in Article 3 of the contract (Compensation). Significant changes affecting the cost or maximum amount payable shall be defined to include but not be limited to new work not previously authorized or previously authorized services that will not be performed. The parties may reevaluate and renegotiate costs at this time.

**C. When to Execute.** Both parties must execute a supplemental agreement within the contract period specified in Article 2 of the contract (Contract Period).

## ARTICLE 7. OWNERSHIP OF DATA

**A. Work for Hire.** All services provided under this contract are considered work for hire and as such all data, basic sketches, charts, calculations, plans, specifications, and other documents created or collected under the terms of this contract are the property of the State.

**B. Disposition of Documents.** All documents prepared by the Engineer and all documents furnished to the Engineer by the State shall be delivered to the State upon request by the State. The Engineer, at its own expense, may retain copies of such documents or any other data which it has furnished the State under this contract, but further use of the data is subject to permission by the State.

**C. Release of Design Plan.** The Engineer (1) will not release any roadway design plan created or collected under this contract except to its subproviders as necessary to complete the contract; (2) shall include a provision in all subcontracts which acknowledges the State's ownership of the design plan and prohibits its use for any use other than the project identified in this contract; and (3) is responsible for any improper use of the design plan by its employees, officers, or subproviders, including costs, damages, or other liability resulting from improper use. Neither the Engineer nor any subprovider may charge a fee for the portion of the design plan created by the State.

Eng-Eng_SpecDel/WA          Page 3 of 9          Attachment A

## ARTICLE 8. PUBLIC INFORMATION AND CONFIDENTIALITY
A. **Public Information.** The State will comply with Government Code, Chapter 552, the Public Information Act, and 43 Texas Administrative Code §3.10 et seq. in the release of information produced under this contract.

B. **Confidentiality.** The Engineer shall not disclose information obtained from the State under this contract without the express written consent of the State.

## ARTICLE 9. PERSONNEL, EQUIPMENT AND MATERIAL
A. **Engineer Resources.** The Engineer shall furnish and maintain quarters for the performance of all services, in addition to providing adequate and sufficient personnel and equipment to perform the services required under the contract. The Engineer certifies that it presently has adequate qualified personnel in its employment for performance of the services required under this contract, or it will be able to obtain such personnel from sources other than the State.

B. **Removal of Contractor Employee.** All employees of the Engineer assigned to this contract shall have such knowledge and experience as will enable them to perform the duties assigned to them. The State may instruct the Engineer to remove any employee from association with work authorized in this contract if, in the sole opinion of the State, the work of that employee does not comply with the terms of this contract or if the conduct of that employee becomes detrimental to the work.

C. **Replacement of Key Personnel.** The Engineer must notify the State in writing as soon as possible, but no later than three business days after a project manager or other key personnel is removed from association with this contract, giving the reason for removal.

D. **State Approval of Replacement Personnel.** The Engineer may not replace the project manager or key personnel without prior consent of the State. The State must be satisfied that the new project manager or other key personnel is qualified to provide the authorized services. If the State determines that the new project manager or key personnel is not acceptable, the Engineer may not use that person in that capacity and shall replace him or her with one satisfactory to the State within forty-five (45) days.

E. **Ownership of Acquired Property.** Except to the extent that a specific provision of this contract states to the contrary, the State shall own all intellectual property acquired or developed under this contract and all equipment purchased by the Engineer or its subcontractors under this contract. All intellectual property and equipment owned by the State shall be delivered to the State when the contract terminates, or when it is no longer needed for work performed under this contract, whichever occurs first.

## ARTICLE 10. NOT APPLICABLE

## ARTICLE 11. SUBCONTRACTING
A. **Prior Approval.** The Engineer shall not assign, subcontract or transfer any portion of professional services related to the work under this contract without prior written approval from the State.

B. **DBE/HUB Compliance.** The Engineer's subcontracting program shall comply with the requirements of Attachment H of the contract (DBE/HUB Requirements).

C. **Required Provisions.** All subcontracts for professional services shall include the provisions included in Attachment A, General Provisions, and any provisions required by law. The Engineer is authorized to pay subproviders in accordance with the terms of the subcontract, and the basis of payment may differ from the basis of payment by the State to the Engineer.

D. **Prior Review.** Subcontracts for professional services in excess of $25,000 may be reviewed by the State prior to performance of work thereunder.

E. **Engineer Responsibilities.** No subcontract relieves the Engineer of any responsibilities under this contract.

## ARTICLE 12. INSPECTION OF WORK
A. **Review Rights.** The State and the U. S. Department of Transportation, when federal funds are involved,

Eng-Eng_SpecDelwWA                Page 4 of 9                Attachment A

and any of their authorized representatives shall have the right at all reasonable times to review or otherwise evaluate the work performed hereunder and the premises in which it is being performed.

B. **Reasonable Access.** If any review or evaluation is made on the premises of the Engineer or a subprovider, the Engineer shall provide and require its subproviders to provide all reasonable facilities and assistance for the safety and convenience of the state or federal representatives in the performance of their duties.

## ARTICLE 13. SUBMISSION OF REPORTS

All applicable study reports shall be submitted in preliminary form for approval by the State before a final report is issued. The State's comments on the Engineer's preliminary report must be addressed in the final report.

## ARTICLE 14. VIOLATION OF CONTRACT TERMS

A. **Increased Costs.** Violation of contract terms, breach of contract, or default by the Engineer shall be grounds for termination of the contract, and any increased or additional cost incurred by the State arising from the Engineer's default, breach of contract or violation of contract terms shall be paid by the Engineer.

B. **Remedies.** This agreement shall not be considered as specifying the exclusive remedy for any default, but all remedies existing at law and in equity may be availed of by either party and shall be cumulative.

## ARTICLE 15. TERMINATION

A. **Causes.** The contract may be terminated before the stated completion date by any of the following conditions.

1. By mutual agreement and consent, in writing from both parties.
2. By the State by notice in writing to the Engineer as a consequence of failure by the Engineer to perform the services set forth herein in a satisfactory manner.
3. By either party, upon the failure of the other party to fulfill its obligations as set forth herein.
4. By the State for reasons of its own, not subject to the mutual consent of the Engineer, by giving thirty business days notice of termination in writing to the Engineer.
5. By the State, if the Engineer violates the provisions of Attachment A, General Provisions Article 21, Gratuities, or Attachment H, Disadvantaged Business Enterprise/Historically Underutilized Business Requirements.
6. By satisfactory completion of all services and obligations described herein.

B. **Measurement.** Should the State terminate this contract as herein provided, no fees other than fees due and payable at the time of termination shall thereafter be paid to the Engineer. In determining the value of the work performed by the Engineer prior to termination, the State shall be the sole judge. Compensation for work at termination will be based on a percentage of the work completed at that time. Should the State terminate this contract under paragraph (4) or (5) above, the Engineer shall not incur costs during the thirty-day notice period in excess of the amount incurred during the preceding thirty days.

C. **Value of Completed Work.** If the Engineer defaults in the performance of this contract or if the State terminates this contract for fault on the part of the Engineer, the State will give consideration to the following when calculating the value of the completed work: (1) the actual costs incurred (not to exceed the rates set forth in Attachment E, Fee Schedule) by the Engineer in performing the work to the date of default; (2) the amount of work required which was satisfactorily completed to date of default; (3) the value of the work which is usable to the State; (4) the cost to the State of employing another firm to complete the required work; (5) the time required to employ another firm to complete the work; and (6) other factors which affect the value to the State of the work performed.

D. **Calculation of Payments.** The State shall use the fee schedule set forth in Attachment E to the contract (Fee Schedule) in determining the value of the work performed up to the time of termination. In the case of partially completed engineering services, eligible costs will be calculated as set forth in Attachment E, Fee Schedule. The sum of the provisional overhead percentage rate for payroll additives and for general and administrative overhead costs during the years in which work was performed shall be used to calculate partial payments. Any portion of the fixed fee not previously paid in the partial payments shall not be included in the final payment.

E. **Excusable Delays.** Except with respect to defaults of subproviders, the Engineer shall not be in default by

CR000264

HNTB.000162

399

reason of any failure in performance of this contract in accordance with its terms (including any failure to progress in the performance of the work) if such failure arises out of causes beyond the control and without the default or negligence of the Engineer. Such causes may include, but are not restricted to, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather.

**F. Surviving Requirements.** The termination of this contract and payment of an amount in settlement as prescribed above shall extinguish the rights, duties, and obligations of the State and the Engineer under this contract, except for those provisions that establish responsibilities that extend beyond the contract period.

**G. Payment of Additional Costs.** If termination of this contract is due to the failure of the Engineer to fulfill its contract obligations, the State may take over the project and prosecute the work to completion, and the Engineer shall be liable to the State for any additional cost to the State.

## ARTICLE 16. COMPLIANCE WITH LAWS
The Engineer shall comply with all applicable federal, state and local laws, statutes, codes, ordinances, rules and regulations, and the orders and decrees of any court, or administrative bodies or tribunals in any manner affecting the performance of this contract, including, without limitation, worker's compensation laws, minimum and maximum salary and wage statutes and regulations, nondiscrimination, and licensing laws and regulations. When required, the Engineer shall furnish the State with satisfactory proof of its compliance therewith.

## ARTICLE 17. INDEMNIFICATION
**A. Errors, Omissions, Negligent Acts.** The Engineer shall save harmless the State and its officers and employees from all claims and liability due to activities of itself, its agents, or employees, performed under this contract and which are caused by or result from error, omission, or negligent act of the Engineer or of any person employed by the Engineer.

**B. Attorney Fees.** The Engineer shall also save harmless the State from any and all expense, including, but not limited to, attorney fees which may be incurred by the State in litigation or otherwise resisting said claim or liabilities which may be imposed on the State as a result of such activities by the Engineer, its agents, or employees.

## ARTICLE 18. ENGINEER'S RESPONSIBILITY
**A. Accuracy.** The Engineer shall be responsible for the accuracy of work and shall promptly make necessary revisions or corrections resulting from its errors, omissions, or negligent acts without compensation.

**B. Errors and Omissions.** The Engineer's responsibility for all questions arising from design errors and/or omissions will be determined by the State and all decisions shall be in accordance with the State's "Errors or Omissions Policy" in accordance with 43 Texas Administrative Code §9.38(e). The Engineer will not be relieved of the responsibility for subsequent correction of any such errors or omissions or for clarification of any ambiguities until after the construction phase of the project has been completed.

**C. Seal.** The responsible Engineer shall sign, seal and date all appropriate engineering submissions to the State in accordance with the Texas Engineering Practice Act and the rules of the Texas Board of Professional Engineers.

**D. Resealing of Documents.** Once the work has been sealed and accepted by the State, the State, as the owner, will notify the party to this contract, in writing, of the possibility that a State engineer, as a second engineer, may find it necessary to alter, complete, correct, revise or add to the work. If necessary, the second engineer will affix his seal to any work altered, completed, corrected, revised or added. The second engineer will then become responsible for any alterations, additions or deletions to the original design including any effect or impacts of those changes on the original engineer's design.

## ARTICLE 19. NONCOLLUSION
**A. Warranty.** The Engineer warrants that it has not employed or retained any company or person, other than a bona fide employee working solely for the Engineer, to solicit or secure this contract and that it has not paid or agreed to pay any company or engineer any fee, commission, percentage, brokerage fee, gifts, or any other consideration, contingent upon or resulting from the award or making of this contract.

CR000265

HNTB.000163

**B. Liability.** For breach or violation of this warranty, the State shall have the right to annul this contract without liability or, in its discretion, to deduct from the contract price or compensation, or otherwise recover, the full amount of such fee, commission, percentage, brokerage fee, gift or contingent fee.

## ARTICLE 20. INSURANCE

The Engineer certifies that it has insurance on file with the Contract Services Section of the Texas Department of Transportation in the amount specified on Texas Department of Transportation Form 20.102-CSS or Form 1560-CSS, Certificate of Insurance, as required by the State. No other proof of insurance is acceptable to the State. The Engineer certifies that it will keep current insurance on file with that office for the duration of the contract period. If insurance lapses during the contract period, the Engineer must stop work until a new certificate of insurance is provided.

## ARTICLE 21. GRATUITIES

**A. Employees Not to Benefit.** Texas Transportation Commission policy mandates that employees of the Texas Department of Transportation shall not accept any benefit, gift or favor from any person doing business with or who reasonably speaking may do business with the State under this contract. The only exceptions allowed are ordinary business lunches and items that have received the advance written approval of the Executive Director of the Texas Department of Transportation.

**B. Liability.** Any person doing business with or who reasonably speaking may do business with the State under this contract may not make any offer of benefits, gifts or favors to department employees, except as mentioned above. Failure on the part of the Engineer to adhere to this policy may result in the termination of this contract.

## ARTICLE 22. DISADVANTAGED BUSINESS ENTERPRISE OR HISTORICALLY UNDERUTILIZED BUSINESS REQUIREMENTS

The Engineer agrees to comply with the requirements set forth in Attachment H, Disadvantaged Business Enterprise or Historically Underutilized Business Subcontracting Plan Requirements with an assigned goal or a zero goal, as determined by the State.

## ARTICLE 23. MAINTENANCE, RETENTION AND AUDIT OF RECORDS

**A. Retention Period.** The Engineer shall maintain all books, documents, papers, accounting records and other evidence pertaining to costs incurred and services provided (hereinafter called the Records). The Engineer shall make the records available at its office during the contract period and for four years from the date of final payment under this contract, until completion of all audits, or until pending litigation has been completely and fully resolved, whichever occurs last.

**B. Availability.** The State or any of its duly authorized representatives, the Federal Highway Administration, the United States Department of Transportation, Office of Inspector General, and the Comptroller General shall have access to the Engineer's Records which are directly pertinent to this contract for the purpose of making audits, examinations, excerpts and transcriptions.

## ARTICLE 24. NOT APPLICABLE

## ARTICLE 25. CIVIL RIGHTS COMPLIANCE

(1) **Compliance with Regulations:** The Engineer shall comply with the regulations of the Department of Transportation, Title 49, Code of Federal Regulations, Parts 21, 24, 26 and 60 as they relate to nondiscrimination; also Executive Order 11246 titled Equal Employment Opportunity as amended by Executive Order 11375.

(2) **Nondiscrimination:** The Engineer, with regard to the work performed by it during the contract, shall not discriminate on the grounds of race, color, sex, or national origin in the selection and retention of subcontractors, including procurement of materials and leases of equipment.

(3) **Solicitations for Subcontracts, Including Procurement of Materials and Equipment:** In all solicitations either by competitive bidding or negotiation made by the Engineer for work to be performed under a subcontract, including procurement of materials or leases of equipment, each potential subcontractor or supplier shall be notified by the Engineer of the Engineer's obligations under this contract and the Regulations relative to nondiscrimination on the grounds of race, color, sex, or national origin.

Eng-Eng_SpecDelwWA                          Page 7 of 9                          Attachment A

(4) **Information and Reports:** The Engineer shall provide all information and reports required by the Regulations, or directives issued pursuant thereto, and shall permit access to its books, records, accounts, other sources of information, and facilities as may be determined by the Texas Department of Transportation or the Federal Highway Administration to be pertinent to ascertain compliance with such Regulations or directives. Where any information required of the Engineer is in the exclusive possession of another who fails or refuses to furnish this information, the Engineer shall so certify to the Texas Department of Transportation or the Federal Highway Administration, as appropriate, and shall set forth what efforts it has made to obtain the information.

(5) **Sanctions for Noncompliance:** In the event of the Engineer's noncompliance with the nondiscrimination provisions of this contract, the Texas Department of Transportation shall impose such contract sanctions as it or the Federal Highway Administration may determine to be appropriate, including, but not limited to:

(a) withholding of payments to the Engineer under the contract until the Engineer complies and/or
(b) cancellation, termination, or suspension of the contract, in whole or in part.

(6) **Incorporation of Provisions:** The Engineer shall include the provisions of paragraphs (1) through (5) in every subcontract, including procurement of materials and leases of equipment, unless exempt by the Regulations or directives issued pursuant thereto. The Engineer shall take such action with respect to any subcontract or procurement as the Texas Department of Transportation or the Federal Highway Administration may direct as a means of enforcing such provisions including sanctions for noncompliance provided, however, that in the event an Engineer becomes involved in, or is threatened with, litigation with a subcontractor or supplier as a result of such direction, the Engineer may request the Texas Department of Transportation to enter into such litigation to protect the interests of the State; and, in addition, the Engineer may request the United States to enter into such litigation to protect the interests of the United States.

## ARTICLE 26.  PATENT RIGHTS
The State and the U. S. Department of Transportation shall have the royalty free, nonexclusive and irrevocable right to use and to authorize others to use any patents developed by the Engineer under this contract.

## ARTICLE 27.  COMPUTER GRAPHICS FILES
The Engineer agrees to comply with Attachment G, Computer Graphics Files for Document and Information Exchange, if determined by the State to be applicable to this contract.

## ARTICLE 28.  CHILD SUPPORT STATEMENT
The Engineer certifies that it has a child support statement on file with the Contract Services Section of the Texas Department of Transportation. The Engineer is responsible for keeping the child support statement current and on file with that office for the duration of the contract period.  The Engineer further certifies that the child support statement on file contains the child support information for the individuals or business entities named in this contrac Under Section 231.006, Family Code, the Engineer certifies that the individual or business entity named in this contract, bid, or application is not ineligible to receive the specified grant, loan, or payment and acknowledges that this contract may be terminated and payment may be withheld if this certification is inaccurate.

## ARTICLE 29.  DISPUTES
A.  **Disputes Not Related to Contract Services.**  The Engineer shall be responsible for the settlement of all contractual and administrative issues arising out of any procurement made by the Engineer in support of the services authorized herein.

B.  **Disputes Concerning Work or Cost.**  Any dispute concerning the work hereunder or additional costs, or any non-procurement issues shall be settled in accordance with 43 Texas Administrative Code §9.2.

## ARTICLE 30.  SUCCESSORS AND ASSIGNS
The Engineer and the State do each hereby bind themselves, their successors, executors, administrators and assigns to each other party of this agreement and to the successors, executors, administrators and assigns of such other party in respect to all covenants of this contract.  The Engineer shall not assign, subcontract or transfer its interest in this contract without the prior written consent of the State.

## ARTICLE 31.  SEVERABILITY
In the event any one or more of the provisions contained in this contract shall for any reason, be held to be

CR000267

HNTB.000165

402

invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision thereof and this contract shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

## ARTICLE 32. PRIOR CONTRACTS SUPERSEDED

This contract constitutes the sole agreement of the parties hereto for the services authorized herein and supersedes any prior understandings or written or oral contracts between the parties respecting the subject matter defined herein.

## ARTICLE 33. CONFLICT OF INTEREST

**A. Representation by Engineer.** The undersigned represents that its firm has no conflict of interest that would in any way interfere with its or its employees' performance of services for the department or which in any way conflicts with the interests of the department. The firm shall exercise reasonable care and diligence to prevent any actions or conditions that could result in a conflict with the department's interests.

**B. Environmental Disclosure.** If the Engineer will prepare an environmental impact statement or an environmental assessment under this contract, the Engineer certifies by executing this contract that it has no financial or other interest in the outcome of the project on which the environmental impact statement or environmental assessment is prepared.

**C. Restrictions on Testing.** If the Engineer will perform commercial laboratory testing under this contract, on any project the Engineer may not perform more than one of the following types of testing:
1. verification testing;
2. quality control testing; or
3. independent assurance testing.

CR000268                                                                    HNTB.000166

403

## SERVICES TO BE PROVIDED BY THE STATE

Highway: _US 290_
Limits: _Harris County Line near FM 2920 to IH610/IH 10 Interchange_
Station _1130+00_ to Station _2892+50.08_

CSJ: _____

Contract No.: _12-648P5013_

The Texas Department of Transportation (hereinafter to be referred to as the State) has commissioned the services of **HNTB Corporation** to serve as the **Program Management Consultant (PMC)** on this project.

The State will furnish to the PMC the following items:

1. Schematic designs and approved environmental documents, if available. Draft copies of partially complete schematic designs and Environmental Documents as necessary for the PMC to perform their services noted in Attachment C.

2. Roadway design requirements.

3. Available horizontal control points.

4. Available benchmark elevations and descriptions for vertical control.

5. Project centerline horizontal geometry in text file format on CD, if available

6. If available, the data on file concerning:

   a. Contact prints of photogrammetric mapping.

   b. An electronic copy of the existing 2D Microstation planimetric mapping file, on a reproducible CD.

   c. Existing roadway 3D Microstation Digital Terrain Mapping (DTM) file on a reproducible CD.

   d. Existing facilities construction documents and "as-builts".

7. Available interface data for any projects adjacent to, crossing, and/or within limits.

8. Available existing traffic counts and design year traffic projections necessary to develop the traffic control plans.

9. Approved Pavement Design. This includes the thickness and specification for each pavement layer, and specifications for subgrade stabilization

10. Existing geotechnical information, if available.

11. Right-of-way maps and any recent right of way appraisals, if available.

12. Applicable special specifications, special provisions, and latest statewide State bid tabulations.

CR000269

HNTB.000167

13. Available approved Houston District design standard drawings and standard summary and border sheets (i.e., blank summary tables, blank plan and profile sheets with title blocks, etc.). All design standards are available on the State's web site.

14. The State will secure all required permits.

15. Assistance will be provided to the PMC to obtain the required data and information from other local, regional, State and federal agencies.

16. Timely review and decisions necessary for the PMC to maintain the contracted project schedule.

17. Sample schedules and formats to the PMC, for design scheduling using Primavera.

18. The State will coordinate and notify in writing EMS, school system, U.S. Mail, etc. for any detour routes/roadway closures.

19. The State will provide the five Preliminary Drainage Impact Studies (including the HEC-1 and HEC-2, if desired), and drainage and flood control impact evaluation material, preliminary drainage engineering information, and any other applicable previous drainage studies related to the US 290 Corridor.

20. The State will provide available Federal Emergency Management Agency (FEMA) flood insurance study maps and studies.

21. Project technical and administrative standards and procedures.

22. Information for Environmental Permits Issues and Commitments (EPIC) sheets to be signed by the State.

23. Design Elements (DE) form, on diskette, for Design Concept Conferences (DCC) with District-wide design parameters provided by the State. Project-wide and project-specific information (i.e., estimate, typical sections, design exceptions, etc.) to be completed by the PMC.

24. If required, design criteria and standard drawings for architectural finishes, landscaping, signals, lighting, signing, and architectural details for structures and retaining walls, per the Green Ribbon report.

25. Standard GEOPAK design cross section criteria files developed by State.

26. Traffic Accident Data necessary for any design exceptions or waivers.

27. Limited access to the State's DCIS will be provided.

28. The State will provide areas of wetlands delineation to be surveyed by the PMC.

29. Provide the "Guide for Determining Time Requirements for Traffic Signal Preemption at Highway-Rail Grade Crossings.

30. National Bridge Inventory (NBI) Number and applicable Bridge Inspection report.

CR000270

31. Electronic Files: If not readily available online, the State may, at the discretion of the State's Project Manager, provide graphic file data, standards, font libraries, and Micro Station cell libraries, etc., as required to provide confirmation to the State's graphic standards.

32. Should the PMC be required to perform engineering services, such as plan preparation, on behalf of an entity owning utilities, the State will obtain a "Memorandum of Understanding" with the local entity describing the terms and conditions under which the engineering services shall be performed.

33. TxDOT Type II Markers for monumentation shall be provided as needed.

34. Copies of Interlocal Agreements with any other Government Entity or any other applicable Third Party Agreements related to the US 290/Hempstead Highway Corridor, or portions thereof, as necessary for the PMC to perform their services noted in Attachment C.

35. District approved format of documents (such as standard agreements, form letters, etc.), as applicable, that the PMC will use in the execution of the program.

CR000271

HNTB.000169

406

## ATTACHMENT "C"

## SERVICES TO BE PROVIDED BY THE ENGINEER

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | CONTRACT SUPPORT & SCHEDULING | 3 |
| III. | PUBLIC INVOLVEMENT AND COMMUNICATIONS PROGRAM (PICP) | 5 |
| IV. | PROGRAM MANAGEMENT AND COMMUNICATIONS | 7 |
| V. | ENVIRONMENTAL INVESTIGATIONS AND MITIGATIONS | 10 |
| VI. | UTILITY ADJUSTMENT COORDINATION | 13 |
| VII. | UTILITY ENGINEERING | 13 |
| VIII. | UTILITY CONSTRUCTION MANAGEMENT AND VERIFICATION | 13 |
| IX. | UTILITY ENGINEERING INVESTIGATION | 13 |
| X. | RIGHT OF WAY SURVEYS | 14 |
| XI. | ROW COORDINATION & UTILITY ADMINISTRATION SUPPORT | 15 |
| XII. | FINANCIAL PLAN AND PROJECT MANAGEMENT PLAN | 21 |
| XIII. | DESIGN MANAGEMENT, COORDINATION AND REVIEW | 22 |
| XIV. | PRELIMINARY ENGINEERING & DEVELOPMENT OF PS&E | 24 |
| XV. | GEOTECHNICAL FIELD INVESTIGATIONS | 27 |
| XVI. | DESIGN AND CONSTRUCTION SURVEY | 28 |
| XVII. | CONSTRUCTION PHASE PROGRAM MANAGEMENT | 29 |
| XVIII. | INSPECTION OF WORK IN PROGRESS AND PROJECT RECORDS | 29 |
| XIX. | MONITORING OF WORK IN PROGRESS AND PROJECT RECORD | 30 |
| XX. | SURVEYS FOR CONSTRUCTION CONTRACTS | 30 |
| XXI. | DESIGN VERIFICATION, CHANGES AND ALTERATIONS | 31 |
| XXII. | ERRORS AND OMISSIONS | 31 |

   Last Updated 05/24/06

CR000272   HNTB.000170

I.  INTRODUCTION

This project will be divided into two (2) separate phases to include:

(1)  Planning and Design Management

(2)  Construction Oversight

The limits of the project are on US 290 from IH 610 to FM 2920, a distance of approximately 33.5 miles (approximate US 290 stationing is from Sta. 1130+00 (west of FM 2920) to Sta. 2892+50.08 at IH610 just north of IH10) and approximate IH610 stationing is from Sta. 2895+00 (at White Oak Bayou) to Sta. 2892+50.08 (just north of IH10).

The Engineer, from this point forward identified as the Program Management Consultant (PMC), will provide the overall project supervision, management, scheduling, administration, review and coordination of several Section Design Consultants (SDCs) preparing plans, specifications and estimates (PS&E) for a segment of the US 290/Hempstead corridor, for a ROW Acquisition Provider Team (ROWAP), as necessary, and for construction oversight/monitoring support for various construction contracts within the US 290/Hempstead Highway Corridor. The PMC will perform all project planning, review all work performed by the SDCs and the ROWAP, coordinate and conduct all meetings, and prepare and submit all project reports and documents. The PMC will be responsible for preparation of ROW Mapping, surveying controls, utility coordination, utility engineering, and development of utility agreements. The PMC shall also support the State during the Construction Administration Phase of the Program. These projects are to be brought to completion as expeditiously as possible to comply with the schedule as proposed by the Texas Department of Transportation (TxDOT), hereinafter to be included as part of any reference to the State.

The PMC will be the single point of contact between the State and all the section design consultants. The PMC shall function as an extension of the State's resources by providing qualified technical and professional personnel to perform the duties and responsibilities assigned under the terms of this Agreement. The PMC shall minimize to the maximum extent possible the need for the State to apply its own resources to work authorized by the State. The State, at its option, may elect to expand, reduce or delete the extent of each work element as described in Attachment C1-entitled Work Outline of this Contract, provided such action does not alter the intent of this Contract.

The PMC shall establish a separate off-site project office, as approved by the State, to be located between IH 610 and BW 8 along US 290. The project office shall be of sufficient size and equipped to effectively carry out its responsibilities under this contract. The PMC shall furnish all necessary furniture and equipment, which shall include, but not be limited to, desk, chairs, bookcases, file cabinets, calculators, personal computers with software and printer, telephones, fax machines, and other essential items. Unless otherwise agreed, this project office shall be staffed with the Project Manager, Deputy Project Managers, Segment Managers, ROW Manager, Utility Manager, Project Control

Last Updated 05/24/06

CR000273

HNTB.000171

408

staff, Standards, Procedures and QA/QC Managers, Communications staff, and the TxDOT Management Team consisting of the TxDOT Project Manager and five other TxDOT employees. This office space will also contain provisions for at least one conference room that accommodate at least 40 people and two conference rooms that accommodate approximately 20 people each, and an area for interagency representatives, should they request office space.

The PMC will be required, prior to making staff assignments, to obtain written approval from the State of all proposed key staff additions or replacements to the initial project office staffing.

There is no guarantee that any or all of the services described in this Contract will be assigned by the State during the term of this Contract unless issued by Work Authorization. The State, at its option, may elect to have any of the services set forth herein performed by other consultants or TxDOT staff.

## II.    CONTRACT SUPPORT & SCHEDULING

The PMC will develop and maintain a fully-integrated schedule and budget project controls tool. Regular maintenance will include continual monitoring of schedule compliance, budget issues, and variance analysis in both schedule and budget performance. Reporting to the State will occur at regular intervals, with discussions focusing on critical path adherence, variance/work progression issues, and path-forward corrective actions, if necessary. Graphical and narrative discussions of work plan adherence and schedule/budget variance will be generated for review. The Master Program Schedule baseline and a Program Risk Matrix will be developed based on preliminary work to date and a charette with District leadership in the first 90 days of the contract. All schedules will be developed using Primavera software and the Master Program Schedule shall use a summary format by Function Code of major task elements.

The PMC will also set parameters and criteria for detailed schedules for Task assignments and sub-task assignments that support the summary schedule and will develop such supporting schedules for services within this scope and provide for coordination of schedule development by others such as the ROWAP, SDC(s), Contractors, and other applicable third parties such as participating agencies and utilities. The design progress and milestones of the multiple design segments will also be monitored.

The PMC will develop the Master Schedule and organize budgets for all tasks in Primavera. The PMC will establish the Program Work Breakdown Structure (WBS). The WBS will define the projects into manageable units and allow for reporting of each. Once the WBS has been established, the design and construction projects will be organized according to the WBS. A coding structure will be established for the program. The Master Schedule will be a Precedence Diagram Method (PDM) network utilizing critical path schedule techniques, specifying proposed start and finish dates, showing the interdependencies of the design and construction projects. The PMC will submit the

CR000274

Master Schedule to the Departments for acceptance, as well as update and publish the Master Schedule monthly on the project-secured web-site for viewing by the Departments.

The PMC shall develop a master milestone schedule of time relationships authorized for the performance of services and coordination between the various SDCs. The physical progress of the design activities versus the master schedule objectives is to be monitored.

The PMC shall evaluate and validate schedules submitted by the individual SDCs with regard to overall compliance with project milestones.

The PMC will establish and monitor project scheduling requirements and milestone events for all activities. The PMC shall prepare construction contract time schedules using Primavera software in accordance with TxDOT Administrative Circular No. 17-93 and coordinate with State selected SDCs for the US 290/Hempstead corridor.

The PMC will aid in the development of a scope of work to be implemented for the individual PS&E design segments of the US 290/Hempstead corridor. The PMC will generate preliminary construction cost estimates for each of the segments.

The PMC will prepare for, coordinate and aid in conducting the scope of services meeting for the individual PS&E design consultants. The PMC shall prepare and submit to the State a pre-negotiation estimate based upon the SDC's finalized scope and prior to submission of the SDC's fee schedule proposal.

The PMC will be available to provide their assessment of the man-hour efforts proposed prior to the contract negotiations between the State and the PS&E SDCs.

The PMC shall prepare the official minutes of all meetings for the State's approval and dissemination.

The PMC should prepare and issue monthly status reports on ROWAP and SDCs project progress and document any problems and delays encountered. This information will also be included in a Quarterly Program Status Report submitted to the State for distribution to senior management.

The PMC will review and determine whether a SDC's claim for supplemental services and/or time extensions for the performance of services are in fact valid. If the request for supplemental services is justified (time, money, and scope), the PMC shall provide associated written documentation to the State.

The PMC shall invoice in accordance with the rate schedules in Attachment E of the executed Contract and the function codes authorized in Exhibit D of the work authorizations and any associated supplements. The invoice package will be prepared using the Houston District Billing Procedures for "Range of Cost Plus Fixed Fee" method

Last Updated 05/24/06

CR000275

of pay. The invoice shall be submitted to the State's Project Manager in draft form containing

- Form 132 ver 97
- Written progress report describing activities during the reporting period; activities planned for the following period; problems encountered and actions taken to remedy; list of meetings attended; and overall status.
- Projected vs. Actual Contract Invoices by Month form
- Copy of Exhibit H-3 and Exhibit H-6
- Bar chart showing percent (%) complete of tasks authorized in accordance with the work authorization and its supplementals
- Time Sheets and expense receipts

Once the State Project Manager recommends the draft invoice package, the PMC may submit invoice package to the State's Houston District's Accounting Department, Attention Mr. David Williams for final approval and further processing.

III. PUBLIC INVOLVEMENT AND COMMUNICATIONS PROGRAM (PICP)

The PMC shall coordinate, manage and implement an extensive public involvement/agency coordination program to provide information to the public regarding the design development, ROW acquisition, and construction of the US 290/Hempstead corridor. The campaign shall educate the public regarding the need for the reconstruction effort, scheduling, construction duration and use of alternate routes. This campaign shall include, but not be limited to:

**Public Information/Advertising**

Public information shall include the following:

a. Creation and development of advertising messages, including graphics, copyrighting and production

b. Placement of these messages in the appropriate media

c. Development and production of additional materials for use in public information. These items may include brochures, pamphlets, newsletters, videos, animation, models and exhibits, etc.

d. Implementation of a telephone hotline, public service announcements, news reports, etc.

e. Coordination of special events and activities which focus on the project development and construction program.

f. Solicitation of free media time and or/space

The PMC may be required to prepare physical models, renderings, computer model simulation and other exhibits and displays for the US 290/Hempstead corridor program.

CR000276

HNTB.000174

The PMC will work with the State to develop and implement a Public Involvement and Communications Plan (PICP) to provide information to the public about the US 290/Hempstead corridor. The focus of the PICP during construction will be to maximize public awareness of and interact with the abutters to minimize disruption from adjacent construction activities.

The PICP includes the following activities:

1. Provide a Public Information Officer (PIO) in the project office to lead in the development, implementation and quality assurance of the PICP. The PIO will coordinate and supervise day-to-day activities related to the PICP and will serve as a communication liaison among the PMC Project Staff, the State's Houston District Public Information Officer and Area Engineers, the general public, and specifically affected constituencies. The PIO will be responsible for interfacing with key stakeholders and representing the interests of the Program at associated public meetings. Additionally, as directed by the State's Program Director or the Houston District Public Information Officer, the PIO will communicate with the media, elected officials and key decision makers. The PIO will help devise strategies with the goal of optimizing public awareness and gaining acceptance and support from stakeholders.

2. Coordinate and facilitate meetings with key elected officials and representatives of civic organizations, businesses, and special interest groups along the corridor (individually or in groups) for the purpose of establishing two-way communication and rapport building with affected stakeholders.

3. Provide public involvement personnel to staff the Public Information Office. The PMC will maintain a Public Information Office in the project office. The purpose of the Public Information Office is to facilitate the exchange of information with the public and provide a centralized location for residents and other stakeholders to obtain information on the program (i.e., view maps and plans and find out about alternative routes, lane closures, construction updates, community impacts, and commute options).

4. Develop and maintain a Program Stakeholder database to enhance the distribution of Program-related information to the public. For the purpose of building the database, potential stakeholders are State employees/officials, general public residing or working within or adjacent to the Program corridor, local agencies, local groups (neighborhood associations, chambers of commerce, convention and visitors bureaus, contractors, etc.) and local contractors and consultants.

5. Develop the Program's public website to contain general Program-related information that enhance the distribution of Program information to the general public including current Program construction activities, timing of street and ramp closures (or openings), recommended route alternatives, special events calendar.

6. Develop and distribute Program-related materials such as newsletters, brochures,

CR000277                                                    HNTB.000175
412

pamphlets and videos. The materials are to be developed for electronic and hard copy distribution. The PMC and the State's Houston District Public Information Officer will assess the need for bilingual adaptations of Program-related materials.

7. In concert with the State's Houston District Public Information Officer, the PMC will develop a public relations campaign and communication strategy to convey key messages and pertinent information about the program to the media, general public, local municipalities, businesses, residents, commuters, and general contractors. The PMC will be responsible for media relations with key transportation and business reporters and preparation and distribution of news releases, and media kits. To determine the necessary level of effort and appropriate budget for the PR campaign, the PMC will conduct an opinion poll to garner a baseline analysis of the public's perception relative to the US 290 reconstruction program.

8. The PMC will be the primary point of contact for the public and serve as a clearinghouse for the receipt and address of complaint correspondence and communiqué received regarding the reconstruction program. Additionally, the PMC will prepare verbal and written responses for appropriate address and/or signature and distribution.

## IV.  PROGRAM MANAGEMENT AND COMMUNICATIONS

Develop Project Controls and a Program Management Plan (PMP) Manual: The PMC will develop a program management and deliverables guideline manual that will contain the standards and project guidelines, based on the State's established criteria and standards, to be used by all parties including the PMC Team, the ROWAP, the SDC(s), and other third parties so that consistent processes are utilized and consistent documents are prepared. This PMP will include:

- Overall Program Summary and goals/objectives
- Overall program deliverables.
- Project communications protocol.
- Responsibility and authority matrix.
- Guidelines for cost/schedule preparation, updating and reporting.
- Technical standards for detailed design.
- Design criteria.
- Construction cost methodologies, including right-of-way.
- Transportation impact analysis methods.
- Process documentation requirements.
- Administrative procedures for invoicing, project memos, reports, etc.
- Public Involvement and Communications Plan including documentation of any public involvement activity.
- Guidelines for access management implementation.
- Guidelines and graphical standards for all exhibits and presentation materials.
- Documentation format and style.
- Quality Assurance and Quality Control procedures.
- Dispute and performance resolution procedures.

CR000278

HNTB.000176

413

The PMC will be required to build, operate, maintain and manage a project communications network between all project relevant State, Federal and Consultant personnel (via server, etc.) which is an effective and efficient means for electronic communications such as internet access. Additional means of communication will include e-mail and the electronic transfer of all types of files, such as project reports, correspondence, schedules, spreadsheets, CADD drawing files, etc. File security, timeliness of the electronic transfers and the necessary staff to manage, maintain and troubleshoot the system must be considered.

The PMC shall develop, implement and maintain an Electronic Document Management System (EDMS), which will control and provide electronic management that shall govern the distribution and file copies of all program-related correspondence, reports, plans, and technical data. These program/project files shall be available at all times for performance of daily project activities, for legal review, audit requests/requirements, and open records request purposes. The system will be a Projectwise application with an electronic interface and comply with the TxDOT Houston District Content Services Library Standards. The EDMS system will integrate with TxDOT's Filenet system and provide the effective electronic transfer of information recognizing appropriate security, versioning, and protocol issues. This should include electronic documents, scanned images, and the metadata for both. The development and implementation of the EDMS will be as described in the US 290 Program Management Plan. The EDMS system will be designed following a detailed analysis of the end user requirements for TxDOT Houston District and will provide for final record retention within TxDOT's Filenet system.

The PMC will collaborate with TxDOT District IS to facilitate the effective electronic exchange of project information and documents. The system controls shall also provide that all program/project files have been appropriately transferred to the State at all critical milestones, established periodic intervals, and as a final project record, including applicable record drawings, following completion of the work.

The PMC shall develop and manage an approach for cost control for the program. The cost control process will be developed in the initial phase of the project, and be updated throughout the project, and reviewed at least monthly with the State for any "added or reduced costs" to the program. The cost control process uses a three part process for development. The first is the Capital Cost Estimate Validation Process (CCEVP). This will develop the total project costs for the proposed improvements. The second component of the cost control is the calculation of Life Cycle Costs, and the third part is Constructability Reviews.

Constructability Reviews will be performed at the conclusion of the preliminary design phase, as well as the milestone submittal phases of all design sections (including 30-60-90). The Constructability Reviews will be performed to determine if the project(s) can be constructed according to the plans. The reviews will look at the design from a contractor's point of view, identify contractor's costs beyond normal materials and labor

CR000279

– whether it is limited site access, restricted work hours, complexity of construction in post-phasing or interfaces with other contractors. Additional elements of the review include:

- Analysis of existing utility systems relative to construction schedule and permanent facilities
- Analysis of permanent material requirements and specifications
- Effect of potential environmental restraints upon production
- Construction staging and sequence of construction
- Material handling
- Recycling capabilities
- Earthwork operation details
- Review of Special Provisions for contract and discipline interfaces
- Development of construction contract matrices to develop shortest overall design and construction durations
- Construction Sequencing / Maintenance of Traffic
- Analysis of Contract Special Provisions

The PMC shall review all invoices submitted by the SDCs and ROWAP and verify they are in accordance with the SDC or ROWAP Contract requirements, as applicable, and any associated supplements. The SDC's monthly invoice shall be in accordance with Function Code breakdowns shown in the SDCs' Contract Attachment "C1" – *Work Outline* and method of pay as described in the SDCs' Contract Attachment "B" – Fee Schedule as well as in accordance with the format provided at the SDC Kick-off meeting and shall include Form 132 ver 97. A preliminary invoice shall be submitted to the PMC and the State's PM for review prior to formal submittal. This preliminary invoice shall include a completed Form 132A ver 9-97, a written progress report, a Projected versus Actual Contract Invoices by Month from, originals of Exhibit H-3, Exhibit H-6, and a bar chart indicating the percentage of completion of each task shown in the SDCs' Contract Attachment B. The written progress report shall describe activities during the reporting period; activities planned for the following period; problems encountered and actions taken to remedy them; list of meetings attended; and overall status, including a percent complete by task. The SDCs shall be required to submit monthly written progress reports to the PMC and the State's Project Manager regardless of whether the SDC is invoicing that month.

Once the PMC and State Project Manager has provided a preliminary approval of the draft invoice package, the SDC or ROWAP will be advised to submit the invoice package to the State's Houston District Accounting Department, Attention Mr. David Williams for final approval and further processing.

### RIGHT OF ENTRY

It shall be the responsibility of the PMC to secure permission to enter private property for purposes of survey, geotechnical investigations, ROW appraisals, and other project related activities. **Documentation of all applicable permissions obtained shall be provided to the State before proceeding with any such activity on any private property.** It is the stated policy of the State to make every effort to maintain positive

CR000280                                          HNTB.000178

415

relations with the general public. In pursuance of that policy, the PMC shall not commit acts which will result in damages to private property, and will make every effort to comply with the wishes and address the concerns of private property owners. The PMC shall also attempt to secure "Possession and Use" agreements where applicable and shall maintain documentation of all such efforts and resulting agreements.

## V. ENVIRONMENTAL INVESTIGATIONS AND MITIGATIONS

The PMC will, as agent for the State, provide or obtain the services of a qualified Environmental Services Manager, support staff and an "on-call" testing, remediation and mitigation subcontractor to implement the State's existing procedures and methods, ancillary to the State's primary Environmental Consultant or, if directed by the State, take primary responsibility for on call environmental services as specifically requested by the State. These services are to facilitate the timely mitigation of environmental issues on the Program.

Environmental services are generally described as hazardous materials initial environmental site assessments, Phase I and Phase II environmental site assessments (ESA), risk-based assessment evaluations and modeling, remediation system design/mitigation and oversight for impacts on the Program, and general environmental support, assistance and oversight.

Testing and monitoring will be carried out for air quality, hazardous materials, contaminated soils and groundwater contamination, asbestos, lead, and other such materials in buildings and bridges, in response to specific requests by the State. Testing, assessment and remediation approach/design development to include ground conditions and improvements (buildings and bridges) within the existing and proposed ROW.

Environmental services work requested may include the following:

1.  Coordinate the activities among the State, Texas Commission on Environmental Quality, Texas Department of Health, U.S. Environmental Protection Agency or any other Federal, State or local agencies as necessary to determine that proper rules, regulations and procedures are followed in providing environmental services in connection with this contract. The above coordination will be conducted at the direction of and in coordination with the State.

2.  To the extent practicable, and as directed by the State, provide technical specifications for the award of the State's Service Purchase Order for non-engineering services. This work, as determined by the PMC and the State, may include the development of specific and general bid items, a community relations plan, site health and safety plan, traffic control plan, utility location, protection and warning statement, emergency procedures, and general site information as necessary to inform prospective bidders as to the nature and scope of work.

Last Updated 05/24/06

CR000281                                        HNTB.000179

416

3. Provide the State with engineer's estimates of project costs prior to the State's release of an invitation to bid.

4. Provide project management for specialty contractors. This includes the on-site inspection of third party contractors performing the excavation, removal and disposal of petroleum storage tanks (PST) and corrective action required for leaking underground petroleum storage tanks (LPST) and other contaminated properties. Work may be required on State maintenance facilities or on State ROW.

5. Provide the State with the following:

   a. Project diaries, logs and other documentation regarding all phases of work as performed.

   b. Chain of Custody forms, sample analyses, quality control documentation, documentation of proper waste disposal including disposal manifests, final disposition of PSTs, site diagrams, photographs, correspondence, licenses, permits, and other documentation relating to work and services performed.

   c. Documentation that supports and correlates the project budget estimate for each work request.

   d. When specified, all deliverables (maps, reports, correspondence, invoice documentation, etc.) in electronic format compatible with the State.

6. Perform Hazardous Materials Initial Site Assessments on State ROW or on properties proposed for acquisition. The goal of such assessments is the identification of potential hazardous material concerns (e.g., contaminated soils or groundwater, presence of asbestos, lead, or other such contaminants) and the determination of the need for additional investigations associated with such concerns. These assessments shall be in general accordance with the protocols established in ASTM 1527 and ASTM 1528.

7. Perform hazardous materials site investigations (Phase II ESAs) to characterize and delineate surface and subsurface contamination.

8. The assessments and investigations described in Sections 6 and 7 are performed to determine the presence of environmental concerns, for example contaminated media, as defined by applicable Federal, State and local laws, rules or regulations. Site assessments and investigations may involve individual parcels or may include multiple parcels in a corridor. The intent of these activities is to support the acquisition of ROW and development of Plans, Specifications, and Estimates (PS&E) by identifying early hazardous materials concerns and determining and implementing a plan to resolve such issues prior to construction. In some cases, it will be necessary to accommodate the integration of site cleanup with the construction of transportation facilities. Integration of cleanup with construction requires an anticipation of health and safety concerns for construction workers and waste management procedures for contaminated soil and groundwater that may be

encountered incidental to trenching, tunneling or excavation within zones of contamination.

9. Act as an agent for the State in the execution of disposal manifests.

10. Perform risk assessment modeling and determination to support development of cleanup levels protective of human health and the environment.

11. Perform work to prepare and manage remedial action plans for sites impacted by contamination. This may include developing work plans, site health and safety plans for State personnel and/or construction workers, detailed site investigations, surface and sub-surface analytical investigations, feasibility and treat ability studies and additional work to fulfill the State's obligations regarding regulatory closure/cleanup requirements for contaminated sites. Also, in connection with transportation construction projects described in Section 8, develop technical specifications for use by the construction contractor in performing or subcontracting special measures associated with soil and groundwater contamination, asbestos removal, and lead base paint or other such contaminants.

12. Perform remediation system design, oversight, and project management as needed to provide for mitigation and cleanup of contaminated areas.

13. Provide engineering support, assistance, and oversight as needed, including permit applications, design specifications, and reviewing engineer-sealed plan sets.

14. Costs associated with corrective action of LPST sites may be eligible for reimbursement from the Petroleum Storage Tank Remediation Fund - herein after referred to as PSTR - as provided for in Chapter 26 of the Texas Water Code, as amended and 30 Texas Administrative Code (TAC) Chapter 334. The PMC shall, to the extent practical, and in keeping with generally accepted practices as applied by engineers of similar expertise in the area, perform work in accordance with Reimbursable Cost Guidelines set forth in 30 TAC Chapter 334.

15. Final engineering documents produced for the State's engineering projects shall be signed, sealed and dated, or CADD sealed in accordance with Administrative Order No. 5-98 and Administrative Circular No. 10-89.

16. Appear as an expert witness in any hearing or tribunal, when requested by the State.

17. Perform services necessary to provide guidance, oversight, and recommendations for the State to achieve cleanup and regulatory closure in conformance with the Texas Underground and Aboveground Tanks Program (30 TAC 334), Texas Risk Reduction Rules (30 TAC 335), Texas Risk Reduction Program (30 TAC 350) and/or other applicable program regulations and requirements.

CR000283

HNTB.000181

418

## VI. UTILITY ADJUSTMENT COORDINATION

Coordination includes utility coordination meetings with individual utility companies, communication and coordination with utilities, and preparation of utility agreement assemblies including utility agreements, joint use agreements and advanced funding agreements.

## VII. UTILITY ENGINEERING

This includes the identification of utility conflicts, coordination, compliance with Utility Accommodation Rules, and resolution of utility conflicts. The PMC shall coordinate all activities with the State to facilitate the orderly progress and timely completion of the State's design phase.

## VIII. UTILITY CONSTRUCTION MANAGEMENT AND VERIFICATION

Includes the coordination of utility construction activities, utility location installation verification, compliance with the Utility Accommodation Rules, monitoring, reporting, and as-built surveying as required for the State.

## IX. UTILITY ENGINEERING INVESTIGATION (currently Subsurface Utility Engineering (SUE))

Includes utility investigations subsurface and above ground prepared in accordance with AASHTO standards and Utility Quality Levels, as follows:

1. Quality Level D – Existing Records: Utilities are plotted from review of available existing records.

2. Quality Level C – Surface Visible Feature Survey: Quality Level "D" information from existing records is correlated with surveyed surface-visible features. Includes Quality Level D information. If there are variances in the designated work area of Level D then a new schematic or plan layout, if needed, is required showing the limits of the proposed project and limits of the work area required; including highway stations, limits within existing or proposed right of way, additional areas outside the proposed right of way, and distances or areas to be included down existing intersecting roadways.

3. Quality Level B – Designate: Two-dimensional horizontal mapping. This information is obtained through the application and interpretation of appropriate non-destructive surface geophysical methods. Utility indications are referenced to established survey control. Incorporates quality levels C and D information to produce Quality Level B. If there are variances in the designated work area of Level D then a new schematic or plan layout, if needed, is required showing the limits of the proposed project and limits of the work area required; including highway stations, limits within existing or proposed right of way, additional areas outside the proposed right of way, and

· distances or areas to be included down existing intersecting roadways.

4. Quality Level A — Locate (Test Hole): Three-dimensional mapping and other characterization data. This information is obtained through exposing utility facilities through test holes and measuring and recording (to appropriate survey control) utility/environment data. Incorporates quality levels B, C and D information to produce Quality Level A.

## X.   RIGHT OF WAY SURVEYS

The services outlined herein are to prepare documents suitable for the acquisition of real property interests and the probable issuance of title policy.

### 1.   OWNERSHIP OF RECORDS
All documents provided to the PMC by the State or prepared by the PMC in pursuance of this contract are the sole property of the State. All requests received by the PMC from third parties for maps, plans, schematics, sketches, calculations or other documents shall be forwarded to the State for further handling.

### 2.   ABSTRACTING
For purposes of this Contract, abstracting shall be defined as a research of the official real property records and other records maintained by public agencies which are considered public information.

### 3.   RIGHT OF WAY MAP
A right-of-way map shall be prepared for each proposed right-of-way project. A right-of-way map shall include a title sheet, an index sheet, a utility table, control data sheet, and sufficient plan sheets to cover the proposed project. All right of way maps shall be drawn to have construction CSJ's to match assigned right of way CSJ's. The State has developed standard title sheets, index sheets and plan sheets, copies of which the PMC shall request and secure for all purposes of this Contract.

By mutual agreement between the Texas Board of Professional Land Surveying and the Texas Department of Transportation, right-of-way maps need not be signed and sealed by a Registered Professional Land Surveyor.

### 4.   PROPERTY DESCRIPTION
A property description shall be prepared for each parcel of land to be acquired. The State has developed standard formats for property descriptions, copies of which the PMC shall request and secure for all purposes of this Contract.
All property descriptions shall be signed and sealed by a Registered Professional Land Surveyor.

### 5.   PARCEL PLAT
A parcel plat shall be prepared for each parcel of land to be acquired. The State has developed standard formats for parcel plats, copies of which the PMC shall request

CR000285

HNTB.000183

420

and secure for all purposes of this contract. Parcel plats shall include each and every item of information shown on the right-of-way map which concerns the individual parcel.

All parcel plats shall be signed and sealed by a Registered Professional Land Surveyor.

6. HORIZONTAL GROUND CONTROL

Horizontal ground control used for right-of-way mapping shall be furnished to the Surveyor by the State, and supplemented by the Surveyor, as necessary, or be based on traverses conducted by the Surveyor meeting standards of accuracy as set forth below. **Copies of all control points set by the Surveyor shall be provided to the State.** Reference may be made to standards of accuracy for Second Order, Class II, horizontal control traverses as described in the Federal Geodetic Control Committee publication entitled *Standards and Specifications for Geodetic Control Networks*, reprinted February 1991.

7. RIGHT OF ENTRY

It shall be the responsibility of the PMC to secure permission to enter private property for purposes of su·· ·, as noted in Section IV – *Program Management and Communications*, of this scope of services.

8. ADHERENCE TO STANDARDS

For purposes of clarity, consistency, and ease of understanding, the State, as an acquiring agency of private property for public use, has adopted standards and formats for right-of-way mapping which have proven to facilitate the processes of negotiation, appraisal, relocation assistance, and condemnation. It shall be the responsibility of the Surveyor to adhere to these standards and formats to every extent possible to ensure that the needs of the State are met.

9. ACCURACY REQUIREMENTS

As a minimum, the Surveyor shall use equipment, procedures, and standards sufficient to report the relative location of property corners and areas in compliance with Board Rule 663.15 as promulgated by the Texas Board of Professional Land Surveying.

XI. RIGHT OF WAY COORDINATION AND UTILITY ADMINISTRATION SUPPORT.

The PMC will provide expert witness testimony in hearings, condemnation proceedings or other litigation with respect to acquisition of right of way, easements, and other forms of property interests required for this project.

**Right-of-Way and Utility Information Management System**
The PMC will develop a web-based Geographic Information System (GIS) right-of-way and utility tracking application to assist the program team with managing property and

CR000286

HNTB.000184

421

acquisition related transactions, right-of-way data, and utility information. The system will provide real time data to accomplish the following:

- Assist with maintaining the project schedule
- Provide the ability to track the status of individual parcels and utility conflicts
- Provide mandatory project controls that impose State procedures and policies concerning land acquisition and utility coordination.
- Provide the ability for the project team to work independently when appropriate
- Provide the ability for the State to manage user access to critical information and to easily obtain necessary data for input into the State's in-house ROW tracking system: Right of Way Information System (ROWIS).

**Utility and Right-of-Way Tracking Application Task Management**
The PMC, with input from TxDOT, will direct the creation of a GIS Application Development Steering Committee to be comprised of 3 to 5 key State and PMC program team members. The purpose of this committee will be to assist the PMC with determining and prioritizing required modifications and enhancements to the PMCs' existing right-of-way acquisition and utility information tracking process.

**ROW Acquisition Management and Services**
The PMC shall provide management oversight for all ROW Acquisition Services to be provided. This includes Acquisition Services provided directly by the PMC and Services provided by a Third Party ROW Acquisition Provider (ROWAP) to be contracted by the State for the US 290/Hempstead Highway Corridor.

Final ROW shall be acquired in accordance with the practices, guidelines, procedures and methods currently employed by the State and TxDOT Houston District and the following, as may be amended from time to time:
a) TxDOT Right of Way Manual (available online),
b) TxDOT Access Management Manual (available online),
c) TxDOT Survey Manual,
d) TxDOT Appraisal and Review Manual,
e) TxDOT Facility Development Process Manual, and
f) Federal Highway Administration's (FHWA's) Right-of-Way Facility Development Guide (as contained in the Federal-Aid Policy Guide (FAPG)).

The PMC shall maintain a complete and current set of TxDOT Right of Way Manual Volumes 1 through 8 (http://manuals.dot.state.tx.us/dynaweb), TxDOT Right of Way Access Management Manual (http://manuals.dot.state.tx.us/dynaweb), TxDOT New & Revised Right of Way Acquisition Procedures, TxDOT Appraisal and Review Manual, and a current approved Final ROW map for public use.

**All Final ROW activities must be completed and documented in compliance with applicable laws, including the *Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970* as amended (hereafter referred to as the Uniform Act), rules and regulations.**

CR000287

HNTB.000185

422

During the Assessment Phase at the beginning of the program, the ROW Section of the Program Management Plan will be developed outlining the key issues and processes to be implemented and the overall approach to the program. The PMC will work with the State including workshops to finalize the approach and identify the QA/QC procedures to be adhered to with respect to all elements of the ROW Acquisition process. The PMC shall establish, implement, and maintain quality control and quality review standards for the acquisition for Final ROW.

The Program Management Plan (PMP) shall be periodically updated for any changes in practices, guidelines, procedures and methods as directed by the State or as recommended by the PMC and approved by the State. The PMP shall include an up to date list of names of State approved title company(ies) to be used for title services.

### ROW Schedule
The Program Schedule shall indicate the date to begin the acquisition of the Final ROW and the anticipated completion date of acquisition activities for each parcel. The State shall be advised of all Additional Properties, TCE's or Temporary Construction Easements, tie-ins to driveway, and temporary rights or interests in real property to be acquired. In developing the Program Schedule, the PMC will recommend and give priority to the acquisition of parcels that have significant impact on the Schedule and/or affect the Critical Path as so indicated or as periodically designated by the State. The monthly status reports required below shall provide updated projections for the acquisition date of each parcel.

In developing the Facility Schedule, the PMC shall incorporate adequate time periods for PMC Team review and approval of acquisition packages and, as applicable, the State spot check and final processing of acquisition packages. If any submitted acquisition package has a deficiency, the PMC shall work with the ROWAP to correct such deficiency and resubmit the package. An acquisition package shall be deficient, as determined by the PMC or the State, if any of its components fails to meet any of the criteria established for such component, or contains any errors or omissions.

The PMC and the State both reserve the right to seek additional review on parcels/packages that are of an unusual/questionable nature in regards to the State's standards.

### PMC's Final ROW Scope of Services
The PMC shall complete all administrative activities and assemble all documentation sufficient for the State to acquire the Final ROW. The PMC shall make a written recommendation to the State and obtain the State's concurrence of all appraisals, legal descriptions, acquisition documentation, purchase price, requests to acquire Final ROW, condemnation-related activities and funding/closing procedures. The State will approve and return the Final ROW acquisition documentation or provide comments for incorporation by the PMC. Right of way acquisition procedures will not commence until released by TxDOT's right of way office. Further, the PMC shall not commence nor allow the ROWAP to commence any negotiations with landowners nor will eminent

CR000288

domain procedures begin until the specific acquisition package for that particular parcel has been approved and minute order issued.

If an agreed upon purchase price, acceptable to the State, cannot be negotiated with the landowner, then the PMC shall make recommendations for proceeding with acquisition of the property through condemnation/eminent domain procedures.

Acquisition Process Summary:
PMC's major activities with respect to the acquisition of the Final ROW include management oversight and/or preparation, as applicable of:
a) Final ROW surveying and mapping,
b) Final ROW budget estimates and updates,
c) Title services,
d) Appraisal services (Billboard Identification),
dd) Requests for variances to billboard ordinance
e) Appraisal review,
f) Negotiations (Billboard research and Bisection clauses),
g) Closing services,
h) Relocation assistance, (Including Billboards),
i) Condemnation support services,
j) Preparation and administration of bid documents for Clearance and Demolition of Final ROW,
k) Environmental due diligence, (PST's, Asbestos and Lead)
l) Documentation and document control, including scanning, file organization and transfer of close files to the State.
m) Progress reports,
o) Final ROW quality control review,
p) Documentation certifying that the required Final ROW acquisition is necessary and that any proposed alternatives are not feasible or are cost prohibitive, and
q) Obtaining rights of entry, as necessary.
r) Temporary Construction Easements (TCE's).
s) Certification preparation.

The PMC will make recommendations on assignment of parcels to Acquisition Provider(s) to include the ROWAP and to include assignments to PMC members, as approved and directed by the State.

**Documentation and Reporting**
PMC shall provide the State with all specific reports and supporting documentation for review and approval during the acquisition process. To facilitate the State's receipt of that portion of the right of way costs to be borne by the local agencies, the PMC shall coordinate with the State regarding accounting and approval of these costs and expenses.
All correspondence with the State and property owners relating to acquisition of real property shall include the following information (at a minimum) as a heading:
a) County,
b) Construction Control Section Job number, (Construction CSJ)

Last Updated 05/24/06

CR000289

HNTB.000187

424

c) Highway Designation
d) Facility limits,
e) Parcel number, and
f) Name of record owner(s)
g) Right of Way Control Section Job number, (ROW CSJ)

**PMC's Responsibility**

The PMC shall be responsible for management of all services and preparation of all documentation for all Final ROW acquisition, easement acquisition, permitting and related relocation assistance for the Program. The Work related to Final ROW acquisition includes, but is not limited to, mapping, surveying, appraisal, appraisal review, negotiation, acquisition, procurement of title insurance, clearing of title, closing of acquisitions, condemnation support, all exhibits and photos associated with condemnation services and proceedings required by the Attorney General's office, relocation assistance, clearance/demolition of improvements, and environmental testing and remediation, as required.

The PMC shall track all costs and payments of: agreed purchase prices or Commissioners' awards and judgments; relocation assistance payments; all legal, administrative and incidental expenses of, or related to, the ROW; and temporary easements or other interests in real property acquired for the Facility.

The PMC will provide management and oversight of the State's consultant ROW team in coordinating the acquisition of unsecured ROW parcels for the Program. The ROW coordination services provided by the PMC will include:

1. Assisting the State's ROW consultant team in the identification and prioritization of parcel acquisitions critical to private utility relocation activities.

2. Coordinating with the State's ROW consultant team to maintain a parcel status tracking system.

3. Assisting the State's Houston District ROW Department in the preparation of documents requesting Right Of Entry to unsecured parcels.

4. Conducting periodic meetings as needed with the private utilities construction representatives and/or engineers to update status of the ROW acquisition and to identify potential ROW problems.

5. Preparing a monthly ROW Status and Critical Parcel Report by ROW Account.

6. Maintaining a composite ROW map with parcel status and critical parcels identified.

7. Developing Utility Agreements for reimbursement of FHWA funds (ROW accounts) and submitting to the State for further review and execution.

CR000290                                    HNTB.000188

425

**Final ROW Acquisition Package Approval**

The PMC shall review all Acquisition packages submitted and verify a complete submittal prepared in accordance with this scope of work and the ROW section of the Program Management Plan, to include the following items prepared for each parcel:

a) A review cover sheet (Checklist) signed by the PMC verifying that the submittal packet is complete and has been reviewed.

b) A cover sheet setting forth the following information for each parcel:
   1) Parcel number and number of parts,
   2) Station number,
   3) ROW CSJ number,
   4) Location of parcel,
   5) Name of owner,
   6) County and/or other jurisdiction,
   7) Extent of acquisition (partial or whole acquisition), and
   8) Type of conveyance (fee, easement, etc.)

c) A complete legal description of the parcel adequate to effect the desired acquisition of the parcel, signed and sealed by an RPLS. A legal description and parcel plat is required for each parcel. Control of access should be addressed in all legal descriptions. All descriptions shall be in recordable form and shall be prepared in a form and manner acceptable to the State in all respects,

d) The parcel plat, as prepared by the RPLS, and a half size (11" x 17") copy of the right of way map sheet(s) pertaining to the parcel, such plat to include control of access designations.

e) A title report, current within ninety (90) Days, including copies of all documents identified in the exceptions listed therein and a plot of all easements identified therein. The acquisition package shall include PMC's analysis of each preliminary title report or title commitment to determine potential problems and proposed methods to cure title deficiencies. The PMC shall perform title curative Work and provide the State with copies of all curative documents,

f) A copy of the appraisal report and all supporting documentation,

g) A copy of the environmental site assessment and all amendments as described in Appraisal Services, if any,

h) A real/personal property report detailing what items making up each parcel are classified as real estate, tenant-owned improvements or personal property. Particular attention should be paid to items that have questionable classifications. Completed ROW Form A-9 Property Classification Agreement,

i) Replacement Housing Calculations, notification of business eligibility, completed displacee interviews, all comparables used in estimating the replacement housing calculations, and letter to displacee(s) explaining replacement housing calculations. Calculations and replacement housing benefit package shall be prepared and reviewed by a qualified consultant, in conformance with the State's standard relocation procedures and applicable to State and federal laws and regulations,

j) The proposed initial offer letter, memorandum of agreement, deed, and any other documents, which shall be prepared as required or requested by the State. The State will provide the format for preparing these documents. Documents referred to in this section are standardized by the State and modification of standardized documents

CR000291                                    HNTB.000189

426

should be kept to a minimum, all changes shall be approved by the State in writing, in the State's sole discretion, and

k) Any other required State forms, such as record of all contacts with the property owner or any party with a compensable interest.

Upon the State's prior written approval of the acquisition package, the PMC may proceed or direct the ROWAP to proceed with the offer to the property owner as appropriate.

## XII. FINANCIAL PLAN AND PROJECT MANAGEMENT PLAN

The PMC will work with the State to provide, in accordance with FHWA requirements and current legislative provisions of SAFETEA-LU, an initial Financial Plan for the US 290/Hempstead Highway Corridor Program. The Initial Financial Plan shall be completed prior to the authorization of federal funds for ROW acquisition (before or within 120 days following the Notice of Availability of the Final Environmental Impact Statement (FEIS)) and shall include the program cost estimates by projected year-of-expenditure including basis of estimates, assessments of risks and uncertainties, and establishment of appropriate contingencies based on program phase of development. The Financial Plan shall capture estimates of all anticipated program costs including State, PMC, design Consultants, ROW acquisition costs, construction, and related third party costs. These costs shall also capture all elements from Planning, Administration, Design, and Construction.

The PMC shall work with the State to provide, in accordance with FHWA requirements, annual updates to the Program Financial Plan. The services associated with the annual update process are:

1. Analyze cost and revenue trends that have impacted project costs and revenues during the previous year.
2. Develop, when necessary, revenue shortfall mitigation strategies to minimize impacts on scheduled project delivery.
3. Prepare a summary of significant cost reductions that will affect the cost of the project.
4. Prepare a summary of significant cost increases that will affect the cost of the project.

The PMC shall also prepare a Project Management Plan in accordance with current Legislative requirements and FHWA published Guidance Documents. The Project Management Plan will include applicable key elements of the PMP noted in Section IV of this scope and will document the procedures and processes that are in affect to provide timely information to the project decision makers to effectively manage the scope, costs, schedules, and quality of, and the Federal requirements applicable to, the project; and the role of the agency leadership and management team in the delivery of the project. The Initial Project Management Plan will also provide background summary on services performed on the Program to date by TxDOT and others and will be provided within 120 days of NTP to meet FHWA submittal and schedule requirements.

CR000292

HNTB.000190

427

The PMC shall provide updates of the Project Management Plan for resubmittal to FHWA in accordance with FHWA published guidelines and updates or interim guidance to such FHWA guidelines.

## XIII. DESIGN MANAGEMENT, COORDINATION AND REVIEW

The PMC will review the Design Concept Conference (DCC) project design elements form produced by the SDCs. Once complete, it will be the responsibility of the PMC to route the completed DCC forms along with the proposed typical sections to the State for further processing.

The PMC will review and track the status of all requests by SDCs for any design exceptions and/or waivers.

The PMC shall review the PS&E design segments at a schedule of no less than 30, 60, 90, 95 and 100 percent. Each separate construction package will have all applicable formal review stages. The sequencing of submissions and reviews for the various contracts will be coordinated to facilitate an orderly and efficient process for both the SDCs and the PMC. For each review submission, all appropriate disciplines will review the developing documents. Based upon such reviews, the PMC will recommend acceptance and approval by the State of such plans, specifications and estimates.

The PMC will review and provide written response on the adequacy of all design consultant submittals of all plans and reports including structural plans, roadway plans, and engineering reports.

The PMC is to provide advice and consultation on questions of engineering with respect to project design intent.

The PMC shall evaluate the PS&E for consistency in design, drainage and traffic control.

The PMC is to oversee that the designs as provided by the SDCs are in accordance with applicable requirements of the State Specifications, Standards and Manuals. Whenever possible, the Department's standard drawings, standard specifications, or previously approved special provisions and/or special specifications shall be used. If a special provision or a special specification must be developed for this project, the PMC shall ensure that provisions and specifications shall be developed in the Department format and to the extent possible, incorporate references to approved Department test procedures.

The PMC will be responsible for organizing the PS&E submittals. The PMC will assemble all PS&E with supporting paperwork and provide them to the State for final PS&E review and processing for letting. The SDCs will assist on an as needed basis. Repackaging of PS&E submittals into different construction packages is not included in the scope of work.

Last Updated 05/24/06

CR000293

HNTB.000191

428

It will be the responsibility of the PMC to confirm that each of the segments designed along the corridor are in compliance with the Americans with Disabilities Act (ADA). The Americans with Disabilities Act Accessibility Guidelines are available on the Internet at http://www.access-board.gov/.

The PMC will need to confirm that the designs are in compliance with the Texas Accessibility Standards under the jurisdiction of the Texas Department of Licensing and Regulation (TDLR). These standards can be obtained from the Internet at http://txarcb.com/tsa/laws/tas.html.

The PMC will be responsible for conducting constructability reviews. This will include but is not limited to utility relocations, SW3P, drainage, typical sections, time constraints, correct bid items, etc.

The PMC shall prepare any exhibits necessary for railroad and utility approvals, and other governmental/regulatory agencies specific to the corridor.

The PMC will implement a quality assurance program intended to monitor that the SDC and the SDCs' subconsultants are producing quality work for the US 290/Hempstead corridor PS&E.

The PMC will coordinate with the individual SDCs to implement the recommendations of the approved overall US 290/Hempstead corridor drainage impact report. The PMC will review the particular section consultant's progress to comply with the terms of the report, monitor the SDCs' progress on the hydraulic design, review findings of the reports and computations, and provide direction/assistance to rectify design issues as they become apparent. · The PMC will provide assistance, coordination and support to the State in the mitigation efforts.

The PMC will monitor design section consultant services to determine adequacy of the work performed relative to contract intent. The PMC will evaluate each of the monthly progress reports as provided by the PS&E consulting design firms together with the evidence of the work accomplished during the period since the previous report. The progress payment request must contain a bar chart indicating the percentage of completion of each task. Formal progress reports with bar charts will be required on a monthly basis. If the progress performed is found to be adequate, the PMC shall then provide a written response stating that the physical progress as reported by the design consultants was found to be satisfactory and they recommend payment.

The PMC will manage and track project costs for escalation during design and construction. The PMC shall apply cost effectiveness strategies and mechanisms for cost containment with the approval of the State.

The PMC is to confer/coordinate with the State, Harris County, any municipality and other legal authorities having jurisdiction regarding the crossing, closing and/or relocation of any roads, ramps and streets.

Last Updated 05/24/06

CR000294

HNTB.000192

429

The PMC shall determine if the Airway-Highway Clearance requirement and agreements have been met in accordance with the latest FAA form 7460-1 "Notice of Proposed Construction or Alteration".

## XIV. PRELIMINARY ENGINEERING & DEVELOPMENT OF PS&E

The PMC will work closely with the State in developing an interim and ultimate conceptual ITS plan for the US 290/Hempstead corridor. The PMC will provide assistance in coordinating and packaging interim design and PS&E development for ITS Control Systems and Illumination. The PMC may serve in a support role to the State in advising and reviewing the ITS design deliverables for the ultimate traffic management system.

The PMC will develop the plans, specifications and estimate for the interim ITS to include the existing traffic management system using temporary fiber, message signs, etc. for the corridor. The PMC is to implement whatever steps necessary to insure that the interim ITS will remain operable during the extended construction period.

The PMC shall design the civil portion of the ultimate traffic management system such as conduits, drill shafts, structures, etc. to be included on each roadway project.

The PMC will develop a Corridor Lighting Master Corridor Plan in the form of a "footprint" based on State standards and criteria. Night lighting (temporary) must be looked at in accordance with FHWA requirements. Night lighting (temporary) plans shall be signed, sealed, and dated accordingly.

The PMC will perform a Light Trespass Alternative Analysis. Sensitive receptors will be identified where the proposed lighting system may have a negative impact, or where community feelings are particularly strong with regard to lighting. In these areas vertical illuminance readings will be taken to establish a baseline light trespass. The light trespass criteria will use the existing light levels as a baseline maximum for the project. For areas where a baseline cannot be established or is unattainable (e.g. a previously unlit area), the values included in the EPRI Document #TR-114914, Light Trespass Research, dated March 2000, or later updates if adopted by the State Houston District prior to the performance of the Light Trespass Alternative Analysis, will be used.

The PMC will review the various Preliminary Drainage Impact Studies performed to date on the US 290/Hempstead Corridor and prepare a single comprehensive Corridor Drainage Impact Report signed sealed and dated by a licensed engineer in the State of Texas. The report shall also consider appropriate elements of the Hempstead Highway ROW and proposed Managed Lanes under development by the Harris County Toll Road Authority (HCTRA).

The Corridor Drainage Impact Report shall include all in-depth hydraulic analysis and modeling and shall provide recommendations for Detention and identify mitigation

CR000295

HNTB.000193

430

options for applicable segments of the corridor including identification of any additional ROW requirements as may be necessary to accommodate Storm Water Management facilities. All hydrology and hydraulics modeling shall be based on the published results and models developed under the Tropical Storm Allison Recovery Project (TSARP) program. If "TSARP" models are not available then the models provided by the flood plain administrator of the area shall be used.

The PMC shall work closely with the State to refine the corridor drainage impact study and provide all analysis throughout the program's development and design phase.

The PMC will provide assistance, coordination and support to the State in the drainage mitigation efforts, including any required approvals and/or reviews of drainage features with other agencies. The PMC shall prepare any addenda to the report. The revised report(s) shall be signed, scaled and dated by a licensed engineer in the State of Texas.

The PMC shall perform all hydraulics modeling for bridges and bridge class culverts. The PMC shall prepare the Drainage Area Maps and Bridge Hydraulic Data Sheets for all bridges and bridge class culverts and shall provide these drawings signed, sealed, and dated by a licensed engineer in the State of Texas for inclusion with appropriate PS&E packages.

Following final design of all drainage elements in the Corridor, The PMC shall provide a comprehensive drainage study for the White Oak Bayou Watershed and an assessment of the mitigation measures implemented on the US 290 Corridor as related to White Oak Bayou.

The PMC shall assemble a multi-disciplinary team to perform reviews of the existing schematic and environmental documents prepared to date. The PMC shall hold a series of workshops to review the existing schematics including interfaces/connections with proposed Managed Lanes, considering geometric configurations, traffic operations, safety issues, cost effectiveness, and constructability, in order to identify opportunities for potential refinements. The PMC shall also provide preliminary engineering to support proposed schematic refinements.

The PMC shall make recommendations on project phasing based on construction cost estimates, ROW impacts, utilities, funding, and permitting. The project phasing will be periodically updated to reflect changes in program development, funding opportunities, and identification of early implementation project opportunities. The PMC shall also coordinate with the State and the Houston Galveston Area Council (HGAC) Metropolitan Planning Organization (MPO) to advance projects through the approval process on the State Transportation Improvement Program (STIP) and the local Transportation Improvement Program (TIP).

The PMC shall assemble and review all costs estimates to date and perform Preliminary Cost Estimating to develop an overall Program Costs Estimate and provide updates during the Program development. The PMC shall also assemble disciplinary experts to

CR000296

HNTB.000194

431

Contract 12-648P5013
Attachment C

verify cost estimation methodology and provide Cost Estimate updates at various stages of the Program's development.

The PMC shall support the State in the quality control review of all environmental documents produced for the US 290/Hempstead Highway Corridor and provide written comments. The PMC shall also support and/or perform supplements, addenda, reevaluations, or additional environmental documents as may be necessary and as directed by the State. The PMC shall also prepare exhibits for environmental permits and shall develop an Environmental Management System to monitor commitments made in the environmental documents.

The PMC shall coordinate with the SDC(s) to implement commitments made in the environmental documents and to review and assemble the Environmental Permits Issues and Commitments (EPIC Sheets) for integration into the PS&E packages.

The PMC shall coordinate with the State to identify funding strategies and potential alternative funding opportunities.

The PMC shall support the State with potential third party corridor agreements including the Harris County Toll Road Authority (HCTRA) and the development of the proposed Managed Lanes, and Harris County, METRO, and the Union Pacific Railroad (UPRR) on high capacity passenger and freight rail movements in the corridor.

A conceptual sequence of the construction plan will be developed by the PMC for the entire corridor. The primary focus of this effort will be to address overall traffic operations for the mainlanes/HOV and local roadway systems. The plan will show the maintenance of continuity during all operations as well as transitions outside the project area. Review of this plan will allow for project-wide operational issues to be identified. The conceptual master plan must consider and address ITS, utility coordination, drainage, interim lighting and prioritize right of way needs for traffic phasing.

The PMC may also be required to provide limited PS&E development to include such items as noise abatement walls, traffic signal interconnects, intersection improvements, landscape architecture etc. The PMC will also accomplish incidental design activities as may be required and authorized.

If required and as directed by the State, the PMC shall prepare detail plans, quantities and estimate for (a local municipality or other agency) water and sanitary sewer relocations and adjustments to be incorporated into the plans or manage such design and plan preparation by an assigned SDC. The quantities and estimate for pertinent bid items shall be broken out separately. Any upgrades or added capacity improvements requested by the municipality or outside agency shall be tracked and made part of the applicable Third Party Agreement between the municipality or outside agency and the State.

The PMC will be responsible for developing the overall signing concept plan.

CR000297        HNTB.000195

432

The aesthetic/landscape architecture specific elements to be evaluated include features as recommended by the Green Ribbon Project, as approved by the State. The PMC will coordinate with the State for the development of a conceptual landscape/aesthetic plan for the corridor.

The PMC will review/evaluate the SDCs' plans to ensure compliance with the approved conceptual aesthetic/landscaping corridor guidelines. The PMC will coordinate with the State for their approval.

The PMC shall support the State in the performance of Value Engineering Studies at the Preliminary Design (Schematic), and at the early stages of design for all design sections.

The PMC shall undertake special studies as directed by the State as related to Program Development issues to investigate and develop recommendations for such items as asset management, funding, financing, alternative project delivery methods, and third party proposals including from HCTRA, METRO, Harris County, local cities or municipalities, public or private utilities, and community associations. All such special studies shall be documented including the background, any recommendations, and the potential results of such recommendations.

The PMC shall monitor Development activity in the Corridor and assess potential impacts of proposed or on-going development as well as review and make recommendations to the State of any third party proposals submitted by Developers.

## XV. GEOTECHNICAL FIELD INVESTIGATIONS

The PMC will furnish the structure boring logs to the SDCs in accordance with State procedures. It will be the responsibility of the PMC to sign, seal and date soil boring mylar sheets to be used in the PS&E packages. The preparation of soil boring mylar sheets are to be in accordance with TxDOT Houston District standards. The PMC will perform all geotechnical investigations required for the design and construction of the corridor. The PMC will perform all geotechnical design/review in accordance with the standard procedures of the State and the TxDOT Houston District.

All geotechnical work should be performed in accordance with the latest version of the TxDOT Geotechnical Manual. All testing shall be performed in accordance with the latest version of the TxDOT Manual of Test Procedures. ASTM test procedures can be used only in the absence of State procedures. All soil classification should be done in accordance with the Unified Soil Classification System.

The PMC shall perform soil borings, testing for bridges, retaining walls, overhead sign structures, along proposed storm sewer alignment, embankments and any temporary soil retaining systems. The PMC should perform analyses including global stability analysis, settlement analysis and foundation design recommendations.

Last Updated 05/24/06

CR000298                                                HNTB.000196

433

The PMC shall provide a signed, sealed and dated geotechnical report(s) which contains but is not limited to soil boring locations, boring logs, laboratory test results, generalized subsurface conditions, ground water conditions, piezometer data, analyses and recommendations for settlement and slope stability of the earthen embankments, skin friction tables and design capacity curves including skin friction and point bearing. The skin friction tables and design capacity curves should be present for piling and drilled shaft foundation. In addition, the PMC should include allowable bearing pressure, passive earth pressure, friction factor and lateral earth pressure for the retaining walls. Retaining wall analysis should include the computation of the factor of safety for bearing capacity, global stability, overturning and sliding. Where scour analysis needs to be done then Grain Size distribution curves with D50 value and consolidation summary report should be provided. The geotechnical report(s) will be subdivided into volumes along the corridor and recommendations including load curves, bearing pressures, retaining wall stability, etc. will be reported by approximate design section.

The PMC shall perform a Phase I Fault Study using available geological records, site reconnaissance and borings.

## XVI. DESIGN AND CONSTRUCTION SURVEY

The PMC's surveyor shall survey and tie down soil boring locations both horizontally and vertically.

The Surveyor shall confirm vertical control of the control points provided by the State.

The Surveyor will need to establish and periodically update temporary control points for implementation by the SDCs' Surveyor to obtain topographic information.

Coordinate geometry shall be based on and tied into State plane surface coordinate system. The PMC shall provide a *Survey Control Index Sheet* and *Horizontal and Vertical Control Sheet* signed, sealed and dated by a Registered Public Land Surveyor and a Texas Licensed Professional Engineer for each design section for insertion into the plans. The Surveyor shall control traffic in and near surveying operations adequately to comply with provisions of the latest edition of the 1980 Texas Manual on Uniform Traffic Control Devices-Part VI.

All standards, procedures and equipment used by the Surveyor shall be such that the results of survey will be in compliance with Board Rule 663.15 as promulgated by the Texas Board of Professional Land Surveying.

It shall be the responsibility of the PMC to secure right of entry to private property for the purpose of performing any surveying and/or soil boring activities. In pursuance of the State's policy with the general public, the PMC shall not commit acts which will result in damages to private property and the PMC will make every effort to comply with the wishes and address the concerns of private property owners.

CR000299

HNTB.000197

434

The PMC shall establish, coordinate and agree with SDC(s) surveyors on all controls at interfaces.

Reference the Construction Phase of the contract for additional surveying activities.

## XVII. CONSTRUCTION PHASE PROGRAM MANAGEMENT

### 1. PROGRAM MANAGEMENT PLAN

The PMC will update the Program Management Plan (PMP), developed in Phase I – Planning and Design Management Services, to reflect activities associated with Phase II Construction Support Services.

Sections of the PMP that require review and updating to reflect on-going construction support services are:

1) Public involvement and communications

2) Reporting procedures and standards

3) Project tracking and control procedures

4) Invoicing procedures

5) Document handling and filing procedures

6) Quality assurance/control plan.

### 2. PRE-BID SCHEDULING SERVICES

The PMC will develop the phasing and sequencing logic, as well as durations for all activities and the interface logic between adjacent construction contracts. The PMC will work with the SDCs to establish quantities for each activity and to provide feedback on the constructability of critical design components. The PMC will incorporate ROW and utility relocation constraints developed as part of the Program Master Schedule

The PMC will prepare the construction time determination schedule, establish contract milestones, develop incentive/disincentive strategies, develop lane rental strategies and scheduling related general notes, special provisions/specifications for design sections. These data will be coordinated with the respective SDCs.

## XVIII. INSPECTION OF WORK IN PROGRESS AND PROJECT RECORDS

### 1. SCHEDULING AND TRACKING

The PMC will provide construction scheduling support services to the State's Area Engineers for the US 290/Hempstead Highway Reconstruction Program corridor.
The PMC services will include the following:

1. Preliminary Schedule Review (1 per project)
2. Monthly Schedule Update Analysis (monthly)
3. Time Impact Analysis (Average of 5 per project)
4. Provide different options to mitigate impact due to conflict.

Last Updated 05/24/06

5. Input Contractor's monthly updated schedule into Program Master Schedule.
6. Coordinate schedule impacts between adjacent construction contracts.
7. Develop and maintain a corridor-wide Program Master Schedule. The schedule will be a composite of the individual construction contractors' schedules supplemented with updated information from regularly scheduled coordination meetings. The Program Master Schedule will be updated on a monthly basis.
8. Coordinate schedules between adjacent construction contracts, utility contracts and follow-on contracts.
9. Develop and maintain a Master Utility Adjustment Construction Schedule. See Attachment C, Section VIII, Utility Construction Management and Verification.

2. UTILITY RELOCATION COORDINATION

The PMC will implement the State's policies and procedures to facilitate the timely relocation of private utilities within the Program Corridor. Given the magnitude of the Program, the PMC will, as necessary, recommend changes to specific procedures to facilitate utility relocation activities.

3. Stormwater Pollution Prevention Plan Inspection (SWP3)

The PMC will provide, on an as requested by the State basis, construction support personnel to support the State's Area Engineer(s) with SWP3 inspections and record keeping.

## XIX. MONITORING OF WORK IN PROGRESS AND PROJECT RECORD

The PMC will provide, on an as requested by the State basis, construction support personnel to support the State's Area Engineer including limited construction inspection field personnel.

The PMC shall identify, track and assist in resolution of construction issues/conflicts, act as liaison between the State and the Designers concerning construction issues/conflicts and plan revisions and maintain and update the Action Item Agenda for Partnering Meetings as directed by the Area Engineer.

## XX. SURVEYS FOR CONSTRUCTION CONTRACTS

The PMC will provide for the services of a surveyor, survey crews and survey equipment on an "as requested basis" to support the State within 24 hours of the request. The PMC surveyor will be acting as a representative of the State to provide surveying services related to construction of the US 290/Hempstead Reconstruction Program. The surveyor will be familiar with the State standards and guidelines to assist in quality control in regards to surveying issues.

CR000301

HNTB.000199

436

## XXI.  DESIGN VERIFICATION, CHANGES AND ALTERATIONS

The PMC will coordinate the distribution of information for, and provide technical support services to the State for shop drawing reviews, redesigns and Requests for Information (RFIs).

The technical support activities for this task will include the following:

1.  The PMC will act as the single point-of-contact for the coordination and distribution of shop drawings submitted by contractors.  A status report will be maintained for submittals routed through the PMC.  See the table below for the distribution requirements for both approved and non-approved shop drawings.
2.  Review shop drawings for elements designed by the PMC.
3.  Review other contractor submittals as directed by the State.
4.  Provide design and CADD support services to the State as requested.
5.  Provide recommendations to the State regarding RFIs submitted by contractors.
6.  Coordinate and track design changes necessitated by associated field changes/conditions.
7.  Provide interface management to make sure that all changes are coordinated with adjoining and follow-on contracts

## XXII.  ERRORS AND OMISSIONS:

For design services specifically provided by and signed and sealed by the PMC, the PMC is responsible for design errors and/or omissions that become evident before, during or after construction of the project.  The PMC's responsibility for all questions arising from such design errors and/or omissions will be determined by the State and all decisions shall be final and binding.  This would include but not necessarily limited to:

1.  All design errors and/or omissions resulting in additional design work to correct the errors and/or omission for elements designed by the PMC.
2.  Preparation of design documents and detail drawings necessary for a field change due to design errors and/or omissions for elements designed by the PMC..
3.  Revisions of original tracings to the extent required for a field change due to design errors and/or omissions for elements designed by the PMC..

The PMC shall promptly make necessary revisions or corrections resulting from the PMC's errors, omissions or negligent acts without additional compensation.  Acceptance of the work by the State will not relieve the PMC of the responsibility for subsequent correction of any such errors or omissions or for clarification of any ambiguities.

CR000302

HNTB.000200

437

**ATTACHMENT C1**
**WORK OUTLINE**

## TABLE OF CONTENTS

Route And Design Studies (FC 110) ......... 4
A.   Data Collection ......... 4
B.   Field Reconnaissance. ......... 4
C.   Master Development Plan ......... 5
D.   Program Design Criteria ......... 6
E.   Traffic Modeling and Planning Studies ......... 6
F.   ITS Planning, Design and Implementation ......... 7
G.   Urban Planning / Context Sensitive Solutions ......... 7
H.   Rail Coordination Services ......... 8
I.   Value Engineering ......... 8
J.   Geotechnical Field Investigations and Reports ......... 9
K.   Special Studies / White papers / Research Documentation ......... 10

Social, Economic And Environmental Studies And Public Involvement (FC 120) ......... 10
A.   Environmental ......... 10
B.   Public Involvement and Communications ......... 12

Right-Of-Way (ROW) Data (FC 130) ......... 15
A.   Right-of-Way and Utility Information Management System ......... 15
B.   ROW Acquisition Management and Services ......... 17
C.   Title Services ......... 18
D.   Initial Appraisal Services ......... 18
E.   Initial Appraisal Review Services ......... 19
F.   Appraisal Update Services ......... 19
G.   Appraisal Review Update Services ......... 19
H.   Right of Way Negotiations ......... 19
I.   Closing Services ......... 20
J.   Relocation Assistance ......... 20
K.   Condemnation Support ......... 23
L.   Clearance/Demolition of Final ROW ......... 24
M.   Deliverables ......... 25
N.   Utility Engineering, Investigations, and Coordination ......... 25
    1.  Utility Engineering Investigation ......... 25
    2.  Utility Adjustment Coordination ......... 28
    3.  Utility Engineering ......... 29
    4.  Utility Construction Management and Verification ......... 31
    5.  Develop Utility Plans, Specifications, and Estimating (PS&E) ......... 32
    6.  Utility Design Survey ......... 34

O.   ROW Surveying ......... 36

Managing Contracted Advance PE Services for FC 110 thru FC 150 (FC 145) ......... 43
A.   Program Management / Administration ......... 43
B.   Program Scheduling ......... 44
C.   Financial Plan and Project Management Plan ......... 45
D.   Project Controls and Program Management Plan (PMP) ......... 45
E.   Program Reporting and Audits ......... 47

Last Updated 05/24/06

CR000303

HNTB.000201

438

ATTACHMENT C1
WORK OUTLINE

F.     Agency Coordination     48

Field Surveying And Photogrammetry (FC 150)     48

Roadway Design Controls (FC 160)     49
A.     Roadway Design     49
B.     Roadway Design Management     50
C.     Deliverables     50

Drainage (FC 161)     50
A.     Modeling and Corridor Drainage Impact Report.     50
B.     Drainage Design Management     51
C.     White Oak Bayou Drainage Study     52

Signing, Pavement Markings, Signalization (Permanent) (FC 162)     52
A.     Traffic Master Plan and Management of Traffic Elements     52
B.     Signing     53
C.     Traffic Signals     53
D.     Staged Construction     53
E.     Deliverables     53

Miscellaneous (FC 163)     54
A.     Retaining Walls     54
B.     Noise Abatement Walls     54
C.     Master Construction Sequencing and Traffic Control Plan (TCP)     54
D.     Illumination     55
E.     Management of CADD Files and Standards     56
F.     Special Utility Details and Plans     56
G.     Construction Cost Estimates     56
H.     Miscellaneous Design PS&E Development     56
I.     Deliverables     56

Managing Contracted Services for FC 160 thru FC 170 (FC 164)     57
A.     Program Management / Administration     57
B.     Program Scheduling     57
C.     Financial Plan     58
D.     Project Controls and Program Management Plan (PMP)     58
E.     Support Procurement and Scope of Work Development for SDC(s)     60
F.     Contract Administration of SDC(s) contracts     60
G.     Coordination, oversight, and work product review of SDC(s)     60
H.     Program Reporting and Audits     61
I.     Agency Coordination     62
J.     General Contracting Procedures     62

Traffic Management Systems (Permanent) (FC 165)     63

Bridge Design (FC 170)     63
A.     Bridge Programming     63
B.     Bridge Layouts.     64
C.     Bridge Design and Detailing Management.     64

CR000304     HNTB.000202

439

## ATTACHMENT C1
## WORK OUTLINE

D.    Staged Construction.                                          65
E.    Deliverables                                                  65

Construction Phase Services (FC 320)                               65
A.    Program Management and Administration                         65
B.    Construction Scheduling Support                               66
C.    Shop Drawing/Submittals Review                                66
D.    Surveys for Construction Contracts                            67
E.    Review and Log Contractor RFI(s) and Submittals              67
F.    Maintenance of Traffic Reviews                                67
G.    Design verification, change order support tasks              68
H.    Construction monitoring support                               68
I.    Deliverables                                                  69

CR000305                                              HNTB.000203

440

ROUTE AND DESIGN STUDIES (Function Code 110)

A.  **Data Collection**

The PMC shall collect, review, and evaluate data described below. The PMC shall maintain a log documenting all information gathered, source obtained from, and applicability to the Program. The PMC shall notify the State in writing whenever the PMC finds disagreement with the information or documents:

1.  Data from the State, including the US 290/Hempstead Highway Corridor MIS, "as-built plans," existing schematics, ROW maps, existing cross sections, existing planimetric mapping, environmental documents, existing geotechnical data and boring logs, existing traffic counts, accident data, PMIS data, identified endangered species, and identified hazardous material sites.

2.  Preliminary Drainage Impact Studies as prepared for the State on specific segments of the US 290/Hempstead Highway Corridor.

3.  Any Preliminary and/or Final Drainage Impact Studies, schematics, and preliminary engineering reports prepared by and/or for HCTRA on the proposed Hempstead Highway Corridor.

4.  Readily available flood plain information and studies including TSARP Flood Boundary Maps and hydraulic models, U.S. Army Corps of Engineers, local municipalities and other governmental agencies in addition to that provided by the State.

5.  Roadway inventory information, including, the number of lanes, speed limits, pavement widths and ROW widths from the State, applicable Cities and the County.

6.  Adopted land use maps and plans as available, Harris County Tax maps, and subdivision plots.

7.  The PMC shall review incoming permit applications made to the State for the US 290 Corridor for conflicts with the US 290 proposed improvements.

8.  Available public and private utility information.

9.  Available studies for the railroad(s) serving the project corridor.

10. Available bridge data on existing structures including "as-built plans," existing schematics, existing bridge sections, bridge inspection records, and current applicable special provisions, special specifications, and standard drawings.

11. Assemble and assess availability of bridge foundation data and provide summary of foundation types and recommend limits of removal, highlighting potential conflicts with proposed construction.

12. Facilitate a kick-off series of meetings with each District Department to gather available information prepared to date on the US 290 Corridor and provide a summary on:

    *   Program Status
    *   Proposed additions to Key Stakeholders List
    *   Overall project objectives
    *   Key stakeholders in the Corridor
    *   Identification and summary of critical design issues and concerns by Department

13. Deliverables

    *   Log of all data collected and electronic record filed in Program Document Controls, source of data and comments on applicability to program.
    *   Report on bridge data obtained and documentation of existing bridge foundations.
    *   Summary report of Kick-off meetings.

B.  **Field Reconnaissance.**

1.  The PMC shall conduct field reconnaissance and collect data including a video tape driving along the corridor and a photographic record of notable existing features.

CR000306

HNTB.000204

441

2. The PMC shall update the video at least once every year and periodically update the pictures as needed based on construction, development, redevelopment, or other notable changes.

C. **Master Development Plan**

1. Schematic Review and Refinement Recommendations

   a. Assemble a multi-disciplinary team and hold a series of workshops to review the schematics including interfaces/connections with proposed Managed Lanes, considering geometric configurations, traffic operations, long-term maintenance accessibility, safety issues, cost effectiveness, and constructability, in order to identify opportunities for potential refinements. The PMC shall provide the State and their schematic design consultant team with a written schematic review summary and recommendations for potential schematic refinements with supporting documentation.

   b. The PMC shall, as directed and approved by the State, provide preliminary engineering for proposed schematic refinements to be incorporated into the schematic.

   c. The PMC shall review proposed ROW border widths for compliance with State standards and criteria and identify any concerns related to utility relocation conflicts and adequacy of border width to accommodate proposed project improvements such as noise walls, sidewalks, and drainage appurtenances.

   d. Access Management shall be reviewed and assessed.

2. Strategic Development Plan

   The PMC shall accomplish the following tasks:

   a. Review the schematic designs including identified refinements and develop recommendations for design and construction sections considering, as feasible, preliminary cost estimates, drainage features and outfalls, utility relocations and service units, ROW, traffic operations, and potential construction sequencing. The PMC shall provide a Technical Memorandum on recommended sections with supporting documentation and methodology used to develop recommendations.

   b. The PMC shall identify potential "Early Implementation" projects or portions of projects that could be accelerated or performed earlier in the schedule depending on available funding options. The PMC shall provide a Project Phasing Technical Memorandum with recommendations on "Early Implementation" projects.

   c. The PMC shall provide a quarterly update of the Project Phasing Technical Memorandum using statistical decision theory procedures for choosing optimal decisions in the face of uncertainties such as utility impacts, ROW clearance and acquisition issues, changes in funding, and alternate funding opportunities.

3. Preliminary Cost Estimates

   a. The PMC shall prepare Preliminary Construction Cost Estimates for the entire program based upon the schematics and current State average bid item costs. Preliminary Construction Cost Estimates shall be broken down by major cost elements. Appropriate contingencies shall be defined along with applicable back-up supporting recommended value of contingency for a specified cost element as appropriate. Potential cost increase based upon anticipated construction year shall also be considered and noted.

   b. The PMC shall provide an independent team of disciplinary experts that is not involved in the daily performance of the scope of work to perform an independent verification of cost estimates.

4. Deliverables

   - Record of Workshops held concerning schematic development and potential refinement.
   - Master Development Plan Technical Memorandum and Project Phasing Technical Memorandum concerning assessment of schematics and proposed program development.
   - Periodic updates to Master Development Plan and Project Phasing Plan documents.

CR000307

HNTB.000205

442

- Recommendations for schematic refinement with supporting engineering documentation and recommendations for potential implementation.
- Revised schematic documents, as applicable and as approved by the State.
- Preliminary Costs Estimates and methodology for development.
- Periodic updates of Preliminary Cost Estimates during Planning Phase.

D.  **Program Design Criteria**
1.  Evaluate and develop program-wide design criteria, and supply program specific design criteria to guide SDC(s) and to provide uniformity throughout the corridor as applicable. The criteria, standards, and any corridor specific guidelines shall be noted in the applicable sections of the Program Management Plan.
2.  Using the State's Design Concept Conference (DCC) Form, develop a Master DCC for the entire corridor highlighting proposed Design Criteria applicable to the US 290/Hempstead Highway Corridor.

E.  **Traffic Modeling and Planning Studies**
1.  The PMC will perform a Freeway Corridor Capacity and Level of Service Analysis within the program limits along the US 290/Hempstead Highway Corridor.
2.  The analysis will be based on methodologies and guidelines found in the Highway Capacity Manual; Texas Department of Transportation's (TxDOT) Roadway Design Manual; TTI Research Report 1393-4F – "Procedures to Determine Frontage Road Level of Service and Ramp Spacing."
3.  Existing Traffic analysis and models will be refined over the project duration as directed by the State. Traffic engineering software will include Traffic Software Integrated System (TSIS) with CORSIM modeling. CORSIM will include both NETSIM (for surface street simulation) and FRESIM (for freeway simulation). Alternatively, 2000 Highway Capacity Software (HCS) will be used for limited freeway corridor analysis. The latest version of PASSER, Synchro, and/or VISSIMS, as applicable, will be used for signalized diamond intersections.
4.  The PMC will perform the following tasks for evaluating the existing conditions on a need basis and if approved by the District:
    a.  Conduct site inspection and obtain photographs. Record pedestrian and vehicular traffic characteristics, grades and sight distances as observed while in the field.
    b.  Manually record turning movement counts and pedestrian counts at 15-minute intervals at the study intersections during a weekday (Tuesday, Wednesday or Thursday) for the following periods: 6:00-9:00 AM, 9:30-11:30 AM, 12:00-1:30 PM, 2:00-3:30 PM and 4:00-6:00 PM.
    c.  Mechanically record 24-hour classified counts at 15-minute intervals on the freeway main lanes, frontage roads, ramps, weave areas etc. using tubes.
    d.  Record 85th% speeds using tubes or other approved mechanical data collection devices.
    e.  Obtain accident records from the local Law Enforcement during the most recent 36-month period, analyze and prepare collision diagrams.
    f.  Obtain data on bus routes, car pools, vanpools, HOV operation, ramp metering, emergency responders, signal timing etc.
    g.  Provide traffic analysis and modeling for hurricane evacuation route plans as directed by the State.
    h.  Perform Trip Generation/Distribution/Modal Split/Traffic Assignment for any new and/or on-going development as well as revitalization in the vicinity of the study locations that has significant impact on intersection traffic operations.
    i.  Evaluate current year peak hour traffic demand and determine capacity / level of service on 1) US 290 main lanes and frontage roads, main lane and frontage road weave areas,

CR000308

HNTB.000206

443

main lane ramps, 2) signalized intersections along the frontage roads etc. within the study limits.

5. For simulation of the proposed condition the PMC will use State provided plans, traffic data, signal timing, accident data, speed zone strip maps, schematic geometrics and proposed intersections.

6. The PMC shall review traffic measurements obtained to date and traffic projections and provide recommendations related to an approach for update and/or verification of traffic counts as may be warranted.

7. The PMC shall obtain additional traffic counts, as directed by the State, to supplement data and update models for areas of concern related to traffic operations.

8. The PMC shall perform additional traffic studies as directed by the State to respond to changing development and assess impacts of changes to adjacent and intersecting roadways under local agency jurisdiction.

9. Deliverables
   - Report of Corridor Capacity and Level of Service Analysis and recommendations of alternative program implementation.
   - Updates based on periodic traffic counts and adjustments based on development in the corridor and staged program implementation.
   - Traffic Count Data.
   - Traffic and Intersection Studies as needed.
   - Traffic Intersection and adjacent street corridor network models as needed to assess temporary and ultimate proposed signal timing and management of traffic.

F. **ITS Planning, Design and Implementation**

1. Obtain from the State an Inventory of Existing and Planned ITS Systems within the corridor including equipment and infrastructure elements.

2. Determine Systems/Technologies/Concepts of Operation – Technologies currently in use and options to implement an interim ITS plan.

3. Identify System Performance Criteria and Technology Options – Expected performance of the various ITS systems to be deployed in the corridor will be recommended to and agreed upon with the State's Houston District ITS staff.

4. Develop an interim conceptual ITS plan including measures to maintain operability during the construction period based on the Traffic Control Master Plan phasing. Fiber should also always be available. The DPS must always have connectivity accommodated.

5. Coordination and packaging interim design and PS&E development for ITS Control Systems.

6. Develop plans, specifications, and estimates for ITS elements for the interim ITS plans as requested by the State.

7. Design the civil portion of the ultimate traffic management system such as conduits, drill shafts, structures, etc. to be included on each roadway project.

8. The PMC shall be familiar with the location of existing ITS to minimize conflicts. Redundancy in the existing ITS is required to ensure a functioning system at all times.

9. Deliverables
   - Interim conceptual ITS Plan
   - PS&E bidding documents for interim ITS elements.

G. **Urban Planning / Context Sensitive Solutions**

1. Develop Program-wide aesthetic/landscape plan and implementation procedures including elements of the District's Green Ribbon Project. This will include strategies for items to be included with roadway construction contracts and elements that should be implemented following completion of roadway construction project.

CR000309

HNTB.000207

444

2. Coordinate with local communities to develop consistent application of corridor-wide aesthetic/landscape plan. Provide record of meetings and the overall methodology for engaging the public in a context-sensitive design process.
3. Develop corridor-wide standards, as applicable, for use within the corridor. Corridor-wide standards will be signed and sealed by a Registered Landscape Architect, Registered Architect, and/or Licensed Professional Engineer as applicable.
4. Final Design PS&E for landscaping and associated amenities to be constructed following completion of the roadway construction projects.
5. Deliverables
   - Corridor-wide aesthetic/landscape plan and procedures for inclusion into Program Management Plan.
   - Record of all meetings with local communities concerning Context Sensitive Solutions and the Corridor-wide aesthetic/landscape plan.
   - Corridor-wide standards for aesthetics/landscaping for use on the US 290/Hempstead Highway Corridor.
   - PS&E for Landscape and associated amenities to be constructed following completion of the roadway construction projects.

H. **Rail Coordination Services**
1. Coordinate meetings between UPRR Management, the State's Houston District Management, the State's Division Multi-Modal Management and other local agencies related to the interaction of Rail and Highway Operations within the Corridor and potential future uses.
2. Coordinate with UPRR Public Projects representative(s), the State's TP&P Division, and SDC(s), as applicable, to accomplish the following:
   a. Field Diagnostic Investigations
   b. Assembling and submittal of Railroad Crossing Exhibits for all Rail / Highway at-grade and grade separated crossings.
   c. Support development of Railroad agreements for all locations within the Corridor that require such an agreement and track, monitor, and report on status of said agreements.
3. Deliverables
   - Record of all meetings/contacts with the Railroad.
   - White Papers and/or Special Study memorandums concerning coordination with the Railroads and potential future uses within the Corridor concerning Railroad coordination, as directed by the State.
   - Record of Field Diagnostic meetings.
   - Draft and Final assemblies of Railroad Agreements for processing by the State's TP&P Division.

I. **Value Engineering**
1. Assemble a Team of multi-disciplinary experts to support the State in the performance of Value Engineering (VE) Studies. The State shall provide the facilitator for all VE Teams and studies. Value Engineering Studies shall be performed as directed by the State and are anticipated at the following stages:
   a. Preliminary Engineering Phase – Final schematic prior to public hearings and following incorporation of recommendations from the PMC on schematic refinements.
   b. For each design section following the 30% submittal and Design Concept Conference.
2. The PMC shall assemble all needed project reference material, design data, cost estimates and documentation supporting development at the following VE study stages:
   a. Schematic Phase
   b. 30% Design Submittal(s) Stage

CR000310

HNTB.000208

445

3. The PMC Management Team and appropriate State representatives shall attend a presentation of session recommendations on the last day of any applicable VE Study.

4. The PMC shall support documentation of the final VE Study in a final VE Study report for any given VE Study performed.

5. The PMC Program Manager will review the VE recommendations and respond in writing to the State with the PMC's opinion. The PMC shall respond to each recommendation with an approval, disapproval, or proposed modification for implementation. The final approval of the incorporation of any recommendations will be made by the State.

J. **Geotechnical Field Investigations and Reports**

1. The PMC shall determine the location of soil borings for bridge design, embankment settlement analysis, retaining walls, slope stability, and along storm sewer alignment. Once the general location and depth of borings is reviewed by the State and recommendations are made, the PMC shall perform soil borings (field work), soil testing and prepare the soil borings in accordance with Houston District's procedures and using the State's WINCORE program.

2. The PMC shall prepare a geotechnical report(s) to include soil boring locations, general characteristics of the ground conditions, results of settlement analysis and slope stability, laboratory test results, foundation and embankment recommendations, and design capacity curves including skin friction and point bearing for piling and drilled shaft foundations. The report(s) shall be divided into volumes by proposed CSJ.

3. The PMC shall install periodic monitoring wells to measure seasonal fluctuations of the groundwater table such as to predict potential areas requiring dewatering during construction.

4. The PMC shall have prepared soil boring log data sheets, signed, sealed, and dated, for insertion into the PS&E plans. The PMC shall provide these drawings to the SDC(s) for inclusion in the plans and shall also provide locations in a graphical format for use by the SDC(s) in their plan preparation.

5. The PMC shall identify any general notes, special specifications, and/or special provisions that may be required and shall coordinate with the applicable SDC for inclusion on the bid documents.

6. The PMC shall provide personnel involved with the geotechnical investigations and reporting to review the section design plans for adherence to the program recommendations and requirements.

7. Perform a Phase 1 Fault Study(ies) as recommended by the Houston Geological Society. The PMC's Geotechnical Engineer(s) is to review the available geological records and perform site reconnaissance to determine approximate location of fault(s) and whether they are present at the surface. Borings will be drilled to determine the location of the fault plane in the subsurface, surface, and fault dip angle.

8. Deliverables
   - Field records of borings
   - WINCORE data
   - Geotechnical Report(s), signed, sealed, and dated by a Licensed Professional Engineer in Texas, including the results of the field and laboratory testing and results of all geotechnical investigations/recommendations based on the above scope of work.
   - Boring log sheets, signed, sealed, and dated for inclusion in the PS&E plans.
   - General Notes, special provisions, and special specifications as applicable.
   - Fault Study(ies) Report signed, sealed, and dated by a Licensed Professional Engineer in Texas citing available data, field investigations, survey information, interpretations of fault hazard zones, recommendation for fault associated construction and placement of long term benchmarks to monitor fault movement.

CR000311

HNTB.000209

446

K.  Special Studies / White papers / Research Documentation
    1.  As directed by the State, the PMC shall undertake special studies and development of white papers concerning Program Development issues to investigate and develop recommendations for specialty items such as the following:
        a.  Asset Management
        b.  Funding / Financing / Cash Flow fluctuations
        c.  Alternative funding / financing
        d.  Alternative Project Delivery methods
        e.  Third party proposals such as from HCTRA, METRO, Harris County concerning interaction and implementation of modal alternatives in the corridor.
        f.  Third Party proposal from private parties such as utility companies.
    2.  The PMC shall produce white papers and/or reports resulting from all assigned special studies to include documentation of the following:
        a.  Research / Background
        b.  Recommendations for action
        c.  Implementation Options
        d.  Impacts and/or potential results of implementation of recommendations.
    3.  The PMC shall develop a plan to implement the results of any special studies as directed by the State.
    4.  Deliverables
        •  Studies, reports, documentation of research.
        •  Log of Studies, reports, research assignments, and applicable recommendations.
        •  Implementation Plans.

## SOCIAL, ECONOMIC AND ENVIRONMENTAL STUDIES AND PUBLIC INVOLVEMENT (Function Code 120)

A.  Environmental
    1.  Environmental Document Review and Recommendations
        The PMC shall provide Senior Environmental professionals, as requested by the State, to review Environmental Documents as prepared for the Corridor under separate contract with the State and provide written comments and recommendations on such documents.
    2.  Environmental Re-Evaluations as may be required to maintain Environmental approval. The PMC will prepare a Re-Evaluation document and follow such document through approval. Any such document will include, but will not be limited to, discussions of purpose and need, existing and proposed design and alternatives description, alternatives analysis, air/noise computer modeling, historical/archeological assessment, wildlife and endangered species, right-of-way, displacements, socioeconomic and environmental justice impacts, water quality, wetlands, floodplains, permits, aesthetics, and construction impacts as well as secondary and cumulative environmental impacts.
    3.  Environmental Addenda and Supplements. The PMC shall prepare addenda and supplements to the initial NEPA approval as requested by the State to accommodate changed conditions, requirements for additional ROW, addition or modification of detention facilities, impacts of on-going development, discovery of unforeseen conditions such as HAZMAT, archeoligical finds, or historic discoveries.
    4.  Environmental Permits. The PMC shall prepare exhibits and supporting documentation including permit applications as directed by the State for any permits that may be required such as with the USACE.
    5.  Prepare updated exhibits, as necessary, including, but not limited to the following: existing and proposed typical sections, plan layout, noise and air receptor location map, wetlands inventory map, if appropriate, and hazardous sites map.

CR000312

6. Environmental Management System (EMS). Develop and implement an EMS to record and track the implementation of all commitments made in the Environmental documents and as required by any environmental permits.

7. Support the State in coordination with Resource Agencies, the State's Environmental Affairs Division, and the Federal Highway Administration (FHWA), as required, for permitting, re-evaluations, preparation of additional environmental documents, and tracking of commitments made in environmental documents.

8. Environmental Permits Issues and Commitments Sheets (EPIC Sheets). The PMC shall complete the EPIC sheets, coordinate with the State signature on such sheets and coordinate inclusion in each PS&E set.

9. Environmental On-Call Services
The PMC will provide for the services of a qualified Environmental Services Manager, support staff and an "on-call" testing, remediation and mitigation subcontractors to implement the State's existing procedures and methods, ancillary to the State's primary Environmental Consultant or, if directed by the State, take primary responsibility for on call environmental services as specifically requested by the State. Services will include:

    a. Management and oversight of environmental services including development of procedures, protocol, and quality control requirements, in accordance with the State's and Houston District's standards and procedures, as detailed in the applicable section of the Program Management Plan.

    b. Perform Hazardous materials Initial Site Assessments on State ROW or on proposed properties for acquisition in general accordance with protocols established in ASTM 1527 and ASTM 1528.

    c. Assessment of hazardous materials or contaminants on existing bridges and structures in State ROW requiring removal.

    d. Perform Hazardous Materials Site Investigations, Phase I and Phase II ESAs, to investigate areas of potential concern, and identify potential hazardous materials such as contaminated soils or groundwater, presence of asbestos, lead, or other contaminants, etc., and the determination for additional investigations associated with such concerns including the potential requirements for mitigation.

    e. Perform Hazardous Materials detailed site investigations and mitigation plan development, Phase III ESAs, as necessary and as directed by the State based on the results of ESA Phase II studies, to develop approach and plans for dealing with hazardous materials and contamination.

    f. Prepare bid plans and technical specifications for the award of cleanup and mitigation contracts using the State's Service Purchase Order for non-engineering services to accommodate remediation or cleanup preceding the award of construction contracts.

    g. Develop Health and Safety Plan requirements and any special provisions, or special specifications, to accommodate integration of site cleanup with construction contracts where applicable.

    h. Meet with prospective contractors to describe the project and the results of site investigations to discuss requirements of bid specifications related to Service Purchase Order contracts.

    i. Hold workshops with prospective Roadway Construction Contractors to discuss any hazardous materials concerns and any special provisions or special specifications included with a prospective roadway construction contract.

    j. Perform risk assessment modeling and determination to support development of cleanup levels protective of human health and environment.

    k. Perform inspections of buildings, as directed by the State, on ROW to be acquired for assessment of any hazardous materials or other conditions affecting removal of structures and clearing of ROW.

CR000313

HNTB.000211

448

l. Prepare and manage remedial action plans for sites impacted by contamination including field monitoring and detailed site investigations.

m. Perform remediation system design, oversight, and project management as needed to provide for mitigation and cleanup of contaminated areas.

n. Testing and monitoring, as requested by the State, for air quality, hazardous materials, contaminated soils and groundwater contamination.

o. Act as an agent for the State in the execution of disposal manifest.

p. Provide engineering support, assistance, and oversight as needed, including permit applications, design specifications, and reviewing engineer-sealed plan sets.

q. Monitor costs and identify potential costs associated with corrective action of LPST sites that are eligible for reimbursement from the Petroleum Storage Tank Remediation Fund and review work performed for conformance with Reimbursable Cost Guidelines set forth in 30 TAC Chapter 334.

r. Appear as an expert witness in any hearing or tribunal, when requested by the State.

s. Perform services necessary to provide guidance, oversight, and recommendations for the State to achieve cleanup and regulatory closure in conformance with the Texas Underground and Aboveground Tanks Program (30 TAC 334), Texas Risk Reduction Rules (30 TAC 335), Texas Risk Reduction Program (30 TAC 350) and/or other applicable program regulations and requirements.

10. Deliverables

a. Environmental Documents including re-evaluations, addenda, and supplements.

b. Environmental Permits and Exhibits as applicable.

c. Environmental Management System reports.

d. EPIC Sheets

e. Meeting summaries and agendas for all meetings including meetings with the State's Environmental Affairs Division, other State Divisions/Departments, FHWA, and all applicable third parties.

f. Reports for all assessments of potentially hazardous material including ESAs Phase I, Phase II, Phase III, mitigation recommendations.

g. Bidding plans and specifications for State's Service Purchase Order for non-engineering services.

h. Health and Safety Plan recommendations.

i. PS&E plans, special specifications, and/or special provisions.

j. Testing and monitoring reports.

k. Project diaries, logs and other documentation regarding all phases of work as performed.

l. Chain of Custody forms, sample analyses, quality control documentation, documentation of proper waste disposal including disposal manifests, final disposition of PSTs, site diagrams, photographs, correspondence, licenses, permits, and other documentation relating to work and services performed.

m. Documentation that supports and correlates the project budget estimate for each work request.

n. When specified, all deliverables (maps, reports, correspondence, invoice documentation, etc.) in electronic format compatible with the State

B. Public Involvement and Communications

1. The PMC shall collaborate with the District PIO and develop a Public Information and Communications Plan (PICP) which will be integrated as a part of the Program Management Plan. The PICP shall contain procedures to demonstrate how the PMC shall:

CR000314

HNTB.000212

449

a. Gain and maintain public support, building on existing community partnerships and communication networks.
b. Provide the public with opportunities for input.
c. Accommodate any bilingual requirements identified for program related materials.
d. External e-mails responded to in less than 24 hours.
e. Web inquiries responded to immediately noting that message was received and then provide an official response in 5 working days.
f. Demonstrate to the public that the Program will be developed pursuant to a well-executed plan.
g. Notify the public in advance of key Program ROW acquisition, construction, operations, maintenance activities and communicate the potential impacts of these activities.
h. Develop, disseminate and display timely, high quality, innovative, user-friendly, accurate and appropriate community information including exhibits showing slope grading, drainage, bridge structures, retaining walls, sound walls and ROW acquisition.
i. Develop and manage a public relations campaign and communication strategy to convey key messages, branding and pertinent information about the Program.
j. Develop a forum to coordinate on-going dialogue among the public, community groups, the State, and the PMC.
k. Prepare and distribute Program-related materials to inform the public such as: meetings, interviews, media kits, news releases, telephone correspondence, newsletters brochures, e-mail, hotlines, HCR, dynamic message boards, web alerts, public opinion polls/surveys, videos, display booths, presentations, public access information kiosks, and special events.
l. Organize and manage meetings with key elected officials, the general public, representatives of civic organizations, businesses, and special interest groups along the Corridor (individually or in groups) for the purpose of building rapport with affected stakeholders.
m. Create and develop advertising messages, including graphics, logos and slogans.
n. Place Program-related messages in the appropriate media.
o. Develop and distribute public service announcements, paid advertising, news reports.

2. The PMC shall provide a Public Information Coordinator and support personnel to lead the Public Information Program and responsibility for public involvement activities on a day-to-day basis. The Public Information Coordinator shall:
a. Provide the primary point of contact between the PMC Team, the State, and the public and act as clearinghouse for the receipt and response to written or verbal comments/inquiries regarding the Program.
b. Lead the production, implementation, audit, quality control/quality assurance and update of the PICP.
c. Coordinate and supervise day-to-day activities of PMC Team's personnel in performing the activities described in the PICP.
d. Facilitate communication among the State, the PMC, and local agencies.
e. Support the State in communication with all State and Federal Agencies.
f. Interact with affected Public and represent the interests of the State at associated public meetings and other formal and informal meetings.
g. Develop a "first-hand feel" for public concerns and reactions regarding the Corridor and the public information program and incorporate that knowledge into improving the PICP.
h. Liaise with the person assigned to coordinate the initial response to any Incident or Emergency and any Government Entity that may have jurisdiction in the Emergency as noted in the PICP.

3. The PMC shall specifically provide for the following services:

CR000315

HNTB.000213

450

a. Provide, host, and maintain, an interactive Public Involvement Web-site and public e-mail address for logging comments and inquiries. The PMC shall keep the web-site up to date on the Program development and shall respond to all inquiries. The PMC proposes to design the project website in conjunction with a customized content management tool, which will allow non-Technical project team members to support web page maintenance by selecting web pages from a standard set of templates, populate the web pages with content, push them through an approval process, and publish them upon approval.

b. Monitor implementation of the PICP and report to the State District's PIO status and effectiveness of the Program and recommend modifications to the PICP.

c. Update and publish applicable updates to the PICP.

d. Perform a public opinion survey at the beginning of the Program to ascertain the public's opinion and understanding of the Program.

e. Provide support and oversight for the preparation of scripts, graphics, and all other materials as needed for presentations, as requested by the State.

f. Make presentations on behalf of the State, as requested including community groups and seminars/industry events as requested by the State.

g. Coordinate and support small group gatherings with community associations, business groups, or other entities at table-top and town hall type meetings to disseminate program related information and updates.

h. Provide support and oversight for the preparation of multi-media public communications that include, but are not limited to:
   - materials for project website
   - updates and articles for project newsletter
   - press releases and media kits
   - legal notices and advertisements
   - district updates
   - outreach materials for minority and under-represented populations

i. Provide materials, supplies, and development of multi-media tools including set-up and disassembly where applicable of multi-media tools, as approved by the State, such as kiosks, video ipods, plasma screen displays, etc.

j. Provide a web-based public kiosk solution. Such solution will serve as an extension of the public website and will incorporate similar content pertaining project status and information. The kiosk will be wirelessly updated on an as needed basis

k. Provide 3-D models for key elements of the program including the following:
   - IH 610 / Managed Lanes / US 290 / IH 10 Interchange complex
   - Beltway 8 Interchange
   - SH 6 Interchange
   - Grand Parkway Interchange
   - Other locations as directed by the State

l. Develop 3-D animation for completed construction and/or to demonstrate construction sequencing / development to support public meetings, public involvement, agency meetings, and coordination with third party interests such as utilities, jurisdictional agencies, the UPRR, METRO, and Harris County. Animations of these 3D models will be rendered and can be used to provide the public with visual depictions of the future roadway enhancements. The animations will consist of virtual cameras that will be developed to explore the 3D model as flyovers and driver perspectives at locations of interest and/or concern along the proposed corridor. The animations will also include a bilingual narration audio overlay developed from scripts that will be provided by the PMC's Public Involvement Group in coordination with the District's PIO. Additionally, the animations may include construction phasing sequences to help educate the public

CR000316

HNTB.000214

451

with construction schedules and considerations. The 3D model will be a reusable asset for any future considerations such as revisions due to additional refinements to the design, new animation paths, and potential real-time exploration. Development and production of additional materials for use in future public presentations may include - but are not limited to - high resolution stills for poster displays, interactive kiosk and DVD menu development, web streaming content.

m. Establish and staff a Program Hotline and publicize the hotline number. The PMC shall log all communications and associated responses.

n. Maintain and update a Stakeholders database.

o. Organize a Citizen Advisory Group to work with the state on the education component of the project. The group will be made up of diverse representatives from the community with an interest in the US 290 project. The group will work to develop messages that will be received by the community. The PMC will be represented at each of these meetings by its on-site Public Information Office staff member(s).

p. Organize a Political Advisory Group composed of political representatives and senior staff of local agencies considered as having a stake in the US 290/Hempstead Highway Corridor. This group will offer decisions and provide insight into the political and community aspects of the program. The PMC will be represented at each of these meetings by its on-site Public Information Office staff member(s).

q. Host public meetings, hearings and open houses as requested by the State. The PMC will provide the presentations and informational materials for the meetings, to include sign-in sheets, displays, exhibits, and/or renderings for distribution and/or display. Multiple displays, renderings, and photo enhancements will be developed to illustrate community cohesion, integration with adjacent contexts, and overall look of facilities.

r. Organize, develop and train a speaker's bureau to act as speakers for various community groups. The PMC will assist in locating and organizing various meetings for presentations on the US 290 project. The speakers will be provided with speakers packets that will include approved project information for the community. In addition, the PMC will track the activities to include as part of the public involvement effort.

s. Coordinate, implement and provide results of a web or phone-based survey of Houston residents to collect immediate feedback and comments on project related activities. The groups will be used to test various ideas and messages and provide valuable information that can be used in the development of the public involvement program for the project.

t. Coordinate and implement community round-table meetings/discussions to maintain communication with the community stakeholders throughout the public involvement process.

## RIGHT-OF-WAY DATA (Function Code 130)

A. Right-of-Way and Utility Information Management System

1. A total of three (3) GIS Application Development Steering Committee meetings will be conducted by the PMC to gather feedback and review deliverables for modification and program implementation of HNTB's developed GIS based ROW and Utility Information Management System.

   a. A Requirements Document and Design Approach review meeting to gather feedback prior to design and development activities required to implement the identified modifications and enhancements.

   b. A Mid-Task Development review meeting to present PMC progress-to-date and gather final feedback.

   c. A Final Deliverable meeting to present the final solution.

CR000317

HNTB.000215
452

2. Requirements Gathering

During the Program Assessment Phase, the PMC will interview 3 to 5 representatives of the State as identified by the GIS Application Development Steering Committee to document functional, design and content requirements and review functionality of existing tool. A final list of requirements, including required modifications, will be compiled into a Requirements Document for presentation to the GIS Application Development Steering Committee during the Requirements Document and Design Approach review meeting for approval.

3. Data Items

The PMC will work with the State to identify a complete list and definition of all required utility and right-of-way data items. An outline of identified data items will be presented at the Requirements Document and Design Approach review meeting for feedback. A final list and definition of data items will be documented in the Requirements Document.

4. Graphics Map Data

The PMC will work with the State to identify a complete list and definition of all required graphics data items. An outline of identified data items will be presented at the Requirements Document and Design Approach review meeting for feedback. A final list and definition of data items will be documented in the Requirements Document.

5. Graphics Functionality

The PMC will work with the State to identify a complete list of required map functionality. An outline of identified functionalities will be presented at the Requirements Document and Design Approach review meeting for feedback. A final list and definition of map functionality will be documented in the Requirements Document.

6. Data Maintenance Functionality

The PMC will work with the State to identify a complete list of required data maintenance functionality. An outline of identified functionalities will be presented at the Requirements Document and Design Approach review meeting for feedback. A final list and definition of map functionality will be documented in the Requirements Document.

7. Tracking Tool Design Approach

The PMC will develop an application graphical user interface (GUI) based upon the *Graphic Identity Design Guidelines* and Requirements Document. The design will consist of the application web site's main page, a search and search results page, a detailed data screen, and an example report. The design will be presented to the GIS Application Development Steering Committee during the Requirements Document and Design Approach review meeting for feedback. Modifications to the GUIs and report format will be discussed and finalized to create the primary design.

8. Utility and ROW tracking application implementation process

The application web site and associated administrative, hosting and operational tools will be incorporated using industry-standard software and methods regularly used by the PMC development team. Conformance with existing State GIS policies, procedures, infrastructure, initiatives and data will be given high priority. Compliance with and deviations from existing GIS policies, procedures, infrastructure and data will be noted in the Requirements Document.

10. Data Management

Utility and right-of-way information will be maintained through the application by the PMC and those assigned by the State that have will have oversight responsibility for utility relocations and right-of-way acquisition.

11. Utility and Right-of-Way Tracking Application Training

The PMC will provide training on the use of the ROW and utility tracking tool to designated State representatives and to the third party ROW Acquisition Provider (ROWAP) personnel.

CR000318

HNTB.000216

453

B. ROW Acquisition Management and Services

1. Provide a full time ROW Acquisition Task Manager and Assistant Task Manager along with associated support personnel for management and administrative tasks.

2. Provide access to ROW management personnel and project files within the Program Office including accommodations for an open door policy with the public during normal State work hours. All questions or concerns from the public shall be recorded and recommendation for follow up, as applicable, made within 24 hours.

3. The PMC shall hold two workshops with the State District ROW personnel to finalize example ROW packages and development of the ROW section of the Program Management Plan including Quality Control checklists for review of Final ROW packages.

4. Identify landowners on the project
   a. Prepare initial property owner contact list and drafts of Acquisition Provider introduction letters.
   b. Maintain and Update property owner database including:
      * addresses
      * phone numbers
      * tax identification number

5. Make recommendations and keep a log of appraisal services assignments.

6. Weekly status meetings to identify any potential problems that could cause delays and develop approach to resolve. Weekly meetings will be held to help facilitate and avoid any delays.

7. Support the State in the procurement of a third party ROW Acquisition Provider (ROWAP) including the following:
   a. Support preparation of the NOI and supporting independent estimate of potential fee for the State District ROW Department to forward to Austin.
   b. Support review of LOI submittals for conformance with NOI requirements.
   c. Draft and make recommendations on the scope of services for the ROWAP.
   d. Support the State in negotiations with the ROWAP and assessment of fee proposals submitted.

8. Monitor all activities to insure all State polices and guidelines are followed. Monitor all acquisitions and relocations to insure they are handled in compliance with Title II and III of the Uniform Act of 1970

9. Notification of impending project to adjacent landowners

10. Make contact and stay current with all brokers and real estate agents along the corridor

11. Meetings and discussions with METRO concerning transit development opportunities

12. Look for early opportunities for making offers and appraisal assignments. Assess and prioritize parcels including identification of parcels critical to permit utility relocation activities, displaces requiring relocation and billboards requiring variance approval by the City of Houston or other cities. Also identify and track parcels qualifying for Advance Acquisition.

13. Develop appraisal plan that allows prompt offers that will reduce future appraisal updates

14. Review all environmental concerns before appraisals ordered.

15. Review ROW and land use to develop potential revision to eliminate unnecessary takes and costly and lengthy negotiations.

16. Review utility easement locations to discuss their relocation with the utility coordinator.

17. File Management:
   a. Prepare warrant transmittal request utilizing State standard payment submissions forms with supporting documentation.
   b. Maintain records of all payments including warrant number, amount, and date paid, etc.
   c. Maintain copies of all incoming and outgoing correspondence and contact with property owners.

CR000319

18. Final ROW Acquisition Package Review and Approval.
19. The PMC shall assess all concerns or unusual circumstances identified, including parcels splits, impacts to remainder, etc., and provide appropriate research back-up and provide recommendations to the State on how to proceed for State review and approval.

C.  **Title Services**

1. Coordinate with the ROWAP and provide management oversight and review on Title Services to accomplish the following:
   a. Secure a current title commitment. A current title commitment is considered good if less than 90 days old and must include a five-year sales data from the Title Company that will be providing title insurance.
   b. Preparation and submittal to the District of a written notice to the negotiator of title issues and proposed resolutions.
   c. Secure title commitment updates in accord with insurance rules and requirements for parcel payment submissions and/or eminent domain package submission.
   d. Secure title insurance for all parcels acquired, insuring acceptable title to the State. Written approval by the State required for any exception.

2. For Parcels assigned to the PMC to provide Title Services, perform the Title Service tasks noted above.

D.  **Initial Appraisal Services**

1. Coordinate with the ROWAP and provide management oversight and review on Initial Appraisal Services to accomplish the following:
   a. Verify Appraiser selected from the State's list of state approved fee appraisers and is available to complete the assignment(s). This approved appraiser list will be available for review at the PMC office, all District offices or the Right of Way Division Office at 118 E. Riverside Drive, Austin, Texas, upon request.
   b. Permission secured from the owner to enter the property from which land is to be acquired. If the Acquisition Provider, after diligent effort, is unable to secure the necessary letter of permission from the property owner, a waiver must be obtained, in writing from the State. Maintain documentation with appraisal reports.
   c. Prepare and conduct personal pre-appraisal contact with interest owner(s) for each parcel using acceptable State forms. Identify items such as PSTS and Water Meters and Vaults.
   d. Contact property owners or their designated representative to offer opportunity to accompany the appraiser on the appraiser's inspection of subject property. Maintain record of contact in file.
   e. Prepare complete appraisal report for each parcel to be acquired utilizing State forms No. ROW-A5, ROW-A6, ROW-A7, ROW-A8, as applicable. These reports shall conform to State policies and procedures along with the Uniform Standards of Professional Appraisal Practices.
   f. As necessary, prepare written notification to the State of any environmental concerns associated with the right of way to be acquired which could require environmental re-mediation.
   g. All completed appraisals assembled and submitted for final approval administratively by the District Right of Way Office and packaged for forwarding with recommendation for approval by the District Engineer or ROW Division Director as appropriate.
   h. As necessary, coordinate with the appraiser to appear and/or testify as an Expert Witness in eminent domain proceedings and be available for pre-hearing or pre-trial meetings.
   i. As necessary, the appraiser will coordinate with review appraiser regarding revisions, comments, or additional information that may be required.

CR000320

HNTB.000218

455

2. For Parcels assigned to the PMC to provide Initial Appraisal Services, perform the Initial Appraisal Services tasks noted above.

E. **Initial Appraisal Review Services**
1. Coordinate with the ROWAP and provide management oversight and review on Initial Appraisal Review Services to accomplish the following:
   a. Verify Review Appraiser selected from the State's list of state approved fee appraisers.
   b. Review all appraisal reports for each parcel to determine consistency of values, supporting documentation related to the conclusion reached and compliance with State policies and procedures and the Uniform Standards of Professional Appraisal Practices.
   c. Completed State Form ROW-A10 "Tabulation of Values", for each appraisal.
2. For Parcels assigned to the PMC to provide Initial Appraisal Review Services, perform the Initial Appraisal Review Services tasks noted above.
3. Complete appraiser evaluations as required.

F. **Appraisal Update Services**
1. Coordinate with the ROWAP and provide management oversight and review on Appraisal Update Services to accomplish the following:
   a. Timely complete appraisal updated for the parcel to be acquired utilizing State Form No. ROW-A5, which will be furnished to the Acquisition Provider by the State. These reports shall conform to State policies and procedures along with the Uniform Standards of Professional Appraisal Practices.
   b. Written notification made to the State of any environmental concerns associated with the right of way to be acquired which could require environmental remediation. Provide completed appraisals with recommendation to the District Right of Way Office for approval by the District Engineer or his/her assigns.
   c. As necessary, coordinate with the appraiser to appear and/or testify as an Expert Witness in eminent domain proceedings and be available for pre-hearing or pre-trial meetings.
2. For Parcels assigned to the PMC to provide Appraisal Update Services, perform the Appraisal Update Services tasks noted above.

G. **Appraisal Review Update Services**
1. Coordinate with the ROWAP and provide management oversight and review on Appraisal Review Update Services to accomplish the following:
   a. Verify appraiser selected from the State's list of State approved fee appraisers.
   b. Compliance with State policies and procedures and the Uniform Standards of Professional Appraisal Practices.
   c. Completed State Form ROW-A10 "Tabulation of Values", for each appraisal.
2. For Parcels assigned to the PMC to provide Appraisal Review Update Services, perform the Appraisal Review Update Services tasks noted above.

H. **Right of Way Negotiations**
1. Coordinate with the ROWAP and provide management oversight and review on Right of Way Negotiation Services to accomplish the following:
   a. Appraisal and appraisal review reports were analyzed and the State's approved value confirmed prior to making an offer for each parcel.
   b. Initial offer letter prepared, memorandum of agreement, instruments of conveyance, and any other documents required or requested by the State on applicable State forms.
   c. Contact made with each property owner or owner's designated representative, to present the written offer in person where practical, and deliver appraisal report and required

CR000321

HNTB.000219

456

brochures. Maintain follow-up contacts and secure the necessary instruments upon acceptance of the offer for the closing.

d. Provide a copy of the appraisal report for the subject property exclusively to the property owner or authorized representative at the time of offer. Maintain original signed Receipt of Appraisal.

e. Response to property owner inquiries verbally and in writing within two business days.

f. Preparation of a separate negotiator contact report for each parcel per contact on State form ROW-N94.

g. Parcel files maintained of original documentation related to the purchase of the real property or property interests.

h. Property owner advised on the Administrative Settlement process. Within 30 days of initial offer (unless an additional 30 day extension is requested), transmit to the State any written counter offer from property owners including supporting documentation, and Acquisition Provider recommendation with regard to Administrative Settlements in accordance with State policy and procedures.

i. Final offer letter and documents of conveyance prepared as necessary within 30 days of initial offer.

j. Make provision for the inclusion of Bisection Clauses of the Deed.

k. Address access issues with Design and make recommendations to the State.

l. Coordinate Expert Witness Testimony by Acquisition Provider as necessary.

2. For Parcels assigned to the PMC to provide Right of Way Negotiations, perform the Right of Way Negotiations tasks noted above.

I. **Closing Services**

1. Coordinate with the ROWAP and provide management oversight and review on Closing Services to accomplish the following:

a. Coordinate with the State and title Company to obtain an updated title commitment along with other Forms and certified copy of the instrument of conveyance necessary when requesting the Parcel Payment from the District. Clear all necessary liens incumberances etc., before closing.

b. Coordinate with Acquisition Provider to attend closings and provide closing services in conjunction with Title Company.

c. Verify Acquisition Provider has recorded all original instruments immediately after closing at the respective County Clerk's Office, except for donations which must be forwarded to the State for acceptance by the Commission prior to recording.

d. Delivery of State "Property Owner Survey" and if applicable, the "Relocation Survey" to the property owner at the closing.

2. For Parcels assigned to the PMC to provide Closing Services, perform the Closing Services tasks noted above.

3. Prepare Affidavit of Inspection as required by Title Company.

J. **Relocation Assistance**

The PMC shall coordinate and perform the administrative requirements necessary in order to relocate any occupants from Final ROW. All services with respect to relocation assistance shall be performed in accordance with applicable law, including the Uniform Act and State standards, and in accordance with all provisions of this Agreement.

1. The PMC shall maintain a relocation office within the Program Office. At a minimum, the office hours of the relocation office shall be posted to meet normal state work hours. In addition to the office hours, the PMC shall be available to all displacees for relocation services at the convenience of the displacees.

CR000322

HNTB.000220

457

2. PMC's major activities with respect to the relocation assistance of occupants from Final ROW includes:
3. Prepare a "Relocation Plan" in accordance with the State's Right of Way Manual, Volume 3, Chapter 8, Section Relocation Program Planning and Construction;
   a. Monitor relocation assistance activities;
   b. Assist with all requests and be responsible for answering initial requests for, Review/Appeal Process and judicial reviews.
4. Relocation assistance shall be provided strictly in accordance with the law, and, in particular, the Uniform Act and State standards. The PMC shall coordinate with the ROWAP and provide management oversight and review on Relocation Assistance Services to accomplish the following:
   a. Personal Property Relocation Services
      1. All property owners and potential displaces notified of eligibility for relocation assistance and provide them with a Relocation Assistance Brochures at time of initial contact. The State will provide brochures to the PMC and ROWAP. If possible, advise displacee of preliminary relocation benefits at this time including any incentive programs.
      2. Completed State Form ROW-R96 (Relocation Advisory Assistance-Parcel Record) for all displacees.
      3. 90-day notice provided to vacate simultaneous with the delivery of relocation benefits package.
      4. Once property acquired, issue a sixty day notice if displacees have not vacated and if the parcel has been acquired, a 30-day letter issued. Notify the State's District Office immediately if displacees do not move after 30-day notice.
      5. Requested moving estimates from moving companies as needed. Coordinate moves with displaced business owners and tenants in accordance with State procedures.
      6. Coordinate availability of Relocation agent for any appeals or hearings.
   b. Residential Relocation Services
      1. All property owners and potential displacees notified of eligibility for relocation assistance and provided with a Relocation Assistance Brochure at time of initial contact. The State will provide brochures to the PMC and ROWAP. If possible, advise displacees of preliminary relocation benefits at this time including any incentive programs.
      2. Completed State form ROW-R96 (Relocation Advisory Assistance-Parcel Record) for all displacees.
      3. Located, evaluated and maintenance files on comparable available housing for State form ROW-R106
      4. Calculated replacement housing supplement benefits for State form R107 (Supplement Payment Estimate-Replacement Housing).
      5. Submitted completed State forms ROW-106 (original only) and ROW-R107 (original and 2 copies) to the District Right of Way Office. Include supporting photographs.
      6. Provided 90-day notice to vacate simultaneous with the delivery of relocation benefits package.
      7. Sixty days later if displaces have not vacated and if the parcel has been acquired, a 30-day letter issued. Notify the State's District Right of Way immediately if displaces do not move after 30-day notice.
      8. Performed a decent, safe and sanitary (DSS) inspection of the replacement housing in accordance with State policy. Prepared and submitted State Form ROW –R116 to the District Right of Way Office.
      9. Requested moving estimates from moving companies as needed. Coordinate moves with displaced business owners and tenants in accordance with State procedures.

CR000323

HNTB.000221

458

10. Submitted requests for relocation payments including forms: Updated ROW-R96 (Relocation Advisory Assistance-Parcel Record) ROW-R99 (Claim for Actual Moving Expenses), ROW-R100 (Claim for Fixed Moving Expense Payment-Individual and Families ), ROW-R105 (Claim for Payment of Rent Supplement), ROW-R113 (Claim for Payment of Down Payment or Housing Supplement), ROW-RCE (Certification of Eligibility), ROW-R166 (Replacement Housing Inspection), and any other applicable forms and support documentation. Ensure owners have terminated all utilities and request all meters be removed.

11. Transmittal of memorandum and completed file to State's District Office

12. Coordinate availability of Relocation agent for any appeals or hearings.

c. Business Relocation Services

1. All property owners and potential displaces notified of eligibility for relocation assistance and provided with a Relocation Assistance Brochure at time of initial contact. The State will provide brochures to the PMC and the ROWAP. If possible, displace advised of preliminary relocation benefits at this time including any incentive programs.

2. Completed State Form ROW-A96 (Relocation Advisory Assistance-Parcel Record) for all displaces.

3. 90-day notice provided to vacate simultaneous with the delivery of relocation benefits package.

4. Once acquired, send thirty day notice to owner/tenants. Sixty days notice if displaces have not vacated and if the parcel has been acquired, 30-day letter issued. Notify State immediately if displaces do not move after 30-day notice to affect eviction process.

5. Requested moving estimates from moving companies as needed. Moves coordinated with displaced business owners and tenants in accordance with State procedures.

6. For complex business moves estimated to cost over $20,000

   a. Prepared dated, written moving plan signed by both the displacee and the relocation agent.

   b. Moving plan in compliance with State requirements and recognized moving principles. The moving plan must contain the method of move, i.e., commercial, self-move, etc.

   c. Clear descriptions of the property to be moved, date of move, appropriate photographs, appropriate sketches, and the location and distance to the replacement site.

   d. Outline of work specifications and requirements for each pahse of the move detailing identification of items requiring removal, re-installation and any special handling, packing, or crating.

   e. Documented inventory of personal property to be moved for non-residential moves.

   f. Closings attended on replacement property if requested by any party involved and assurance supplement payment is properly distributed and "Relocation Survey" is delivered to displacee.

7. For non-complex business moves estimated to cost $20,000 or less
An abbreviated written moving plan. The difference in the non-complex moving plan is that it can be prepared and signed solely by the relocation agent. Ensure owners have terminated all utilities and required meters be removed.

8. Relocation agent available for any appeals or hearings.

CR000324

HNTB.000222

459

K.   **Condemnation Support**

The PMC shall support condemnation efforts as directed by the State and coordinate the involvement of the ROWAP as follows:

1.  Make provisions for preparation of a Bisection Clause for the original set of Legal Descriptions supplied by the State if applicable.
2.  Review and prepare, as applicable, Form ROW-E49 used to join all interested parties. If married, spouses of owners must also be joined unless separate property is declared.

Pre-Hearing Support

1.  Notify the State of any potential condemnation and document the reason(s) for condemnation including recommendations for property closure.
2.  Upon delivery of a copy of the final offer, have request made for an updated title commitment for Eminent Domain from the Title Company.
3.  Upon verification of From ROW-E49, prepare a packet containing 2 copies each of the following documents: ROW-E49 from, Commitment, Negotiator's Reports, Appraisal Acknowledgement, Pre-Appraisal Contact Sheet, signed and sealed property description, and plat, Final Offer letter, any correspondence from the land owner or representatives, along with one copy of the appraisal report. Submit packet to the District ROW Office for submission to the Right of Way Division.
4.  Address 49 deficiencies as required by ROWD.
5.  Upon receipt of concurrence for the Appraisal Witness, request the update of appraisal.
6.  Upon receipt of packet prepared by the Attorney General's Office which will include Petition for Condemnation, Lis Pendens, Order Appointing Commissioners, Order Setting Hearing, Oath of Special Commissioner, and Notice of Hearings, coordinate with provider the filing of the original petition with the County Court at Law or other appropriate Court for a cause number to be assigned.
7.  Coordinate filing the Petition and Lis Pendens including the cause number with the County with the County Clerk's Office.
8.  Upon assignment of a court, coordinate filing the Order of Appointing Commissioners with the judge retaining a copy of the Order for the files.
9.  Following appointment of Commissioners by the judge, secure the following documents: Oath of Commissioners signed by the Commissioners, Order Setting Hearing, 2 copies of the Notice of Hearing signed by the Commissioners.
10. File all originals with the court and send copies marked "copy" to the State's District Office and the Assistant Attorney General.
11. Send a copy of the petition to the Title Company so that the title Company can make sure the appropriate parties were joined and that no changes in title have occurred.
12. Set the Commissioners Hearing after the updated appraisal has been submitted, if there is no change in value. If there is an increase in value, PMC will make a revised offer. The PMC shall prepare a final offer letter and submit a copy of the final offer letter.
13. Coordinate a conference room or court room reservation for the hearing.
14. Coordinate the hearing date with the Assistant Attorney General, Appraiser, the State's Representative, three commissioners, and a court reporter.
15. Coordinate a pre-hearing conference prior to the hearing (the day before or earlier) to discuss the facts of the case with the Assistant Attorney General, Appraiser, and the State.
16. After the hearing is set, serve Notices of Hearing to the indicated parties at least 11 days prior to the Commissioner's hearing. If it is necessary to join the Federal Government, the Notice of Hearing must be served 60 days prior to the Hearing. Make arrangements for Citation by Publication if needed.

CR000325

HNTB.000223

460

17. Once the notices have been served, file the original notices with the court and send copies stamped "copy" to the State and Assistant Attorney General.
18. Send a reminder letter 2 to 3 weeks in advance to the Assistant Attorney General, Appraiser, three Commissioners, Court Reporter, and the State concerning Hearing dates.
19. Depending on the market conditions or if over six months have elapsed since the date of the initial offer, contact the attorney handling the case for the State and confer about the advisability of preparing an updated appraisal. If it is determined that an updated or new appraisal is determined to be necessary or desirable, the PMC shall schedule and arrange for such appraisal with the original appraiser.
20. Coordination with the State on behalf of the Attorney General as to the need for a land planner. The land planner report should be completed and forwarded to the appraiser before the updated appraisal is completed.
21. Upon request, provide a land planner to perform a land planner report.
22. Review the updated appraisal and submit to the attorney handling the case. The State must approve any revised offer in writing prior to an offer letter being sent within ten (10) Business days of receiving the updated appraisal. If a revised offer is approved by the State, prepare a final offer letter, make the revised offer to the property owner or other holder of a compensable interest, as applicable, and submit a copy of the final offer letter to the State.

Post Hearing Support
1. For the hearing, prepare Form ROW-E73 and commissioners time sheets. Submit Form ROW-E73 to the State's District Office.
2. Obtain signatures of Commissioners on the Award of Commissioners and file with the court for the judge's signatures within 48 hours of the Hearing.
3. Give timesheets to the Judge. The Judge determines amount paid to Commissioners.
4. Obtain and distribute 3 certified copies of the award as follows: 1 certified copy to the title company with a request for a commitment, 1 certified copy to the Assistant Attorney General, 1 certified copy to the State with the Commitment to request the warrant in the amount of the Commissioners' Award.
5. Send the Commitment and the Award to the State's District ROW Office, along with individual commissioner's Billing Statement Form 132 requesting payment for their fees, and evaluation of appraisers testimony and availability.
6. Deposit State warrant in the registry of the court. File a Notice of Deposit with the court and send certified copies to each defendant notifying them of the date of the deposit. The Date of the Deposit is the Date of Take.
7. Take photograph of the interest to be acquired on the day of deposit for relocation verification and coordinate jury trial and appraisal photographs with District appraisers.
8. Send written notices of the date of deposit to the State's District ROW office and all interested parties.
9. Appear or coordinate appearance of Expert Witness as requested. Sub-contractors or members of the ROWAP may also need to appear as Expert Witnesses as requested.
10. File Objections.

L.   Clearance/Demolition of Final ROW
Prior to demolition of any improvements, the PMC shall provide to the State, photographs of the property and all improvements, unless the Special Commissioner's Hearing has been completed and objections have not been filed. The PMC shall also have photos of personal and any other items of dispute in and of a quality suitable for presentation as evidence in court. Following acquisition or possession of any parcel of Final ROW, the PMC shall:

CR000326

HNTB.000224

461

1. Coordinate with the owner and occupants to assure the clearance of personal property from the Final ROW, as applicable.
2. Secure Governmental Approvals required for demolition and environmental surveys or tests, and notify the State in writing of all such activities.
3. Test for Asbestos.
4. Prepare necessary documentation for disposal of improvements, fixtures and buildings in accordance with applicable laws and submit the same to the State.
5. Provide written notification to the State of any real and/or personal property remaining on the Final ROW after vacated by the occupants and not acquired as part of the acquisition.
6. Right after vacate, terminate all utility services when appropriate.
7. Process all required forms, documents and permit applications in order to proceed with the timely demolition or removal of any and all improvements, buildings and fixtures located within the Final ROW, as applicable.
8. Notify the State upon completion of the demolition and clearance of the Final ROW, as applicable.

**M.** Deliverables

In administering and managing its Final ROW activities, the PMC shall:

a. Maintain parcel records on file of all aspects of the acquisition process in accordance with State requirements and applicable Law. Each parcel file shall include all documents required by the Contract Documents, Federal Highway Administration, and/or the State.
b. Provide monthly summaries of Facility expenses including amounts authorized, amounts paid and budget forecasting on a parcel-by-parcel and overall Program basis as requested by the State.
c. Provide budget projections and anticipated funding requirements every thirty (30) days and more frequently as requested by the State.
d. Maintain and electronically transmit to the State, in a format acceptable to the State, monthly status reports of all parcels and activities related to Schematic ROW, acquisition and disposition of Additional Properties and acquisition and disposition of temporary easements or other property interests, and provide weekly (or as requested) updates to the State.
e. Evaluate and report to the State, Acquisition Consultant's status and performance on a monthly basis or more frequently as requested.
g. Prepare and submit to the State, on a monthly basis, an electronically or a spreadsheet that contains Final ROW specific data required by the State ROW Division's Right of Way Information System (ROWIS) tracking software program or as directed by the State.
h. Input and update parcel status in the Program's web based tracking system.

**N.** Utility Coordination, Investigation, and Engineering Services
1. **Utility Engineering Investigation (currently Subsurface Utility Engineering)** including utility investigations subsurface and above ground prepared in accordance with AASHTO standards and Utility Quality Levels as follows:
   1.1. As defined in Attachment C.
   1.2. Designate (Quality Level B). Designate means to indicate the horizontal location of underground utilities by the application and interpretation of appropriate non-destructive surface geophysical techniques and reference to established survey control. Designate (Quality Level B) Services are inclusive of Quality levels C and D.
      1.2.1. The PMC shall:
         1.2.1.1. As requested by the State compile "As Built" information from plans, plats and other location data as provided by the utility owners.

CR000327

HNTB.000225

1.2.1.2. Coordinate with utility owner when utility owner's policy is to designate their own facilities at no cost for preliminary survey purposes. The PMC will examine utility owner's work to ensure accuracy and completeness.

1.2.1.3. Designate, record and mark the horizontal location of the existing utility facilities and their service laterals to existing buildings using non-destructive surface geophysical techniques. No storm sewer facilities are to be designated unless authorized by the State. A non-water base paint, utilizing the APWA color code scheme, must be used on all surface markings of underground utilities.

1.2.1.4. Correlate utility owner records with designating data and resolve discrepancies using professional judgment. A color-coded composite utility facility plan with utility owner names, quality levels, line sizes and subsurface utility locate (test hole) locations, if applicable will be prepared and delivered to the State. It is understood by both the PMC and the State that the line sizes of designated utility facilities detailed on the deliverable are from the best available records and that an actual line size is normally determined from a test hole vacuum excavation. A note must be placed on the designate deliverable only that states "lines sizes are from best available records". All above ground appurtenance locations must be included in the deliverable to the State. This information will be provided in the latest version of Microstation or Geopak used by the State. The electronic file will be delivered on C.D., as required by the State's District Office. A hard copy is required and must be signed, sealed, and dated by the Engineer. When requested by the State's District Office, the designated utility information must be over laid on the State's design plans.

1.2.1.5. Determine and inform the State of the approximate utility depths at critical locations as determined by the State. This depth indication is understood by both the PMC and the State to be approximate only and is not intended to be used preparing the right of way and construction plans.

1.2.1.6. When requested, provide a monthly summary of work completed and in process with adequate detail to verify compliance with agreed work schedule.

1.2.1.7. Close-out permits as required.

1.2.1.8. Clearly identify all utilities that were discovered from quality levels C and D investigation, but can not be depicted in quality level B standards. These utilities must have a unique line style and symbology in the designate (Quality Level B) deliverable.

1.2.1.9. Comply with all applicable State policy and procedural manuals.

1.3. Subsurface Utility Locate (Test Hole) Service (Quality Level A). Locate means to obtain precise horizontal and vertical position, material type, condition, size and other data that may be obtainable about the utility facility and its surrounding environment through exposure by non-destructive excavation techniques that ensures the integrity of the utility facility. Subsurface Utility Locate (Test Hole) Services (Quality Level A) are inclusive of Quality Levels B, C, and D.

1.3.1. The PMC shall:

1.3.1.1. Review requested test hole locations and advise the State in the development of an appropriate locate (test hole) work plan relative to the existing utility infrastructure and proposed highway design elements.

1.3.1.2. Coordinate with utility owner inspectors as may be required by law or utility owner policy.

CR000328

HNTB.000226

463

1.3.1.3. Neatly cut and remove existing pavement material, such that the cut not to exceed 0.10 square meters (1.076 square feet) unless unusual circumstances exist.

1.3.1.4. Measure and record the following data on an appropriately formatted test hole data sheet that has been sealed and dated by the Engineer:

    1.3.1.4.1. Elevation of top and/or bottom of utility tied to the datum of the furnished plan.

    1.3.1.4.2. Identify a minimum of two benchmarks utilized. Elevations shall be within an accuracy of 15mm (.591 inches) of utilized benchmarks.

    1.3.1.4.3. Elevation of existing grade over utility at test hole location.

    1.3.1.4.4. Horizontal location referenced to project coordinate datum.

    1.3.1.4.5. Outside diameter of pipe or width of duct banks and configuration of non-encased multi-conduit systems.

    1.3.1.4.6. Utility facility material(s).

    1.3.1.4.7. Utility facility condition.

    1.3.1.4.8. Pavement thickness and type.

    1.3.1.4.9. Coating/Wrapping information and condition.

    1.3.1.4.10. Unusual circumstances or field conditions.

1.3.1.5. Excavate test holes in such a manner as to prevent any damage to wrappings, coatings, cathodic protection or other protective coverings and features. Water excavation can only be utilized with written approval from the appropriate State District Office.

1.3.1.6. Be responsible for any damage to the utility during the locating process. In the event of damage, the PMC shall stop work, notify the appropriate utility facility owner, the State and appropriate regulatory agencies. The regulatory agencies include, but are not limited to the Railroad Commission of Texas and the Texas Commission on Environmental Quality. The PMC will not resume work until the utility facility owner has determined the corrective action to be taken. The PMC shall be liable for all costs involved in the repair or replacement of the utility facility.

1.3.1.7. Back fill all excavations with appropriate material, compact backfill by mechanical means, and restore pavement and surface material. The PMC shall be responsible for the integrity of the backfill and surface restoration for a period of three years. Install a marker ribbon throughout the backfill.

1.3.1.8. Furnish and install a permanent above ground marker (as specified by the State's District Office), directly above center line of the utility facility.

1.3.1.9. Provide complete restoration of work site and landscape to equal or better condition than before excavation. If a work site and landscape is not appropriately restored, the PMC shall return to correct the condition at no extra charge to the State.

1.3.1.10. Plot utility location position information to scale and provide a comprehensive utility plan sign and sealed by the responsible Engineer. This information will be provided in the latest version of Microstation or Geopak format used by the State. The electronic file will be delivered on C.D. When requested by the State, the Locate information must be over laid on the State's design plans.

1.3.1.11. Return plans, profiles, and test hole data sheets to the State. If requested, conduct a review of the findings with the State.

1.3.1.12. Close-out permits as required.

CR000329

HNTB.000227

464

2. **Utility Adjustment Coordination** including utility coordination meetings with individual utility companies, communication and coordination with utilities, and preparation of utility agreement assemblies including utility agreements, joint use agreements, and advanced funding agreements.

2.3. The PMC shall perform utility coordination and liaison activities with involved utility owners, their consultants, and the State to achieve timely project notifications, formal coordination meetings, conflict analysis and resolution. The PMC shall act as the "Responsible Party" as indicated in the State's– Utility Cooperative Management Process (See the State's ROW Utility Manual, chapter 2).

2.3.1. The PMC shall coordinate all activities with the State, or their designee, to facilitate the orderly progress and timely completion of the State design phase. The PMC will be responsible for the following:

2.3.1.1. Work Plan. Coordinate a work plan including a list of the proposed meetings and coordination activities, and related tasks to be performed, a schedule and an estimate. The work plan must satisfy the requirements of the project and must be approved by the State prior to commencing work.

2.3.1.2. Orientation. Prepare and present, in collaboration with State staff, instruction and orientation sessions as required by the State's District Office. The instruction shall introduce the subsurface utility engineering process, demonstrate the technology and facilitate the preparation of work orders, billings, and contract related documentation.

2.3.1.3. Initial Project Meeting. Attend an initial meeting and an on-site inspection (when appropriate) to ensure familiarity with existing conditions, project requirements and prepare a written report of the meeting.

2.3.1.4. External Communications: The PMC will coordinate all activities with the State and its consultants or other contractors or representatives, as authorized by the State. The PMC will also provide the State copies of diaries, correspondence and other documentation of work-related communications between the Engineer, utility owners and other outside entities when requested by the State.

2.3.1.5. Permits and rights of entry. Obtain all necessary permits from city, county, municipality, railroad or other jurisdiction to allow the PMC to work within existing streets, roads or private property for additional designating and/or subsurface utility locating.

2.4. The PMC shall determine which utilities will conflict with highway construction or the "Utility Accommodation Rules" (UAR), and make the utility company aware of these conflicts. The PMC shall assist the utility companies in the preparation of required agreements associated with the funding of adjustments and the occupation of state right of way;

2.4.1. Utility Agreement Assemblies: A packaged agreement consisting of a Utility Joint Use Acknowledgement, Standard Utility Agreements, Plans on 11x17 sheets, Statement of contract work form, Affidavit form and copy of recorded easement, schedule of work and various attachments as detailed in the UAR and the State's Utility Manual.

2.4.1.1. Utility Agreements: If a utility is located within an easement, the utility company may have a compensable interest. The utility company must furnish a copy of their easement to the Engineer. The PMC shall determine whether or not a compensable interest exists and the owner's degree of eligibility. The PMC shall assist the utility company with adjustment plans and cost estimate for these adjustments. The PMC shall review plans to ensure compliance with UAR and to ensure that the proposal will not conflict

CR000330

HNTB.000228

465

with highway construction. The PMC will submit a copy of the easement, plans, and estimate to the State by letter recommending approval (6 copies of each). The utility should be reimbursed all cost incurred within their easement limits for replacement in kind.

2.4.1.2. Utility Acknowledgement: For this project, all Non-Reimbursable Utility Adjustments shall be submitted with the form ROW-U-JUAB "Utility Joint Use Acknowledgement, Non-Reimbursable Utility Adjustment. This form replaces the Notice of Proposed Installation" (Form 1082). The term permit refers to form 1082 or form ROW-U-JUAB. The PMC will furnish the appropriate form to the utility company and assist them with adjustment plan preparation. The utility company should submit the Utility Joint Use Acknowledgement and adjustment plans to the PMC for review. The PMC shall review plans to ensure compliance with UAR and to ensure that the proposal will not conflict with highway construction. The PMC will submit the Utility Joint Use Acknowledgement to the State by letter recommending approval (6 copies).

2.4.1.3. Escrow Agreements: If it is determined that the utility will be adjusted as part of the highway contract; the State's project manager shall be notified immediately. The PMC shall determine what funding amount is required based upon the applicable betterment or eligibility ratio. The State shall be notified immediately of the need for an AFA by the Engineer. The PMC shall coordinate the development of the required Advanced Funding Agreement (AFA) with the utility owner and the State in accordance with established procedures of the State's District Contracts section. Procure or verify all Advanced Funding Agreement payments have been submitted to the State.

2.4.2. The PMC will submit the required number of executed copies of the Utility Agreement assemblies, which include the appropriate Forms as detailed in the UAR and supplied by the State, a copy of the recorded easement Deed, plans, and estimate to the State by letter recommending approval (6 copies of each). The utility should be reimbursed eligible costs incurred within their easement limits for replacement in kind." The transmittal should also provide a description of the work being done as well as the estimated cost and schedule of work. The PMC shall not perform engineering of relocation plans relative to a particular Utility Agreement under this supplemental as this is a cost of Right of Way that is subsidiary to the specific Utility Agreement.

2.4.3. The PMC shall be solely responsible for determining which utilities will be installed by "ROW-U-JUAB", or by "Agreement". The PMC shall Process all ROW-U-JUAB requests, Utility Agreements and determine necessity of any Escrow Agreements and forward to the State for final approval;

3. **Utility Engineering** including the identification of utility conflicts, coordination, compliance with the UAR, and resolution of utility conflicts. The PMC shall coordinate all activities with the State, or their designee, to facilitate the orderly progress and timely completion of the State's design phase.

3.1. Coordination of engineering activities include:

3.1.1. Utility Layout: The PMC shall maintain a utility layout in the latest version of Microstation used by the State. This layout shall include all existing utilities which are to remain in place or be abandoned, and all adjusted utilities. This layout will be utilized to monitor the necessity and evaluate alternatives. The PMC's licensed Professional Engineer (P.E.) will utilize the layout of existing

CR000331

HNTB.000229

466

utilities as prepared, if available, and make a determination of the following;

    3.1.1.1.  Facilities in conflict with the proposed project that are to be relocated.

    3.1.1.2.  Facilities to be abandoned in place.

    3.1.1.3.  Facilities to remain in service and in place as a result roadway design adjustments and meeting the current UAR.

    3.1.1.4.  The Engineer's P.E. shall be responsible for determining if there are additional facilities, not shown in the Subsurface Utility Engineering (SUE) documents, which require relocation. The PMC shall coordinate this information with the State immediately upon discovery.

3.2.  Public & Individual Meetings with Utility Companies, as required, to facilitate utility conflict identification and resolution.

    3.2.1.  Establish Contact with all existing utilities within and adjacent to the project limits and set up utility coordination meetings to discuss concepts and options for construction.

    3.2.2.  Schedule all utility coordination meetings and ensure compatibility with the schedule of the State.

    3.2.3.  Set agenda for all coordination meetings as directed by the State.

    3.2.4.  Establish and promote the desired agenda and methodologies for utility construction within the project limits. This will consist primarily of promoting the construction of utilities as a part of the Highway Contract.

    3.2.5.  Orientation: Prepare and present, in collaboration with the State, instruction and orientation sessions as required. The instruction shall introduce the SUE Plans, the proposed utility layout, processes, demonstrate the technology and facilitate the preparation of work orders, billings, and contract related documentation as it pertains to utility adjustment work.

    3.2.6.  Initial Project Meeting: Attend an initial meeting and an on-site inspection (when appropriate) to ensure familiarity with existing conditions, project requirements and prepare a written report of the meeting.

    3.2.7.  Work Plan: Develop a work plan including a list of the tasks to be performed, a schedule and an estimate. The work plan must satisfy the requirements of the project and must be approved by the State prior to commencing work.

    3.2.8.  Progress Meetings: Meet with the State periodically to coordinate the work effort and resolve problems and prepare a written report of such meetings. The meetings will review:

        3.2.8.1.  Activities completed since the last meeting

        3.2.8.2.  Problems encountered.

        3.2.8.3.  Late activities.

        3.2.8.4.  Activities required by the next progress meeting.

        3.2.8.5.  Solutions for unresolved and/or anticipated problems.

        3.2.8.6.  Information or items required from other agencies/consultants.

3.3.  Review of Utility's Proposed Adjustments

    3.3.1.  Evaluate Alternatives: The Engineer's P.E. will evaluate alternatives in the adjustment of utilities balancing the needs of both the State and the Utility.

    3.3.2.  Review Estimates and Schedules: The Engineer's P.E. will review the utility adjustment estimates for reasonableness of cost and the timely scheduling of the adjustment.

    3.3.3.  Review Plans for compliance with Utility Accommodation Rules and proposed location data. The responsibility for quality and accuracy of Utility adjustment plans will remain with the Utility Company.

    3.3.4.  Inspect Traffic control setup. Ensure necessary traffic control, labor and equipment is utilized where applicable during the utility relocation process. The

CR000332

HNTB.000230

467

Engineer's P.E. shall ensure compliance with the regulations of the most recent edition of the "Texas Manual on Uniform Traffic Control Devices" (TMUTCD). The PMC must obtain approval from the State concerning the proposed method of handling traffic prior to allowing commencement of work.

3.4. The PMC will not provide services for the sole benefit of third parties.

3.5. Prepare a Signed and Sealed Proposed Utility Layout in the latest version of MicroStation used by the State that can be overlaid on the base file with drainage and determine the following;

    3.5.1. All facilities conflicts have been resolved.

    3.5.2. All stakeholders have concurred with the various alignments.

    3.5.3. Establish the sequence of construction for all utility relocation work. whether it is included as a part of the Highway Construction or not

    3.5.4. Determine which utilities will be built as part of the contract.

    3.5.5. Determine which facilities will be relocated prior to construction.

3.6. Coordinate, develop and or review PS&E for all utilities included in the construction contract.

3.7. Utility Certification/Special Provisions: The Engineer's P.E. shall submit upon request from the State, a Utility Certification or a Special Provisions report. Utility Certification will certify that all utilities are clear for highway construction. However, if the utility adjustments are not complete prior to highway project letting, a Special Provision will be required outlining all outstanding utility conflicts and their affects on highway construction. Furthermore, A Utility Clearance schedule, signed by the utility owner shall be provided with the certification as noted above. The Formats for the Certification and the Clearance schedule will be provided by the State.

3.8. The PMC will submit the required number of executed copies of the Utility Agreement assemblies, which include the appropriate Forms as detailed in the UAR and supplied by the State, a copy of the recorded easement Deed, plans, and estimate to the State by letter recommending approval (6 copies of each). The Transmittal letter should include the following statement "The proposed utility adjustment will not conflict with proposed highway construction and will comply with UAR. The utility should be reimbursed eligible costs incurred within their easement limits for replacement in kind." The transmittal should also provide a description of the work being done as well as the estimated cost and schedule of work. The PMC shall not perform engineering of relocation plans relative to a particular Utility Agreement under this contract as this is a cost of Right of Way that is subsidiary to the specific Utility Agreement.

4. **Utility Construction Management and Verification**, including the coordination of utility construction activities, utility location installation verification, compliance with Utility Accommodation Rules, monitoring, reporting, and as-built surveying as required for the State's District Office.

    4.1. The PMC shall schedule a Pre-Construction meeting for each utility adjustment for which they are required to perform field verification and inspection duties. The PMC is responsible for ensuring the necessary State representatives are present.

    4.2. Verification:

        4.2.1. The Engineer's P.E. shall field verify all utility adjustments to ensure that the new facilities are located according to plans, specifications, and the Proposed Utility Layout. This shall include all surveying and right of way staking as needed to clear the proposed construction.

        4.2.2. The Engineer's P.E. shall insure that the utility is in compliance with the TMUTCD, "Storm Water Pollution Prevention Plan" (SW3P), backfill specifications, and restoration of right of way upon completion of work.

CR000333

HNTB.000231

4.3. Status Reports: The PMC shall provide the State with a status report for all utility adjustments on a monthly basis. The State will provide the status report format to the Engineer.

4.4. Review Payment Request: The Engineer's P.E. will review all payment requests for conformance with the utility estimate and verify the work has been performed.

4.5. Notification. The PMC shall notify the State if demobilizing occurs before the approved scope of services is completed. This notification must occur before the demobilization process begins. This requirement may only entail documentation into diaries.

4.6. As-Built Drawings and GPS File: The PMC will, per work authorization, provide a GPS file showing all bends, installation types, casings, and above ground appurtenances and shall be supplied upon completion of the utility work in a format specified by the State. The drawings and GPS files will also include all utility adjustments and installations that are not to be constructed as a part of the Highway Project. A set of 11" x 17" as built drawings, signed and sealed by the PMC along with a CD containing electronic files shall be submitted prior to final payment and acceptance of all Utility Coordination activities.-

4.7. The Utility Company retains all responsibility for all inspections related to compliance with Utility Codes, Industry standards, and design of the Utility Facility.

4.8. The PMC will not provide services for the sole benefit of third parties.

5. **Develop Utility Plans, Specifications and Estimates (PS&E):** The work to be performed by the PMC under this category consists of providing engineering services required for preparation of PS&E for associated activities that may include utility relocation plans, stormwater permits, and maintenance of traffic control during utility relocation. These tasks may be also involve coordination of plan revisions with applicable SDC's to accommodate necessary utility relocations or adjustments.

5.1. Data Collection: The PMC shall collect, review, and evaluate data described below and notify the State in writing if errors, omissions or discrepancies of any related data are discovered:

5.1.1. Data, as available, including data previously collected by the PMC for the US 290/Hempstead Highway Corridor Program, may include as-built plans, existing schematics, right-of-way maps, SUE mapping, existing cross sections, existing planimetric mapping, environmental documents, existing channel and drainage easement data, existing traffic counts, accident data, Bridge Inspection records, PMIS data, identified endangered species, identified hazardous material sites, current unit bid price information, current special provisions, special specifications, and standard drawings.

5.1.2. Documents for existing and proposed development along planned route from local municipalities and local ordinances related to project development.

5.1.3. Utility plans and documents form appropriate municipalities and agencies. Readily available flood plain information and studies from the Federal Emergency Management Agency (FEMA), the U. S. Army Corps of Engineers, local municipalities and other governmental agencies in addition to that provided by the State.

5.2. Coordination: The PMC shall coordinate, through the State's Project Manager, the development of the PS&E with any local entity having jurisdiction or interest in the project (e.g., city, county, municipal utility district, etc.)

5.3. Field Survey: The PMC shall conduct supplemental field reconnaissance and collect additional data including a photographic record (to be maintained in the PMC's office) of notable existing features, if warranted.

CR000334

HNTB.000232
469

5.4. Detailed Design: The PMC shall design the project in accordance with the State's current design criteria. As directed, the following items may apply:

    5.4.1. Title Sheet

    5.4.2. Index of Sheets

    5.4.3. Typical Sections: Shall be required for all proposed and existing roadways and structures. Typical sections shall include width of travel lanes, shoulders, outer separations, border widths, curb offsets, managed lanes, and ROW.

    5.4.4. Plan and Profile: The PMC shall provide plan and profile drawings using CADD standards as required by the State. The drawings shall consist of a planimetric file of existing features and files of the proposed improvements.

    5.4.5. The PMC shall sign, seal, and date all project specific modifications to standard drawings.

5.5. The PS&E shall be developed in English units using the 2004 specifications and provisions. The final plan sheets shall be 4 mil white opaque or 4 mil-double matte standard mylars, size 11" x 17", signed, sealed, and dated by a Professional Engineer licensed in the State of Texas. The plans shall be noted as copyrighted with the State's logo.

    5.5.1. Temporary Drainage Facilities: The PMC shall develop plans or coordinate with SDC's for all temporary drainage facilities necessary to allow staged construction of the project and to conform with the phasing of adjacent construction projects without significant impact to the hydraulic capacity of the area.

5.6. Construction Cost Estimate: The PMC shall prepare construction costs estimated using the State's District Office 12 month average unit rates.

    5.6.1. Submit Preliminary Cost Estimate (spreadsheet)

    5.6.2. Submit Quantities and Summary Sheets

    5.6.3. Construction Contract Time Determination (Primavera or Suretrack)

5.7. Traffic Control Plan: The PMC shall prepare Traffic Control Plans (TCP) in coordination with the State and any applicable SDC's. The TCP shall include preliminary sequencing and interim signing for every phase of construction. This is to include regulatory, warning, construction, route, and guide signs. The PMC shall interface and coordinate phases of work, including the TCP, with adjacent Engineers, which are responsible for the preparation of the PS&E for adjacent projects.

5.8. Design Exceptions/Waivers: The PMC shall identify, prepare exhibits and complete all necessary forms required to obtain applicable Design Exceptions and/or Waivers.

5.9. Water and/or Sanitary Sewer Design: As requested, the PMC shall prepare or coordinate the SDC preparation of detail plans, quantities and estimate for (various municipalities or other agencies) water and sanitary sewer relocations and adjustments for incorporation into the State's highway construction plans. The quantities and estimates for pertinent bid items shall be separated by type and itemized.

    5.9.1. The PS&E package shall be suitable for the bidding and awarding of a construction contract, and in accordance with the latest State's policies and procedures.

    5.9.2. The PMC may be asked to insert their plans into the project PS&E package, additional plans, specifications and quantities developed by others. The PMC shall provide a construction cost estimate to be inserted into the plans developed by others.

5.10. General Notes and/or Special Provisions: Whenever possible, the State's standard drawings, standard specifications, or previously approved special provisions and/or special specifications shall be used.

    5.10.1. Unique to the Project: If a special provision or a special specification must be developed or modified for this project, it shall be in the State's format and, to the

CR000335

HNTB.000233
470

extent possible, incorporate references to approved State test procedures. Any specifications developed by the PMC shall be submitted to the State for approval prior to inclusion in the PS&E.

6. **Utility Design Survey:** This work includes performance of surveys associated with the gathering of survey data for topography, cross-sections, and other related work in order to design a project's utility relocation, or during layout and staking of projects for construction.

    6.1. Field Surveying and Photogrammetry: The PMC shall verify the benchmark coordinates and establish the horizontal and vertical control for the project. The PMC shall coordinate control with the adjacent SDC's as appropriate or other third parties, if any, for consistency and accuracy of the project.

    6.2. Project Baseline: The project base line must be coincidental with, or parallel to, the stationed "Design Center Line". Base line control points shall be established using 15M (ASTM) (5/8 inch) iron rods, 36 inches long, at P.C.'s, P.I.'s, and P.T.'s of horizontal curves and at 1,000 feet maximum intervals on tangents. Baseline control points shall be offset with set iron rods on both sides near the existing ROW lines at a measured distance. If available, coordinate to field tie to the project baseline set by adjacent Engineers for consistency and accuracy.

    6.3. Vertical Control: Locate previously set benchmarks established by State or PMC (State Datum); verify benchmark circuit (run levels) throughout the project; establish additional benchmarks at intervals not to exceed 1,000 feet for the limits of the utility design; tie benchmarks (station/offset) to project baseline. Benchmarks shall be 20M (ASTM) (3/4 inch) diameter, 48 inches long, located near the existing ROW line at a measured distance. All benchmark circuits shall be tied to the State's elevation datum. Perform the benchmark circuits in accordance with good surveying practices. The surveyor shall verify the closure and submit adjustments to the State for approval prior to beginning the field surveys. Provide 8 ½" x 11" location sketches of horizontal and vertical benchmarks. Also provide 11" x 17: overall sketch showing bearings and distances between control monuments (benchmarks) and tied benchmarks (i.e., HCFCD, FEMA, GPS points, etc.). These sketches shall be signed, sealed and dated by a Registered Professional Land Surveyor (RPLS).

    6.4. Profile and Cross Section: Intersecting streets and driveways (to 50 feet outside ROW for driveway, and 200 feet for intersecting streets, and 500 feet for intersecting streets greater than two (2) lanes wide) for tie into the project. Existing data shall be used where applicable including data obtained by the SDC's surveyors.

        6.4.1. Cross Section Drainage Channels for a distance of 200 feet each way outside the ROW lines. Cross sections shall not exceed 100 feet intervals and shall be taken at right angles to the channels. The width of the cross sections shall cover the top of the channel over bank extending at least 50 feet beyond. Cross section data shall include flow line of the channel. Existing data shall be used where applicable including data obtained by the SDC's surveyors.

    6.5. Right-of-Entry (short of litigation): Secured as needed for project.

        6.5.1. Tie to existing underground and overhead utilities (location, elevation, size and direction).

    6.6. ROW Staking for additional field topography related to design work.

        6.6.1. Provide temporary signs, traffic control, flags, safety equipment, etc. and obtain necessary permits.

        6.6.2. Determine/Obtain

            6.6.2.1. Type of existing material, pavements, etc.

            6.6.2.2. Profiles: Existing drainage facilities.

            6.6.2.3. Measurement of Hydraulic opening under existing bridges.

CR000336

HNTB.000234
471

6.6.2.4. Top of manhole and flowline elevations, type and size, etc. of manholes, inlets, and valves of utilities.

6.7. Verify digital terrain Model (DTM) (cross sections at panel points) and planimetric mapping (DGN).

6.7.1. Obtain additional existing ground cross sections as necessary to supplement the DTM files.

6.7.2. Obtain cross sections at the center panel points to verify the DTM.

6.7.3. Obtain line (PGL) and the edges of slab at bent location.

6.7.4. Tie down soil boring locations by station, offset and surface elevation.

6.7.5. Perform datum ties as required (HCFCD, COH, FEMA, etc.). If required, establish an elevation base on the State's datum to other public entities' published benchmarks.

6.7.6. The surveyor using wetlands delineation information provided by the State shall stake and fence the areas containing wetlands. The surveyor is to provide information back to the PMC in an electronic file to be incorporated onto the P&P sheets.

6.8. Survey Control Index Sheet and a Horizontal and Vertical Control Sheet, signed, sealed, and dated by the responsible RPLS and Texas Licensed Professional Engineer for insertion into the plan set. The *Survey Control Index Sheet* shows an overall view of the project control and the relationship or primary monumentation and control whereas the *Horizontal and Vertical Control Sheet* identifies the primary survey control and the survey control monumentation used in the preparation of the project. The following information should be shown:

6.8.1. Overall view of the project and primary control monuments set for control of the project.

6.8.2. Identification of the control points.

6.8.3. Baseline and/or centerline.

6.8.4. Graphic (Bar) Scale.

6.8.5. North Arrow.

6.8.6. Professional Engineer and RPLS signature, seal, and date.

6.9. Horizontal and Vertical Control Sheet: The following information should be shown:

6.9.1. Location for each control point, showing baseline and/or centerline alignment and North arrow.

6.9.2. Station and offset (with respect to the baseline or centerline alignments) of each identified control point.

6.9.3. Basis of Datum for horizontal control (base control monument/benchmark name/number, datum).

6.9.4. Basis of Datum for vertical control (base control monument, benchmark name, number, datum).

6.9.5. Date of current adjustment of the datum.

6.9.6. Monumentation set for Control (Description, State's District name/number and location ties).

6.9.7. Surface Adjustment Factor and unit of measurement.

6.9.8. Coordinates (SPC Zone and surface or grid).

6.9.9. Relevant metadata.

6.9.10. Graphic (Bar) Scale

6.9.11. Professional Engineer and RPLS signature, seal, date, State title block containing State District name, County, Highway Number, and CSJ.

CR000337

O.   ROW Surveying

1. Services To Be Provided By The PMC Surveyor

The following is an outline of the work to be performed and the products to be provided by the surveyor for each ROW CSJ in pursuance of this Contract. Note that ROW CSJ(s) shall be established to match Construction CSJ(s).

1.1. Prepare an abstract map of the current record title holders covering the ROW CSJ project area.

1.2. Prepare a preliminary right-of-way layout covering each ROW CSJ.

1.3. Prepare a completed right-of-way map, including a control data sheet and utility table for each ROW CSJ.

1.4. Prepare property descriptions, parcel plots and area calculation sheets describing parcels of land to be acquired. These documents may be packaged in subcategories of the ROW CSJ as approved by the State.

1.4.1 Monument the proposed right-of-way lines at intersecting property lines with appropriate Monuments, and at all PCs, PTs, angle points, intersecting right-of-way lines of side streets, and 1,500 foot stations.

1.4.2 Monument the existing right-of-way lines in areas of no proposed acquisition at all PCs, PTs, angle points, and 1,500 foot stations.

1.5 Provide to the State a copy of all instruments of record acquired pursuant to this Contract.

1.6 Provide the computer graphics files of the right-of-way map and field note descriptions on a medium and in a format acceptable to the State.

1.7 Provide computer disks of scanned instruments of record (deeds).

2. Deliverables and Schedule

For purposes of this Contract, the following submission schedule shall apply.

2.1. The Master Program Schedule will include a detailed schedule break-out for the ROW Mapping and Surveying with individual tasks and milestone deliverables noted by ROW CSJ. The PMC will collaborate with the State on the detailed schedule with appropriate consideration of District and Division resources for final reviews and processing of each deliverable.

2.2. Abstract maps shall be completed and documented in accordance with the established schedule for each ROW CSJ and verified by the PMC using the State's standard checklist.

2.3. Preliminary right-of-way layouts shall be completed and verified against the State's checklist in accordance with the established schedule. The PMC Surveyor shall not proceed with the preparation of the right-of-way map, property descriptions, parcel plats or area calculation sheets until the internal approvals are documented. The PMC upon request, will provide the State a copy of Preliminary Right-of-Way Maps for reference along with documentation of the associated QA/QC process.

2.4. Completed right-of-way maps for each ROW CSJ shall be completed and verified against the State's checklist in accordance with the established schedule. The PMC Surveyor shall not proceed with the preparation of the property descriptions, parcel plats, or area calculation sheets until appropriate internal approvals are documented. The completed right-of-way map shall be prepared for submitted in hard copy and graphic file form on microstation. The PMC upon request, will provide the State a copy of the Completed Right-of-Way Maps for reference along with documentation of the associated QA/QC process.

CR000338

HNTB.000236

473

2.5.1. An initial submittal of the completed right-of-way maps, property descriptions, parcel and area calculation sheets and instruments of record, shall be assembled for each ROW CSJ after appropriate approvals of the completed right-of-way map.

2.5.2. The final submittal of any completed right-of-way map, property descriptions, parcel plats, area calculation sheets, graphics files, computer disk and mark-ups of the initial submittal shall be assembled, verified using the State's checklist, and then forwarded for acceptance by the State and further processing in accordance with the established schedule.

2.5.3. If the State determines additional changes are still necessary to the final submittal, they shall be addressed and the final submittal returned to the State no later than 5 calendar days after notice of such change.

2.6. Monumentation of the existing right-of-way lines in areas of no proposed acquisitions and the proposed right-of-way lines shall be completed in accordance with the established schedule and after receipt by the PMC Surveyor of written authorization to proceed with said monumentation. The PMC Surveyor shall notify the State in writing when all monumentation for any ROW CSJ has been completed.

2.7 The PMC Surveyor shall promptly provide the State with a schedule to accommodate revisions to ROW Maps and associated documents when advised of any change that requires such revisions including changes in ownership, design changes warranting ROW adjustments, or adjustments in State standards for these documents.

3. Definitions

For purposes of this Contract, the following definitions shall apply.

3.1. Abstract Map - a drawing to scale depicting proposed right-of-way lines, existing right-of-way lines, easement lines, and private property lines with relevant grantee names, recording data, and recording dates.

3.2. Area Calculation Sheet - A computer generated print-out of the area and the perimeter bearings, distances, curve data, and coordinates of an individual parcel of land to be acquired

3.3 Access Denial Line - A line which indicates specific locations where access to the roadway is denied

3.4. Property Description - A written metes and bounds description delineating the area and boundary and describing the location of an individual parcel of land unique to all other parcels of land

3.5. Owner - The most current title holder of record as determined by a study of the Real Property Records

3.6. Parcel Plat - an 8 ½ inch by 11 inch drawing to scale depicting all the information shown on the right-of-way map regarding an individual parcel of land to be acquired

3.7. Parent Tract – A unit or contiguous units of land under one ownership, comprising a single marketable tract of land consistent with the principle of highest and best use. A parent tract may be described by a single instrument or several instruments. A single parent tract cannot be severed by a public right-of-way, easement, or separate ownership which destroys unit of use.

3.8. Parent Tract Inset – A small line drawing, to an appropriate scale, of the parent tract perimeter placed upon the right of way map in the proximity of the respective parcel. Parent tract insets are used in cases where the parent tract cannot be shown to the same scale as the right-of-way map. Since parent tract insets are used to identify the limits and location of parent tracts, they should include public right-of-ways, utility easements and fee strips, and identifiable water courses which bound the parent tract.

CR000339

HNTB.000237

474

3.9. Point of Beginning (P.O.B.) - A corner of the parcel of land to be acquired, located on the proposed right-of-way line and being the beginning terminus of the first course of the property description

3.10. Point of Commencing (P.O.C.) - A monumented property corner which can be identified in the Real Property Records and is located outside the proposed right of-way corridor. For title purposes the point of commencing should be a monumented back corner of the parent tract. In the event a monumented back corner of the parent tract cannot be recovered, the nearest identifiable, monumented property corner located outside the proposed right-of-way corridor may be used.

3.11. Preliminary Right-of-Way Layout - A drawing to scale depicting proposed right of-way lines, existing right-of-way lines, proposed pavement, control of access lines, the proposed centerline alignment, private property lines, easement lines, visible improvements, visible utilities, the station and offset from the centerline alignment to each PC, PT, and angle point in the proposed right-of-way lines and to each PC, PT, and angle point in the existing right-of-way lines in areas of no proposed acquisition

3.12. Right-of-Way Map - A series of 22 inch by 34 inch drawings to scale depicting the results of relevant elements of records research, field work, analyzation, computation, and map making required to determine title, delineate areas and boundaries, locate and describe utilities and improvements to the extent necessary to appraise the value and negotiate the acquisition of individual parcels of private land for a proposed right-of-way project

4. Abstracting

Abstracting shall be sufficient to determine and depict the following.

4.1. Any and all interests of public record held in land to be acquired

4.2. The total record holdings of an owner contiguous to land to be acquired from that owner

4.3. Any and all interests in land to be acquired held in common (shopping mall parking lots, subdivision reserves, etc.)

4.4. Any and all improvements proposed by other agencies which may have a bearing on project development

4.5. All called monuments, bearings, and distances per recorded information.

5. Right-Of-Way Map

5.1. Proposed right-of-way lines shall be delineated with appropriate bearings, distances and curve data. Curve data shall include the radius, delta angle, arc length and long chord bearing and distance.

5.2. Existing right-of-way lines shall be delineated with appropriate bearings, distances and curve data to the extent necessary to describe the individual parcels of land to be acquired. Curve data shall include the radius, delta angle, arc length and long chord bearing and distance.

5.3. The proposed centerline alignment shall be delineated with appropriate bearings, distances and curve data. Curve data shall include the station of the curve PI, radius, delta angle, arc length, tangent length, long chord bearing and distance, and the X and Y coordinates of the curve PI. All centerline alignment PCs, PTs and even 500 foot stations shall be labeled as to station.

5.4. Proposed paving lines combined with relevant existing paving lines shall be shown to the extent necessary to compile a complete picture of proposed traffic movements.

CR000340

HNTB.000238

475

Proposed paving on the final mylars submitted to the State shall be shaded with colored pencil or highlighted by some other means acceptable to the State.

5.5. Control of access lines shall be shown sufficiently to indicate areas where access is to be denied and where access is to be permitted.

5.6. Private property lines shall be delineated with appropriate bearings, distances and curve data to the extent necessary to describe the individual parcels of land to be acquired. Curve data shall include the radius, delta angle, arc length and long chord bearing and distance.

5.7. League lines and survey lines shall be shown and identified by name and abstract number.

5.8. County lines and city limit lines shall be located and identified by name.

5.9. A north arrow shall be shown on each sheet and, if possible, in the upper right hand corner.

5.10. Monumentation set or found shall be shown and described as to material and size.

5.11. A station and offset shall be shown for each PC, PT and angle point in the proposed right-of-way lines. Stations and offsets shall be with respect to the proposed centerline alignment.

5.12. Adjoining public right-of-ways shall be shown and identified by name, right-of-way width, and recording data.

5.13. Railroads shall be shown and identified by name, right-of-way width, and recording data.

5.14. Utility corridors shall be identified as to easement or fee.

5.15. Easements and fee strips shall be shown and identified by width, owner and recording data.

5.16 Building lines or set-back lines shall be shown and identified.

5.17. Visible improvements located within the proposed right-of-way corridor or within 50 feet of a proposed right-of-way line shall be shown and completely identified.

5.18. Structures shall be identified as commercial or residential, by number of stories, and as to type (brick, wood frame, etc.).

5.19. Structures which are severed by a proposed right-of-way line shall be dimensioned to the extent necessary to completely delineate the severed parts.

5.20. Parking areas, billboards and other on-premise signs which are severed by a proposed right-of-way line shall be dimensioned to the extent necessary to delineate that portion of the parking area, billboard or sign which is located within the proposed right-of-way corridor.

5.21. In cases where structures are located outside the proposed right-of-way corridor and within 10 feet of a proposed right-of-way line, the shortest distance between the structure and the proposed right-of-way line shall be shown.

5.22. If the structure is an element of the planimetric furnished to the PMC Surveyor by the State, the PMC Surveyor may snap to the structure to determine this shortest distance. However, if this distance is less than 3 feet, it shall be field verified.

5.23. Visible utilities located within the proposed right-of-way corridor or within 50 feet of a proposed right-of-way line shall be shown and completely identified.

5.24. The location of underground fuel storage tanks situated within the proposed right-of-way corridor or within 50 feet of a proposed right-of-way line shall be determined and shown. The visible location of vent and filler caps in conjunction with available design and as-built drawings may be used to determine a most probable location in the event an actual location is indeterminable.

5.25. Points of commencing and points of beginning shall be shown and labeled. Points of beginning shall be shown with their respective X and Y surface coordinates. As an

CR000341

HNTB.000239

exception, a point of commencing will not be required in the case of a total taking without remainder.

5.26. Each parcel of land to be acquired shall be identified by a parcel number which shall appear in the ownership tabulation and on the right-of-way map in the proximity of the respective parcel. If the PMC Surveyor is unfamiliar with the criteria used by the State to assign parcel numbers, he shall seek the assistance of the State at the time the abstract map is complete.

5.27. An ownership tabulation shall be shown which shall include the parcel number, existing area of the parent tract, lot(s) and block(s) constituting the parent tract when applicable, owner's name, type of conveyance, film code, county clerks file number, taking area, and remaining area of the parent tract located left and/or right of the centerline alignment. Types of conveyance, film codes and file numbers refer to conveyances into the State and will be added to the right-of-way map by the State at a later date. Several blank lines shall be provided for in the tabulation block to facilitate future map additions.

5.28. A parent tract inset shall be shown for each parent tract which cannot be shown to scale on the right-of-way map. The use of broken scale lines should be avoided. When parent tract insets are used, the point of commencing with the appropriate bearing and distance to the point of beginning may be shown on the parent tract inset.

5.29. A note shall be included on the title sheet, and each map sheet stating the source of bearings, coordinates and datum used.

5.30. Appropriate notes shall be included on the title sheet and each map sheet stating the following.

5.30.1. Month(s) and year abstracting was performed upon which the map is based

5.30.2. Month(s) and year field surveys were conducted upon which the map is based

5.30.3. Month and year map was completed by the PMC Surveyor

5.30.4. The right-of-way account number, if available

5.31. The right-of-way account number, if available, shall be shown on each right-of way map sheet.

6. Property Description

The property description shall begin with a general description which shall include as a minimum:

6.1. State, County, and Survey within which the proposed parcel of land to be acquired is located

6.2. A reference to unrecorded and recorded subdivisions by name, lot, block, and recording data to the extent applicable

6.3. A reference by name to the grantor and grantee, date and recording data of the most current instrument(s) of conveyance describing the parent tract
It is the preference of the State to use execution dates in deed references as opposed to recording or filing dates. In any case, the property description shall make clear which date is being used.

The property description shall continue with a metes and bounds description which shall include as a minimum:

6.4. A point of commencing

6.5. A point of beginning with the appropriate X and Y surface coordinates

6.6. A series of courses, identified by number and proceeding in a clockwise direction, describing the perimeter of the parcel of land to be acquired, and delineated with appropriate bearings, distances and curve data

CR000342

HNTB.000240

477

Curve data shall include the radius, delta angle, arc length, and long chord bearing and distance.

Each course shall be identified either as a proposed right-of-way line, an existing right-of-way line, or a property line of the parent tract. Each property line of the parent tract shall be described with an appropriate adjoiner call.

6.7. A description of all monumentation set or found to include, as a minimum, size and material

6.8. A reference to the source of bearings, coordinates, and datum used

7. Mapping and Parcel Plat General Specifications

For purposes of this Contract the following general specifications for right-of-way mapping and parcel plats shall apply.

7.1. Completed right-of-way maps shall be submitted to the State on single or double matte mylar, 22 inches by 34 inches in size with a 21 inch by 32 inch printed border positioned ½ inch from the top, bottom, and right edge of the sheet.

7.2. Parcel plats shall be submitted to the State on single or double matte mylar, 8½ inch by 11 inch in size with respective borders of 7½ inches by 10 inches, positioned ½ inch from the top, bottom, and right edge of the sheet. Match lines shall be used where more than one sheet is required

7.3. Right-of-way maps shall be drawn to a scale of 1 inch = 50 feet. An appropriate scale other than 1 inch = 50 feet may be used on some proposed right-of-way projects upon prior approval by the State.

7.4. Since right-of-way maps are reduced in size by one-half for archiving purposes, the smallest size lettering acceptable on a right-of-way map shall be 1/10 of one inch (Leroy #100). A right-of-way map which contains any lettering smaller than 1/10 of one inch will not be accepted by the State.

7.5. Parcel plats shall be drawn to a scale of 1 inch = 50 feet. An appropriate scale may be used on some proposed right-of-way projects upon prior approval by the State. In the case of a very large parcel which would be difficult to show with clarity on a single 8 1/2 inch by 11 inch sheet, the PMC Surveyor shall use multiple 8 1/2 inch by 11 inch sheets with matching lines.

7.6. The smallest size lettering acceptable on a parcel sketch shall be 1/10 of one inch (Leroy #100).

7.7. Property descriptions shall be submitted on an 8½ inch by 11 inch bond paper.

7.8. The State has encountered a number of mylar products which are considered unacceptable. The PMC Surveyor shall confer with the State regarding mylar products he intends to use which he has not previously used on State projects.

7.9. Zip-a-Tone or other similar stick-on products shall not be used on right-of-way maps or parcel plats.

8. Mapping General Requirements

For purposes of this Contract the following general requirements shall apply.

8.1. Copies of instruments of record submitted to the State shall be indexed by parcel number.

8.2. Coordinates appearing on right-of-way maps and in property descriptions shall be surface coordinates based on the Texas State Plane Coordinate System. The combined adjustment factors (sea level factor x scale factor) which have been developed by the State for its use are as follows: In Harris, Galveston, Fort Bend,

CR000343

HNTB.000241
478

Brazoria and Waller Counties (south central zone), grid coordinates are multiplied by a combined adjustment factor of 1.00013 to obtain surface coordinates.

8.3. Line and curve tables may be used when necessary.

8.4. The number of centerline alignment stations to be shown on a single plan sheet shall be restricted to the extent necessary to allow approximately 4 inches between match lines and sheet borders for future details and notes.

8.5. A minimum 4 inch by 4 inch space shall be reserved at the bottom right hand corner of each map sheet for future revision notes.

9. Horizontal Ground Control

9.1. Azimuth closure shall not exceed 4.5 seconds times the square root of the number of traverse segments.

9.2. Position closure after azimuth adjustment shall not exceed 1 in 20,000 or 0.2 meters times the square root of the distance in kilometers (1 foot times the square root of the distance in miles). The expression containing the square root is designed for longer lines where higher proportional accuracy is required. The formula that gives the smallest permissible closure should be used.

9.3. Twenty courses between azimuth checks shall be considered the maximum number acceptable.

9.4. In cases where a traverse approaches but does not entirely meet these standards of accuracy and the PMC Surveyor has assured himself that systematic errors and mistakes have been eliminated; the PMC Surveyor shall submit the traverse data to the State for further study. The State will make a determination as to the acceptability of the traverse as an exception to the standard and notify the PMC Surveyor accordingly.

10. Safety

10.1. The PMC Surveyor shall control traffic in and near surveying operations adequately to comply with provisions of the latest edition of the *Texas Manual on Uniform Traffic Control Devices.*

10.2. In the event field crew personnel must divert traffic or close traveled lanes, a Traffic Control Plan based upon principles outlined in the latest edition of the *Texas Manual on Uniform Traffic Control Devices* shall be prepared by the PMC Surveyor and approved by the State prior to commencement of field work. A copy of the approved plan shall be in the possession of field crew personnel on the job site at all times and shall be made available to TxDOT personnel for inspection upon request.

11. Automation Requirements

Recognizing the fact that the State has made a significant investment in equipment and training to develop an automated plan preparation system, the following requirement shall apply.

11.1. Right-of-way maps and parcel plats shall be prepared using Microstation version V8 or a more current version.

11.2. It is the intent of the State to secure graphics files which have elements of equal integrity, singularity, and attribute as elements prepared using Microstation version V8 or a more current version.

11.3. As a minimum requirement, graphics files shall be comprised of elements defined with the following graphic entities.

CR000344

HNTB.000242

479

11.3.1   Line - two connected points that form a single entity
11.3.2.   Line string - a series of connected points that form a single entity
11.3.3.   Polygon - a series of connected points that form a closed entity
11.3.4.   Circle - The geometric definition of a circle (not a line string)
11.3.5.   Arc - a segment of a circle (not a line string)
11.3.6.   Symbol - a group of graphic entities that form a single entity

11.4.   As a minimum requirement, graphic elements shall be comprised of entities which possess the following attributes.

11.4.1.   Overlay - a drawing layer that can be selectively turned on or off
11.4.2.   Line weight - a line width
11.4.3.   Line style - a line symbology (dashed, dot-dashed, etc.)
11.4.4.   Color - a color code

11.5.   For purposes of clarity, consistency, and ease of utilization, the State has developed standard level menus, font tables, pen tables, color tables, and legends which are available in hard copy and/or graphic file form. The PMC Surveyor shall request and secure standards relevant to right-of-way mapping to the extent necessary to ensure that the needs of the State are met.

11.6.   Graphics files furnished to the State by the PMC Surveyor shall be submitted on a medium and in a format acceptable to the State. The PMC Surveyor shall confer with the State regarding acceptable media and formats before making submissions. The PMC Surveyor shall request and secure a Consultant File Index form provided by the State, to be completed by the PMC Surveyor, and to be submitted to the State along with the graphics files.

11.7.   Property descriptions shall be prepared using the latest version of *Microsoft Word*, word processing software used by the State or a computer word processing system capable of producing files importable into said software.

## MANAGING CONTRACTED ADVANCE PE SERVICES FOR FC 110 THRU FC 150 (Function Code 145)

A.   **Program Management / Administration**

1. The PMC Team shall provide a Program Manager, Two Deputy Program Managers, and support administrative staff to manage the daily activities of the program, the scope of services noted herein and provide the primary contact point between the State, the PMC Team, third party consultants to include the ROWAP, utility companies, third party agencies, and the general public.

2. The PMC shall establish, and maintain an electronic network for communications within the PMC Team, the State, the ROWAP, the SDC(s), and other identified third parties as approved by TxDOT including assigning and managing individual user accounts.

3. Partnering Meetings
   The PMC shall provide for facilitation of partnering meetings to strengthen relationships and overall program delivery including such partnering meetings, either individually or together, with the following:

   - Houston District's Senior Management and US 290 Corridor Management Team
   - Houston District's Department Directors
   - ROW Acquisition Provider Team (ROWAP)
   - Utility Companies
   - Third Party Agencies such as HCTRA, HCFCD, COH, City of Jersey Village, Harris County Public Infrastructure, etc. as identified by the State

CR000345

HNTB.000243

480

Note: Support of Partnering meetings associated with construction are within the scope for FC 320, Construction Phase Services, and the support of such meetings with SDCs within the scope for FC 164, Managing Contracted Services for FC 160 thru FC 170.

4.  Records of all meetings held both internally and externally as related to the US 290/Hempstead Highway Corridor Program including a record of attendees, agendas, and summary of discussions, action items, and decisions as applicable.
5.  The PMC shall prepare and execute contracts with their sub-consultants once the PMC contract has been fully executed. The PMC is to provide a copy of each sub-consultant contract to the State. Any subsequent amendment to the PMC Contract with the State requiring services to be performed by a sub-consultant will require an amendment to the sub-consultant's contract with the PMC. A copy of all such amendments to sub-consultant contracts shall be provided to the State.

B.  **Program Scheduling**
1.  Master Program Scheduling and Risk Matrix Development Charette
    The PMC shall facilitate a charette with the State's District leadership to finalize the following:
    a.  Initial Master Program Schedule (Primavera format) with critical milestones and identification of schedule influences.
    b.  Risk Assessment exercise and development of Risk Assessment Matrix
2.  Development of Schedule parameters and criteria including Work Breakdown Structure for development of detailed schedules for each program tasks. The PMC will provide training to the State's personnel, ROWAP, SDC(s), Contractors, and other third parties as approved by the State for detailed schedule development to facilitate schedule coordination for the entire program.
3.  PMC shall develop detailed schedules for the following major Tasks:
    a.  Program Management Tasks
    b.  ROW Acquisition and Coordination
    c.  Utility Coordination, Development of Agreements, and Adjustments, as applicable
    d.  Environmental Document(s), supplementals, addendas, reevaluations, and permitting
    e.  Environmental studies and tasks associated with clearance of ROW acquired.
    f.  Public Involvement, Meetings, Hearings, and Communications
    g.  ROW and Planning activities by others for the proposed Managed Lanes/Hempstead Highway reconstruction.
    h.  Master construction time schedules for each CSJ including disincentives and incentives.
4.  The PMC shall monitor all detailed schedules and all schedules produced by others including SDC's, ROWAP(s), and Utility Companies that are a subset of the PMC's Master Program Schedule.
5.  The PMC shall provide monthly updates of all schedules at the appropriate stages of the program and shall provide an assessment of schedules provided by applicable third parties for integration into the Master Program Schedule.
6.  Deliverables
    *   Initial Program Schedule
        o   Electronic data of the schedule on CD
        o   A plot of the program WBS in chart form
        o   A plot of the Primavera Project Schedule (P3), organized by WBS
        o   A plot of the program critical path, as defined by the longest path
        o   A narrative report of the baseline contained within a baseline submittal book
    *   A risk assessment document containing the results of the risk assessment exercise.
    *   Detailed Task Schedules for applicable segments of the work.

CR000346

HNTB.000244
481

- Monthly Schedule and Risk Matrix Updates and narrative discussion of progress along with identification of any schedule recovery strategies as necessary. The Schedule Updates will include:
  - o Critical Path Report for the Program
  - o Critical Path Report for current projects
  - o Work in Progress this Update by project
  - o Six Week Look ahead by project
  - o Recommendations concerning schedule recovery strategies where necessary.

C. Financial Plan

1. Develop Initial Financial Plan for submittal to FHWA. Plan elements shall address:
   a. Costs Estimates including Basis of estimates, year-of-expenditure projections, assessment of risks and contingencies with supporting documentation.
   b. Methodology and Approach for developing costs estimates, validation of estimates and revalidation of estimates.
   c. Transition from Planning to ROW acquisition to Design to Construction.
   d. Public Involvement and Outreach strategies.
   e. MPO coordination
   f. Assessment of construction materials and resources versus proposed bidding and construction schedules.
   g. Third party related costs for RR agreements and utility adjustments/relocations.

2. Provide the State's Houston District Administration quarterly assessments reviewing the status of the Financial Plan and anticipated issues in preparation for Annual Updates.

3. Provide Annual Financial Plan Updates
   a. Program status and expenditures to date.
   b. Analyze cost and revenue trends that have impacted project costs and revenues during the previous year.
   c. Develop, when necessary, revenue shortfall mitigation strategies to minimize impacts on scheduled project delivery.
   d. Prepare a summary of significant cost reductions that will affect the cost of the project.
   e. Prepare a summary of significant cost increases that will affect the cost of the project.

4. Deliverables
   - Initial Financial Plan.
   - Documentation of Quarterly assessments of the Financial Plan.
   - Annual Updates of the Financial Plan.

D. Project Controls and Program Management Plan (PMP)

1. Establish, host, and maintain a web-based electronic network including development, maintenance and hosting of the "Dashboard" web interface to link all critical project controls, documents, and applicable reference materials. The necessary programming will be coordinated with the State and the access criteria and communications tools set up for all Program Team members including the State's personnel requiring controlled access. The web-based tool interface will be accessible from any internet explorer tool, but only allow password security controlled access to the PMC Team and specified individuals as approved by the State.

2. The PMC shall provide full time staff in the Project Office to troubleshoot the electronic system, resolve performance or access issues, and establish and maintain the internal computer network.

3. Prepare a single Program Management Plan (PMP) in accordance with FHWA published Guidance Documents that outlines the project organization; communication protocol

CR000347

HNTB.000245
482

throughout the entire project team including the PMC, the State, ROWAP, SDCs, and third party entities organizations; electronic document control system procedures; QA/QC procedures; project scheduling requirements; and CADD file standards and file transfer procedures. Sections or Chapters of this document will be developed in their applicable tasks within this scope and the PMP will bring these elements into a single reference. This document will be made available on the project team web site as well as hard copy distribution to all team member organizations (one (1) per organization) and applicable Departments of the State (one (1) per Department) involved in the project. The initial PMP shall be developed for submittal to the FHWA in the first 120 days of the Contract.

4. The PMP will be a living document in which revisions will be issued as the program progresses in order to add, modify, or delete provisions as necessary. The PMC shall post updates and issue addenda or supplementary information as necessary during the Planning and Design Phases of the Program. Modifications for the PMP for services associated with the program's construction phase will be covered under FC 320, Construction Phase Services. All addenda, updates, or supplementary information shall be identified and noted in the electronic posting as well as in an advisory update to all Program Team members. The PMP revisions and updates will include periodic resubmittals to the FHWA including, but not limited to:

- Prior to issuing the initial environmental decision releasing Federal-aid funds for ROW acquisition
- Prior to the release of Federal-aid funds for construction
- Annual updates documenting program adjustments
- Response to official Action Plans from any Program Audits as may be necessary to comply with State or Federal requests.
- Response to revised or updated FHWA Guidelines or changes in legislative requirements.

5. Document Controls: A web-based electronic document control system will be implemented for the project. The system will be designed to store and manage critical documents and submittals, provide controlled internet access for project participants, and a record of all program communications. To implement this system, the PMC will setup and maintain two (2) computer file servers dedicated to this project. The PMC will develop a "Document Control Manual," which will include web access procedures for project participants, directory structures, submittal requirements, and archiving protocols. The *Document Control Manual* will be also incorporated into the "Program Management Plan" for the project. The PMC shall maintain staff in the project office to log all documents (hard copy and electronic), scan necessary documents not received in electronic format, and coordinate with Project Controls staff on the electronic network interface.

6. The PMC will also develop training materials specifically tailored to this network and document control procedures of this project, and offer training sessions at the PMC's office. The sessions will be four (4) hours each, with a maximum of twelve (12) people per class.

7. Develop and manage a Cost Control System for the project including:
   a. Develop a Capital Cost Estimate Validation Process (CCEVP). This will be developed in three steps to describe the risks and opportunities related to cost and schedule on the program:
   - The Baseline Development Costs including a wide-variety of project costs that range from existing geotechnical conditions; right-of-way acquisition; utility mitigation and relocations; aesthetics and environmental mitigation. Preliminary estimates developed to date will be collected and supplemented to capture all elements anticipated to impact overall program costs.
   - Development of initial conceptual quantities of work, compilation and review of historic State unit price data, detailed estimates for project-specific items where

Last Updated 05/24/06

CR000348

HNTB.000246
483

historical data is not available, use of traditional State allowances and contingencies, and recommendations for methodology on contingencies, review of trends that impacted cost and schedule of the State's Katy Freeway Program.

- Assessment of risks and opportunities associated with the program, related to: scope, normal escalation, geotechnical exposure from differing site conditions, environmental considerations, outside political influence, site and weather-related conditions, construction method exposure, projected market conditions, compression of the schedule and alternative procurement methods.

b. Life Cycle Cost Analysis will be conducted to analyze the life cycle costs of various systems or components of the work. These studies will look at the initial cost of construction versus the cost of maintaining and operating over the anticipated life. These studies will assist the design process by providing a better understanding of the cost impact of particular components of the design, since initial costs of a component should not be the sole determining factor in the selection process of a particular design methodology. The Life Cycle Cost Analysis will be performed several times throughout the life of the project.

c. Constructability Reviews
- Constructability Reviews will be performed at the conclusion of the following stages:
  o preliminary design phase to assist in setting up project limits.
  o milestone submittal phases of all design sections (30-60-90) (Reference FC 164).
- Constructability reviews shall be captured in a Constructability Report identifying areas of concern/potential conflict. The Constructability Report will be updated following the performance of constructability reviews on each design section submittal.
- The PMC Program Manager will review results of all Constructability reviews and provide in writing recommendations to the State with the PMC's opinion for implementation or identification of potential risks. The final approval of the incorporation of any recommendations will be made by the State.

8. Deliverables
- Electronic Network with list of approved users, their organization/agency affiliation, and security level access allowed.
- Program Management Plan, Electronic and Hard Copy format.
- Program Management Plan Updates as required, Electronic and Hard Copy format.
- Document Control Manual
- Training Manuals/Sessions for Electronic Network access and Document Control procedures including log of attendees for all training sessions.
- Cost Control Procedures and Periodic Program Cost Estimate Updates.
- Constructability Review Reports.

E. **Program Reporting and Audits**
1. PMC shall update the TxDOT PM and support team weekly on key tasks accomplished during the past week, meetings and key activities for the upcoming week, and identify outstanding issues requiring resolution.
2. PMC shall prepare a monthly report and invoice noting program progress to date including a percent complete of all scope items, progress of all applicable third party consultants, assessment of Program Schedule with update of Summary Master Program Schedule, major tasks accomplished during the previous month, major activities planned for the next 90 days, outstanding issues requiring resolution, HUB/DBE programs as applicable, review program financial status; and update cost-to-complete budgets, as appropriate.

CR000349                    HNTB.000247
484

3.  The PMC shall provide Project Administrative support staff to track, monitor, and report on contracts and budgets for the PMC, all subconsultants, the ROWAP Team, and all SDC(s) including subconsultants.
4.  The Project Administrative support staff shall also track, monitor, and prepare reports on HUB utilization by Prime and SDC(s), and HUB/DBE programs for all other program contracts including construction contracts.
5.  The PMC shall prepare a Quarterly Report with an Executive Summary that provides a comprehensive summary of the monthly reports and the overall program progress. The Quarterly Reports shall also summarize the status of Program elements that would be covered typically in an audit by the US DOT Office of Inspector General. The Quarterly Report shall also report on status of any action items generated by any Audit of the Program.
6.  The PMC shall support the State in all State or Federal audits of the US 290/Hempstead Highway Corridor including providing listing and copies of all applicable documents, preparation of exhibits and presentations as may be necessary, attendance at meetings with auditors, and response to inquiries or action items as generated by any audit.

F.  **Agency Coordination**

The PMC shall support the State in coordination and any interlocal agency agreements including exhibit preparation and supporting document preparation and assembly including with the following agencies:
a.  City of Houston (COH)
b.  Harris County Toll Road Authority (HCTRA)
c.  METRO
d.  Harris County Flood Control District (HCFCD)
e.  Harris County
f.  Local Municipalities and Municipal Utility Districts
g.  Other Agencies as identified and as directed by the State

## FIELD SURVEYING AND PHOTOGRAMMETRY (Function Code 150)

A.  The PMC Surveyor shall prepare a *Survey Control Index Sheet(s)* and *a Horizontal and Vertical Control Index Sheet(s)* for each ROW CSJ, signed, sealed, and dated by the responsible Registered Land Surveyor (RPLS), and a Licensed Professional Engineer in the State of Texas, for insertion into the ROW Maps and insertion into the PS&E documents. The *Survey Control Index Sheet(s)* shows an overall view of the applicable portion of the project and the relationship or primary monumentation and control whereas the *Horizontal and Vertical Control Sheet(s)* identified the primary survey control and the survey control monumentation used in the preparation of the project.

The following information should be shown on the Survey Control Index Sheet(s):
- Overall view of the applicable section of the project and primary control monuments set for control of the project.
- Identification of the control points.
- Baseline and/or centerline
- Graphic (Bar) Scale
- North Arrow
- RPLS signature, seal and date

The following information should be shown on the Horizontal and Vertical Control Sheet(s):
- Location for each control point, showing baseline and/or centerline alignment and North Arrow.

CR000350

- Station and offset (with respect to the baseline or centerline alignments) of each identified control point.
- Basis of Datum for horizontal control (base control monument, benchmark, number, datum).
- Basis of Datum for the vertical control (base control monument, benchmark name, number, datum).
- Date of current adjustment of the datum.
- Monumentations set for Control (Description, District name/number and Location ties).
- Surface Adjustment Factor and unit of measurement.
- Coordinates (SPC Zone and surface or grid).
- Relevant metadata
- Graphic (Bar) Scale
- RPLS signature, seal, and date.
- TxDOT title block containing District Name, County, Highway No., and CSJ.

B.    The PMC Surveyor shall periodically verify and re-establish as necessary the controls within the corridor.

C.    The PMC Surveyor shall control traffic in and near surveying operations adequately to comply with the latest edition of the *Texas Manual on Uniform Traffic Control Devices*. In the event field personnel must divert traffic or close traveled lanes; a Traffic Control Plan shall be prepared by the PMC's Surveyor and approved by the State prior to commencement of field work. A copy of the approved plans shall be in the possession of field personnel on the job site at all times and shall be made available to State personnel upon request.

D.    The PMC Surveyor shall establish in coordination with the State criteria for topographic surveying on the Program and develop the appropriate section of the PMP for distribution to the SDC(s).

E.    The PMC Surveyor shall coordinate with the SDC field surveyors and review submittals from the SDC for conformance with State procedures and the US 290/Hempstead Highway Corridor Program requirements. The PMC Surveyor shall resolve discrepancies or questions in the field related to coordination between surveyors on adjacent sections.

## ROADWAY DESIGN (Function Code 160)

A.    **Roadway Design**
   1.    Provide a Design Management Manager and support personnel for performing tasks as noted within this scope of work that will report directly to the Deputy Project Manager for Production.
   2.    Evaluate and develop program wide design criteria, and supply program specific design criteria to detail design development. The program specific criteria will be noted in applicable section of the Program Management Plan along with recommended corridor-wide standards and procedures as noted below. The PMC shall conduct a minimum of three workshops with the State's Houston District Consultant Contracts, Area Engineer and Maintenance Department representatives to coordinate and finalize development of these elements.
   3.    Provide Roadway Design experts, as directed, for Value Engineering Studies and Constructability Reviews as identified within applicable sections of the scope of work.
   4.    The PMC will review and monitor identification of any potential design exceptions and/or waivers within the corridor including requests of such from the SDC(s). The PMC will also

CR000351

HNTB.000249
486

assemble and/or prepare the necessary documentation including photographs and traffic accident information, if warranted, to process any design exceptions and/or waivers within the individual segments that are identified by the SDC.

B. **Roadway Design Management.**

1. The PMC will review and provide written response on the adequacy of all design consultant submittals of all plans and reports including detailed review of the proposed roadway profiles at the 30% design phase development for all design section. The PMC is to oversee that the designs as provided by the SDC(s) are in accordance with applicable requirements of the State's Specifications, Standards and Manuals. Whenever possible, the Department's standard drawings, standard specifications, or previously approved special provisions and/or special specifications shall be used. If a special provision or a special specification must be developed for this project, the PMC shall ensure that provisions and specifications shall be developed in the Department format and to the extent possible, incorporate references to approved Department test procedures.

2. The PMC Roadway Manager will support the PMC's evaluation of the monthly progress reports as provided by the SDC together with the evidence of the work accomplished during the period since the previous report.

3. The PMC is to confer/coordinate with the State, Harris County, any municipality and other legal authorities having jurisdiction regarding the crossing, closing and/or relocation of any roads, ramps and streets.

C. **Deliverables**

- Section of the Program Management Plan identifying Roadway Standards, Details, and Procedures for the US 290/Hempstead Highway Corridor.
- Log of all review comments related to Submittals on roadway design and plan development.
- Assembly of submittals for any potential design exceptions and/or waivers.
- Periodic summary of Roadway Design Issues Identified and resolution(s).
- Identification of Roadway Standards and modification of applicable standards or creation of specific standards for the US 290/Hempstead Highway Corridor.
- Preliminary, Interim, and Final Cost Estimates as related to roadway items.

## DRAINAGE (Function Code 161)

The PMC shall provide drainage planning, modeling and design management services to guide and oversee implementation of a corridor-wide approach to drainage analysis, modeling, mitigation, permitting, and coordination in conformance with the State *Hydraulic Manual* and Houston District criteria, and to establish program specific design criteria and standards. The services to be provided shall include the following:

A. **Modeling and Corridor Drainage Impact Report.**

1. Review all preliminary drainage studies previously prepared along the corridor and provide a summary of key issues/assumptions to be utilized in preparation of a Corridor Drainage Impact Report.

2. Provide all modeling necessary to consolidate the previous studies and support development of a Corridor Drainage Impact Report.

3. Coordinate with HCTRA and their consultant(s) and provide review of available data and studies prepared for and along the Hempstead Highway corridor and the proposed managed lanes incorporating these elements into the Corridor Drainage Impact Report.

CR000352

4. Prepare a single Drainage Impact Report for the US 290/Hempstead Highway Corridor Program which includes approach to design, mitigation, and coordination.

5. Develop corridor-wide drainage program design criteria and standards for distribution to the segment design consultants.

6. Provide coordination with applicable local, state, and federal agencies and shall advise the State as to the status of all coordination and any applicable approval efforts.

7. Consider drainage features, proposed outfalls, mitigation requirements, storm water management requirements, and temporary drainage requirements in development of the overall construction sequence master plan and in determination of proposed project sections for design and construction.

8. Provide drainage support for value engineering studies and workshops to support a cost effective implementation of the corridor-wide program.

9. Provide preliminary cost estimating for drainage features and elements to support program master and financial planning tasks.

10. Update and provide addenda to Corridor Drainage Impact Report during planning and design development as necessary.

11. Prepare Conditional Letter of Map Revision (CLOMR) requests to the Federal Emergency Management Agency (FEMA), if needed.

12. Deliverables
   - Corridor Drainage Impact Report including a summary of key issues/assumptions.
   - Addenda and Updates to Corridor Drainage Impact Report as necessary.
   - Corridor-wide drainage program design criteria and standards.
   - Meeting Agendas and Minutes from all meetings with third party agencies.
   - Preliminary Cost Estimates.
   - Conditional Letter of Map Revision, if needed.

B. **Drainage Design Management**

1. Review Design Concept Conference forms developed by Section Design Consultants and provide direction to maintain conformance of drainage design with Corridor Drainage Impact Report.

2. Review the particular section consultant's progress to comply with the terms of the report, monitor the section design consultant progress on the hydraulic design, review computations, and provide direction/assistance to rectify design issues as they become apparent. Review shall include monthly review of progress providing recommendations to the State on progress status to date and plan development reviews at 30-60-90-95-100 for each design section. Elements to be reviewed include:
Drainage Area Maps.
Storm drainage design calculation and details.
Bridge and Culvert hydraulics.
Scour Analysis and reporting.
Mitigation design and detailing.
Storm Water Pollution Prevention Plans
Environmental Data Sheets for information related to drainage and outfalls.
Temporary drainage elements and facilities.
Outfall Channel treatments.

3. Pump Stations: The PMC shall perform preliminary calculations and determine the pump size and the hydraulic and hydrology characteristics of any pump stations at depressed roadway sections. The PMC will review any reports prepared by section design consultants and determine acceptability for submission by the District to Austin for approval. The PMC shall provide plans, details, and calculations for the following pump station elements:

CR000353

- Structural design
- Mechanical design
- Electrical design

4. Deliverables
   - Log of all review comments, per Design Section and submittal, including status of comment incorporation.
   - Periodic summary of Drainage Design Issues identified and resolution(s).
   - Meeting Agendas and Minutes from all meetings with Section Design Consultant Teams.
   - Pump Station Preliminary and Final Reports.
   - Pump Station PS&E Standards and Details for Structural, Mechanical, and Electrical elements.

C. **White Oak Bayou Drainage Study**

Following completion of all final drainage design to include all detention sizes and locations, the PMC shall perform a comprehensive study analyzing the effects on the US 290/Hempstead Highway Corridor to the White Oak Bayou Watershed.

## SIGNING, PAVEMENT MARKINGS, SIGNALIZATION (PERMANENT) (Function Code 162)

A. **Traffic Master Plan and Management of Traffic Elements**
   1. Evaluate and develop program-wide design criteria, and supply program specific design criteria to guide detail design development. The program specific criteria will be noted in applicable sections of the Program Management Plan along with corridor-wide standards to be applied.
   2. The PMC shall conduct three workshops with the State's Houston District Traffic Section to coordinate and finalize development of these elements.
   3. The PMC shall recommend and develop any Corridor specific standard drawings or modifications of State standards, as approved by the State, for use on the US 290/Hempstead Highway Corridor.
   4. The PMC shall maintain a Master List of all existing as-builts and reports noting the following:
      - Type and location of guide sign structures
      - Type and location of illumination
      - Type and location of ITS
      - Signal plans
   5. The PMC is to provide advice and consultation on questions of engineering with respect to traffic design intent.
   6. The PMC is to confer/coordinate with the State, Harris County, any municipality and other legal authorities having jurisdiction regarding the crossing, closing and/or relocation of any roads, ramps and streets.
   7. The PMC shall provide for reviews to confirm that each of the sections designed along the corridor are in compliance with the Americans with Disabilities Act (ADA) and the Texas Accessibility Standards and the jurisdiction of the Texas Department of Licensing and Regulation (TDLR).
   8. The PMC shall coordinate, review, and oversee all traffic design and final detail drawing preparation for each Construction CSJ within the program. Coordination shall include monthly, or more frequent as may be necessary, meetings with each assigned design group per CSJ, to include SDC(s), the State's Houston District and PMC Team, to assess progress and identify issues that may be hindering design/plan development and develop resolution action plans as appropriate.

CR000354

HNTB 000252
489

9. PMC shall review Design Concept Conference forms developed by Section Design Consultants and provide direction to maintain conformance with US 290/Hempstead Corridor traffic design criteria, standards and procedures.

10. Using the District checklist, perform design Milestone Reviews during 30, 60, 90, 95, and 100 percent PS&E development with the applicable identified elements.

B.  **Signing**

Develop an overall signing concept plan for the entire US 290/Hempstead Highway Corridor and prepare a layout(s) illustrating proposed large signs including overhead, cantilever, and large ground mounted signs. Also provide for overall temporary, interim and final signing strategies and placement of signs outside contract limits. Sign poles, attachments, and details shall conform to the overall aesthetic/landscaping plan for the US 290/Hempstead Highway Corridor including application of the Green Ribbon Project's recommendations and standards.

C.  **Traffic Signals**

1.  The PMC will investigate and provide recommendations to the State on the use of traffic signal state-of-the-art techniques and equipment that can be incorporated into the corridor.

2.  The PMC will investigate development along the corridor and at the intersections in order to provide a more accurate estimate of traffic volumes and movements during different phases of construction.

3.  Analyze signal design and timing for different phases of TCP. This includes maintaining the coordination between frontage road signals throughout the temporary signal construction phase.

4.  The PMC will evaluate the intersections for potential traffic flow improvement.

5.  The PMC will analyze the existing condition and prepare a signal timing plan for all intersections along the entire corridor prior to construction. Make appropriate adjustments to the signal timing during and after construction.

6.  The PMC will prepare an overall signal interconnect plan for cross streets throughout the corridor.

7.  The PMC will perform traffic studies as requested by the State along the corridor to evaluate the impact of construction along the major arterials.

8.  The PMC will prepare, as requested by the State, PS&E construction plans for traffic signal design, signing and markings and/or intersection improvements along the corridor to address isolated congestion problems.

D.  **Staged Construction**

1.  The Traffic Manager will participate in Constructability Review Teams to identify issues related to construction.

2.  The PMC will investigate traffic impact analysis for each phase of construction as identified in the Master Program Schedule.

E.  **Deliverables**

- Corridor-wide standards and procedures as applicable portion of Program Management Plan and associated standard drawings or modifications of standard drawings for signing, pavement markings, and signalization for the US 290/Hempstead Highway Corridor.
- Signal Timing Plan for all intersections along the corridor.
- TCP Signal Analysis Summary for each section.
- Traffic Analysis Summary for each of the intersections.
- Traffic Signal Techniques and Equipment Report
- Traffic Count and Development Analysis Report

Last Updated 05/24/06

CR000355

HNTB 000253
490

- Signal Timing Report
- Signal Interconnect Summary
- Pavement Marking Analysis Summary
- Log of all review comments, per Design Section and submittal, including status of comment incorporation.
- Periodic summary of Traffic Design Issues identified and resolution(s).
- Traffic Studies as assigned.
- Reports identify results of constructability reviews.

## MISCELLANEOUS (Function Code 163)

A. **Retaining Walls**
   1. Evaluate and develop program-wide retaining wall design and layout criteria that will compliment the US 290/Hempstead Corridor landscape/aesthetic plan using the Green Ribbon Project that will guide the SDC(s) for each design segment. The program specific criteria will be noted in applicable sections of the Program Management Plan along with corridor-wide standards.
   2. The PMC shall coordinate with the State's Houston District to coordinate and finalize development of these elements.
   3. The PMC shall recommend and develop Corridor specific standard drawings or modifications of State standards, as approved by the State, for use on the US 290/Hempstead Highway Corridor.
   4. Working with the District, the PMC will develop a sample retaining wall layout sheet that will be used for the different type of retaining walls to provide consistency in plan preparation.
   5. The PMC shall provide PS&E documents for retaining walls as directed by the State for either separate bidding or for inclusion with SDC PS&E documents as applicable.
   6. The PMC shall review all retaining wall plans prepared and submitted by the SDC(s) at appropriate milestone submittals for verification of conformance with Program requirements.

B. **Noise Abatement Walls**
   1. Evaluate and develop program-wide Noise Abatement Wall criteria for implementation on the US 290/Hempstead Corridor. The walls will compliment the landscape/aesthetic plan. The program specific criteria will be noted in applicable sections of the Program Management Plan.
   2. The PMC shall conduct a workshop with the State's Houston District to coordinate and finalize development of these elements.
   3. The PMC shall recommend and develop Corridor specific standard drawings or modifications of State standards, as approved by the State, for use on the US 290/Hempstead Highway Corridor.
   4. The PMC shall provide PS&E documents for noise abatement walls as directed by the State for either separate bidding or for inclusion with SDC PS&E documents as applicable.
   5. The PMC shall review all noise abatement wall plans prepared and submitted either by the SDC(s), PMC Team, or by the State, at appropriate milestone submittals for verification of conformance with Program requirements.

C. **Master Construction Sequencing and Traffic Control Plan (TCP)**
   1. During the early review of the schematic, the Strategic Development Plan will include an overall implementation plan for the corridor that will include construction phasing for each

CR000356

construction segment. This plan will be part of the Master Program Schedule that will be maintained by the PMC.

2. Evaluate and develop program-wide Traffic Control criteria, in coordination with representatives of the District's Traffic Operations, to guide the SDC in the development of the TCP. The program specific criteria will be noted in applicable sections of the Program Management Plan along with corridor-wide standards.

3. The PMC shall conduct a workshop with the State's Houston District Traffic Operations and Area Engineer(s) to coordinate and finalize the implementation plan and the construction phasing.

4. During each project section kickoff meeting, the PMC will present the limits for each segment, schematic details, the construction phasing plans and the appropriate details that comply with the corridor PMP.

5. The PMC will review the SDC's TCP to evaluate for compliance with the terms of the PMP and provide direction/assistance to rectify issues as they become apparent. Review shall include monthly review of progress providing recommendations to the State on progress status to date and plan development at applicable milestone reviews for each design section.

6. The PMC will make periodic presentations to local officials and organizations in accordance with the PMP PI Plan.

7. The PMC will coordinate TCP workshop meetings at the early design phases of each section and all District Safety Review Team (SRT) meetings with the SDC and the State to review the TCP at final stages of design for each section. All Traffic Control Plans and Phasing workshops shall include representatives of the District's Traffic Operations Department.

8. US290 is considered a Hurricane Evacuation Route and as such the PMC will integrate a contraflow plan in all Traffic Control Plans to handle the period annually between June 1 and October 1.

D. **Illumination**

1. The PMC will develop a Master High Mast Illumination Plan for the US 290/Hempstead corridor. The program specific criteria will be noted in applicable sections of the Program Management Plan along with corridor-wide standards. The Master Plan shall consider maintenance access for high mast poles.

2. The PMC will investigate whether an early illumination project can be implemented by identifying acceptable work areas for the contractor that will compliment the ultimate Master High Mast Illumination Plan. The Illumination Plan shall consider electric service requirements and accessibility.

3. If an early project is possible and acceptable to the State, the PMC will develop the plans and specifications in accordance with District criteria for letting of an Illumination construction contract.

4. If the SDC(s) are required to include high mast illumination on their plans, the PMC will review the SDC's illumination plans to evaluate for compliance with the terms of the PMP and provide direction/assistance to rectify issues as they become apparent. Review shall include monthly review of progress providing recommendations to the State on progress status to date and plan development reviews at applicable milestone reviews for each design section.

5. Perform Light Trespass Analysis. Areas identified as sensitive receptors will be analyzed for light trespass. This analysis will be performed by calculating the impact of the preferred lighting alternative on these receptors in vertical illuminance at the property line 5 feet above grade. Alternatives will be developed for minimizing the amount of light trespass in these areas. The options that will be investigated are:
   a. Shielding the luminaries
   b. The use of different optical systems

CR000357

c. Lowering pole height
d. Custom luminaries

E. **Management of CADD Files and Standards**
1. The PMC shall conduct a workshop with the State's Houston District to coordinate and verify the CADD filing system for the Microstation files developed by the State, the PMC and the SDC(s). The workshop will also develop a list of acceptable standards that will be specific to the US 290/Hempstead Corridor.
2. The PMC will include standards for electronic submittal that include applicable GIS data for integration into the US 290/Hempstead Highway Corridor GIS database system.
3. The PMC will maintain a list and copies of all applicable State standards to be utilized in the Program and all modified standards and shall distribute to the SDC(s) all applicable standards and procedures to the SDC(s) at their respective kickoff meeting. The PMC shall also provide updates and distribute modifications at periodic intervals as required.
4. The monthly coordination meetings with the SDC(s) will include verification of whether the filing system and corridor standards are being used as originally intended.

F. **Special Utility Details and Plans**
1. The PMC will prepare any special utility details and/or design plans, as approved by the District to assure that the project proceeds in accordance with the overall PMP and schedule.
2. The PMC will assemble and prepare any permits and/or agreements as needed for the processing of the improvements.
3. The PMC shall review any utility exhibits and plans developed by the SDC(s) at appropriate milestone reviews for development of section design plans.

G. **Construction Cost Estimates**
1. As part of the PMC's cost control team, the PMC will periodically evaluate construction bid items and evaluate construction cost and material trends.
2. The PMC will provide an update of the revised bid items to the SDC(s) for inclusion into the milestone submittals.
3. The PMC will review the SDC(s) cost estimates for conformance to the latest bid items and make recommendations based on the particulars of the individual section.

H. **Miscellaneous Design PS&E Development**
1. The PMC will prepare PS&E documents on intersections improvements and traffic signal interconnects, as approved by the District, as necessary to expedite the construction improvements on the US 290/Hempstead Highway Corridor.
2. The PMC will follow US 290/Hempstead PMP processes and procedures to design, assemble, and perform quality control review on all PS&E development by the PMC Team.
3. The PMC will coordinate and review the status of the project development process with the SDC(s) and provide direction/assistance to rectify issues as they become apparent.
4. The PMC will prepare PS&E documents, as approved by the State, to accommodate an expedited construction schedule or to accommodate funding schedule limitations, if the situation becomes necessary.

I. **Deliverables**
- Corridor-wide standards and procedures as applicable portion of Program Management Plan and associated standard drawings or modifications of standard drawings for retaining walls, noise abatement walls, Traffic Control Plan, illumination and electronic CADD standards for the US 290/Hempstead Highway Corridor.
- Aesthetic corridor guidelines based on District's Green Ribbon Project.

CR000358

HNTB.000256
493

- Notes from project workshops.
- TCP Implementation Plan including construction phasing
- Construction schedule for the overall project and each individual project section.
- Notes from SDC kick-off meeting.
- Monthly review of construction bid items.
- Meeting minutes from all SRT meetings.
- List of all current electronic standards acceptable for the US 290/Hempstead Corridor Project.
- Notes documenting adherence to the electronic filing management system.
- Any special utility details and plans as requested by the State to meet project need and schedule.
- Any PS&E documents for miscellaneous design tasks as requested by the State to meet project schedule.
- Log of all review comments, per Design Section and submittal, including status of comment incorporation.
- Identify results of constructability reviews.

## MANAGING CONTRACTED SERVICES FOR FC 160 THRU FC 170 (Function Code 164)

A.  **Program Management / Administration**
    1.  The PMC Team shall provide a Program Manager, Two Deputy Program Managers, and support administrative staff to manage the daily activities of the program, the scope of services noted herein for Function Codes 160 through Function Codes 170 and provide the primary contact point between the State, the PMC Team, third party consultants to include the SDC(s), utility companies, third party agencies, and the general public.
    2.  The PMC shall continue to maintain an electronic network for communications within the PMC Team, the State, the ROWAP, the SDC(s), and other identified third parties as approved by TxDOT including assigning and managing individual user accounts.
    3.  Partnering Meetings
        The PMC shall provide for facilitation of partnering meetings to strengthen relationships and overall program delivery including such partnering meetings, either individually or together, with the following:
        - Section Design Consultants (SDCs)
        - Third Party Agencies such as HCTRA, HCFCD, COH, City of Jersey Village, Harris County Public Infrastructure, etc. as identified by the State
        Note: Support of Partnering meetings associated with construction are within the scope for FC 320, Construction Phase Services, and support of such meetings during the Planning process are within the scope for FC 145, Managing Contracted PE Services for FC 110 thru FC 150.
    4.  Records of all meetings held both internally and externally as related to the US 290/Hempstead Highway Corridor Program including a record of attendees, agendas, and summary of discussions, action items, and decisions as applicable.

B.  **Program Scheduling**
    1.  The PMC shall maintain the Master Program Schedule developed within the scope for FC 145, Managing Contracted Advance PE Services for FC 110 thru FC 150, and provide updates/revisions to include Design Services provided under FC 160 through FC 170.
    2.  The PMC shall develop detailed schedules as a part of the Master Program Schedule for the following major Tasks:
        a.  Program Management Tasks for FC 160 through FC 170
        b.  Proposed schedules for SDC(s)

  c. Proposed Managed Lanes/Hempstead Highway reconstruction milestones and interaction.

  d. Proposed Construction Lettings and the State's processes supporting letting

  e. Construction Time Schedule estimates

 3. The PMC shall provide monthly updates of all schedules at the appropriate stages of the program and shall provide an assessment of schedules provided by applicable third parties for integration into the Master Program Schedule. (Note: Review and assessment of construction schedules is provided under FC 320, Construction Phase Services)

 4. Deliverables

  • Detailed Task Schedules for applicable segments of the work.

  • Monthly Schedule and Risk Matrix Updates and narrative discussion of progress along with identification of any schedule recovery strategies as necessary. The Schedule Updates will include:

   o Critical Path Report for the Program

   o Critical Path Report for current projects

   o Work in Progress this Update by project

   o Six Week Look ahead by project

   o Recommendations concerning schedule recovery strategies where necessary.

## C. Financial Plan

 1. Continue to provide the State's Houston District Administration quarterly assessments reviewing the status of the Financial Plan and anticipated issues in preparation for Annual Updates.

 2. Provide Annual Financial Plan Updates including:

  a. Program status and expenditures to date.

  b. Analyze cost and revenue trends that have impacted project costs and revenues during the previous year.

  c. Develop, when necessary, revenue shortfall mitigation strategies to minimize impacts on scheduled project delivery.

  d. Prepare a summary of significant cost reductions that will affect the cost of the project.

  e. Prepare a summary of significant cost increases that will affect the cost of the project

 3. Deliverables

  • Documentation of Quarterly assessments of the Financial Plan.

  • Annual Updates of the Financial Plan.

## D. Project Controls and Program Management Plan (PMP)

 1. Continue to host and maintain a web-based electronic network including maintenance and hosting of the "Dashboard" web interface to link all critical project controls, documents, and applicable reference materials. The web-based tool interface will be accessible from any internet explorer tool, but only allow password security controlled access to the PMC Team and specified individuals as approved by the State. The PMC shall maintain a list of all approved users and changes in account status.

 2. The PMC shall provide full time staff in the Project Office to troubleshoot the electronic system, resolve performance or access issues, and maintain the internal computer network.

 3. Expand or develop applicable portions of the Program Management Plan (PMP) in accordance with FHWA published Guidance Documents that outlines the communication protocol throughout the entire project team including the PMC, the State, ROWAP, SDCs, and third party entities organizations; electronic document control system procedures; QA/QC procedures; project scheduling requirements; and CADD file standards and file transfer procedures. Sections or Chapters of this document will be developed in their applicable tasks within this scope and the PMP will bring these elements into a single

CR000360

HNTB_000258
495

reference. This living document will be maintained on the project team web site as well as distribution of hard copy updates, as directed by TxDOT, to all team member organizations (one (1) per organization) and applicable Departments of the State (one (1) per Department) involved in the project.

4. The PMP will be a living document in which revisions will be issued as the program progresses in order to add, modify, or delete provisions as necessary. The PMC shall post updates and issue addenda or supplementary information as necessary during the Planning and Design Phases of the Program. All addenda, updates, or supplementary information shall be identified and noted in the electronic posting as well as in an advisory update to all Program Team members. The PMP revisions and updates will include periodic resubmittals to the FHWA including, but not limited to:

   - Prior to issuing the initial environmental decision releasing Federal-aid funds for ROW acquisition
   - Prior to the release of Federal-aid funds for construction
   - Annual updates documenting program adjustments
   - Response to official Action Plans from any Program Audits as may be necessary to comply with State or Federal requests.
   - Response to revised or updated FHWA Guidelines or changes in legislative requirements.

5. Document Controls: The PMC shall continue to maintain a web-based electronic document control system for the project. The system will be designed to store and manage critical documents and submittals, provide controlled internet access for project participants, and a record of all program communications. The PMC will update the "Document Control Manual," to address any necessary changes or updates as the program develops. The PMC shall maintain staff in the project office to log all documents (hard copy and electronic), scan necessary documents not received in electronic format, and coordinate with Project Controls staff on the electronic network interface.

6. Provide updates to the Cost Control System and cost estimates to reflect the applicable stage of program development.

   a. Updates to the Capital Cost Estimate Validation Process (CCEVP) to include the following:
      - Periodic update of cost estimates and incorporation of cost estimates provided at various milestones by the SDCs. Periodic updates to include escalation of unit prices as experienced on other construction projects and evaluation of price impacts based on material availability.
      - Update to costs associated with risks and opportunities on the program, as related to: scope, normal escalation, geotechnical exposure from differing site conditions, environmental considerations, outside political influence, site and weather-related conditions, construction method exposure, projected market conditions, compression of the schedule and alternative procurement methods.
      - Updates to applicable Life Cycle Cost Analysis and estimates.

   b. Constructability Reviews
      Constructability Reviews will be performed at milestone submittal phases of all design sections (30-60-90).
      - Constructability reviews shall be captured in a Constructability Report identifying areas of concern/potential conflict. The Constructability Report will be updated following the performance of constructability reviews on each design section submittal.
      - The PMC Program Manager will review results of all Constructability reviews and provide in writing recommendations to the State with the PMC's opinion for

CR000361

HNTB 000259
496

implementation or identification of potential risks. The final approval of the incorporation of any recommendations will be made by the State.

7. Deliverables
   - Updates to the list of approved users on the Electronic Network, their organization/agency affiliation, and security level access allowed.
   - Program Management Plan Updates as required, Electronic and Hard Copy format.
   - Document Control Manual Updates.
   - Periodic Updates to Cost Control Procedures and Program Cost Estimates.
   - Constructability Review Reports.

E. **Support Procurement and Scope of Work Development for SDC(s)**
   1. Support preparation of the Scope of Work for the Design Sections and an independent estimate of level of effort/project fee for submittal by the State's Houston District to the Division Office with the draft NOI, and for use by the State during negotiations with selected SDC(s).
   2. Attend the mandatory short-list meeting and provide support in preparation of the Interview and Contract Guide (ICG).
   3. Attend SDC interviews in a consulting capacity.
   4. Attend and document the scope and fee negotiations between the State and the selected SDC(s).
   5. Support the Houston District, as directed, in the preparation of all final contract documents for submittal to Division for final processing.

F. **Contract Administration of SDC(s) contracts**
   1. Assign a Project Manager to each SDC as the day-to-day contact and to provide project management oversight for the assigned design section. Each SDC PM shall not be assigned more than three SDC(s) at any given time.
   2. Provide resolution and recommendations to any contract issues and provide response to Requests for Information and Requests for Clarification received from SDC(s) as related to contract issues.
   3. Maintain a schedule for Billing and monitor budgets established for each SDC.
   4. Review all invoices submitted by SDC(s) for completeness, accuracy, and conformance to State criteria, Program requirements noted in Attachment C, and the SDC Contracts, and provide recommendation as related to stated progress and proposed payment amounts.
   5. Assess requests for supplemental agreements as submitted by SDC(s) and provide written recommendations to the State concerning validity of requests and proposed man-hours, and whether a supplemental agreement is warranted under the terms of the contract(s).
   6. Prepare independent estimate (pre-negotiation estimate) of proposed fee for supplemental agreements as may be required.
   7. Review supplemental agreements and contracts for spreadsheet accuracy using approved rates from the contracts prior to SDC submittal to the State.
   8. Support the Houston District, as directed, in the preparation of all final supplemental agreement documents for submittal to either the District Engineer or Division, as applicable, for final processing.

G. **Coordination, oversight, and work product review of SDC(s)**
   1. Facilitate SDC "Kick-off" meetings and establish user identifications and passwords for access to the web-based program network.
   2. Hold SDC progress meetings, at least monthly, to assess progress, schedule, and quality of services being provided as well as identify design or project issues. This includes periodic

CR000362

HNTB.000260
497

visits to the SDC(s) offices by PMC representatives to review project progress and audit application of Program Management Plan requirements.

3. Provide resolution and recommendations to any design issues, conflicts, or special conditions. Respond to Requests for Information and Requests for Clarification received from SDC(s).

4. Facilitate Design Concept Conferences (DCC) with each SDC, and assemble and route to the State completed DCC forms and associated exhibits for further processing.

5. Coordinate, log, and track comments on all reviews of SDC submittals including:
   a. Engineering Reports
   b. 30% Plan Submittals
   c. 60% Plan Submittals
   d. 90% Plan Submittals
   e. 95% Plan Submittals (Plan Review)
   f. 100% Plan Submittals (Design Division)
   The PMC SDC Manager shall review all submittals for completeness and coordinate reviews by discipline area specialists and appropriate State District personnel as applicable.

6. The PMC shall update the estimates on the State's DCIS and shall provide final assembly of all PS&E packages with supporting paperwork for the State's further processing to letting.

7. The PMC will monitor and verify reviews for compliance of each section design PS&E final package with the American with Disabilities Act (ADA) and the Texas Accessibility Standards (TAS).

8. The PMC shall provide documentation that all PS&E packages have been prepared in conformance with the Program Quality Control Management Procedures.

9. The PMC shall support the State in assessment, preparation of supporting documents, and documentation of meetings with SDC(s) related to Provider's Performance Reviews.

10. The PMC shall assist in the preparation of the SDC's performance evaluation on a yearly basis and, as requested, on an interim basis if warranted.

**H. Program Reporting and Audits**

1. PMC shall update the TxDOT PM and support team weekly on key tasks accomplished during the past week, meetings and key activities for the upcoming week, and identify outstanding issues requiring resolution.

2. PMC shall prepare a monthly report and invoice noting program progress to date including a percent complete of all scope items, progress of all applicable third party consultants, assessment of Program Schedule with update of Summary Master Program Schedule, major tasks accomplished during the previous month, major activities planned for the next 90 days, outstanding issues requiring resolution, HUB/DBE programs as applicable, review program financial status; and update cost-to-complete budgets, as appropriate.

3. The PMC shall provide Project Administrative support staff to track, monitor, and report on contracts and budgets for the PMC, its subconsultants, the ROWAP Team, and all SDC(s) including their subconsultants.

4. The Project Administrative support staff shall also track, monitor, and prepare reports on HUB utilization by Prime and SDC(s), and HUB/DBE programs for all other program contracts including construction contracts.

5. The PMC shall prepare a Quarterly Report with an Executive Summary that provides a comprehensive summary of the monthly reports and the overall program progress. The Quarterly Reports shall also summarize the status of Program elements that would be covered typically in an audit by the US DOT Office of Inspector General. The Quarterly Report shall also report on status of any action items generated by any Audit of the Program.

6. The PMC shall support the State in all State or Federal audits of the US 290/Hempstead Highway Corridor including providing listing and copies of all applicable documents,

CR000363

HNTB.000261
498

preparation of exhibits and presentations as may be necessary, attendance at meetings with auditors, and response to inquiries or action items as generated by any audit.

I. **Agency Coordination**
The PMC shall maintain support to the State for coordination and any interlocal agency agreements including exhibit preparation and supporting document preparation and assembly with all third parties including the following agencies:
a. COH
b. HCTRA
c. METRO
d. HCFCD
e. Harris County
f. Local Municipalities and Municipal Utility Districts
g. Other Agencies or entities as directed by the State.

J. **General Contracting Procedures**
1. All documents submitted to the State shall be accompanied by a letter of transmittal which shall include but need not be limited to, contract and work authorization number, the highway number, project limits, county and project CSJ.
2. The PMC shall furnish equipment, materials, supplies, and incidentals, required to perform the work described above. Once a project is clearly defined in a work authorization shall be issued to initiate the work.
3. The PMC may be required to meet with the State's Project Manager to report on routine progress. After each meeting with the State and any other meeting, the PMC shall prepare meeting minutes, solicit and incorporate participants' comments, distribute the minutes, submit a memorandum summarizing the events, including an Action Item List, within five (5) working days of the meeting.
4. The project's engineering work may be inspected by both the State and the Federal Highway Administration (FHWA) in the offices of the Engineer, except for the field work which shall be performed on-site, and the sub-consultant work which will be performed in the office of the sub-consultant. After notice to proceed is given in writing, the PS&E for the work outlined above shall be completed and submitted to the State within the negotiated contract period per the identified milestones in the schedule.
5. The PMC shall implement their Quality Assurance/Quality control program prior to submitting plans to the State for each of the milestones. The PMC is responsible for design errors and/or omissions that become evident before, during, or after construction of the project. The PMC's responsibility for all questions arising from design errors and/or omissions will be determined by the State and all decisions shall be final and binding.

The PMC shall promptly make necessary revisions or corrections resulting from the PMC's errors, omissions or negligent acts without additional compensation. Acceptance of the work by the State will not relieve the PMC of the responsibility for subsequent correction of any such errors or omissions or for clarification of any ambiguities.

6. All electronic files shall be delivered within thirty (30) days of written request in conformance with the State's *Document and Information Exchange*.
7. Design Graphic Standards: The PMC shall use CADD to fully develop all drawings. The CADD drawings developed shall be compatible with the State's *Document and Information Exchange*.
8. An evaluation of the PMC's performance, professionalism, quality of plan preparation and fee proposal spreadsheets for work described, etc. will be performed by the State.

CR000364

HNTB.000262
499

9. All documents provided to the PMC by the State or prepared by the PMC in pursuance of a work authorization shall be deemed the sole property of the State. All requests received by the PMC from third parties for maps, plans, schematics, sketches, calculations or other documents shall be forwarded to the State for handling.

10. In preparation for each meeting, the PMC shall prepare and distribute a "Meeting Agenda" which shall include a brief description of the meeting objectives, a list of the topics to be covered and a list stating who will address each topic to direct efforts toward the desired outcome. When action items arise from the meeting discussion, an assignment of responsibility, a priority level and due date for each action item shall be made immediately.

## TRAFFIC MANAGEMENT SYSTEMS (PERMANENT) (Function Code 165)

A. **Ultimate Traffic Management System**
   1. Develop an ultimate ITS plan including measures to maintain operability during the construction period.
   2. Coordination and packaging design and PS&E development for ITS Control Systems.
   3. Develop plans, specifications, and estimates for ITS elements for the ultimate ITS plans as requested by the State.
   4. Design the civil portion of the ultimate traffic management system such as conduits, drill shafts, structures, etc. to be included on each roadway project.
   5. At completion of design, the PMC shall develop a proposed ITS scheduled maintenance plan for the US 290/Hempstead Highway Corridor, in coordination with the Houston District Director of Traffic Operations, to include all ITS components and appurtenances.
   6. Trucklane restrictions on US 290 are to be maintained if at all possible.
   7. Deliverables
      - Ultimate ITS Plan.
      - ITS PS&E bidding documents.
      - Plans and Details for civil portion of ultimate traffic management system.
      - Traffic Management System Maintenance Plan

## BRIDGE DESIGN (Function Code 170)

A. **Bridge Programming**
   1. Provide a Task Manager and support personnel for performing tasks as noted within this scope of work that will report directly to the Design Management Manager.
   2. Evaluate and develop program wide design criteria, and supply program specific design criteria to guide bridge layout and detail design development. The program specific criteria will be noted in applicable section of the Program Management Plan along with recommended corridor-wide standards and procedures as noted below. The PMC shall conduct a minimum of three workshops with the Houston District Bridge Department and with Houston District Area Engineer and Maintenance Department representatives to coordinate and finalize development of these elements.
   3. The PMC shall develop a Master List of all existing and proposed structures and maintain noting the following:
      a. Location and Proposed Type
      b. Preliminary Foundation Recommendations
      c. Issues affecting design such as Traffic Control or construction phasing. This includes assessment of partial demolition of existing structures as may be necessary to accommodate staged construction.

CR000365

HNTB_000263
500

4. Provide Bridge/Structural experts, as directed, for Value Engineering Studies, Foundation Studies, and Aesthetic Work Groups as identified within applicable sections of the scope of work.

5. The PMC shall provide Preliminary Costs Estimates and applicable cost estimate updates and supporting documentation for all proposed Bridges during the Bridge Program development to support program master and financial planning tasks.

6. The PMC shall identify within the Master Program Schedule all elements of bridge and other structures development and maintain an updated schedule with appropriate links to assess overall schedule impacts and assign appropriate milestone deliverables for the structural tasks.

B. **Bridge Layouts.** The PMC shall review all Bridge Layouts prepared by the SDCs for the US 290 Corridor for compliance with the Program Management Plan and identified applicable standards. The PMC shall maintain a log of all review comments and their appropriate resolution. The final (100% complete) Bridge Layouts shall be provided as a part of the 30% PS&E milestone submittals.

The PMC shall sign a cover sheet with final packaging of bridge layouts for each Construction CSJ and forward to Houston District Bridge Department for further processing and final approval through Division in Austin. All Bridges and Bridge Class Culverts must be approved by the Division prior to proceeding to detail design and plan preparation. The PMC shall notify the assigned detail designers, whether the SDC(s), TxDOT Bridge Department, or the PMC Team, of applicable approvals and issue a notice to proceed with final design and detail plan development.

C. **Bridge Design and Detailing Management.**
1. The PMC shall coordinate, review, and oversee all final design and final detail drawing preparation for each Construction CSJ within the program. Coordination shall include monthly, or more frequent as may be necessary, meetings with each assigned design group per CSJ, to include SDC(s), TxDOT District Bridge Department, or PMC Team, to assess progress and identify issues that may be hindering design/plan development and develop resolution action plans as appropriate.

2. PMC shall review Design Concept Conference forms developed by Section Design Consultants and provide direction to maintain conformance of bridge design with identified US 290 Corridor standards and procedures.

3. Final Design Milestone Reviews to include 60, 90, 95, and 100 percent stage with the applicable identified elements. These elements will include:
   a. Bridge Summary Sheets and Quantities / Pay Items
   b. Bridge General Notes and Listing of Specification, Special Specifications, Special Provisions, and Standard Drawings.
   c. Foundation Layouts and Details.
   d. Abutment and Interior Bent Details.
   e. Superstructure Framing Plans, Typical Sections, and Details including Beam Designs (Prestressed Concrete and Structural Steel as applicable).
   f. Special Details such as for Aesthetic and Special Rail treatments.
   g. Milestone Updates and Final Engineering Estimates of Probable Construction Costs.

CR000366

HNTB_000264
501

D.    **Staged Construction:**

1. The PMC shall review and evaluate the need for phased construction for all structures in the project limits and provide recommendations on phased construction plans for the structures, if necessary. The PMC shall also review plans for staged construction details, as applicable.
2. The PMC shall review and evaluate the need for staged demolition of existing structures to accommodate Traffic Control and Construction Sequencing. The PMC shall review all design and plan development related to staged demolition.
3. Participate in Constructability Review Teams to identify issues related to construction of all structural elements of the program.

E.    **Deliverables**

- Master List of existing and proposed bridge structures / types.
- Section of the Program Management Plan identifying Structural Standards and procedures for the US 290 Corridor.
- Submittal Packages with signed cover sheet for all Bridge Layout submittals.
- Log of all review comments, per Design Section and submittal, including status of comment incorporation.
- Periodic summary of Bridge Design Issues identified and resolution(s).
- Meeting Agendas and Minutes from all meetings with Section Design Consultant Teams.
- Identification of Bridge Standards and modification of applicable standards or creation of specific standards for the US 290 Corridor.
- Meeting Agendas and Minutes from all meetings within Project Team and with third parties, including Section Design Consultants.
- Preliminary, Interim, and Final Cost Estimates.

## CONSTRUCTION PHASE SERVICES (Function Code 320)

A.    **Program Management and Administration**

1. The PMC shall continue to provide a Program Manager, Two Deputy Program Managers, and support administration to continue management of the daily aspects of the program during the Construction Phase and the scope of services listed herein.
2. The PMC shall provide updates and amendments to the PMP as necessary to address Construction Phase Services.
3. The PMC shall develop all sequencing and logic, as well as durations of activities and the interface logic between adjacent construction contracts. All construction schedules will be linked to the Master Program Schedule and summarized with the program's monthly program reports.
4. The PMC shall develop initial construction time determination schedule, establish contract milestones for all construction lettings. The PMC shall develop incentive/disincentive strategies, lane rental strategies.
5. The PMC shall provide recommendations on and develop scheduling related general notes, special provisions, and special specifications for design sections. These will be coordinated with the respective SDC(s).
6. Prepare summary progress reports for each construction contract on a quarterly basis. The report will provide a progress curve that compares planned construction performance, expressed as percentage complete, with actual performance. It will also include a summary of amounts paid to date compared with contract value, a summary statement regarding accomplishments during the reporting period and a listing of major concerns and issues pertaining to construction performance. A summary performance curve will be developed and maintained that shows the overall status of the entire construction project for presentation

CR000367

HNTB_000265
502

on an as-needed basis.

7. Log of construction segments including time constructed, major elements, major sequencing, contractors involved, utilities and third parties involved, and record drawings.

B. **Construction Scheduling Support**

The PMC will provide construction scheduling support services to the State's Area Engineers utilizing Primavera. Services for the following are included:

1. Schedule Review
   a. Review, analyze and provide recommendations and report on Contractors' Preliminary Schedule.
   b. Review, analyze and provide recommendations and report on Contractors' Detailed Schedule.
   c. Coordinate with Area Office and contractor to modify preliminary and detailed schedule, if needed.
   d. Attend Preconstruction Meeting and any other meetings as needed.

2. Monthly Schedule Update Analysis
   a. Review and analyze contractor's monthly schedule update. Include review of critical and near critical activities.
   b. Coordinate with field personnel, including site visits, to compare actual construction status with contractor's monthly update.
   c. Coordinate with adjacent project to determine possible conflicts or impacts.
   d. Provide monthly report documenting findings and identifying possible future conflicts.
   e. Attend meetings on an as needed basis.

3. Time Impact Analysis
   a. Review and analyze Time Impact Analysis from contractor
   b. Coordinate with field personnel and Area Office personnel to determine reasoning for time impact.
   c. Provide report and recommendations to mitigate impact and justification for granting/rejecting time requested.
   d. Recommend scheduling alternatives to mitigate impact resulting from conflict.

4. Investigate, analyze and recommend resolution to mitigate schedule impacts between adjacent construction contracts.

5. Monitor and document construction progress in a manner approved by the Area Engineer

6. Identify, track and assist in resolution of construction issues/conflicts and prepare draft responses to Requests for Information (RFIs) as directed by the Area Engineer.

7. Identify, track and assist in resolution of utility conflicts impacting roadway construction.

8. When requested by the Area Engineer, maintain and update the Action Item Agenda for Partnering Meetings.

9. Prepare summary progress reports for each construction contract on a quarterly basis. The report will provide a progress curve that compares planned construction performance, expressed as percentage complete, with actual performance. It will also include a summary of amounts paid to date compared with contract value, a summary statement regarding accomplishments during the reporting period and a listing of major concerns and issues pertaining to construction performance. A summary performance curve will be developed and maintained that shows the overall status of the entire construction project for presentation on an as-needed basis.

C. **Shop Drawing/Submittals Review**

The PMC will coordinate the distribution of information for, and provide technical support services to the State for shop drawing reviews, redesigns and Requests for Information (RFIs).

CR000368

HNTB_000266
503

The technical support activities for this task will include the following:

1. The PMC will act as the single point of contact for the coordination and distribution of shop drawings submitted by the contractor(s). A status report will be maintained for submittals routed through the PMC. There is a maximum of 14 calendar days from receipt of the shop drawings to review and distribute the shop drawings. Review of shop/working drawings for bridges and roadway elements which have been designed and sealed by personnel of the State are not included under this scope of services. Review of bridge and roadway elements covered by State standards are not included under this scope of services. The shop drawings, if applicable, which are to be submitted for review are listed in the Program Management Plan.

2. Review shop drawings for elements designed by the PMC

3. Review other contractor submittals as directed by the State

4. Coordinate and track schedule of reviews provided by others.

The contractor/fabricator shall forward the shop/working drawings to the PMC electronically in a PDF format. Each shop/working drawing submission will be limited to 10 megabytes in size (Larger submittals will be broken into 10 megabyte units and forwarded as Part 1, Part 2, etc.). The electronic submission will be as shown in the Program Management Plan Section: "Example Submittal and Reply". The review Items and the Fabricator/Detailer shall be abbreviated as shown in the Program Management Plan Section: "Item Abbreviations" and Section: "Fabricator and Detailer Abbreviations" respectively. For those elements designed by the PMC, it shall be their responsibility to review and annotate, if necessary, each page of the submittal. Upon completion of their review, the PMC will electronically stamp (all pages), flatten and secure the document prior to the electronic distribution of the drawings (Adobe 7.0 Pro will be required to electronically review the submitted drawings). For those shop/working drawings designed by others, the PMC upon their receipt of the package will route it electronically in PDF format to the appropriate parties.

D. **Surveys for Construction Contracts**
1. Provide survey crews for "as requested" services to support the Area Engineer in verification of field surveys and perform quality control in regards to surveying issues.
2. After construction is complete, the PMC's surveyor will establish, set and/ or replace 5/8 inch rods with cap using TxDOT Type II markers for the right of way and control points at approximately 1000 feet intervals. These points will be set under the supervision of a Texas Registered Land Surveyor.
3. On-call Subsurface Utility Engineering (SUE) services to provide field investigations of previously unknown utility conflicts or to verify critical utility locations in close proximity to proposed construction activities.

E. **Review and Log Contractor RFI(s) and Submittals**
1. Identify, track and assist in resolution of construction issues/conflicts and prepare draft responses to Requests for Information (RFIs) as directed by the Area Engineer.
2. Identify, track and assist in resolution of utility conflicts impacting roadway construction.
3. When requested by the Area Engineer, maintain and update the Action Item Agenda for Partnering Meetings.

F. **Maintenance of Traffic Reviews**
1. Review and comment on contractor's submittals related to Maintenance of Traffic submittals.
2. Review field implementation of Maintenance of Traffic for compliance with Plan Documents and Specifications.

CR000369

HNTB.000267
504

3. Coordinate maintenance of traffic and major traffic shifts between adjacent contractors.

4. Advise Emergency Services, Schools, Communities, and other stakeholders of major traffic changes in accordance with the Public Involvement and Communications Plan.

5. Review and coordinate with local entities signal timing at all intersections. Facilitate signal timing adjustments within and adjacent to the construction vicinity to optimize flow of traffic during construction.

G. **Design verification, change order support tasks**

The PMC will coordinate the distribution of information for, and provide technical support services to the State for review of design changes and change orders as a result of unexpected field conditions and/or contractor/State requests.

The technical support activities for this task will include the following:

1. The PMC will act as the single point-of-contact for the coordination and distribution of design changes to the corridor.

2. Provide design and CADD support services and field measurement services to the State as requested.

3. Coordinate and track design changes necessitated by associated field changes/conditions by construction contract.

4. Provide interface management to make sure that all changes are coordinated with adjoining and follow-on contracts.

5. Change Order Reviews and recommendations including:

   a. Review contractor submittals and proposed change orders as directed by the State.

   b. Provide recommendations to the State regarding requested change orders submitted by contractors.

   c. Provide interface management to make sure that all changes are coordinated with adjoining and follow-on contracts.

   d. Provide recommendations on proposed costs and support the Houston District's Area Engineer in negotiations with Contractor(s).

   e. Assemble all paperwork and supporting documentation for processing of Change Orders.

   f. Assist with updates of final plans (mylars) for "as-built" records.

H. **Construction monitoring support**

1. The PMC will provide, as requested by the State, construction support personnel to support the State's Area Engineer including field inspection personnel.

2. The PMC shall provide, on as requested by the State basis, construction support personnel to support the State's Area Engineer with storm water pollution prevention inspection (SWP3) and associated record keeping. Inspection records shall be provided to the State's project manager the same day as the inspection and shall be performed as outlined in the SWP3 documents.

3. The PMC shall identify, track and assist in resolution of construction issues/conflicts, act as liaison between the State and the Designers concerning construction issues/conflicts and plan revisions and maintain and update the Action Item Agenda for Partnering Meetings as directed by the Area Engineer.

4. The PMC will provide support personnel to assist the State with field measuring, preparation of drawings, calculating quantities/estimates for resolving minor problems and/or information gathering as requested.

5. Review and assist with Quality Assurance testing and reporting as directed by the Area Engineer.

CR000370

HNTB.000268
505

I.  Deliverables

- Monthly summary report of construction contract progress and status.
- Construction schedule update showing overall progress of active construction contracts.
- Log of Construction submittals and status by Construction CSJ and contract.
- Log of RFIs submitted and status/resolution by Construction CSJ and contract.
- Survey field data reports and SUE reports of any field investigations performed.
- Construction Diaries and Reports for assigned construction inspection assignments.
- SWP3 inspection reports delivered to State Project Manager the same day as the inspection.
- Attend SWP3 meetings with the State, as directed.
- Log of change orders and documentation on submittal reviews for reason of change.
- Report of Maintenance of Traffic Reviews and field checks.
- Log of construction and record drawings.

CR000371

HNTB_000269
506

## ATTACHMENT D
### WORK AUTHORIZATION
### D-1
### WORK AUTHORIZATION NO. _____
### CONTRACT FOR ENGINEERING SERVICES

**THIS WORK AUTHORIZATION** is made pursuant to the terms and conditions of Article 5 of Engineering Contract No. _____ (the Contract) entered into by and between the State of Texas, acting by and through the Texas Department of Transportation (the State), and _____ (the Engineer).

**PART I.** The Engineer will perform engineering services generally described as _____ in accordance with the project description attached hereto and made a part of this Work Authorization. The responsibilities of the State and the Engineer as well as the work schedule are further detailed in exhibits A, B and C which are attached hereto and made a part of the Work Authorization.

**PART II.** The maximum amount payable under this Work Authorization is $_____. This amount is based upon fees set forth in Attachment E, Fee Schedule, of the Contract and the Engineer's estimated Work Authorization costs included in Exhibit D, Fee Schedule, which is attached and made a part of this Work Authorization.

**PART III.** Payment to the Engineer for the services established under this Work Authorization shall be made in accordance with Articles 3 thru 5 of the contract, and Attachment A, Article 1.

**PART IV.** This Work Authorization shall become effective on the date of final acceptance of the parties hereto and shall terminate on _____, unless extended by a supplemental Work Authorization as provided in Attachment A, Article 1.

**PART V.** This Work Authorization does not waive the parties' responsibilities and obligations provided under the Contract.

**IN WITNESS WHEREOF,** this Work Authorization is executed in duplicate counterparts and hereby accepted and acknowledged below.

|  |  |
|---|---|
| **THE ENGINEER** | **THE STATE OF TEXAS** |
| | Executed for the Executive Director and approved for the Texas Transportation Commission for the purpose and effect of activating and/or carrying out the orders, established policies or work programs heretofore approved and authorized by the Texas Transportation Commission. |

| | |
|---|---|
| _____ | _____ |
| (Signature) | (Signature) |
| _____ | _____ |
| (Printed Name) | (Printed Name) |
| _____ | _____ |
| (Title) | (Title) |
| _____ | _____ |
| (Date) | (Date) |

**LIST OF EXHIBITS**

| | |
|---|---|
| Exhibit A | Services to be provided by the State |
| Exhibit B | Services to be provided by the Engineer |
| Exhibit C | Work Schedule |
| Exhibit D | Fee Schedule/Budget |
| Attachment H-2 | DBE/HUB subprovider Form |

Eng-Eng_SpecDelwWA.doc

Attachment D-1

CR000372

Contract No. **12-648P5013**

## ATTACHMENT D
### D-2
#### SUPPLEMENTAL WORK AUTHORIZATION  NO. _____
#### TO WORK AUTHORIZATION NO. _____
#### CONTRACT FOR  ENGINEERING SERVICES

**THIS SUPPLEMENTAL WORK AUTHORIZATION** is made pursuant to the terms and conditions of Article 5 Contract No. _____ hereinafter identified as the "Contract," entered into by and between the State of Texas, acting by and through the Texas Department of Transportation (the State), and _____ (the Engineer).

The following terms and conditions of Work Authorization No. _____ are hereby amended as follows:

This Supplemental Work Authorization shall become effective on the date of final execution of the parties hereto.  All other terms and conditions of Work Authorization No. _____ not hereby amended are to remain in full force and effect.

**IN WITNESS WHEREOF,** this Supplemental Work Authorization is executed in duplicate counterparts and hereby accepted and acknowledged below.

| THE ENGINEER | THE STATE OF TEXAS |
|---|---|
| | Executed for the Executive Director and approved for the Texas Transportation Commission for the purpose and effect of activating and/or carrying out the orders, established policies or work programs heretofore approved and authorized by the Texas Transportation Commission. |

_____
(Signature)

_____
(Printed Name)

_____
(Title)

_____
(Date)

_____
(Signature)

_____
(Printed Name)

_____
(Title)

_____
(Date)

CR000373

HNTB_000271

# ATTACHMENT E

## FEE SCHEDULE
### (Final Cost Proposal)

This attachment provides the basis of payment and fee schedule. **The basis of payment for this contract is indicated by an "X" in the applicable box.** The basis shall be supported by the Final Cost Proposal (FCP) shown below. If more than one basis of payment is used, each one must be supported by a separate FCP.

| "X" | Basis | |
|-----|-------|--|
| ___ | Lump Sum | The lump sum shall be equal to the maximum amount payable. The lump sum includes all direct and indirect costs and fixed fee. The Engineer shall be paid pro rata based on the percentage of work completed. For payment the Engineer is not required to provide evidence of actual hours worked, travel, overhead rates or other evidence of cost. |
| ___ | Unit Cost | The unit cost(s) for each type of unit and number of units are shown in the FCP. The unit cost includes all direct and indirect costs and fixed fee. The Engineer shall be paid based on the type and number of units fully completed and the respective unit cost. For payment, the Engineer is not required to provide evidence of actual hours worked, travel, overhead rates or any other cost data. The FCP may include special items, such as equipment which are not included in the unit costs. Documentation of these special costs may be required. The maximum amount payable equals the total of all units times their respective unit cost plus any special direct items shown. |
| X | Specified Rate Basis | The specified rates for each type of labor are shown in the FCP below. The FCP may include special items, such as equipment which are not included in the specified rates. Payment shall be based on the actual hours worked multiplied by the specified rate for each type of labor plus other agreed to special direct cost items. The specified rate includes direct labor and indirect cost and fixed fee. The State may request documentation of reimbursable direct costs including hours worked. Documentation of special item costs may be required. The specified rate is not subject to audit. |
| X | Cost Plus Fixed Fee | Payment shall be based on direct and indirect costs incurred plus a pro rata share of the fixed fee based on the ratio of labor and overhead cost incurred to total estimated labor and overhead cost in the FCP or the percentage of work completed. The invoice must itemize labor rates, hours worked, other direct costs and indirect costs. The Engineer may be required to provide documentation of hours worked and any eligible direct costs claimed. The provisional overhead rate charged is subject to audit and adjustment to actual rates incurred. The FCP below shows the hourly rates for labor, other direct expenses including but not limited to travel and allowable materials, provisional overhead rate and the fixed fee.<br>___ A. Actual Cost Plus Fixed Fee - Actual wages are paid (no minimum, no maximum. This option does not apply to Indefinite Deliverable Contracts.)<br>X B. Range of Cost Plus Fixed Fee – Actual wages must be within the allowable range shown on the Final Cost Proposal. |

CR000374

## ATTACHMENT E – FEE SCHEDULE

Final Cost Proposal (FCP) Supporting Basis of Payment

* The **MAXIMUM AMOUNT PAYABLE** is **$85,250,000.00.**

The maximum amount payable is based on the attached rate schedules and the 10 year order of magnitude costs based on fiscal year and function code:

**Note:** The labor rate and/or contract rate billed to the State for a particular employee of the Engineer or its sub-provider may not increase by more than four percent within a classification within any twelve-month period unless promotion to a higher classification and no particular employee shall receive more than one promotion to a higher classification within a twenty-four month period.

CR000375

HNTB_000273
510

ATTACHMENT E-RATE SCHEDULE
PRIME OR SUBPROVIDER NAME:   Crossland Acquisition, Inc.
METHOD OF PAY: SPECIFIED RATE

| Labor/Staff Classification | Negotiated Contract Rate | Contract Rate FY 06 | Contract Rate FY 07 | Contract Rate FY 08 | Contract Rate FY 09 |
|---|---|---|---|---|---|
| Principal/Atty | $250 | $250 | $ 257.50 | $ 257.50 | $ 265.23 |
| Atty | $125 | $125 | $ 128.75 | $ 128.75 | $ 132.61 |
| Title Manager/Atty | $200 | $200 | $ 206.00 | $ 206.00 | $ 212.18 |
| Sr. Project Manager | $235 | $235 | $ 242.05 | $ 242.05 | $ 249.31 |
| ROW Manager | $200 | $200 | $ 206.00 | $ 206.00 | $ 212.18 |
| ROW Asst. Manager | $125 | $125 | $ 128.75 | $ 128.75 | $ 132.61 |
| ROW Agent | $125 | $125 | $ 128.75 | $ 128.75 | $ 132.61 |
| ROW Agent - QC | $125 | $125 | $ 128.75 | $ 128.75 | $ 132.61 |
| Assistant ROW Agt | $90 | $90 | $ 92.70 | $ 92.70 | $ 95.48 |
| Assistant ROW Agt | $90 | $90 | $ 92.70 | $ 92.70 | $ 95.48 |
| Relocation Manager. | $200 | $200 | $ 206.00 | $ 206.00 | $ 212.18 |
| Relocation Agt. | $125 | $125 | $ 128.75 | $ 128.75 | $ 132.61 |
| Relocation Agt. | $125 | $125 | $ 128.75 | $ 128.75 | $ 132.61 |
| Appraisal Manager | $200 | $200 | $ 206.00 | $ 206.00 | $ 212.18 |
| Appraiser | $125 | $125 | $ 128.75 | $ 128.75 | $ 132.61 |
| Asst. Appraisal Mgr. | $100 | $100 | $ 103.00 | $ 103.00 | $ 106.09 |
| IT and/or Access Database | $100 | $100 | $ 103.00 | $ 103.00 | $ 106.09 |
| Assistant | $50 | $50 | $ 51.50 | $ 51.50 | $ 53.05 |

Contract rates include labor, overhead, and profit.
All rates are negotiated rates and are not subject to change or adjustment. Contract Rates are to be billed.

*If the maximum rates are changed in the future by the State Legislature, the "current State of Texas approved rates at the time of expenditure" will apply.*

| Other Direct Expenses: | Cost |
|---|---|
| Lodging (Maximum - taxes/fees not included) | $85.00/Day/Per Person |
| Meals (Overnight stay required) | $36.00/Day/Per Person |
| Mileage | $0.445/mile |
| Car Rental (Maximum - taxes/fees not included) | $50/Day |
| Air Travel (Coach/Business Class) | NTE $450.00/trip/person |
| 8 1/2" X 11" copies | $.10/sheet |
| 11" X 17" copies | $.10/sheet |
| 11" X 17" Mylar | NTE $6.50 each |
| Overnight Mail - Letter Size | NTE $30.00/Letter |
| Overnight Mail - Oversized Box | NTE $50.00/box |
| Misc. Expenses (Lifetime NTE $5,000.00) | $100.00/Unit |

Documentation of hrs worked, receipts or usage logs, as applicable, for direct expenses are required for reimbursement. Profit not allowed on Other Direct Expenses.

CR000377

HNTB_000275
512

CR000378



Attachment F Work Schedule
Contract 13-646001

CR000379

## ATTACHMENT H-SG

### Historically Underutilized Business
### for State Funded Professional or Technical Services Contracts
### HUB Goal Assigned-State of Texas Subcontracting Plan Required

1) POLICY. It is the policy of the Department to ensure that HUBs shall have an equal opportunity to participate in the performance of contracts; to create a level playing field on which HUBs can compete fairly for contracts and subcontracts; to ensure nondiscrimination on the basis of race, color, national origin, or gender in the award and administration of contracts; to help remove barriers to the participation of HUBs in department contracts; and, to assist in the development of firms that can compete successfully in the market place outside the HUB program. Consequently, the HUB requirements of the Department's HUB Program apply to this contract as follows:

   (1) The Provider agrees to insure that they shall take all necessary and reasonable steps to meet the HUB goal for this contract.

   a. The Provider and any subprovider(s) shall not discriminate on the basis of race, color, national origin, or sex in the award and performance of contracts.

   b. When submitting the contract for execution by the Department, the Provider must complete and furnish Exhibit H-1 which lists the commitments made to certified HUB subprovider(s) that are to meet the contract goal and Exhibit H-2 which is a commitment agreement(s) containing the original signatures of the Provider and HUB(s) that were indicated in the original submitted State of Texas HUB Subcontracting Plan in area 3a. For Work Authorization Contracts, Exhibit H-1 is required at the time of submitting the contract for execution by the Department. Exhibit H-2 will be required to be completed and attach with each work authorization number that is submitted for execution, if the HUB will be performing work. A prime must allow a HUB maximum opportunity to perform the work by not creating unnecessary barriers or artificial requirements for the purpose of hindering a HUB's performance under the contract. Any substitutions or changes to the HUB Subcontracting Plan, in addition to any changes to the original contract award, shall be subject for approval by the Department.

   c. Failure to carry out the requirements set forth above shall constitute a breach of contract and may result in a letter of reprimand; in termination of the contract by the Department; in a deduction from money due or to become due to the Provider, not as a penalty but as damages to the Department's HUB Program; or such other remedy or remedies as the Department deems appropriate.

2) DEFINITIONS.
   a. "Department" means the Texas Department of Transportation (TxDOT).
   b. "Contract" is the agreement between the Texas Department of Transportation and a Provider.
   c. "Provider" is any individual or company that provides professional or technical services.
   d. "Joint Venture" means an association of two or more businesses to carry out a single business enterprise for profit which combines their property, capital, efforts, skills and knowledge.
   e. "Historically Underutilized Business (HUB)" means any business so certified by the Texas Building and Procurement Commission.

3) PERCENTAGE GOAL. The goal for Historically Underutilized Business (HUB) participation in the work to be performed under this contract is **20** % of the contract amount.

4) PROVIDER'S RESPONSIBILITIES. A HUB prime can fulfill the HUB program requirements. A HUB prime must perform a minimum of 30% of the contract with its employees (as defined by the Internal Revenue Service). A HUB prime may subcontract the remaining 70% of the contract but any subcontracted work will still be subjected to the State of Texas HUB Subcontracting Plan,

CR000380                                                        HNTB_000278

515

Good Faith Effort Requirements. No subprovider shall perform a larger percentage of the contract work than the prime.

a. A Provider who cannot meet the contract goal, in whole or in part, shall document any of the following and other efforts made as a "Good Faith Effort" to obtain HUB participation.

(1) Whether the prime advertised in general circulation, trade association, and/or minority/women focus media concerning subcontracting opportunities.

(2) Whether the prime provided written notice to at least three qualified HUBs allowing sufficient time for HUBs to participate effectively.

(3) Whether the prime documented reasons for rejection or met with the rejected HUB to discuss the rejection.

(4) Whether the prime provided qualified HUBs with adequate information about bonding, insurance, the plans, the specifications, scope of work and requirements of the contract.

(5) Whether the prime negotiated in good faith with qualified HUBs, not rejecting qualified HUBs who are also the lowest responsive bidder.

(6) Whether the prime used the services of available minority and women community organizations, contractor's groups, local, state, and federal business assistance offices, and other organizations that provide support services to HUBs.

NOTE: The Provider must not cause or allow subproviders to bid their services.

b. The preceding information shall be submitted directly to the Chair of the Consultant Selection Team responsible for the contract.

c. The Provider shall make all reasonable efforts to honor commitments to HUB subproviders named in the original State of Texas HUB Subcontracting Plan in area 3e. Where the Provider terminates or removes a HUB subprovider named in the initial commitment, the Provider must demonstrate on a case-by-case basis to the satisfaction of the Department that the originally designated HUB was not able or willing to perform. The term unable includes, but is not limited to, a firm that does not have the resources and expertise to finish the work and/or a firm that substantially increases the time to complete the project.

d. The Provider shall make all reasonable efforts to replace a HUB subprovider that is unable or unwilling to perform successfully with another HUB and must meet the State of Texas HUB Subcontracting Plan, Good Faith Effort Requirements. Any substitution of HUBs shall be subject to approval by the Department. The Department may request a statement from the firm being replaced concerning its replacement prior to approving the substitution.

e. The Provider shall designate a HUB liaison officer who will administer the Provider's HUB program and who will be responsible for maintenance of records of efforts and contacts made to subcontract with HUBs.

6) ELIGIBILITY OF HUBs.

a. The Texas Building and Procurement Commission certifies the eligibility of HUBs.

b. The Texas Building and Procurement Commission maintains a directory of certified HUBs. The HUB Directory is available through the Department's Business Opportunity Programs Office and through the Internet at the Texas Building and Procurement Commission's Website (www.tbpc.state.tx.us/cmbl/hubonly.html/).

c. Only HUB firms certified and identified in specific categories and classes at the time the contract is signed or at the time the commitments are submitted are eligible to be used in the information furnished by the Provider as required under Section 2.c. above.

d. If during the course of the contract it becomes necessary to substitute another HUB firm for a firm named in the information submitted by the Provider as required by Section 2.c. above, then only certified HUBs will be considered eligible as a substituted firm. The Provider's request for substitutions of HUB subproviders shall be accompanied by a detailed explanation, which should substantiate the need for a substitution. The Department may verify the explanation with the HUB firm being replaced before giving approval of the substitution.

e. The 73rd Legislature passed Texas Civil Statutes, Article 601l, relative to contracts between governmental entities and certain disadvantaged businesses. The Statute provides for civil

CR000381

HNTB.000279
516

penalties for persons who falsely claim disadvantaged business status and for the general contractor who knowingly contracts with a person claiming to be a disadvantaged business.

6) UNDERLINE DETERMINATION OF HUB PARTICIPATION.

A firm must be an eligible HUB and perform a professional or technical function relating to the project. Proof of payment, such as copies of canceled checks, properly identifying the Department's contract number or project number may be required to substantiate the payment, as deemed necessary by the Department. A HUB subprovider, with prior written approval from the Department, may subcontract 70% of a contract as long as the HUB subprovider performs a commercially useful function. All subcontracts shall include the provisions required in the subcontract and shall be approved as to form, in writing, by the Department prior to work being performed under the subcontract. A HUB performs a commercially useful function when it is responsible for a distinct element of the work of a contract; and actually manages, supervises, and controls the materials, equipment, employees, and all other business obligations attendant to the satisfactory completion of contracted work. If the subcontractor uses an employee leasing firm for the purpose of providing salary and benefit administration, the employees must in all other respects be supervised and perform on the job as if they were employees of the subcontractor.

7) COMPLIANCE OF PROVIDER.

To ensure that HUB requirements of this contract are complied with, the Department will monitor the Provider's efforts to involve HUBs during the performance of this contract. This will be accomplished by a review of the monthly State of Texas HUB Subcontracting Plan Prime Contractor Progress Assessment Report submitted to the Business Opportunity Programs Office by the Provider indicating his/her progress in achieving the HUB contract goal, and by compliance reviews conducted by the Department.

The Provider shall receive credit toward the HUB goal based on actual payments to the HUB subproviders with the following exceptions and only if the arrangement is consistent with standard industry practice.
(1) Payments to brokers or firms with a brokering type operation will be credited only for the amount of the commission;
(2) Payments to a joint venture will not be credited unless all partners in the joint venture are HUBs;
(3) Payments to a HUB subprovider who has subcontracted a portion of the work required under the subcontract will not be credited unless the HUB performs a commercially useful function;
(4) Payments to a HUB will not be credited if the firm does not provide the goods or perform the services paid for;
(5) Payments made to a HUB that cannot be linked by an invoice or canceled check to the contract under which credit is claimed will not be credited.
A Provider must not withhold or reduce payments to any HUB without a reason that is accepted as standard industry practice. A HUB prime or subprovider must comply with the terms of the contract or subcontract. Work products, services, and commodities must meet contract specifications whether performed by a prime or subprovider.

A Provider's failure to meet the HUB goal and failure to demonstrate to the Department's satisfaction, sufficient "Good Faith Effort" on his/her part to obtain HUB participation shall constitute a breach of contract. In such a case, the Department reserves the right to issue a letter of reprimand; to deduct the amount of HUB goal not accomplished by HUBs from the money due or to become due the Provider, not as a penalty but as damages to the Department's HUB program; or such other remedy or remedies as the Department deems appropriate.

8) RECORDS AND REPORTS.
a. After submission of the initial commitment (Exhibit H-1), required by Section 2.c. of this attachment, the Provider shall submit State of Texas HUB Subcontracting Plan Prime

CR000382

Contractor Progress Assessment Report monthly, after contract work begins, on HUB involvement. One copy of each monthly State of Texas HUB Subcontracting Plan Prime Contractor Progress Assessment Report is to be sent to the Business Opportunity Programs Office of the Department monthly, and one copy is to be submitted with the Provider's invoice. Only actual payments made to HUB subproviders are to be reported. These State of Texas HUB Subcontracting Plan Prime Contractor Progress Assessment Reports will be required monthly even during months when no payments to HUB providers have been made. The State of Texas HUB Subcontracting Plan Prime Contractor Progress Assessment Report will be required until all work on the contract has been completed. The Department may verify the amounts being reported as paid to HUBs by requesting copies of canceled checks paid to HUBs on a random basis.

b. HUB subproviders should be identified on the State of Texas HUB Subcontracting Plan Prime Contractor Progress Assessment Report by name, type of work being performed, the amount of actual payment made to each during the billing period, cumulative payment amount and percentage of the total contract amount. Reports are required even when no HUB activity has occurred in a billing period.

c. All such records must be retained for a period of four years following final payment, or until an investigation, audit, examination, or other review undertaken during the four years, and shall be available at reasonable times and places for inspection by authorized representatives of the Department and other agencies.

d. Prior to receiving final payment, the Provider shall submit a Final Report (Exhibit H-4), detailing the HUB payments to the Business Opportunity Programs Office of the Department, and one copy to the Department with the Provider's final invoice.

01/01
HUB.ATT

CR000383

HNTB 000281
518

## EXHIBIT H-1

### Texas Department of Transportation
### Subprovider Monitoring System
### Commitment Worksheet

Contract #:_____ Assigned Goal: ___% Federally Funded _____ State Funded _____

Prime Provider:_____ Total Contract Amount: _____

DBE ___ HUB ___ Both ___ Vendor ID #: _____ Expiration Date: _____
(First 11 Digits Only)

| Subprovider(s) (List All) | Type of Work | Vendor ID # (First 11 Digits Only) | D=DBE H=HUB | Expiration Date | $ Amount or % of Work * |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Subprovider(s) Contract or % of Work' Totals | | | | | |

*For Work Authorization Contracts, indicate the % of work to be performed by each subprovider.

Total DBE or HUB Commitment Dollars  $_____

Total DBE or HUB Commitment Percentages of Contract ____%

9/97 DBEH1.AT

CR000384                                       HNTB 000282
519

WAs Used

Contract No. 12-648P5013

# EXHIBIT H-2
## Texas Department of Transportation
## Subprovider Monitoring System
## Commitment Agreement

### Complete this Form for each DBE or HUB Subprovider

This commitment agreement is subject to the award and receipt of a signed contract from the Texas Department of Transportation (TxDOT). *NOTE: For Work Authorization Contracts, Exhibit H2 is required to be completed and attached with each work authorization number that is submitted for execution.*

Contract #: _____ Assigned Goal: _____% Prime Provider: _____

Work Authorization: _____ Work Authorization Amount: _____ Date: _____

| Description of Work (List by category of work. Attach additional pages, if necessary.) | Dollar Amount (For each category of work.) |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total Commitment Amount** (including all additional pages.) | $ |

IMPORTANT: The signatures of the prime and the DBE/HUB and Second Tier Subprovider, if any (both DBE and Non-DBE) and the total commitment amount must always be on the same page.

| | |
|---|---|
| Provider Name:<br>Address:<br>Phone #: | Name: _____ (Please Print)<br><br>Title: _____<br><br>_____<br>Signature          Date |
| DBE/HUB Sub Provider<br>Subprovider Name:<br>VID Number:<br>Address:<br>Phone #: | Name: _____ (Please Print)<br><br>Title: _____<br><br>_____<br>Signature          Date |
| Second Tier Sub Provider<br>Subprovider Name:<br>VID Number:<br>Address:<br>Phone #: | Name: _____ (Please Print)<br><br>Title: _____<br><br>_____<br>Signature          Date |

VID Number is the Vendor Identification Number issued by the Comptroller. If a firm does not have a VID Number, please enter the owner's Social Security or their Federal Employee Identification Number (if incorporated).

CR000385

HNTB_000283
520

WAs Used

Contract No. 12-648P5013

## EXHIBIT H-3

Texas Department of Transportation Subprovider Monitoring System
Progress Assessment Report for month of (Mo./Yr.) _____/_____

Contract #: _____
Date of Execution: _____
Prime Provider: _____
Work Authorization No. _____

Original Contract Amount: _____
Approved Supplemental Agreements: _____
Total Contract Amount: _____
Work Authorization Amount: _____

| HUB | DBE | Subprovider | Category of Work | Total Subprovider Amount | % Total Contract Amount | Amount Paid This Period | Amount Paid To Date | Subcontract Balance Remaining |
|-----|-----|-------------|------------------|--------------------------|-------------------------|-------------------------|---------------------|-------------------------------|
|     |     |             |                  |                          |                         |                         |                     |                               |
|     |     |             |                  |                          |                         |                         |                     |                               |
|     |     |             |                  |                          |                         |                         |                     |                               |
|     |     |             |                  |                          |                         |                         |                     |                               |
|     |     |             |                  |                          |                         |                         |                     |                               |
|     |     |             |                  |                          |                         |                         |                     |                               |
|     |     |             |                  |                          |                         |                         |                     |                               |
|     |     |             |                  |                          |                         |                         |                     |                               |
|     |     |             |                  |                          |                         |                         |                     |                               |

Fill out Progress Assessment Report with each estimate submitted, *for all subcontracts*, and forward as follows:
1 Copy with Invoice - Contract Manager/Managing Office
1 Copy – TxDOT, Construction Division, BOP Section, Goal Setting & Data Reporting Branch, 125 E. 11th, Austin, TX 78701, 512-485-5547, toll free 866-480-2518, or Fax to 512-486-5519

I hereby certify that the above is a true and correct statement of the amounts paid to the firms listed above.

_____     _____     _____
Print Name - Company Official /DBE/HUB Liaison Officer     Signature     Phone     Date

Page 1 of 1

01/01 DBS-H3.ATT

Exhibit H-3

CR000386

HNTB.000284
521

WAs Used                                          Contract No. 12-648P5013

# EXHIBIT H-4

## Texas Department of Transportation
## Subprovider Monitoring System
## Final Report

The Final Report Form should be filled out by the Prime Provider and submitted to the Contract Manager and the Business Opportunity Programs Section (Construction Division) for review upon completion of the contract. The report should reflect **all subcontract activity** on the project. The report will aid in expediting the final estimate for payment. If the HUB or DBE goal requirements were not met, documentation supporting good faith efforts must be submitted.

DBE Goal: _____%              **OR**              HUB Goal: _____%

Total Contract Amount: $_____        Total Contract Amount: $_

Contract Number: _____

| Vendor ID # | Subprovider | Total $ Amt Paid to Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **TOTAL** | |

This is to certify that _____% of the work was completed by the HUB or DBE subproviders as stated above.

_____
By: Prime Provider

_____
Per: Signature

Subscribed and sworn to before me, this _____ day of _____, 20 __

_____Notary Public _____ County

My Commission expires:_____

                                                          01/01   DBE-H4.A

CR000387                                                        HNTB_000285
                                                                        522



# HUB Subcontracting Plan (HSP)
# Prime Contractor Progress Assessment Report

*This form must be completed and submitted to the contracting agency on a monthly basis to document compliance with your HSP.*

Contract/Requisition Number: <u>12-648P5013</u>　　　Date of Award: <u>11/18/2005</u> Object Code: ____
　　　　　　　　　　　　　　　　　　　　　　(mm/dd/yyyy)　　　　　(Agency use only)

Contracting Agency/University Name: <u>Texas Department of Transportation</u>

Contractor Name: <u>HNTB Corporation</u>

Contractor Vendor Identification Number (VID Number): <u>14316230920008</u>

Reporting Period: ____　　Total Contract Amount Paid this Reporting Period to Contractor: $____
(January, February, March...)

*Document HUB Subcontractor Information, as applicable below:*

| HUB Subcontractor Name(s) | HUB Subcontractor's VID or HUB Certificate Number | Total Contract $ Amount from HSP with HUB Subcontractor | Total $ Amount Paid This Period to HUB Subcontractor | Total Contract $ Amount Paid to Date to HUB Subcontractor | Object Code (agency use only) |
|---|---|---|---|---|---|
| Entech Civil Engineers | 14604911694 | | | | |
| Aviles Engineering | 17421528195 | | | | |
| GeoSolutions, Ltd. | 14812606664 | | | | |
| GeoTest Engineering | 17420489209 | | | | |
| HVJ Associates | 17601464104 | | | | |
| TEDSI Infrastructure | 17601280146 | | | | |
| United Engineers | 17605189392 | | | | |
| PMA Consultants | 13833277687 | | | | |
| Rodriquez Transportation Group | 17427768746 | | | | |
| The Lentz Group | 17602662532 | | | | |
| TOTALS | | $____ | $____ | $____ | |

Signature: ____　　　　Title: ____　　　　Date: ____

CR000388　　　　　　　　　　　　　　　　　　　　　　HNTB 000286
523

## SUPPLEMENTAL AGREEMENT NUMBER 1
### 38861 – US 290 PROGRAM MANAGEMENT

This Supplemental Agreement, Number 1, to the AGREEMENT BETWEEN HNTB CORPORATION (HNTB) AND CROSSLAND ACQUISITION, INC. (CONSULTANT), dated July 5, 2006 (the Agreement) is made effective as of June 26, 2010.

1. Consultant shall perform the following Services:

   The Services to be Provided by the Consultant (Attachment C) of the contract is amended by adding Attachment C-1, Services to be Provided by the Consultant.

2. The Work Outline (Attachment C-1) of the contract is amended by adding Attachment C1-1 Work Outline.

3. Consultant shall perform the Services and deliver the related Documents (if any) according to the following schedule:

   Consultant shall perform the Services and Deliver the related documents (if any) according to the work schedule for Individual tasks as agreed to with HNTB. Written correspondence including electronic mail will be used to record established due dates.

4. Attachment E Rate Schedule is amended by adding Attachment E-1.

   The Rate Schedule is amended to add Attachment E-1 Rate Schedule for new work authorized after the execution of this supplemental agreement, beginning with Crossland Acquisition, Inc. Task Order Number 3.

Except to the extent modified herein, all terms and conditions of the Agreement shall continue in full force and effect.

| HNTB Corporation (HNTB) | Crossland Acquisition, Inc. (Consultant) |
|---|---|
| Signature _Deborah C. Taylor_ | Signature: _____ |
| Name: Deborah C. Taylor, CEP | Name: _John K Harrison II_ |
| Title: Vice President | Title: _President_ |
| Date: _8/19/10_ | Date: _7-28-10_ |

CR000213

HNTB.000111

524

List of Attachments:
Attachment A:      NOT USED
Attachment B:      NOT USED
Attachment C-1:    Contract 12-648P5013, Services to be Provided by the Consultant
Attachment C1-1:   Contract 12-648P5013, Work Outline
Attachment D:      NOT USED
Attachment E-1:    Contract 12-648P5013, Rate Schedule

CR000214

HNTB.000112

# ATTACHMENT C-1

TO

**Supplemental Agreement Number 1**
US 290 Program Management

For

Crossland Acquisition, Inc.

**Contract 12-648P5013**
**Attachment C-1, Services to be Provided by the Consultant**
(1 page)

## ATTACHMENT C-1
## SERVICES TO BE PROVIDED BY THE CONSULTANT

*Amended Sections of the Master Agreement, Attachment C, Services to be Provided by the Consultant, is as noted below with additional services shown in italicized text.*

### INTRODUCTION

*The limits of this project also includes preliminary engineering and design coordination for Hempstead from west of the proposed Grand Parkway to the IH 610 Interchange.*

*The US 290 Corridor includes improvements along existing IH 610, US 290, and Hempstead Road and is divided into areas of focus as follows:*

*US 290 Phase I:*

Segment 1: Hempstead Tollway interchange with IH 610 and the Hempstead Tollway from south of Old Katy Road on IH 610 to west of Mangum Road.

Segment 2: IH 610 from East of Ella Boulevard to IH 10 including the Hempstead Tollway interchange and Direct Connectors US 290 from West 34 Street to IH 10.

Segment 3: IH 610/US 290 interchange including US 290 from west of W. 34th Street to north and south of US 290 on IH 610.

*US 290 Phase IIA*

Segment 4: US 290 from west of West 34th Street to west of Pinemont drive

Segment 5: US 290 from west of Pinemont to Gessner Drive

Segment 6: US 290 from Gessner Drive to FM 529 including the Beltway 8 interchange.

*US 290 Phase IIB*

Segment 7: US 290 from FM 529 to west of Eldridge Parkway

Segment 8: US 290 from west of Eldridge Parkway to Telge Road including SH 6 grade separation.

*US 290 Phase III*

Segment 9: US 290 from Telge Road to Mueschke Road

Segment 10: US 290 from Mueschke Road to Bauer Road including the proposed Grand Parkway (SH 99) interchange.

Segment 11: US 290 from Bauer Road to Badike Road

Segment 12: US 290 from Badike Road to FM 2920

*Hempstead Phase I*

Segment ML2A: Hempstead from west of Mangum Road to Clay Road

Segment ML2B: Hempstead from Clay Road to Gessner Drive

Segment ML2C: Hempstead from Gessner Drive to Jones Road

Segment ML2D: Hempstead from Jones Road to west of Huffmeister Road

*Hempstead Phase II*

Segment ML3: Hempstead from west of Huffmeister Road to west of SH 99

*Furthermore, the limits include adjacent projects at the IH 610/IH 10 Interchange and along the IH 610 North Loop to east of Ella Boulevard as necessary to coordinate letting joint projects as required by funding requirements and/or to accommodate connectivity improvements to the IH 610/US 290 Interchange.*

CR000216

HNTB.000114

527

# ATTACHMENT C1-1

## TO

Supplemental Agreement Number 1
US 290 Program Management

For

Crossland Acquisition, Inc.

Contract 12-648P5013
Exhibit C1-1, Work Outline
(10 pages)

CR000217

HNTB.000115

# ATTACHMENT C1-1
# WORK OUTLINE

*Amended Sections of the Master Agreement, Attachment C1, Work Outline, is as noted below with additional services shown in italicized text.*

Route And Design Studies (FC 110)    2
C.    Master Development Plan    2
D.    Program Design Criteria    2
E.    Traffic Modeling and Planning Studies    2
F.    ITS Planning, Design and Implementation    3
G.    Urban Planning / Context Sensitive Solutions    3
H.    Rail Coordination Services    3
J.    Geotechnical Field Investigations and Reports    4

Social, Economic And Environmental Studies And Public Involvement (FC 120)    4

Right-Of-Way (ROW) Data (FC 130)    6
B.    ROW Acquisition Management and Services    6
M.    Additional Deliverables    6
N.    Utility Engineering, Investigations, and Coordination    6

Managing Contracted Advance PE Services for FC 110 thru FC 150 (FC 145)    6

Field Surveying And Photogrammetry (FC 150)    7

Drainage (FC 161)    7
A.    Modeling and Corridor Drainage Impact Report.    7
B.    Drainage Design Management    8
D.    *Cypress Creek Drainage Study*    8

Signing, Pavement Markings, Signalization (Permanent) (FC 162)    8
B.    Signing    8
E.    Additional Deliverables    8

Miscellaneous (FC 163)    8
C.    Master Construction Sequencing and Traffic Control Plan (TCP)    8
D.    Illumination    8
F.    Special Utility Details and Plans    9
G.    Construction Cost Estimates    9
I.    Additional Deliverables    9

Managing Contracted Services for FC 160 thru FC 170 (FC 164)    9
D.    Project Controls and Program Management Plan (PMP)    9
I.    Agency Coordination    9

Bridge Design (FC 170)
B.    Bridge Layouts    10
C.    Bridge Design and Detailing Management.    10
E.    Additional Deliverables    10

CR000218

HNTB.000116

529

ROUTE AND DESIGN STUDIES (Function Code 110)

C. Master Development Plan
   1. Schematic Review and Refinement Recommendations
      *e. The PMC shall provide schematic drawing updates and/or other related exhibits for elements of IH 610 and/or US 290 to support any Environmental Re-evaluations, Supplements, Addendas or related program environmental documents, and related Meetings with Affected Property Owners.*
      *f. The PMC shall review all schematic refinements, adjustments, or modifications recommended or prepared by the Harris County Toll Road Authority (HCTRA) or their consultants related to the Hempstead Tollway, and provide recommendations as related to compliance with applicable design criteria and applicable agency agreements.*
      *g. The PMC shall generate schematic exhibits or make use of appropriate data provided by HCTRA for elements of the proposed Hempstead Tollway to support development of any Environmental Re-evaluations, Supplements, Addendas, or related program environmental documents, and related Meetings with Affected Property Owners.*

   3. Preliminary Cost Estimates
      *c. The PMC shall maintain preliminary cost estimates for Hempstead Tollway and update annually utilizing any available data from HCTRA as necessary to maintain reporting requirements for the Financial Plan. Assumptions should be noted.*
   4. Additional Deliverables
      • *Schematic Exhibits to illustrate feasible alternatives developed and/or to support environmental document preparations.*
      • *Written review comments on document and/or exhibits submitted by HCTRA, and alternative exhibits to support schematic coordination efforts with HCTRA.*

D. Program Design Criteria
   1.1 The criteria, standards, and any corridor specific guidelines shall also be noted in other *associated Program Manuals.*

   3. *Provide periodic updates to the design criteria where necessary based on procedure and/or design changes by the State or FHWA. Updates shall be published in applicable Program Manuals.*

   4. *Deliverables*
      • *Publish US 290 Program Design Guidelines and Criteria, and provide appropriate references within other Program Manuals and the Program Management Plan.*
      • *Periodic published updates to the US 290 Program Design Guidelines and Criteria.*

E. Traffic Modeling and Planning Studies
   8.1. *The PMC shall manually record traffic counts for identified driveways to support Access Management assessments and design activities as approved by the State.*

   8.2. *The PMC shall prepare existing and proposed VISSIM traffic models for the major Interchange complexes to provide operational analysis in support of design changes such as ramp relocations, assessments of impacts for proposed traffic control and construction sequences, and development of interagency operational agreements.*

   9. Additional Deliverables

CR000219

HNTB.000117

530

- *VISSIM and CORSIM simulation models and analysis summaries and recommendations.*
- *Traffic modeling exhibits to support interagency agreements.*

F. **ITS Planning, Design and Implementation**
8.1. *The PMC shall review existing and proposed ITS elements and provide recommendations concerning use of existing, proposed, or temporary cameras and other elements to support incident management during construction projects.*

9. Additional Deliverables
- *PS&E bidding documents for ultimate traffic management system.*
- *Recommendations and plan drawings for any identified temporary ITS systems or elements necessary to support incident management during construction projects.*

G. **Urban Planning / Context Sensitive Solutions**
4.1. *Develop exhibits and cost estimates to support interagency and/or interlocal agreements for funding participation in approved aesthetic/landscape upgrades proposed by these entities.*

5. Additional Deliverables
- *Exhibits and cost data for associated interlocal and interagency agreements.*

H. **Rail Coordination Services**
2.1. *Coordinate with the UPRR, Gulf Coast Rail District and/or METRO concerning joint operations of freight and commuter rail in the corridor and impact to existing and proposed grade crossings, coordinate multi-party agreements as noted within FC 164, Agency Coordination, of this scope, and coordinate impacts to design of the US 290 and Hempstead roadway facilities based on freight and passenger rail operations within the project limits.*

2.2. *Provide detail design of rail protective elements, as requested by the State, to protect bridge and roadway facilities in accordance with Railroad requirements and in accordance with the American Railway Engineering and Maintenance of Way Association (AREMA) Manual of Railway Engineering. Plan drawings shall also be developed as requested by the State to delineate ROW between State, County, and Rail property where application is approved by the State.*

2.3. *Coordinate Right-of-Entry for Railroad property to accommodate survey and design services by the PMC and/or the SDCs.*

2.4. *Provide rail design services for spurs, sidings, and industry turnouts, as directed by the State, where ROW acquisition requires adjustments or restoration of access connections to the Railroad based on impacts of ROW acquisition.*

3 Additional Deliverables
- *Exhibits and plan drawings, signed, sealed, and dated by a Licensed Professional Engineering Texas, where applicable, of bridge and roadway protective elements such as crash walls, and ROW delineations such as guard rail, fencing, etc.*
- *Record of executed or written Right-of-Entry requests and approvals from the Railroad.*
- *Track plans, details, and exhibits for noted rail service adjustments where applicable and as requested by the State.*

CR000220

HNTB.000118

531

J.  Geotechnical Field Investigations and Reports

*7.1. The PMC shall provide recommendations for any construction treatments for elements that may be directly impacted by the fault zone and recommendations for placement of long term benchmarks to monitor fault movements.*

*7.2. The PMC shall review proposed retaining wall types and heights as recommended by the Section Design Consultants and provide recommendations for soil stabilization and/or treatments to increase foundation capacity.*

*7.3. The PMC shall provide foundation design details and depths of foundation elements for bridge and other structural elements as assigned by the State to support design plan preparation by the State and/or the SDCs.*

8.  Additional Deliverables
    - *All approved special soil treatments or stabilization techniques included in the PS&E plans shall be signed, sealed, and dated by a Licensed Professional Engineer in Texas.*
    - *Addendums and Supplements to Geotechnical Study(ies) prepared under this scope of services to support additional geotechnical investigations and analysis necessary for detention ponds and associated appurtenances, and foundations for overhead sign structures, traffic signal systems, or other proposed project items requiring a structural foundation system for support.*
    - *All approved structural foundation details for elements designed by the PMC used inapplicable PS&E plans shall be signed, sealed, and dated by a Licensed Professional Engineer in Texas.*

## SOCIAL, ECONOMIC AND ENVIRONMENTAL STUDIES AND PUBLIC INVOLVEMENT (Function Code 120)

A.  Environmental
    2

    a. *Provide Public Involvement to support any re-evaluations. Public involvement procedures will be in accordance with 43 Texas Administrative Code (TAC) 2.40-2.50, Code of Federal Regulations, Title 23, Part 771 and TxDOT's Environmental Manual. Public involvement will be an ongoing process throughout project development. The Engineer will assist the State with public inquiries regarding the environmental process and environmental document.*
    b. *Provide Meetings with Affected Property Owners, public meetings, and/or public hearings, as identified by the State, necessary to support Re-Evaluations, addenda, supplements, or related environmental documents. Prepare printed materials (public notices, mail outs, sign-in sheets, agendas, environmental handouts) and exhibits for these public meetings and hearings as requested by the State.*

    *3.1. Environmental Documents including Environmental Assessments or Categorical Exclusions as assigned by the State to cover Detention Pond sites or related facilities that were not within the ROW footprint defined in the Final EIS.*

    *4.1. Environmental Permits. Services shall include wetland delineations and surveys identified project areas and preparation of the necessary permit documentation for the USACE to approve and/or permit potential impacts to jurisdictional waters of the U.S., including wetlands, associated with the proposed construction. Each of the following subtasks will be conducted separately for each wetland delineation.*

CR000221

HNTB.000119

- *Stake ROW Boundaries: Prior to beginning fieldwork, the Engineer will stake the ROW boundaries for the proposed project at intervals of 50 to 400 feet as appropriate for visibility between stakes. The State will supply digital ROW data to the Engineer prior to surveying the ROW boundaries.*

- *Field Preparation: The PMC will collect background information and review available resources including DOQQ color infrared aerial photography, NRCS local soil survey data, USGS 7.5' topographic maps, USFWS NWI maps, and FEMA Flood Insurance Rate Maps for the applicable project areas prior to the field delineation.*

- *Delineation: Potential wetlands within the existing ROW, ditches connecting wetlands, streams, creeks and/or any detention or drainage areas specified will be assessed utilizing the methods and procedures provided by the U.S. Army Corps of Engineers 1987 Wetland Delineation Manual or latest updates. The field effort will identify waters of the U.S. and adjacent or isolated wetlands within the project limits, if necessary. Portions of water crossings and wetlands that are bisected by and/or extend outside the existing and/or proposed ROW will be identified but not delineated during the field survey. Potential impacts to all wetlands within the existing and proposed ROW, immediately adjacent to the ROW, or within any detention areas that are planned at the time of this work authorization will be addressed in the wetlands report. Wetland determinations/delineations will be completed for applicable project areas. Representative USACE routine data forms will be completed for each potential wetland determined. Representative uplands will be documented on these data forms as necessary to determine wetland boundaries. Data forms will be completed each time the vegetative community changes within the project area (based on 5 dominant species). All data points will be reproducible through conventional survey techniques or differentially corrected global positioning satellite (DGPS) systems. Boundaries of potentially impacted wetlands/waters will be staked and surveyed prior to verification by the USACE. If field access is not possible on all proposed ROW parcels, the Engineer will utilize other available resources such as NRCS Soil Surveys, infrared photography, topographic maps, and NWI data to delineate wetlands within the project area. Windshield surveys or other remote sensing techniques will be used to validate the size, classification, and location of wetlands identified through these other resources.*

- *Wetlands Report: The wetlands report will summarize the results and methods used to conduct the wetland delineation. The PMC will provide the State with two draft copies of the report for review. Following the State's review, four (4) copies of the final report will be prepared for TxDOT submittal to the USACE for use in their delineation verification and jurisdictional determination activities related to this project.*

- *Survey Wetland Boundaries: Data point locations, potential jurisdictional wetland boundaries, and ordinary high water mark limits of waters of the U.S. within the proposed project ROW will be manually staked and surveyed in the field. All locations will also be digitally mapped in the field, for back-up purposes, using DGPS systems. The potential jurisdictional wetlands/waters staked in the field may need to be re-staked just before the USACE verification, especially in areas that have a high potential of disturbance because of weather, animals, or human activities. The jurisdictional boundaries will be located on a schematic or plan layout and sealed by a Registered Professional Land Surveyor (RPLS) or a Licensed State Land Surveyor (LSLS) as required, after the verification.*

- *USACE Verification: Accompany USACE representatives on applicable site visits to verify wetland field delineations and reports. The PMC will have the ROW staked by a surveyor for purposes of the verification prior to the site visit. USACE requests for adjustments to the jurisdictional boundaries will be identified in the field and associated*

CR000222

HNTB.000120

533

*revisions will be made to applicable wetland delineation reports.*

    10.  *Additional* Deliverables
        a.1 *Environmental documents prepared for off-site detention ponds.*
        b.1 *Wetland delineation reports.*

## RIGHT-OF-WAY DATA (Function Code 130)

B.    ROW Acquisition Management and Services
    20. *Develop and update ROW acquisition plans and relocation plans for both the US 290 and Hempstead corridors to document approach to acquisition and relocation activities.*

    21. *Develop and maintain a list of priority parcels based on issues that may impact or delay the timeline for acquisition or relocation.*

    22. *Review acquisition plans and documents for parcels to be acquired by HCTRA, METRO, or other governmental entities for conformance with requirements of applicable interlocal and/or interagency agreements.*

    23. *Provide and maintain preliminary cost estimates for all ROW elements to be used in Financial Plan documents and reporting in accordance with applicable state and federal requirements for major projects. This includes coordination with acquisition providers for HCTRA, METRO, or other third party agencies that may be responsible for acquisitions related to the US 290/Hempstead Corridor Program.*

M.    Additional Deliverables
In administering and managing its Final ROW activities, the PMC shall:
  i.  *Provide printed copies and document record of all ROW acquisition and relocation plans and associated updates.*

  j.  *Track, monitor, and report on funding by type as used for acquisition on various portions or segments of the project.*

N.    Utility Coordination, Investigation, and Engineering Services

    3.  Utility Engineering

        3.9. *Coordinate with HCTRA, METRO, and other governmental agencies concerning any utility adjustments and/or relocations that may be jointly affected by each entities responsibilities for implementation of improvements within the US 290/Hempstead Corridor and support applicable cost sharing agreements with such agencies to facilitate timely and cost effective adjustments that may minimize and manage overall program costs.*

## MANAGING CONTRACTED ADVANCE PE SERVICES FOR FC 110 THRU FC 150 (Function Code 145)

F.    Agency Coordination
The PMC shall support the State in coordination and any interlocal agency agreements including exhibit preparation and supporting document preparation and assembly including with the additional following agencies:

CR000223

HNTB.000121

534

    h   *Gulf Coast Rail District and other rail authorities as directed by the State*

    i   *Houston-Galveston Area Council (H-GAC)*

## FIELD SURVEYING AND PHOTOGRAMMETRY (Function Code 150)

F.    *The PMC Surveyor shall perform select field topographic surveys to support drainage impact studies where outfall channels or existing off-site drainage features, and/or features impacting proposed detention ponds require information that is not otherwise available.*

G.    *The PMC Surveyor shall provide datum adjustments among benchmarks for multiple jurisdictional agencies that impact the services to be provided, including but not limited to, Tropical Storm Allison Recovery Project (TSARP) and related HCFCD benchmarks as related to the TxDOT program survey controls to support the drainage study, assessment, design, and agency reviews of proposed drainage features and to support drainage modeling.*

H.    *The PMC Surveyor shall provide support to adjust Digital Terrain Models (DTM) for the various design projects as developed during the schematic design process and review updates provided by the Section Design Consultants. Final DTM files will be provided to the State including updates that may be necessary to represent development up to and during construction.*

I.    *Deliverables*
- *Survey Control Index Sheets for each construction CSJ.*
- *Survey Control sketches and updates to TxDOT survey control records as applicable and approved to support corridor construction projects.*
- *Field books and cadd files with survey data and coordinates.*
- *Electronic copies of DTM files.*

## DRAINAGE (Function Code 161)

A.    Modeling and Corridor Drainage Impact Report.

    4.1 *The Drainage Report shall be provided in volumes subdivided by Phases and watersheds.*

    11.1 *Coordinate with HCFCD and other applicable agencies concerning their proposed improvement programs and any impact to the watersheds within the US 290 Program. The Drainage Impact Study Report(s) shall be updated with these other improvements where they affect the proposed US 290 improvements and/or mitigation plans.*

    12. Additional Deliverables
- *Supporting Drainage Impact reports, memorandums, and volumes.*
- *Supporting documents, as necessary and as requested by the State.*

B. Drainage Design Management

2.1. *Maintain hydraulic models to represent final design adjustments and provide hydraulic data sheets for the trunk line system on individual projects for insertion into the PS&E bidding documents by applicable Section Design Consultants.*

2.2. *Provide hydraulic modeling and analysis for all bridge crossings of waterway and drainage channels and bridge class culverts, as well as produce associated hydraulic data sheets for insertion into PS&E bidding documents by applicable Section Design Consultants. Analysis shall also include scour analysis and reporting for each crossing. Exhibits and permit applications as may be necessary shall be produced as directed by the State.*

4. Additional Deliverables
   - *Hydraulic data sheets for trunk lines and channel crossings, signed, sealed, and dated by a Licensed Professional Engineer in Texas.*
   - *Scour reports documenting analysis results and recommendations of potential scour.*

D. Cypress Creek Drainage Study
*Following completion of all final drainage design within the Cypress Creek Watershed to include all detention sizes and locations, the PMC shall perform a comprehensive study analyzing the effects of the US 290/Hempstead Highway Corridor to the Cypress Creek Watershed.*

## SIGNING, PAVEMENT MARKINGS, SIGNALIZATION (PERMANENT) (Function Code 162)

B. Signing
*1) The overall signing concept plan shall include the preliminary signing for the Hempstead Managed Toll Lanes. The PMC shall also coordinate with HCTRA and METRO concerning any special signing requirements to accommodate the managed toll lanes including advance signing along IH 610, US 290, SH 6, FM 1960, Beltway 8, and other state, HCTRA, or METRO facilities.*

E. Additional Deliverables
   - *Signing concept schematics*

## MISCELLANEOUS (Function Code 163)

C. Master Construction Sequencing and Traffic Control Plan (TCP)
   9. *The PMC shall analyze impacts to traffic control sequencing based on changing funding constraints, ROW constraints, status of utility adjustments, and integration options for other agency proposed improvements and provide recommendations to support interlocal and interagency agreements and to analyze the potential to combine or further segregate proposed construction packages into a single or multiple project(s).*

   10. *The PMC shall analyze staged construction to accommodate connectivity with other agency proposed improvements and prepare exhibits for coordination and applicable agreement development.*

D. Illumination
   6. *The PMC shall analyze existing high mast lighting and proposed lighting based on different funding and construction sequencing and make recommendations for interim lighting during construction.*

CR000225

HNTB.000123

536

F.   Special Utility Details and Plans
   4.   *The PMC shall support review of all driveway and utility permit requests within the US 290/Hempstead Corridor and provide recommendations related to impact of proposed program improvements.*

G.   Construction Cost Estimates
   4.   *The PMC shall maintain, monitor, and update construction and related total program costs and shall report deviations or adjustments from the Initial Financial Plan. All construction and total cost data shall be updated in the District's ProtoCost program*

I.   Additional Deliverables
   • *Recommendations memorandum concerning permit requests.*
   • *Exhibits to support interlocal and interagency agreements concerning construction sequencing, traffic control, traffic operations, and staged implementation.*

## MANAGING CONTRACTED SERVICES FOR FC 160 THRU FC 170 (Function Code 164)

D.   Project Controls and Program Management Plan (PMP)
   5.   Document Controls:
      a.   *Record copy of documents shall be electronically transferred directly to TxDOT's Electronic Document Management System (EDMS), "TXDOCS". The PMC shall maintain a record of documents transferred and shall place classification attribute files consistent with TxDOT published procedures to minimize TxDOT staff time in reviewing these final record drawings as filed on TxDOT's server.*

   7.   Additional Deliverables
      • *Maintain list of all documents transferred electronically to TxDOT's servers.*
      • *Maintain a Document Control Manual with naming and file attributes that facilitate record storage and coordination with TxDOT's EDMS.*

E.   Support Procurement and Scope of Work Development for new work performed by SDC(s)
   1.   Support preparation of the Scope of Work for the Design Sections and an independent estimate of level of effort/project fee for submittal by the State's Houston District to the Division Office with the draft NOI, and for use by the State during negotiations with selected SDC(s).
   2.   Attend the mandatory short-list meeting and provide support in preparation of the Interview and Contract Guide (ICG).
   3.   Attend SDC interviews in a consulting capacity.
   4.   Attend and document the scope and fee negotiations between the State and the selected SDC(s).
   5.   Support the Houston District, as directed, in the preparation of all final contract documents for submittal to Division for final processing.

I.   Agency Coordination
   With Additional Agencies:

      h   *Gulf Coast Rail District and other rail authorities as directed by the State*
      i.   *Houston-Galveston Area Council (H-GAC)*

CR000226                                                    HNTB.000124

537

1. *HCTRA PS&E Documents: The PMC shall provide design review support to TxDOT for review of PS&E documents provided by HCTRA, and/or their consultants, for the Hempstead Tollway and related facilities in accordance with and to verify compliance with applicable agency agreements.*

2. *Passenger Rail Implementation and Design Plans: The PMC shall coordinate with applicable local government(s) and agencies concerning any proposed passenger rail improvements within the corridor and shall review applicable design plans for conflict with proposed US 290/Hempstead Corridor improvements and to facilitate development of an integrated system for moving people, automobiles and freight.*

## BRIDGE DESIGN (Function Code 170)

B. **Bridge Layouts**
   *The PMC shall also prepare and/or support preparation of Bridge Layouts and/or Foundations Layouts for any bridges on the US 290 program as assigned by the State.*

C. **Bridge Design and Detailing Management.**
   *4.1 The PMC shall provide detailed bridge design for any bridges as assigned by the State and/or provide peer review and design collaboration for detailed design performed by the TxDOT District Bridge Department upon the TxDOT District Bridge Department and the TxDOT US 290 Program Manager's request. Peer reviews would be provided for structural steel tub girder designs and/or other specialized structural design elements.*

E. **Additional Deliverables**
   - *Bound copies of all structural design calculations and electronic copies of any supporting spreadsheets utilized as part of design. Print out of inputs and outputs for any structural computer programs used.*
   - *Plan drawings, signed, sealed, and dated by a Licensed Professional Engineer in Texas, for insertion into applicable PS&E documents, for all bridge and associated structural details as assigned by the State.*

Attachment C1-1

CR000227

HNTB.000125

538

# ATTACHMENT E-1

## TO

Supplemental Agreement Number 1
US 290 Program Management

For

Crossland Acquisition, Inc.

Contract 12-648P5013
Attachment E-1, Rate Schedule
(6 pages)

CR000228

HNTB.000126

ATTACHMENT E-1 / RATE SCHEDULE

PRIME OR SUBPROVIDER NAME:  Crossland Acquisition, Inc.
METHOD OF PAY:  Specified Rate

| Labor/Staff Classification | Negotiated Contract Rate | Contract Rate FY 2010 | Contract Rate FY 2011 | Contract Rate FY 2012 | Contract Rate FY 2013 | Contract Rate FY 2014 | Contract Rate FY 2015 | Contract Rate FY 2016 |
|---|---|---|---|---|---|---|---|---|
| | | | | Contract Rate Per Hour | | | | |
| Principal/Atty | $ 250.00 | $ 265.23 | $ 269.87 | $ 274.59 | $ 279.40 | $ 284.29 | $ 289.27 | $ 294.33 |
| Atty | $ 125.00 | $ 132.61 | $ 134.93 | $ 137.29 | $ 139.69 | $ 142.13 | $ 144.62 | $ 147.15 |
| Title Manager/Atty | $ 200.00 | $ 212.18 | $ 215.89 | $ 219.67 | $ 223.51 | $ 227.42 | $ 231.40 | $ 235.45 |
| Sr. Project Manager | $ 235.00 | $ 249.31 | $ 253.67 | $ 258.11 | $ 262.63 | $ 267.23 | $ 271.91 | $ 276.67 |
| ROW Manager | $ 200.00 | $ 212.18 | $ 215.89 | $ 219.67 | $ 223.51 | $ 227.42 | $ 231.40 | $ 235.45 |
| ROW Asst. Manager | $ 125.00 | $ 132.61 | $ 134.93 | $ 137.29 | $ 139.69 | $ 142.13 | $ 144.62 | $ 147.15 |
| ROW Agent | $ 125.00 | $ 132.61 | $ 134.93 | $ 137.29 | $ 139.69 | $ 142.13 | $ 144.62 | $ 147.15 |
| ROW Agent - QC | $ 125.00 | $ 132.61 | $ 134.93 | $ 137.29 | $ 139.69 | $ 142.13 | $ 144.62 | $ 147.15 |
| Assistant ROW Agt | $ 90.00 | $ 95.48 | $ 97.15 | $ 98.85 | $ 100.58 | $ 102.34 | $ 104.13 | $ 105.95 |
| Assistant ROW Agt | $ 90.00 | $ 95.48 | $ 97.15 | $ 98.85 | $ 100.58 | $ 102.34 | $ 104.13 | $ 105.95 |
| Relocation Manager. | $ 200.00 | $ 212.18 | $ 215.89 | $ 219.67 | $ 223.51 | $ 227.42 | $ 231.40 | $ 235.45 |
| Relocation Agt. | $ 125.00 | $ 132.61 | $ 134.93 | $ 137.29 | $ 139.69 | $ 142.13 | $ 144.62 | $ 147.15 |
| Relocation Agt. | $ 125.00 | $ 132.61 | $ 134.93 | $ 137.29 | $ 139.69 | $ 142.13 | $ 144.62 | $ 147.15 |
| Appraisal Manager | $ 200.00 | $ 212.18 | $ 215.89 | $ 219.67 | $ 223.51 | $ 227.42 | $ 231.40 | $ 235.45 |
| Appraiser | $ 125.00 | $ 132.61 | $ 134.93 | $ 137.29 | $ 139.69 | $ 142.13 | $ 144.62 | $ 147.15 |
| Asst. Appraisal Mgr. | $ 100.00 | $ 106.09 | $ 107.95 | $ 109.84 | $ 111.76 | $ 113.72 | $ 115.71 | $ 117.73 |
| IT and/or Access Database | $ 100.00 | $ 106.09 | $ 107.95 | $ 109.84 | $ 111.76 | $ 113.72 | $ 115.71 | $ 117.73 |
| Assistant | $ 50.00 | $ 53.05 | $ 53.98 | $ 54.92 | $ 55.88 | $ 56.85 | $ 57.86 | $ 58.87 |

Contract rates include labor, overhead, and profit.
All rates are negotiated rates and are not subject to change or adjustment.

For Specified Rate Basis - Contract rates to be billed. Documentation of hours required.
For Lump Sum Basis - Physical percent complete to be billed. Documentation of hours not required.

| Other Direct Expenses |
|---|
| See separate sheet for Other Direct Expenses |

Attachment E-1/Rate Schedule

CR000229

HNTB.000127

540

Other Direct Expenses
For Prime and Sub-Providers
Contract Number: 12-648P5013

| Other Direct Expenses | Unit | Fixed Cost | Maximum Cost |
|---|---|---|---|
| Air Travel (Coach) | Rd Trip/person | | $450.00 |
| Courier | each | | $30.00 |
| Exhibit Mounting | square foot | | $5.00 |
| Film Development – 24 Exp Roll | roll | | $10.00 |
| HGAC Aerial Photography Data | CD for 36 images | | $150.00 |
| Lodging/Hotel (Taxes/fees not included) | day/person | | Current State Rate* |
| Meals (overnight stay required) | day/person | | Current State Rate* |
| Mileage | mile | Current State Rate* | |
| Office Equipment Non-HNTB employees | NTE/month/employee | | $1,300.00 |
| Overnight Mail – Letter Size | each | | $25.00 |
| Overnight Mail – Box | each | | $30.00 |
| Parking | day | | $15.00 |
| Rental Car (Taxes/fees not included) | day | | $45.00 |
| ROW/UTIL GIS Application Hosting | month | | $2,500.00 |
| Web based Special Program Hosting | month/per approved program application | | $200.00 |
| Standard Postage | each | Current Postal Rate* | |
| 24-Hour Classified Traffic Counts | each | $175.00 per direction | |
| 7 Day Continuous Counts (same location) | day | $175.00 1st day/ $100.00 ea day after | |
| Spot Speed Survey (2 hours maximum) | each | $200.00 | |
| Turning movement counts | hour | $100.00 | |
| Truck Allowance (construction engineers/managers/representatives) | month | | $1,000.00 |
| **Other Direct Expenses (Printing/Repro.)** | **Unit** | **Fixed Cost** | **Maximum cost** |
| 8 1/2" X 11" BW copies | sheet | | $0.10 |
| 8 1/2" X 11" Color copies | sheet | | $0.90 |
| 8 1/2" X 14" BW copies | sheet | | $0.15 |
| 8 1/2" X 14" Color copies | sheet | | $1.25 |
| 11" X 17" BW copies | sheet | | $0.20 |
| 11" X 17" Color copies | sheet | | $1.80 |
| 12" X 18" Color copies | sheet | | $2.20 |
| Blueline/Blackline Prints (8 1/2" X 11") | sheet | | $0.31 |
| Blueline/Blackline Prints (11" X 17") | sheet | | $0.65 |
| Blueline/Blackline Prints (22" X 34") | sheet | | $1.25 |
| Gloss Paper | each | | $3.50 |
| Mylar Plot (8 1/2" x 11") | sheet | | $2.50 |
| Mylar Plot (11" x 17") | sheet | | $5.00 |
| Mylar Plot (22" x 34") | sheet | | $14.00 |
| Paper Plot (8 1/2" x 11") | sheet | | $1.21 |
| Paper Plot (11" x 17") | sheet | | $2.00 |
| Paper Plot (22" x 34") | sheet | | $4.00 |
| Plots (B/W on Bond) | square foot | | $0.30 |
| Plots (Color on Bond) | square foot | | $2.00 |
| Plots (Color on Photographic Paper) | square foot | | $5.50 |
| Scanning Large Format 24x36 | each | | $17.00 |
| Vellum Plot (8 1/2" x 11") | sheet | | $1.94 |
| Vellum Plot (11" x 17") | sheet | | $3.25 |
| Vellum Plot (22" x 34") | sheet | | $7.30 |

CR000230                                                          HNTB.000128

541

| Other Direct Expenses | Unit | Fixed Cost | Maximum Cost |
|---|---|---|---|
| Bound Reports | each | | $25.00 |
| Custom Z fold | each | | $0.28 |
| Report Covers | each | | $2.00 |
| GBC Binding | each | | $2.00 |
| Tape Binding | each | | $2.00 |
| Wire Binding | each | | $3.00 |

| Other Direct Expenses (PI/Communication) | Unit | Fixed Cost | Maximum Cost |
|---|---|---|---|
| 3D Physical Model | each model component | | $50,000.00 |
| Audio Equipment Rental | each | | $2,000.00 |
| Court Reporter | page | | $7.00 |
| Display Advertisements | each | | $5,000.00 |
| Facility Rental | each | | $1,500.00 |
| Handheld video/audio devices | each | | $400.00 |
| Kiosk (Equipment Only) | each | | $4,000.00 |
| Legal Notices | each | | $2,200.00 |
| Plasma Monitor / TV Monitor Rentals | day / each | | $500.00 |
| Professional Facilitator | hour | | $250.00 |
| Public Meeting Security | hour | | $25.00 |
| Public Meeting Supplies | each | | $500.00 |
| Translator (Documents) | word | | $0.16 |
| Translator (Meetings) | hour | | $100.00 |
| News Router Service | release | | $500.00 |
| News Router Service (Annual Fee) | year | | $3,000.00 |

| Other Direct Expenses (ROW Acquisition) | Unit | Fixed Cost | Maximum Cost |
|---|---|---|---|
| Appraisal (limited damages) | parcel | | $5,000.00 |
| Appraisal Review (limited damages) | parcel | | $2,000.00 |
| Appraisal (significant acquisition/damages) | parcel | | $10,000.00 |
| Appraisal Review (significant acquisition/damages) | parcel | | $3,500.00 |
| Appraisal (specialty properties) | parcel | | $15,000.00 |
| Appraisal Review (special properties) | parcel | | $5,000.00 |
| Title Services (as established by Texas Department of Insurance) | title | | Current State Rate* |

| Other Direct Expenses (surveying) | Unit | Fixed Cost | Maximum Cost |
|---|---|---|---|
| Air Boat w/ Operator | day | | $525.00 |
| All Terrain Vehicle | day | | $90.00 |
| Boat with Motor | day | | $180.00 |
| Certified Map Records | page | | $7.50 |
| Certified Real Property Records | document | | $5.00 |
| Compilation Equipment | hour | | $8.75 |
| Designate Level B (including level C & D) | foot | $1.60 | |
| Designate Level C & D | foot | $0.32 | |
| Designating Vehicle | trip | $250.00 | |
| Desktop and Computer with Plotter | hour | $12.00 | |
| Digital Level | hour | $7.00 | |
| Electronic Distance Meter | hour | | $5.00 |
| Fathometer / Depth Finder | NTE / day | | $85.00 |
| GPS Receiver (RTK) | NTE / hour | | $32.00 |

Attachment E-1/Rate Schedule

CR000231

HNTB.000129

542

**Other Direct Expenses**
**For Prime and Sub-Providers**
**Contract Number: 12-648P5013**

| Other Direct Expenses | Unit | Fixed Cost | Maximum Cost |
|---|---|---|---|
| GPS Receiver (Static) | NTE / hour | | $25.00 |
| Location Vehicle (SUE) | trip | | $750.00 |
| Official Real Property Records | page | | $1.00 |
| Map Records | page | | $6.50 |
| Microstation CADD System w/ Plotter | hour | | $15.00 |
| Ground Penetrating Radar | hour | | $125.00 |
| Hydrographic Electronic Position Equip | NTE / day | | $94.00 |
| Interior Pipe Wall Condition Video | each | | $320.00 |
| Robotic Total Station | hour | | $18.00 |
| Scanning Equipment | hour | | $8.75 |
| Scanning Material (Compact Disk) | each | | $5.50 |
| Scanning Material (DVD) | each | | $17.50 |
| Side Scan Sonar | NTE / day | | $400.00 |
| Subbottom Profiler | NTE / day | | $400.00 |
| Total Station W/Data Collector | hour | | $8.00 |
| Triangulation Equipment | NTE / hour | | $8.75 |
| Type II Right of Way Marker (M-92) | each | $25.00 | |

| Other Direct Expenses (Aerial Photography) | Unit | Fixed Cost | Maximum cost |
|---|---|---|---|
| Digital Orthophoto Workstation | NTE / hour | | $8.75 |
| Aerial Photamphy Mobilization | each | | $328.00 |
| Graphic Edit Equipment | NTE / hour | | $8.75 |
| Graphic Edit Material (CD) | NTE / each | | $5.50 |
| Graphic Edit Material (Paper) | NTE / square foot | | $3.00 |
| Lab Material - Color Infrared 10" x 10" Prints | each | | $12.00 |
| Lab Material - Color Infrared Film | linear foot | | $9.25 |
| Lab Material - Film | linear foot | | $4.75 |
| Lab Material - Paper | square foot | | $2.73 |
| Lab Material - Photo Mylar | linear foot | | $11.62 |
| Lab Material - Photo Paper | square foot | | $5.36 |
| Photography Taken During Flight | NTE / mile | | $17.50 |
| Transit | mile | | $4.50 |
| Turn | mile | | $5.00 |

| Other Direct Expenses (Subsurface Utility Eng. (test hole services) | Unit | Fixed Cost | Maximum cost |
|---|---|---|---|
| 0 ft. to 5 ft | NTE / each | | $990.00 |
| 10 ft to 15 ft | NTE / each | | $1,680.00 |
| 15 ft to 20 ft | NTE / each | | $2,300.00 |
| 5 ft to 10 ft. | NTE / each | | $1,184.00 |
| Over 20 ft | NTE / each | | $2,900.00 |
| Electronic Distance Meter | Hour | | $5.00 |

| Other Direct Expenses (Geotechnical) | Unit | Fixed Cost | Maximum cost |
|---|---|---|---|
| Coring 6" dia. (up to 12" thick) | core | $150.00 | |
| Crew Travel to/from Job Site | hour | $120.00 | |
| Drilling and Sampling (0'-50') | foot | $16.50 | |
| Drilling and Sampling (100'-150') | foot | $20.50 | |
| Drilling and Sampling (50'-100') | foot | $18.50 | |
| Drilling Rig Mobilization | each | $450.00 | |

CR000232
HNTB.000130

543

| Other Direct Expenses | Unit | Fixed Cost | Maximum Cost |
|---|---|---|---|
| Drilling Standby Time | hour | $175.00 | |
| Extra Drilling Charge If Buggy Rig Is Used | foot | $5.00 | |
| Grouting Boreholes | foot | $5.26 | |
| Piezometer Abandonment | each | $450.00 | |
| Piezometer Completion | each | $450.00 | |
| Piezometer Installation | foot | $16.00 | |
| Standby Time (all field crew, if incurred due to reasons beyond consultant's control) | hour | $275.00 | |
| TxDOT Cone | test | $20.00 | |
| Atterberg Limits | test | $45.00 | |
| Consolidated Undrained Strength | test | $450.00 | |
| Consolidation (Double Loop) | each | $526.44 | |
| Consolidation (Single Loop) | each | $701.92 | |
| Direct Shear Test | test | $520.00 | |
| Grain Size Analyses with Hydrometer (ASTM D-422) | each | $146.23 | |
| Grain Size Analysis (GSA) | each | $56.00 | |
| Moisture Content | test | $7.50 | |
| Percent Passing No. 200 Sieve | test | $36.00 | |
| Permeability-Constant Head | test | $200.00 | |
| Permeability-Falling Head | test | $145.00 | |
| pH OF SOIL | each | $23.40 | |
| Pinhole Test | each | $180.00 | |
| Shrinkage Factors of Soils | test | $52.60 | |
| Specific Gravity | test | $50.60 | |
| Standard Proctor Tests (including sample collection & preparation, 4 pts Proctor/set) | set | $350.96 | |
| TEX-118-E Triaxial Compression test for undisturbed samples | test | $550.00 | |
| Unconfined Compression Strength | test | $50.00 | |
| Unconsolidated Undrained Strength | test | $70.00 | |
| Environmental "On Call" Services | NTE | | $250,000.00 |
| **Other Direct Expenses (Fault Studies)** | **Unit** | **Fixed Cost** | **Maximum cost** |
| Geophysical Logging Unit (day) | day | $1,200.00 | |
| Geophysical Logging Unit (week) | week | $4,500.00 | |
| Lost Circulation Materials | borehole | $50.00 | |
| Mob/Demob, Logger | fault location | $950.00 | |
| Rotary Wash Drilling | foot | $2.50 | |
| **Other Direct Expenses (Traffic Control)** | **Unit** | **Fixed Cost** | **Maximum cost** |
| Traffic Control (frontage road/cross street) Signs, barrels/cones, set-up, adjustment, removal | day | $450.00 | |
| Crash Truck w/attenuator | NTE / day | | $400.00 |
| Flashing Arrow Board | NTE / day | | $500.00 |
| Portable Message Board | NTE / day | | $200.00 |
| Railroad Flagman | hour | | $60.00 |
| Railroad Permits | each | | $1,000.00 |

CR000233

HNTB.000131

544

Other Direct Expenses
For Prime and Sub-Providers
Contract Number: 12-648P5013

| Other Direct Expenses | Unit | Fixed Cost | Maximum Cost |
|---|---|---|---|
| Railroad Right of Entry Permit Fee | each | | $3,000.00 |
| Required Permit Fees | NTE / each | | $1,100.00 |
| Traffic Control (Freeway Mainlanes/Shoulder) | day | | $1,400.00 |
| Type I-III Barricade | NTE / day | | $50.00 |
| Uniformed Officer | NTE / hour | | $25.00 |
| | | | |

NOTE: For Cost Plus Fixed Fee, Specified Rate, and Unit Cost - Miscellaneous other direct expenses up to $50 per unit will be reimbursed at cost if approved and documented in advance by the TxDOT Project Manager. Miscellaneous other direct expenses of $50 per unit or more will not be reimbursed unless a supplemental agreement to the contract and work authorization (if WAs are used) has been executed in advance authorizing the miscellaneous other direct expenses. No more than $2,500 in miscellaneous other direct expenses may be approved by the TxDOT Project Manager over the life of this contract including prime provider and subproviders. For Lump Sum - This statement does not apply.

Profit not allowed on Other Direct Expenses. Costs included in overhead will not be reimbursed as other direct expenses. For Cost Plus Fixed Fee, Specified Rate, and Unit Cost - Unless fixed, actual rates to be billed not to exceed the maximum shown. Documentation such as receipts or usage logs for other direct expenses are necessary for reimbursement. For Lump Sum - No documentation required. Invoicing by physical percent complete includes combination of direct labor and other direct expenses.

CR000234               HNTB.000132

545

# ATTACHMENT E-2

TO

**Supplemental Agreement Number 2**
US 290 Program Management

For

Crossland Acquisition, Inc.

**Contract 12-648P5013**
**Attachment E-2, Rate Schedule**
(1 page)

CR000235

HNTB.000133

# SUPPLEMENTAL AGREEMENT NUMBER 2
## 38861 – US 290 PROGRAM MANAGEMENT

This Supplemental Agreement, Number 2, to the AGREEMENT BETWEEN HNTB CORPORATION (HNTB) AND CROSSLAND ACQUISITION, INC. (CONSULTANT), dated July 5, 2006 (the Agreement), as amended June 26, 2010, is made effective as of **April 29, 2011.**

1.  Attachment E Rate Schedule is amended by adding Attachment E-2.

    The Rate Schedule is amended to add Attachment E-2 Rate Schedule.

Except to the extent modified herein, all terms and conditions of the Agreement shall continue in full force and effect.

HNTB Corporation
(HNTB)

Signature _____

Name: Thomas D. Ellis, PE

Title: Vice President

Date: 8-5-11

Crossland Acquisition, Inc.
(Consultant)

Signature: _____

Name: John K Harrison II

Title: President

Date: 8-2-11


List of Attachments:

| Attachment A: | NOT USED |
| Attachment B: | NOT USED |
| Attachment C: | NOT USED |
| Attachment D: | NOT USED |
| Attachment E-1: | NOT USED |
| Attachment E-2: | Contract 12-648P5013, Rate Schedule |

CR000236

HNTB.000134

547

## ATTACHMENT E-2
## RATE SCHEDULE

Other Direct Expenses
For Prime and Sub-Providers
Contract Number: 12-648P5013

| Other Direct Expenses | Unit | Fixed Cost | Maximum Cost |
|---|---|---|---|
| Overnight Mail - USPS Certified with Return Receipt | each | | $20.00 |
| | | | |
| Other Direct Expenses (IT/Communication) | Unit | Fixed Cost | Maximum Cost |
| News Router Newsroom Integration Services | hour | | $100.00 |
| News Router Searchable Archive | News Section | $2,500.00 | |
| NewsRouter.com Training | user | | $200.00 |
| News Router Contact Database Conversion | hour | | $125.00 |
| | | | |
| Other Direct Expenses (ROW Acquisition) | Unit | Fixed Cost | Maximum Cost |
| Negotiations | parcel | | $5,000.00 |
| Eminent Domain Package Preparation/Hearing Coordination | parcel | | $5,500.00 |
| Relocation Services for Outdoor Advertising Sign (OAS) | displacee | | $3,000.00 |
| Relocation Services for Business | displacee | | $6,500.00 |
| Relocation Services for Personal Property and Mini-Storage Units | displacee | | $2,000.00 |
| Relocation Services for Residential | displacee | | $6,000.00 |
| Disposal of Property Services | parcel | | $1,200.00 |

NOTE: For Cost Plus Fixed Fee, Specified Rate, and Unit Cost - Miscellaneous other direct expenses up to $50 per unit will be reimbursed at cost if approved and documented in advance by the TxDOT Project Manager. Miscellaneous other direct expenses of $50 per unit or more will not be reimbursed unless a supplemental agreement to the contract and work authorization (if WAs are used) has been executed in advance authorizing the miscellaneous other direct expenses. No more than $2,500 in miscellaneous other direct expenses may be approved by the TxDOT Project Manager over the life of this contract including prime provider and subproviders. For Lump Sum - This statement does not apply.

Profit not allowed on Other Direct Expenses. Costs included in overhead will not be reimbursed as other direct expenses. For Cost Plus Fixed Fee, Specified Rate, and Unit Cost - Unless fixed, actual rates to be billed not to exceed the maximum shown. Documentation such as receipts or usage logs for other direct expenses are necessary for reimbursement. For Lump Sum - No documentation required. Invoicing by physical percent complete includes combination of direct labor and other direct expenses.

CR000237

HNTB.000135

548

E

## TASK ORDER NUMBER 3
### 38861 - US 290 Program Management

This Task Order is made as of June 26, 2010, under the terms and conditions established in the MASTER AGREEMENT BETWEEN HNTB CORPORATION (HNTB) AND CROSSLAND ACQUISITION, INC. (CONSULTANT), dated July 5, 2006. This Task Order is made for the following purpose, consistent with the Project defined in the Agreement:

The Consultant shall directly support the HNTB Team in performing engineering services generally described as the program management of the US 290 corridor extending from IH 610 to FM 2920, a distance of approximately 33.5 miles which shall include such services as project/financial planning, right of way surveying/mapping, scheduling, utility coordination, locating and designating services, right of way acquisition support, geotechnical services, and design support.

### Section A. - Scope of Services
Consultant shall perform the following Services:

Reference the attached Exhibit B -- Services to be Provided by the Consultant

### Section B. - Schedule
Consultant shall perform the Services and deliver the related Documents (if any) according to the following schedule:

Reference the attached Exhibit C – Work Schedule

Schedule for individual task assignment shall be as agreed with HNTB and written correspondence including electronic mail will be used to record associated established due dates.

### Section C. - Compensation
In return for the performance of the foregoing obligations, HNTB shall pay to Consultant the maximum amount of $1,988,636.46, payable in accordance with Attachment E and E-1 of the Master Agreement and the attached Exhibit D - Fee Schedule.

### Section D. - HNTB's Responsibilities
HNTB shall perform and/or provide the following:
- US 290 Program Management and US 290 Deputy Program Manager will provide daily oversight and management of the PMC Scope and Services.
- Provisions for a Project Office subject to terms of the Master Agreement between HNTB and Consultant.

This Task Order does not waive the parties' responsibilities and obligations provided under the Master Agreement between HNTB and Consultant.

CR000103

HNTB.000001

IN WITNESS WHEREOF, HNTB and Consultant have executed this Task Order.

**HNTB Corporation**
(HNTB)

Signature *Deborah C. Taylor*

Name: Deborah C. Taylor, CEP

Title: Vice President

Date 8/19/10

**Crossland Acquisition, Inc.**
(Consultant)

Signature

Name John K Harrison II

Title President

Date 7·28·10

List of Exhibits:
    Exhibit A:   NOT USED
    Exhibit B:   Contract 12-648P5013 - Services to be Provided by the Consultant
    Exhibit C:   Contract 12-648P5013 - Exhibit C, Work Schedule
    Exhibit D:   Contract 12-648P5013 - Exhibit D, Fee Schedule

CR000104

HNTB.000002

551

# EXHIBIT B

TO

**TASK ORDER NUMBER 3**
US 290 Program Management

For

Crossland Acquisition, Inc.

**Contract 12-648P5013 - Work Authorization Number 3**
Exhibit B, Services to be Provided by the Consultant
(18 pages)

CR000105

HNTB.000003

## EXHIBIT B

### I. INTRODUCTION

This task order is for the initial period from execution through September 30, 2011.

This project is generally divided into two (2) phases and several implementation stages and project segments which are currently summarized as follows:

(1) Planning and Design Management

- Preliminary Design/Environmental Impact Statement (EIS) Stage
- US 290 Final Design and Post-initial EIS/Agency Agreement
   o US 290 Phase I Segments 1 through 3
   o US 290 Phase II Segments 4 through 8
   o US 290 Phase III Segments 9 through 12
- Hempstead Tollway Final Design Coordination and Reviews
- High Capacity Transit Implementation Coordination

(2) Construction Oversight

- Letting support of first construction project (Prop 12 funding)
- Construction Administration IH 610/US 290 Interchange
- Letting Support of projects by fiscal year
- Construction Administration US 290 Phase II Segments 4 through 8
- Construction Administration US 290 Phase III Segments 9 through 12
- Construction Implementation Coordination Hempstead Tollway

This task order involves ROW Acquisition related to letting the first construction project at the IH 610/US 290 Interchange and associated 100% PS&E Milestone for Segments 1 through 3, as well as ROW and utility coordination tasks related to the associated design development of US 290 Segments 4 through 8, and Segments 9 through 12.

The limits of the project are on US 290 from IH 610 to FM 2920, a distance of approximately 33.5 miles (approximate US 290 stationing is from Sta. 1130+00 (west of FM 2920) to Sta. 2892+50.08 at IH 610 just north of IH 10) and approximate IH 610 stationing is from Sta. 2848+00 (just east of Ella Boulevard) to Sta. 2892+50.08 (just north of IH 10). This Task Order also includes preliminary engineering and design coordination for Hempstead from west of the proposed Grand Parkway to the IH 610 Interchange as related to the post-initial EIS/Agency Agreement Stage and as applicable within the initial period of this Task Order.

The US 290 Corridor includes improvements along existing IH 610, US 290, and Hempstead Road and is divided into areas of focus as follows:

US 290 Phase I:

Segment 1: Hempstead Tollway interchange with IH 610 and the Hempstead Tollway from south of Old Katy Road on IH 610 to west of Mangum Road.

Segment 2: IH 610 from East of Ella Boulevard to IH 10 including the Hempstead Tollway interchange and Direct Connectors US 290 from West 34 Street to IH 10.

Segment 3: IH 610/US 290 interchange including US 290 from W. 34th Street to north and south of US 290 on IH 610.

Exhibit B

CR000106

HNTB.000004

553

US 290 Phase IIA
Segment 4:    US 290 from west of West 34th Street to west of Pinemont Drive
Segment 5:    US 290 from west of Pinemont to Gessner Drive
Segment 6:    US 290 from Gessner Drive to FM 529 including the Beltway 8 interchange.

US 290 Phase IIB
Segment 7:    US 290 from FM 529 to west of Eldridge Parkway
Segment 8:    US 290 from west of Eldridge Parkway to Telge Road including SH 6 grade
              separation.

US 290 Phase III
Segment 9:    US 290 from Telge Road to Mueschke Road
Segment 10:   US 290 from Mueschke Road to Bauer Road including the proposed Grand
              Parkway (SH 99) interchange.
Segment 11:   US 290 from Bauer Road to Badtke Road
Segment 12:   US 290 from Badtke Road to FM 2920

Hempstead Phase I
Segment ML2A:   Hempstead from west of Mangum Road to Clay Road
Segment ML2B:   Hempstead from Clay Road to Gessner Drive
Segment ML2C:   Hempstead from Gessner Drive to Jones Road
Segment ML2D:   Hempstead from Jones Road to west of Huffmeister Road

Hempstead Phase II
Segment ML3:  Hempstead from west of Huffmeister Road to west of SH 99

Furthermore, the limits include adjacent projects at the IH 610/IH 10 Interchange and along the IH 610 North Loop to east of Ella Boulevard as necessary to coordinate letting joint projects as required by funding requirements and/or to accommodate connectivity improvements to the IH 610/US 290 Interchange.

The Consultant is a member of the US 290/Hempstead Corridor Program Management Consultant (PMC). For the initial period of this Task Order, the Consultant, will participate and/or support all tasks noted herein as the responsibility of the Program Management Consultant (PMC), including ROW acquisition services at the IH 610/US 290 Interchange and any assigned advance purchases along US 290. These projects are to be brought to completion as expeditiously as possible to comply with the schedule as proposed by the Texas Department of Transportation (TxDOT), hereinafter to be included as part of any reference to the State.

The PMC shall function as an extension of the State's resources by providing qualified technical and professional personnel to perform the duties and responsibilities assigned under the terms of this Agreement. The PMC shall minimize to the maximum extent possible the need for the State to apply its own resources to work authorized by the State. The State, at its option, may elect to expand, reduce or delete the extent of each work element as described in Exhibit B1 entitled Work Outline to be Provided by the Consultant, provided such action does not alter the intent of this task order. The Consultant shall coordinate all services with HNTB's designated US 290 Program Manager or their designee.

CR000107                                                            HNTB.000005

554

The Consultant will be required, prior to making staff assignments, to obtain written approval from the State of all proposed key staff additions or replacements to the project office staffing.

There is no guarantee that any or all of the services described in this Task Order will be assigned by the State and/or HNTB during the term of this Task Order. The State, at its option, may elect to have any of the services set forth herein performed by other consultants or TxDOT staff. The Services on this Task Order are generally for major elements during Preliminary and Final Design Development and many of these services have started in the previous Task Orders (Crossland Acquisition Task Order #1 and Crossland Acquisition Task Order #2) and/or will be completed or continued in subsequent Task Orders as deemed necessary by the State.

II.     CONTRACT SUPPORT & SCHEDULING

The Consultant will coordinate and assist the assigned PMC personnel responsible for the program schedule in the maintenance of a fully-integrated schedule and budget project controls tool for the Consultant's applicable scope of services. Regular maintenance will include continual monitoring of schedule compliance, budget issues, and variance analysis in both schedule and budget performance. Reporting will occur at regular intervals, with discussions focusing on critical path adherence, variance/work progression issues, and path-forward corrective actions, if necessary. The Master Program Schedule shall use a summary format by Function Code of major task elements.

The PMC will continue to maintain the Master Schedule and organize budgets for all tasks in Primavera. The PMC will continue to utilize the Program Work Breakdown Structure (WBS). The WBS will define the projects into manageable units and allow for reporting of each. The design and construction projects will be organized according to the WBS. A coding structure will be maintained for the program. The Master Schedule is a Precedence Diagram Method (PDM) network utilizing critical path schedule techniques, specifying proposed start and finish dates, showing the interdependencies of the design and construction projects. The PMC will continue to update and publish the Master Schedule monthly and submit to the TxDOT.

The PMC shall continue to monitor the master milestone schedule of time relationships authorized for the performance of services and coordinate with the various SDCs. The physical progress of the design activities versus the master schedule objectives is to be monitored.

The PMC shall prepare the official minutes of all meetings for the State's approval and dissemination.

The PMC should prepare and issue monthly status reports on ROW Acquisition project progress and document any problems and delays encountered. This information will also be included in a Quarterly Program Status Report submitted to the State for distribution to senior management.

The Consultant shall invoice the PMC in accordance with the rate schedules in Attachment E of the Prime Agreement and Master Agreement between HNTB and the Consultant including associated supplemental agreements, and the function codes authorized in Exhibit D of this task order and any associated supplements. The invoice package will be prepared using the Houston District Billing Procedures for "Specified Rate" method of pay. The invoice shall contain:

* Cover Letter
* US 290 Consultant Invoice Form

Exhibit B

HNTB.000006

- Written progress report describing activities during the reporting period; activities planned for the following period; problems encountered and actions taken to remedy; list of meetings attended; and overall status.
- Consultant's Back-up as applicable
- Time Sheets and expense receipts

## III.    PROGRAM MANAGEMENT AND COMMUNICATIONS

### RIGHT OF ENTRY

It shall be the responsibility of the PMC to secure permission to enter private property for purposes of survey, geotechnical investigations, ROW appraisals, and other project related activities under this Task Order. Documentation of all applicable permissions obtained shall be provided to the State before proceeding with any such activity on any private property. It is the stated policy of the State to make every effort to maintain positive relations with the general public. In pursuance of that policy, the PMC shall not commit acts which will result in damages to private property, and will make every effort to comply with the wishes and address the concerns of private property owners. The PMC shall also attempt to secure "Possession and Use" agreements where applicable and shall maintain documentation of all such efforts and resulting agreements.

## IV.    ENVIRONMENTAL INVESTIGATIONS AND MITIGATIONS

The PMC will review reports related to environmental investigations and mitigations as prepared by the state and/or others on behalf of the state concerning the US 290/Hempstead Corridor Program as specifically requested by the State and as applicable to this Task Order. These services are to facilitate the timely mitigation of environmental issues on the Program.

Environmental services are generally described as hazardous materials initial environmental site assessments, Phase I and Phase II environmental site assessments (ESA), risk-based assessment evaluations and modeling, and remediation system design/mitigation.

## V.    RIGHT OF WAY COORDINATION AND UTILITY ADMINISTRATION SUPPORT.

During the initial period of this Task Order, the PMC will provide expert witness testimony in hearings, condemnation proceedings or other litigation with respect to acquisition of right of way, easements, and other forms of property interests required for this project.

### Utility and ROW Tracking Application Task Management
The PMC shall provide personnel to operate and manage data within the ROW and Utility Information Management System.

### ROW Acquisition Management and Services
The PMC shall provide management oversight for all ROW Acquisition Services to be provided. This Task Order includes ROW acquisition management services for the Proposition 12 portion of the IH 610/US 290 interchange and select advance acquisitions along US 290 such as for detention pond parcels.

Final ROW shall be acquired in accordance with the practices, guidelines, procedures and methods currently employed by the State and TxDOT Houston District and the following, as may be amended from time to time:

a) TxDOT Right of Way Manual (available online),
b) TxDOT Access Management Manual (available online),
c) TxDOT Survey Manual,
d) TxDOT Appraisal and Review Manual,
e) TxDOT Facility Development Process Manual, and
f) Federal Highway Administration's (FHWA's) Right-of-Way Facility Development Guide (as contained in the Federal-Aid Policy Guide (FAPG)).

The PMC shall maintain a complete and current set of TxDOT Right of Way Manual Volumes 1 through 8 (http://manuals.dot.state.tx.us/dynaweb), TxDOT Right of Way Access Management Manual (http://manuals.dot.state.tx.us/dynaweb), TxDOT New & Revised Right of Way Acquisition Procedures, TxDOT Appraisal and Review Manual, and a current approved Final ROW map for public use.

All Final ROW activities must be completed and documented in compliance with applicable laws, including the *Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970* as amended (hereafter referred to as the Uniform Act), rules and regulations.

The PMC shall establish, implement, and maintain quality control and quality review standards for the acquisition for Final ROW.

The PMC shall maintain an up to date list of names of State approved title company(ies) to be used for title services.

**ROW Schedule**
The Program Schedule shall indicate the date to begin the acquisition of the Final ROW and the anticipated completion date of acquisition activities for each parcel. The State shall be advised of Additional Properties, TCE's or Temporary Construction Easements, tie-ins to driveway, and temporary rights or interests in real property to be acquired. In developing the Program Schedule, the PMC will recommend and give priority to the acquisition of parcels that have significant impact on the Schedule and/or affect the Critical Path as so indicated or as periodically designated by the State. The monthly status reports required below shall provide updated projections for the acquisition date of each parcel.

In maintaining the Schedule, the PMC shall incorporate adequate time periods for PMC Team review and approval of acquisition packages and, as applicable, the State spot check and final processing of acquisition packages. If any submitted acquisition package has a deficiency, the PMC shall correct such deficiency and resubmit the package. An acquisition package shall be deficient, as determined by the PMC or the State, if any of its components fails to meet any of the criteria established for such component, or contains any errors or omissions.

The PMC and the State both reserve the right to seek additional review on parcels/packages that are of an unusual/questionable nature in regards to the State's standards.

**PMC's Final ROW Scope of Services**
The PMC shall complete all administrative activities and assemble all documentation sufficient for the State to acquire the Final ROW as applicable to this Task Order during the initial period. The PMC shall make a written recommendation to the State and obtain the State's concurrence of all appraisals, legal descriptions, acquisition documentation, purchase price, requests to acquire Final ROW, condemnation-related activities and funding/closing procedures. The State will

CR000110

HNTB.000008

557

approve and return the Final ROW acquisition documentation or provide comments for incorporation by the PMC. Right of way acquisition procedures will not commence until released by TxDOT's right of way office. Further, the PMC shall not commence any negotiations with landowners nor will eminent domain procedures begin until the specific acquisition package for that particular parcel has been approved and minute order issued.

If an agreed upon purchase price, acceptable to the State, cannot be negotiated with the landowner, then the PMC shall make recommendations for proceeding with acquisition of the property through condemnation/eminent domain procedures.

Acquisition Process Summary:
PMC's major activities with respect to the acquisition of the Final ROW include management oversight and/or preparation, as applicable of:
a) Final ROW surveying and mapping,
b) Final ROW budget estimates and updates,
c) Title services,
d) Appraisal services (Billboard Identification),
dd) Requests for variances to billboard ordinance
e) Appraisal review,
f) Negotiations (Billboard research and Bisection clauses),
g) Closing services,
h) Relocation assistance, (Including Billboards),
i) Condemnation support services,
j) Preparation and administration of bid documents for Clearance and Demolition of Final ROW,
k) Environmental due diligence, (PST's, Asbestos and Lead)
l) Documentation and document control, including scanning, file organization and transfer of close files to the State.
m) Progress reports,
o) Final ROW quality control review,
p) Documentation certifying that the required Final ROW acquisition is necessary and that any proposed alternatives are not feasible or are cost prohibitive, and
q) Obtaining rights of entry, as necessary.
r) Temporary Construction Easements (TCE's).
s) Certification preparation.

Documentation and Reporting
PMC shall provide the State with all specific reports and supporting documentation for review and approval during the acquisition process as applicable to this Task Order. To facilitate the State's receipt of that portion of the right of way costs to be borne by the local agencies, the PMC shall coordinate with the State regarding accounting and approval of these costs and expenses.
All correspondence with the State and property owners relating to acquisition of real property shall include the following information (at a minimum) as a heading:
a) County,
b) Construction Control Section Job number, (Construction CSJ)
c) Highway Designation
d) Facility limits,
e) Parcel number, and
f) Name of record owner(s)
g) Right of Way Control Section Job number, (ROW CSJ)

Exhibit B

CR000111

HNTB.000009

**PMC's Responsibility**

During the initial period of this Task Order the PMC shall be responsible for management of all services and preparation of all documentation for all Final ROW acquisition, easement acquisition, permitting and related relocation assistance for the Program. The Work related to Final ROW acquisition includes, but is not limited to, mapping, surveying, appraisal, appraisal review, negotiation, acquisition, procurement of title insurance, clearing of title, closing of acquisitions, condemnation support, all exhibits and photos associated with condemnation services and proceedings required by the Attorney General's office, relocation assistance, clearance/demolition of improvements, and environmental testing and remediation, as required.

The PMC shall track all costs and payments of: agreed purchase prices or Commissioners' awards and judgments; relocation assistance payments; all legal, administrative and incidental expenses of, or related to, the ROW; and temporary easements or other interests in real property acquired for the Facility.

The PMC will provide management and oversight of all ROW tasks, coordinating the acquisition of unsecured ROW parcels for the Program as applicable to this Task Order. The ROW coordination services provided by the PMC will include:

1. Assisting the State's in the identification and prioritization of parcel acquisitions critical to private utility relocation activities.

2. Maintain a parcel status tracking system.

3. Assisting the State's East Region ROW Department in the preparation of documents requesting Right Of Entry to unsecured parcels.

4. Conducting periodic meetings as needed with the private utilities construction representatives and/or engineers to update status of the ROW acquisition and to identify potential ROW problems.

5. Preparing a monthly ROW Status and Critical Parcel Report by ROW Account.

6. Maintaining a composite ROW map with parcel status and critical parcels identified.

7. Developing Utility Agreements for reimbursement of FHWA funds (ROW accounts) and submitting to the State for further review and execution.

**Final ROW Acquisition Package Approval**

The PMC shall review all Acquisition packages submitted and verify a complete submittal prepared in accordance with this scope of work and the ROW section of the Program Management Plan, to include the following items prepared for each parcel:

a) A review cover sheet (Checklist) signed by the PMC verifying that the submittal packet is complete and has been reviewed.

b) A cover sheet setting forth the following information for each parcel:
   1) Parcel number and number of parts,
   2) Station number,
   3) ROW CSJ number,
   4) Location of parcel,
   5) Name of owner,
   6) County and/or other jurisdiction,
   7) Extent of acquisition (partial or whole acquisition), and

CR000112

HNTB.000010

559

      8)   Type of conveyance (fee, easement, etc.)

c) A complete legal description of the parcel adequate to effect the desired acquisition of the parcel, signed and sealed by an RPLS. A legal description and parcel plat is required for each parcel. Control of access should be addressed in all legal descriptions. All descriptions shall be in recordable form and shall be prepared in a form and manner acceptable to the State in all respects,

d) The parcel plat, as prepared by the RPLS, and a half size (11" x 17") copy of the right of way map sheet(s) pertaining to the parcel, such plat to include control of access designations.

e) A title report, current within ninety (90) Days, including copies of all documents identified in the exceptions listed therein and a plot of all easements identified therein. The acquisition package shall include PMC's analysis of each preliminary title report or title commitment to determine potential problems and proposed methods to cure title deficiencies. The PMC shall perform title curative Work and provide the State with copies of all curative documents,

f) A copy of the appraisal report and all supporting documentation,

g) A copy of the environmental site assessment and all amendments as described in Appraisal Services, if any,

h) A real/personal property report detailing what items making up each parcel are classified as real estate, tenant-owned improvements or personal property. Particular attention should be paid to items that have questionable classifications. Completed ROW Form A-9 Property Classification Agreement,

i) Replacement Housing Calculations, notification of business eligibility, completed displacee interviews, all comparables used in estimating the replacement housing calculations, and letter to displacee(s) explaining replacement housing calculations. Calculations and replacement housing benefit package shall be prepared and reviewed by a qualified consultant, in conformance with the State's standard relocation procedures and applicable to State and federal laws and regulations,

j) The proposed initial offer letter, memorandum of agreement, deed, and any other documents, which shall be prepared as required or requested by the State. The State will provide the format for preparing these documents. Documents referred to in this section are standardized by the State and modification of standardized documents should be kept to a minimum, all changes shall be approved by the State in writing, at the State's sole discretion, and

k) Any other required State forms, such as record of all contacts with the property owner or any party with a compensable interest.

Upon the State's prior written approval of the acquisition package, the PMC may proceed or direct negotiation agents to proceed with the offer to the property owner as appropriate.

## VI. ERRORS AND OMISSIONS:

For design services specifically provided by and signed and sealed by the Consultant, the Consultant is responsible for design errors and/or omissions that become evident before, during or after construction of the project. The Consultant's responsibility for all questions arising from such design errors and/or omissions will be determined by the State and all decisions shall be final and binding. This would include but not necessarily limited to:

1. All design errors and/or omissions resulting in additional design work to correct the errors and/or omission for elements designed by the Consultant.
2. Preparation of design documents and detail drawings necessary for a field change due to design errors and/or omissions for elements designed by the Consultant.
3. Revisions of original tracings to the extent required for a field change due to design errors

CR000113

HNTB.000011

560

and/or omissions for elements designed by the Consultant.

The Consultant shall promptly make necessary revisions or corrections resulting from the Consultant's errors, omissions or negligent acts without additional compensation. Acceptance of the work by the State and/or HNTB will not relieve the Consultant of the responsibility for subsequent correction of any such errors or omissions or for clarification of any ambiguities.

## RIGHT-OF-WAY DATA (Function Code 130)

A.   Right-of-Way and Utility Information Management System
  1.   Utility and ROW tracking application implementation process
    - The application web site will be maintained and updated during the initial period of this Task Order to track ROW acquisition and utility agreement and adjustments at the IH 610/US 290 Interchange projects and any advance acquisitions approved along US 290 such as for proposed detention pond locations. Right-of-Entry requests for all US 290 Segments will be monitored and recorded using the tracking application.
    - Exhibits and reports will be published monthly and at other intervals as requested to illustrate the status of ROW acquisition and utility activities for individual parcels and the record of all correspondence with the subject property owners.
  2.   Data Management
      Utility and right-of-way information will be maintained through the application by the PMC and those assigned by the State that have will have oversight responsibility for utility relocations and right-of-way acquisition.

B.   ROW Acquisition Management and Services
    This Task Order is for services related to ROW acquisition for portions of the IH 610/US 290 Interchange as funded by Proposition 12 bond funding approved by the Commission in November 2009 and as applicable during the initial period of this Task Order. The state may also assign limited parcels that will be acquired in advance of full funding for segments along US 290 to accommodate proposed detention pond sites, hardships, or other need as determined by the state necessary to acquire prior to planned development.
  1.   Provide a full time ROW Acquisition Task Manager along with associated support personnel for management and administrative tasks.
  2.   Provide access to ROW management personnel and project files within the Program Office including accommodations for an open door policy with the public during normal State work hours. Questions or concerns from the public shall be recorded and recommendation for follow up, as applicable, made within 24 hours.
  3.   Identify landowners on the project
    a.   Prepare drafts of Acquisition Provider introduction letters.
    b.   Maintain and Update property owner database including:
      - addresses
      - phone numbers
      - tax identification number
  5.   Make recommendations and keep a log of appraisal services assignments.
  6.   Weekly status meetings to identify any potential problems that could cause delays and develop approach to resolve. Weekly meetings will be held to help facilitate and avoid any delays.

CR000114

HNTB.000012

561

7. Monitor activities with respect to applicable State polices and guidelines. Monitor acquisitions and relocations to verify they are handled in compliance with Title II and III of the Uniform Act of 1970.
8. Notification of impending project to adjacent landowners
9. Make contact and stay current with brokers and real estate agents along the corridor
10. Meetings and discussions with METRO concerning transit development opportunities
11. Look for early opportunities for making offers and appraisal assignments. Assess and prioritize parcels including identification of parcels critical to permit utility relocation activities, displaces requiring relocation and billboards requiring variance approval by the City of Houston or other cities.
12. Develop appraisal plan that allows prompt offers that will reduce future appraisal updates.
13. Review environmental concerns before appraisals ordered.
14. Review ROW and land use to develop potential revision to eliminate unnecessary takes and costly and lengthy negotiations.
15. Review utility easement locations to discuss their relocation with the utility coordinator.
16. File Management:
    a. Prepare warrant transmittal request utilizing State standard payment submissions forms with supporting documentation.
    b. Maintain records of all payments including warrant number, amount, and date paid, etc.
    c. Maintain copies of all incoming and outgoing correspondence and contact with property owners.
17. Final ROW Acquisition Package Review and Approval.
18. The PMC shall assess concerns or unusual circumstances identified, including parcels splits, impacts to remainder, etc., and provide appropriate research back-up and provide recommendations to the State on how to proceed for State review and approval.
19. Develop and update ROW acquisition plans and relocation plans for both the US 290 and Hempstead corridors to document approach to acquisition and relocation activities.
20. Develop and maintain a list of priority parcels based on issues that may impact or delay the timeline for acquisition or relocation.
21. Provide and maintain preliminary cost estimates for ROW elements to be used in Financial Plan documents and reporting in accordance with applicable state and federal requirements for major projects. This includes coordination with acquisition providers for HCTRA, METRO, or other third party agencies that may be responsible for acquisitions related to the US 290/Hempstead Corridor Program.

C. Title Services
   This Task Order consists of the title services of the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290.

   1. Provide management oversight and review on Title Services to accomplish the following:
      a. Secure a current title commitment. A current title commitment is considered good if less than 90 days old and must include a five-year sales data from the Title Company that will be providing title insurance.
      b. Preparation and submittal to the Region and District of a written notice to the negotiator of title issues and proposed resolutions.
      c. Secure title commitment updates in accord with insurance rules and requirements for parcel payment submissions and/or eminent domain package submission.
      d. Secure title insurance for all parcels acquired during the subject Task Order initial period, insuring acceptable title to the State. Written approval by the State required for any exception.

CR000115                                                          HNTB.000013

                                                                        562

D.  Initial Appraisal Services

This Task Order consists of the initial appraisal services for the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290.

1.  Provide management oversight and review on Initial Appraisal Services to accomplish the following:

    a.  Verify Appraiser selected from the State's list of state approved fee appraisers and is available to complete the assignment(s). This approved appraiser list will be available for review at the PMC office, all Region and District offices or the Right of Way Division Office at 118 E. Riverside Drive, Austin, Texas, upon request.

    b.  Permission secured from the owner to enter the property from which land is to be acquired. If the Acquisition Provider, after diligent effort, is unable to secure the necessary letter of permission from the property owner, a waiver must be obtained, in writing from the State. Maintain documentation with appraisal reports.

    c.  Prepare and conduct personal pre-appraisal contact with interest owner(s) for each parcel using acceptable State forms. Identify items such as PSTS and Water Meters and Vaults.

    d.  Contact property owners or their designated representative to offer opportunity to accompany the appraiser on the appraiser's inspection of subject property. Maintain record of contact in file.

    e.  Prepare complete appraisal report for each parcel to be acquired utilizing State forms No. ROW-A5, ROW-A6, ROW-A7, ROW-A8, as applicable. These reports shall conform to State policies and procedures along with the Uniform Standards of Professional Appraisal Practices.

    f.  As necessary, prepare written notification to the State of any environmental concerns associated with the right of way to be acquired which could require environmental re-mediation.

    g.  All completed appraisals assembled and submitted for final approval administratively by the Region Right of Way Office and packaged for forwarding with recommendation for approval by the District Engineer, Region Director, or ROW Division Director as appropriate.

    h.  As necessary, coordinate with the appraiser to appear and/or testify as an Expert Witness in eminent domain proceedings and be available for pre-hearing or pre-trial meetings.

    i.  As necessary, the appraiser will coordinate with review appraiser regarding revisions, comments, or additional information that may be required.

E.  Initial Appraisal Review Services

This Task Order consists of the initial appraisal review services for the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290.

1.  Provide management oversight and review on Initial Appraisal Review Services to accomplish the following:

    a.  Verify Review Appraiser selected from the State's list of state approved fee appraisers.

    b.  Review all appraisal reports for each parcel to determine consistency of values, supporting documentation related to the conclusion reached and compliance with State policies and procedures and the Uniform Standards of Professional Appraisal Practices.

    c.  Completed State Form ROW-A10 "Tabulation of Values", for each appraisal.

2.  Complete appraiser evaluations as required.

Exhibit B

CR000116

HNTB.000014

563

F.  Appraisal Update Services
This Task Order consists of the initial appraisal update services for the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290.

1.  Provide management oversight and review on Appraisal Update Services to accomplish the following:
    a.  Timely complete appraisal updated for the parcel to be acquired utilizing State Form No. ROW-A5, which will be furnished to the Acquisition Provider by the State. These reports shall conform to State policies and procedures along with the Uniform Standards of Professional Appraisal Practices.
    b.  Written notification made to the State of any environmental concerns associated with the right of way to be acquired which could require environmental remediation. Provide completed appraisals with recommendation to the District Right of Way Office for approval by the District Engineer or his/her assigns.
    c.  As necessary, coordinate with the appraiser to appear and/or testify as an Expert Witness in eminent domain proceedings and be available for pre-hearing or pre-trial meetings during the initial period of this Task Order.

G.  Appraisal Review Update Services
This Task Order consists of the initial appraisal review update services for the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290.

1.  Provide management oversight and review on Appraisal Review Update Services to accomplish the following:
    a.  Verify appraiser selected from the State's list of State approved fee appraisers.
    b.  Compliance with State policies and procedures and the Uniform Standards of Professional Appraisal Practices.
    c.  Completed State Form ROW-A10 "Tabulation of Values", for each appraisal.

H.  Right of Way Negotiations
This Task Order consists of right of way negotiation services for the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290.

1.  Provide management oversight and review on Right of Way Negotiation Services to accomplish the following:
    a.  Appraisal and appraisal review reports were analyzed and the State's approved value confirmed prior to making an offer for each parcel.
    b.  Initial offer letter prepared, memorandum of agreement, instruments of conveyance, and any other documents required or requested by the State on applicable State forms.
    c.  Contact made with each property owner or owner's designated representative, to present the written offer in person where practical, and deliver appraisal report and required brochures. Maintain follow-up contacts and secure the necessary instruments upon acceptance of the offer for the closing.
    d.  Provide a copy of the appraisal report for the subject property exclusively to the property owner or authorized representative at the time of offer. Maintain original signed Receipt of Appraisal.
    e.  Response to property owner inquiries verbally and in writing within two business days.
    f.  Preparation of a separate negotiator contact report for each parcel per contact on State form ROW-N94.

CR000117

HNTB.000015

564

g. Parcel files maintained of original documentation related to the purchase of the real property or property interests.
h. Property owner advised on the Administrative Settlement process. Within 30 days of initial offer (unless an additional 30 day extension is requested), transmit to the State any written counter offer from property owners including supporting documentation, and Acquisition Provider recommendation with regard to Administrative Settlements in accordance with State policy and procedures.
i. Final offer letter and documents of conveyance prepared as necessary within 30 days of initial offer.
j. Make provision for the inclusion of Bisection Clauses of the Deed.
k. Address access issues with Design and make recommendations to the State.
l. Coordinate Expert Witness Testimony by Acquisition Provider as necessary.

I. Closing Services

This Task Order consists of Closing services for the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290 which reach closing stage during the initial period of this Task Order.

1. Provide management oversight and review on Closing Services to accomplish the following:
   a. Coordinate with the State and title Company to obtain an updated title commitment along with other Forms and certified copy of the instrument of conveyance necessary when requesting the Parcel Payment from the District. Clear necessary liens incumberances etc., before closing.
   b. Coordinate with Acquisition Provider to attend closings and provide closing services in conjunction with Title Company.
   c. Verify Acquisition Provider has recorded original instruments immediately after closing at the respective County Clerk's Office, except for donations which must be forwarded to the State for acceptance by the Commission prior to recording.
   d. Delivery of State "Property Owner Survey" and if applicable, the "Relocation Survey" to the property owner at the closing.
2. Prepare Affidavit of Inspection as required by Title Company.

J. Relocation Assistance

This Task Order consists relocation assistance services for the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290 as applicable during the initial period of this Task Order.

The PMC shall coordinate and perform the administrative requirements necessary in order to relocate any occupants from Final ROW. All services with respect to relocation assistance shall be performed in accordance with applicable law, including the Uniform Act and State standards, and in accordance with applicable provisions of this Agreement.
1. The PMC shall maintain a relocation office within the Program Office. At a minimum, the office hours of the relocation office shall be posted to meet normal state work hours. In addition to the office hours, the PMC shall be available to all displacees for relocation services at the convenience of the displacees.
2. PMC's major activities with respect to the relocation assistance of occupants from Final ROW includes:
3. Update the "Relocation Plan" in accordance with the State's Right of Way Manual, Volume 3, Chapter 8, Section Relocation Program Planning and Construction;
   a. Monitor relocation assistance activities;

Exhibit B

CR000118

HNTB.000016

565

b. Assist with all requests and be responsible for answering initial requests for, Review/Appeal Process and Judicial reviews.

4. Relocation assistance shall be provided strictly in accordance with the law, and, in particular, the Uniform Act and State standards. The PMC shall provide management oversight and review on Relocation Assistance Services to accomplish the following:

a. Personal Property Relocation Services

1. All property owners and potential displaces notified of eligibility for relocation assistance and provide them with a Relocation Assistance Brochures at time of initial contact. The State will provide brochures to the PMC. If possible, advise displaces of preliminary relocation benefits at this time including any incentive programs.

2. Completed State Form ROW-R96 (Relocation Advisory Assistance-Parcel Record) for all displacees.

3. 90-day notice provided to vacate simultaneous with the delivery of relocation benefits package.

4. Once property acquired, issue a sixty day notice if displacees have not vacated and if the parcel has been acquired, a 30-day letter issued. Notify the State's District Office immediately if displacees do not move after 30-day notice.

5. Requested moving estimates from moving companies as needed. Coordinate moves with displaced business owners and tenants in accordance with State procedures.

6. Coordinate availability of Relocation agent for any appeals or hearings.

b. Residential Relocation Services

1. Property owners and potential displacees notified of eligibility for relocation assistance and provided with a Relocation Assistance Brochure at time of initial contact. The State will provide brochures to the PMC. If possible, advise displacees of preliminary relocation benefits at this time including any incentive programs.

2. Completed State form ROW-R96 (Relocation Advisory Assistance-Parcel Record) for all displacees.

3. Located, evaluated and maintenance files on comparable available housing for State form ROW-R106

4. Calculated replacement housing supplement benefits for State form R107 (Supplement Payment Estimate-Replacement Housing).

5. Submitted completed State forms ROW-106 (original only) and ROW-R107 (original and 2 copies) to the District Right of Way Office. Include supporting photographs.

6. Provided 90-day notice to vacate simultaneous with the delivery of relocation benefits package.

7. Sixty days later if displaces have not vacated and if the parcel has been acquired, a 30-day letter issued. Notify the State's District Right of Way immediately if displaces do not move after 30-day notice.

8. Performed a decent, safe and sanitary (DSS) inspection of the replacement housing in accordance with State policy. Prepared and submitted State Form ROW –R116 to the District Right of Way Office.

9. Requested moving estimates from moving companies as needed. Coordinate moves with displaced business owners and tenants in accordance with State procedures.

10. Submitted requests for relocation payments including forms: Updated ROW-R96 (Relocation Advisory Assistance-Parcel Record) ROW-R99 (Claim for Actual Moving Expenses), ROW-R100 (Claim for Fixed Moving Expense Payment-Individual and Families ), ROW-R105 (Claim for Payment of Rent Supplement), ROW-R113 (Claim for Payment of Down Payment or Housing Supplement), ROW-RCE (Certification of Eligibility), ROW-R166 (Replacement Housing Inspection),

CR000119

HNTB.000017

566

and any other applicable forms and support documentation. Ensure owners have terminated all utilities and request all meters be removed.

11. Transmittal of memorandum and completed file to State's District Office.
12. Coordinate availability of Relocation agent for any appeals or hearings.

  c. Business Relocation Services

1. All property owners and potential displaces notified of eligibility for relocation assistance and provided with a Relocation Assistance Brochure at time of initial contact. The State will provide brochures to the PMC. If possible, displace advised of preliminary relocation benefits at this time including any incentive programs.
2. Completed State Form ROW-A96 (Relocation Advisory Assistance-Parcel Record) for all displaces.
3. 90-day notice provided to vacate simultaneous with the delivery of relocation benefits package.
4. Once acquired, send thirty day notice to owner/tenants. Sixty days notice if displaces have not vacated and if the parcel has been acquired, 30-day letter issued. Notify State immediately if displaces do not move after 30-day notice to affect eviction process.
5. Requested moving estimates from moving companies as needed. Moves coordinated with displaced business owners and tenants in accordance with State procedures.
6. For complex business moves estimated to cost over $20,000
   a. Prepared dated, written moving plan signed by both the displaces and the relocation agent.
   b. Moving plan in compliance with State requirements and recognized moving principles. The moving plan must contain the method of move, i.e., commercial, self-move, etc.
   c. Clear descriptions of the property to be moved, date of move, appropriate photographs, appropriate sketches, and the location and distance to the replacement site.
   d. Outline of work specifications and requirements for each phase of the move detailing identification of items requiring removal, re-installation and any special handling, packing, or crating.
   e. Documented inventory of personal property to be moved for non-residential moves.
   f. Closings attended on replacement property if requested by any party involved and assurance supplement payment is properly distributed and "Relocation Survey" is delivered to displacee.
7. For non-complex business moves estimated to cost $20,000 or less
   An abbreviated written moving plan. The difference in the non-complex moving plan is that it can be prepared and signed solely by the relocation agent. Ensure owners have terminated utilities and required meters be removed.
8. Relocation agent available for any appeals or hearings.

K. **Condemnation Support**

This Task Order consists of condemnation support services for the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290 as applicable during the initial term of this Task Order.

The PMC shall support condemnation efforts as directed by the State as follows:

CR000120

HNTB.000018

567

1. Make provisions for preparation of a Bisection Clause for the original set of Legal Descriptions supplied by the State if applicable.
2. Review and prepare, as applicable, Form ROW-E49 used to join all interested parties. If married, spouses of owners must also be joined unless separate property is declared.

Pre-Hearing Support
1. Notify the State of any potential condemnation and document the reason(s) for condemnation including recommendations for property closure.
2. Upon delivery of a copy of the final offer, have request made for an updated title commitment for Eminent Domain from the Title Company.
3. Upon verification of Form ROW-E49, prepare a packet containing 2 copies each of the following documents: ROW-E49 form, Commitment, Negotiator's Reports, Appraisal Acknowledgement, Pre-Appraisal Contact Sheet, signed and sealed property description, and plat, Final Offer letter, any correspondence from the land owner or representatives, along with one copy of the appraisal report. Submit packet to the District ROW Office for submission to the Right of Way Division.
4. Address 49 deficiencies as required by ROWD.
5. Upon receipt of concurrence for the Appraisal Witness, request the update of appraisal.
6. Upon receipt of packet prepared by the Attorney General's Office which will include Petition for Condemnation, Lis Pendens, Order Appointing Commissioners, Order Setting Hearing, Oath of Special Commissioner, and Notice of Hearings, coordinate with provider the filing of the original petition with the County Court at Law or other appropriate Court for a cause number to be assigned.
7. Coordinate filing the Petition and Lis Pendens including the cause number with the County with the County Clerk's Office.
8. Upon assignment of a court, coordinate filing the Order of Appointing Commissioners with the judge retaining a copy of the Order for the files.
9. Following appointment of Commissioners by the judge, secure the following documents: Oath of Commissioners signed by the Commissioners, Order Setting Hearing, 2 copies of the Notice of Hearing signed by the Commissioners.
10. File all originals with the court and send copies marked "copy" to the State's District Office and the Assistant Attorney General.
11. Send a copy of the petition to the Title Company so that the title Company can make sure the appropriate parties were joined and that no changes in title have occurred.
12. Set the Commissioners Hearing after the updated appraisal has been submitted, if there is no change in value. If there is an increase in value, PMC will make a revised offer. The PMC shall prepare a final offer letter and submit a copy of the final offer letter.
13. Coordinate a conference room or court room reservation for the hearing.
14. Coordinate the hearing date with the Assistant Attorney General, Appraiser, the State's Representative, three commissioners, and a court reporter.
15. Coordinate a pre-hearing conference prior to the hearing (the day before or earlier) to discuss the facts of the case with the Assistant Attorney General, Appraiser, and the State.
16. After the hearing is set, serve Notices of Hearing to the indicated parties at least 11 days prior to the Commissioner's hearing. If it is necessary to join the Federal Government, the Notice of Hearing must be served 60 days prior to the Hearing. Make arrangements for Citation by Publication if needed.
17. Once the notices have been served, file the original notices with the court and send copies stamped "copy" to the State and Assistant Attorney General.
18. Send a reminder letter 2 to 3 weeks in advance to the Assistant Attorney General, Appraiser, three Commissioners, Court Reporter, and the State concerning Hearing dates.

CR000121                                                                HNTB.000019

568

19. Depending on the market conditions or if over six months have elapsed since the date of the initial offer, contact the attorney handling the case for the State and confer about the advisability of preparing an updated appraisal. If it is determined that an updated or new appraisal is determined to be necessary or desirable, the PMC shall schedule and arrange for such appraisal with the original appraiser.

20. Coordination with the State on behalf of the Attorney General as to the need for a land planner. The land planner report should be completed and forwarded to the appraiser before the updated appraisal is completed.

21. Upon request, provide a land planner to perform a land planner report.

22. Review the updated appraisal and submit to the attorney handling the case. The State must approve any revised offer in writing prior to an offer letter being sent within ten (10) Business days of receiving the updated appraisal. If a revised offer is approved by the State, prepare a final offer letter, make the revised offer to the property owner or other holder of a compensable interest, as applicable, and submit a copy of the final offer letter to the State.

Post Hearing Support

1. For the hearing, prepare Form ROW-E73 and commissioners time sheets. Submit Form ROW-E73 to the State's District Office.

2. Obtain signatures of Commissioners on the Award of Commissioners and file with the court for the judge's signatures within 48 hours of the Hearing.

3. Give timesheets to the Judge. The Judge determines amount paid to Commissioners.

4. Obtain and distribute 3 certified copies of the award as follows: 1 certified copy to the title company with a request for a commitment, 1 certified copy to the Assistant Attorney General, 1 certified copy to the State with the Commitment to request the warrant in the amount of the Commissioners' Award.

5. Send the Commitment and the Award to the State's District ROW Office, along with individual commissioner's Billing Statement Form 132 requesting payment for their fees, and evaluation of appraisers testimony and availability.

6. Deposit State warrant in the registry of the court. File a Notice of Deposit with the court and send certified copies to each defendant notifying them of the date of the deposit. The Date of the Deposit is the Date of Take.

7. Take photograph of the interest to be acquired on the day of deposit for relocation verification and coordinate jury trial and appraisal photographs with District appraisers.

8. Send written notices of the date of deposit to the State's District ROW office and all interested parties.

9. Appear or coordinate appearance of Expert Witness as requested. Sub-contractors or members of the ROWAP may also need to appear as Expert Witnesses as requested.

10. File Objections.

L.  Clearance/Demolition of Final ROW
This Task Order consists of clearance/demolition services for the Proposition 12 funded portion of the IH 610/US 290 interchange and select limited parcels as assigned along US 290 as applicable during the initial period of this Task Order.

Prior to demolition of any improvements, the PMC shall provide to the State, photographs of the property and all improvements, unless the Special Commissioner's Hearing has been completed and objections have not been filed. The PMC shall also have photos of personal and any other items of dispute in and of a quality suitable for presentation as evidence in court. Following acquisition or possession of any parcel of Final ROW, the PMC shall:

CR000122

HNTB.000020

569

1. Coordinate with the owner and occupants to assure the clearance of personal property from the Final ROW, as applicable.
2. Secure Governmental Approvals required for demolition and environmental surveys or tests, and notify the State in writing of all such activities.
3. Test for Asbestos.
4. Prepare necessary documentation for disposal of improvements, fixtures and buildings in accordance with applicable laws and submit the same to the State.
5. Provide written notification to the State of any real and/or personal property remaining on the Final ROW after vacated by the occupants and not acquired as part of the acquisition.
6. Right after vacate, terminate all utility services when appropriate.
7. Process all required forms, documents and permit applications in order to proceed with the timely demolition or removal of any and all improvements, buildings and fixtures located within the Final ROW, as applicable.
8. Notify the State upon completion of the demolition and clearance of the Final ROW, as applicable.

M. **Deliverables**
In administering and managing its Final ROW activities, the PMC shall:
a. Maintain parcel records on file of all aspects of the acquisition process covered in this Task Order in accordance with State requirements and applicable Law. Each parcel file shall include all documents required by the Contract Documents, Federal Highway Administration, and/or the State.
b. Provide monthly summaries of Facility expenses covered in this Task Order including amounts authorized, amounts paid and budget forecasting on a parcel-by-parcel and overall Program basis as requested by the State.
c. Provide budget projections and anticipated funding requirements every thirty (30) days and more frequently as requested by the State during this Task Order.
d. Maintain and electronically transmit to the State, in a format acceptable to the State, monthly status reports of all parcels and activities related to Schematic ROW, acquisition and disposition of Additional Properties and acquisition and disposition of temporary easements or other property interests, and provide weekly (or as requested) updates to the State during this Task Order.
e. Evaluate and report to the State, Acquisition Consultant's status and performance on a monthly basis or more frequently as requested during this Task Order.
g. Prepare and submit to the State, on a monthly basis, an electronically or a spreadsheet that contains Final ROW specific data required by the State ROW Division's Right of Way Information System (ROWIS) tracking software program or as directed by the State during this Task Order.
h. Input and update parcel status for parcels included in this Task Order in the Program's web based tracking system.
i. Provide printed copies and document record of all ROW acquisition and relocation plans and associated updates prepared during with Task Order.
j. Track, monitor, and report on funding by type as used for acquisition during this Task Order.

CR000123

HNTB.000021

570

# EXHIBIT C

TO

**TASK ORDER NUMBER 3**
US 290 Program Management

For

Crossland Acquisition, Inc.

**Contract 12-648P5013 - Work Authorization Number 3**
**Exhibit C, Work Schedule**
(2 pages)

CR000124

HNTB.000022

EXHIBIT C
WORK SCHEDULE
WORK AUTHORIZATION NO. 3

Contract 12-5l8P5013

| Activity Name | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| US 290 CORRIDOR IH610 to FM 2920 | | | | | | | | | | | | | | | | |
| US 290 PMC WA03 SUMMARY SCHEDULE | | | | | | | | | | | | | | | | |
| Administration | | | | | | | | | | | | | | | | |
| Work Authorization #3 Notice to Proceed | | | | | | | | | | | | | | | | |
| Work Authorization Termination | | | | | | | | | | | | | | | | |
| Program Management/Administration | | | | | | | | | | | | | | | | |
| Program Mgmt/Admin, FC 100 (ROW and JUtility coord.) Prop 12 IH 610 interchg | | | | | | | | | | | | | | | | |
| Support Hempstead Tollway Agreement Negotiations with HCTRA | | | | | | | | | | | | | | | | |
| Maintain Program and Public Information Office | | | | | | | | | | | | | | | | |
| Agency Coordination Meetings | | | | | | | | | | | | | | | | |
| GCRD and HGAC Coordination Meetings | | | | | | | | | | | | | | | | |
| Update and Maintain Master Program Schedule and Risk Matrix | | | | | | | | | | | | | | | | |
| Second Round Cost Estimate Review Workshop | | | | | | | | | | | | | | | | |
| Financial Plan Annual Updates | | | | | | | | | | | | | | | | |
| Maintain Project Network (Support and Maintenance) | | | | | | | | | | | | | | | | |
| Update Program Management Plan | | | | | | | | | | | | | | | | |
| Maintain Document Controls | | | | | | | | | | | | | | | | |
| Route and Design Studies | | | | | | | | | | | | | | | | |
| Field Reconnaissance Updates (Annual) | | | | | | | | | | | | | | | | |
| Schematic Refinements/Design Modifications | | | | | | | | | | | | | | | | |
| Schematic Refinements to support Environmental Reevaluations | | | | | | | | | | | | | | | | |
| Schematic Refinements coordination for the Hempstead Tollway | | | | | | | | | | | | | | | | |
| Schematic Refinements to support US 290 Phase III design development | | | | | | | | | | | | | | | | |
| Monitor Cost Controls/Update Program Cost Estimates | | | | | | | | | | | | | | | | |
| Hempstead Cost Estimate Updates / Coordination | | | | | | | | | | | | | | | | |
| Updates to Program Design Criteria based on Fed / State Mods/Design Notices | | | | | | | | | | | | | | | | |
| Traffic Modeling Review and design assessments | | | | | | | | | | | | | | | | |
| Traffic Modeling Updates for Hempstead Tollway Coordination | | | | | | | | | | | | | | | | |
| Urban Planning / CSS Preliminary Plan Development for US 290 Phase II | | | | | | | | | | | | | | | | |
| Update Landscape plan for IH 610 interchange per SDC road/bridge designs | | | | | | | | | | | | | | | | |
| Landscape/aesthetic exhibits and agreement preparation of IH 610 interchange | | | | | | | | | | | | | | | | |
| Railroad Coordination | | | | | | | | | | | | | | | | |
| Field Diagnostic Investigations Segments 6, 7, and 8 | | | | | | | | | | | | | | | | |
| Assembling Preliminary Railroad Exhibits for US 290 Phase II, Segments 6, 7, 8 | | | | | | | | | | | | | | | | |
| Passenger Rail Studies / Facilities Coordination | | | | | | | | | | | | | | | | |
| Execution of Railroad Agreements for IH 610 Interchange Segments 1, 2, and 3 | | | | | | | | | | | | | | | | |
| Coordination - GCRD Rail Studies | | | | | | | | | | | | | | | | |
| Right-of-Entry Coordination for Phase III Segments 9 through 12 | | | | | | | | | | | | | | | | |
| Geotechnical Investigations Report - Phase I and Phase II Addenda | | | | | | | | | | | | | | | | |
| Geotechnical Review of Phase I Plans (90% thru 100%) | | | | | | | | | | | | | | | | |
| Geotechnical Review/Wall Analysis, Phase II PS&E through 60% development | | | | | | | | | | | | | | | | |
| Foundation Designs Phase I, Segments 1, 2, and 3 | | | | | | | | | | | | | | | | |
| Preliminary Foundation Designs Phase II | | | | | | | | | | | | | | | | |
| Geotechnical Field Investigations Segment 5 | | | | | | | | | | | | | | | | |
| Geotechnical Investigations Report Segment 5 | | | | | | | | | | | | | | | | |
| Geotechnical Design for elements impacted by findis | | | | | | | | | | | | | | | | |
| Retaining Wall Stability / Design Assessments Phase II Segments 4 through 8 | | | | | | | | | | | | | | | | |
| Foundation Design and Plan Preparation Support | | | | | | | | | | | | | | | | |
| Special Studies / Research Documentation | | | | | | | | | | | | | | | | |
| Environmental | | | | | | | | | | | | | | | | |
| Review Environmental Documents/Addenda | | | | | | | | | | | | | | | | |
| EIS Reevals / Supplements / Addenda support & exhibits | | | | | | | | | | | | | | | | |
| Meetings with Affected Property Owners | | | | | | | | | | | | | | | | |
| Environmental Permitting Support | | | | | | | | | | | | | | | | |

Milestones noted on chart: Work Authorization #3 Notice to Proceed (◆ early 2010); Work Authorization Termination ◆ Sept. 30, 2011

CR000125

HNTB.000023

572

EXHIBIT C
WORK SCHEDULE
WORK AUTHORIZATION NO. 3

Contract 12-648P5013

| Activity Name | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Public Involvement and Communications Plan | | | | | | | | | | | | | | | | |
| Maintain Public Information Office and Public Web Site | | | | | | | | | | | | | | | | |
| Stakeholder and Community Meetings | | | | | | | | | | | | | | | | |
| Publish supporting PI materials (exhibits, animation, media releases, etc.) | | | | | | | | | | | | | | | | |
| ROW Data | | | | | | | | | | | | | | | | |
| Maintain ROW / Utility GIS Tool and provide monthly ROW/Utility Reports | | | | | | | | | | | | | | | | |
| ROW Acquisition Management Services Proposition 12 Project Limits | | | | | | | | | | | | | | | | |
| Title and Appraisal Services | | | | | | | | | | | | | | | | |
| ROW Negotiation Support Services | | | | | | | | | | | | | | | | |
| Relocation Services | | | | | | | | | | | | | | | | |
| Closing and Condemnation Support Services | | | | | | | | | | | | | | | | |
| ROW Coordination Phase II and III | | | | | | | | | | | | | | | | |
| Surveying | | | | | | | | | | | | | | | | |
| Maintain Survey Controls | | | | | | | | | | | | | | | | |
| ROW Mapping Updates, Segments 1, and 3 through 8 | | | | | | | | | | | | | | | | |
| ROW Monumentation Segment 2 (Proposition 12 construction) | | | | | | | | | | | | | | | | |
| ROW Field Surveying and Mapping, Segment 9 | | | | | | | | | | | | | | | | |
| Supplemental Topo Surveys | | | | | | | | | | | | | | | | |
| Utilities | | | | | | | | | | | | | | | | |
| Utility Coordination and Management | | | | | | | | | | | | | | | | |
| Utility Agreements, IH 610 Interchange Segments 1 through 3 | | | | | | | | | | | | | | | | |
| SUE Level A, B, and C, Beltway 8 Interchange | | | | | | | | | | | | | | | | |
| SUE Level B select locations, Phase II Segments 4 through 8 | | | | | | | | | | | | | | | | |
| SUE Level D and Utility coordination, Phase III Segments 9 through 12 | | | | | | | | | | | | | | | | |
| Utility Coordination Meetings through 100%, IH 610 Interchange Segments 1 & 3 | | | | | | | | | | | | | | | | |
| Utility Coordination Meetings through pre-construction, Segment 2 | | | | | | | | | | | | | | | | |
| Utility Coordination Meetings 30% and 60%, Phase II Segments 4 through 8 | | | | | | | | | | | | | | | | |
| Utility Engineering and IH 610 Interchange Utility adjustments plan reviews | | | | | | | | | | | | | | | | |
| Utility Engineering and Phase II utility conflict reviews through 60% PS&E | | | | | | | | | | | | | | | | |
| Utility and Driveway permit review support | | | | | | | | | | | | | | | | |
| Design Management | | | | | | | | | | | | | | | | |
| Hempstead Drainage Study Updates and Preliminary Design Coordination | | | | | | | | | | | | | | | | |
| Preliminary Drainage Impact Study for Segments 9 through 12 | | | | | | | | | | | | | | | | |
| Update Phase II Drainage Impact Study Models based on 60% PS&E design | | | | | | | | | | | | | | | | |
| Drainage Design Plan Review Phase I through 100% PS&E | | | | | | | | | | | | | | | | |
| Drainage Design Plan Review Phase II through 60% PS&E development | | | | | | | | | | | | | | | | |
| Bridge Hydraulic Data Sheets | | | | | | | | | | | | | | | | |
| Overall Signing Plan Updates Segments 4 through 8 based on 60% PS&E | | | | | | | | | | | | | | | | |
| CADD and GIS Standards Management | | | | | | | | | | | | | | | | |
| Stream Crossing Scour Analysis and Reports | | | | | | | | | | | | | | | | |
| ITS PS&E Documents for Phase I | | | | | | | | | | | | | | | | |
| Bridge Peer Reviews and Design Development support | | | | | | | | | | | | | | | | |
| SDC Coordination / Management | | | | | | | | | | | | | | | | |
| SDC Contract Admin (Phase I to 100% PS&E; Phase II to 90% development) | | | | | | | | | | | | | | | | |
| SDC Contract Supplemental Agreement Support (Segments 1 thru 8) | | | | | | | | | | | | | | | | |
| Work Authorizations and applicable supplements (Segments 4 thru 8) | | | | | | | | | | | | | | | | |
| SDC Design Reviews (Phase I through 100% PS&E) | | | | | | | | | | | | | | | | |
| SDC Design Reviews (Phase II through 60% PS&E) | | | | | | | | | | | | | | | | |
| Construction Phase Services | | | | | | | | | | | | | | | | |
| Construction Management Support | | | | | | | | | | | | | | | | |
| Pre-construction meeting with Contractor | | | | | | | | | | | | | | | | |
| Scheduling assessments, Shop Drawing Review, and RFI Process | | | | | | | | | | | | | | | | |

CR000126

HNTB.000024

573

# EXHIBIT D

## TO

### TASK ORDER NUMBER 3
US 290 Program Management

For

Crossland Acquisition, Inc.

Contract 12-648P5013 - Work Authorization Number 3
Exhibit D, Fee Schedule
(1 page)

CR000127

HNTB.000025

PROJECT NAME:

CONTRACT NUMBER:

SUB-PROVIDER NAME:

CR000128

F

**SUPPLEMENTAL AGREEMENT NUMBER 1**
**TO TASK ORDER NUMBER 3**
US 290/Hempstead Corridor Program Management

This Supplemental Agreement, Number 1, to TASK ORDER NUMBER 3, effective August 17, 2011, between HNTB CORPORATION (HNTB) and CROSSLAND ACQUISITION, INC. (Consultant) is for the purpose noted below and is consistent with the MASTER AGREEMENT BETWEEN HNTB AND CONSULTANT, dated July 5, 2006 (the Agreement).

Exhibit C, Work Schedule is amended by adding Exhibit C-1, Work Schedule, which is attached to this Supplemental Agreement.

Section B. – Schedule is amended to extend the termination date from September 30, 2011, to September 30, 2012.

Except to the extent modified herein, all terms and conditions of Task Order Number 3, and the Agreement shall continue in full force and effect.

**HNTB Corporation**
(HNTB)

Signature _____

Name: Thomas D Ellis, PE

Title: Vice President

Date: 9-15-11

**Crossland Acquisition, Inc.**
(Consultant)

Signature: _____

Name: Peter K HARRISON, II

Title: PRESIDENT

Date: 9-12-11

List of Attachments:
Attachment A:     NOT USED
Attachment B:     NOT USED
Attachment C-1 :  Contract 12-648P5013, Work Schedule

CR000129

HNTB.000027

# ATTACHMENT C-1

## TO

**Supplemental Agreement Number 1**
US 290 Program Management

For

**Crossland Acquisition, Inc.**

Contract 12-648P5013 – Work Authorization Number 3
Exhibit C-1, Work Schedule
(1 page)

CR000130

HNTB.000028

EXHIBIT C-1
WORK SCHEDULE

| Activity Name | 2011 CY | | 2012 CY | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| US 290 CORRIDOR, IH 610 to FM 2920 | | | | | | |
| | | | | | | |
| Administration | | | | | | |
| Previous Work Authorization Termination | ◇ Sept. 30, 2011 | | | | | |
| Work Authorization Termination | | | | Sept. 30, 2012 ◇ | | |
| Route and Design Studies (FC 110) | | | | | | |
| Geotechnical Field Investigations and Reports | | | | | | |
| Geotechnical Field Investigations Segment 9 | | ▓▓▓ | | | | |
| Geotechnical Investigations Report Segment 9 | | | ▓▓▓ | | | |
| Geotechnical Design for elements impacted by faults | | | | | ▓▓ | |
| Foundation Design and Plan Preparation Support | | | | ▓▓ | | |
| Right-of-Way Data (FC 130) | | | | | | |
| ROW Acquisition Management Services (Proposition 12 project limits) | ▓▓▓▓ | | | | | |
| Relocation Services | ▓▓▓▓ | | | | | |
| Closing and Condemnation Support Services | ▓▓▓ | | | | | |
| Utilities | | | | | | |
| Utility and Driveway Permit review support | | ▓▓▓ | | | | |
| | | | | | | |

Note: CY is abbreviation for Calendar Year

CR000131                                               HNTB.000029

579

G

**SUPPLEMENTAL AGREEMENT NUMBER 2**
**TO TASK ORDER NUMBER 3**
**38861 – US290 Program Management**

This Supplemental Agreement Number 2 to TASK ORDER NUMBER 3 BETWEEN HNTB Corporation (HNTB) AND **Crossland Acquisition, Inc.** (CONSULTANT), is made effective on November 21, 2011. This Supplement Agreement is for the purpose noted below and is consistent with the MASTER AGREEMENT BETWEEN HNTB AND CONSULTANT, dated July 5, 2006, amended on June 26, 2010 and April 29, 2011. (the Agreement).

### Section A – Scope of Services

The services to be provided by the Consultant, Exhibit B, is amended to include the attached Exhibit B-1, Services to be Provided by the Consultant.

### Section B - Schedule

The Work Schedule, Exhibit C is amended to include Exhibit C-2 Work Schedule.

### Section C - Compensation

Compensation is amended to increase the maximum amount payable by HNTB to Consultant under this Task Order by $562,489.68 from $1,988,636.46 to $2,551,126.14, payable in accordance with Attachment E, E-1 and E-2 of the Master Agreement and the attached Exhibit D-2 Fee Schedule.

Except to the extent modified herein, all terms and conditions of Task Order Number 3, Task Order Number 3 Supplemental Agreement Number 1, and the agreement shall continue in full force and effect.

HNTB Corporation                          Crossland Acquisition, Inc.
(HNTB)                                    (Consultant)

Signature: _____              Signature: _____

Name: Thomas D. Ellis, PE               Name: _John K Harrison, II_

Title: Vice President                   Title: _President_

Date: _12/13/11_                        Dated: _12-12-11_

List of Attachments:

Exhibit A:  Not Used
Exhibit B-1: Not Used
Exhibit B-1: Services to be Provided by the Consultant
Exhibit C-1: Not Used
Exhibit C-2: Contract 12-648P5013. Work Schedule
Exhibit D-1: Not Used
Exhibit D-2: Contract 12-648P5013, Fee Schedule, Crossland Acquisition, Inc

## EXHIBIT B-2

### SERVICES TO BE PROVIDED BY THE CONSULTANT

Highway: US 290

Limits:   Harris County Line near FM 2920

             To: IH 610/IH 10 Interchange

Station 1130+00 to Station 2892+50.08

CSJ: Various

The additional services to be performed under this supplemental to Task Order #3 consists of providing engineering services to support Right-of-Way acquisition through eminent domain proceedings and associated relocations for parcels beyond the initial period of this Task Order.

The Consultant shall perform the following additional services:

- Coordinate and perform appraisal update services and appraisal update review services for parcels 202, 203, 204, 209, 212, 213, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 229, 232, 234, and 235.
- Attend hearings and have appraiser provide testimony at for the noted parcels to be acquired through eminent domain proceedings.
- Provide additional ROW negotiation services for Parcel 217 to support acquisition negotiations for this specialty property including unique steel processing business equipment purchase.
- Provide additional coordination and relocation support services for Parcel 217 based on unique business enterprise of steel processing plant.
- Provide relocation services for completing relocation of 115 individual vendors which is 30 additional vendors than originally anticipated.
- Provide relocation assistance for late tenants on Parcel 223 that moved in after initial offer.
- Provide relocation assistance for tenant with specialty requirements for moving liquid mercury on Parcel 221.
- Provide for condemnation support to comply with Senate Bill 18 requirements becoming effective September 1, 2011. This includes adjustments in access for Parcels 223 and 226 to accommodate existing neighboring access agreements with multiple landowners.

The Consultant shall perform the additional tasks by function code as outlined below:

### RIGHT-OF-WAY DATA (Function Code 130)

C. Title Services.

c.  The Consultant shall coordinate securing title insurance for all parcels acquired after the initial term of this authorization, insuring acceptable title to the State. This includes coordinating access modifications for Parcels 223 and 226 to resolve potential

CR000133                                                          HNTB.000031

582

encumbrances from access rights to the IH 610 Southbound frontage road held by adjacent landowners.

### F. Appraisal Update Services.

The Consultant shall provide for appraisal update services and appraiser attendance at hearings for all parcels proceeding to eminent domain or requiring additional time for acquisition to include parcels 202, 203, 204, 209, 212, 213, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 229, 232, 234, and 235.

### G. Appraisal Review Update Services.

The Consultant shall provide for appraisal review update services for all parcels proceeding to eminent domain or requiring additional time for acquisition to include parcels 202, 203, 204, 209, 212, 213, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 229, 232, 234, and 235.

### H. Right of Way Negotiations.

The Consultant shall provide for additional services to accommodate multiple extensions for Parcel 217 and additional meetings and negotiations to include involvement of the Office of the Attorney General because of the unique issues concerning acquisition of this steel processing plant and the value of specialized equipment owned by the business entity.

### J. Relocation Assistance.

The Consultant shall provide additional relocation services after the initial term for the following:

- Parcel 217 based on unique business enterprise of steel processing plant.
- Provide for completing relocation of 115 individual vendors which is 30 additional vendors than originally anticipated.
- Late tenants on Parcel 223 that moved in after initial offer.
- Provide for tenant on Parcel 221 with specialty requirements related to moving liquid mercury.

### K. Condemnation Support.

The Consultant shall provide condemnation support services for all parcels after the initial term to include the following:

- Parcels 204, 209, 218, 219, 220, 221, 222, 224, 227, 229, and 235.
- Update forms and coordinate revisions to accommodate Senate Bill 18 compliance following September 1, 2011.
- Coordinate and negotiate access modifications to Parcel 223 and 226 to mitigate potential title encumbrances for access rights to IH 610 Southbound frontage road from adjacent landowners considering updates from Senate Bill 18.

CR000134



583

# EXHIBIT C-2

## TO

Supplemental Agreement Number 2 to Task Order Number 3
US 290 Program Management

## FOR

Crossland Acquisition, Inc.

Contract 12-648P5013 – Work Authorization Number 3
Exhibit C-2, Work Schedule
(1 page)

CR000135

HNTB.000033

EXHIBIT C-2
WORK SCHEDULE

| Activity Name | 2011 CY | | 2012 CY | | | |
|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| US 290 CORRIDOR, IH 610 to FM 2920 | | | | | | |
| US 290 PMC SWA#2 to WA#3 SUMMARY SCHEDULE | | | | | | |
| Start Supplemental Services | | ◈Nov. 21, 2011 | | | | |
| Work Authorization Termination | | Sept. 30, 2012 ◈ | | | | |
| Right-of-Way Data (FC 130) | | | | | | |
| Title Services | | ▨▨▨ | | | | |
| Appraisal Update Services | | ▨▨▨ | | | | |
| Appraisal Review Update Services | | ▨▨▨ | | | | |
| Right of Way Negotiations | | ▨▨▨ | | | | |
| Relocation Assistance | | ▨▨▨▨▨▨ | | | | |
| Condemnation Support | | ▨▨▨▨ | | | | |

Note: CY is abbreviation for Calendar Year

Exhibit C-2

CR000136        HNTB.000034

585

**EXHIBIT D-2**

TO

Supplemental Agreement Number 2 to Task Order Number 3
US 290 Program Management

FOR

Crossland Acquisition, Inc.

Contract 12-648P5013 – Work Authorization Number 3
Exhibit D-2, Fee Schedule
(2 page)

CR000137

HNTB.000035

EXHIBIT D - 2
FEE SCHEDULE
METHOD OF PAYMENT: SPECIFIED RATE

PROJECT NAME/CSJ: US 290 CORRIDOR PROGRAM MANAGEMENT CONSULTANT
SUB-PROVIDER NAME: CROSSLAND ACQUISITION, INC.

| TASK DESCRIPTION | PRINCIPAL/ATTY | SR PROJECT MANAGER | TITLE MANAGER/ ATTY | ROW MANAGER | ROW ASST MANAGER | ROW AGENT | RELOCATION MANAGER | RELOCATION AGT | APPRAISER | IT AND/OR ACCESS DATABASE | ASSISTANT | TOTAL LABOR HRS. & COSTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIGHT OF WAY DATA (FC 130) | | | | | | | | | | | | |
| C. TITLE SERVICES (BEYOND INITIAL TERM) | | | 80 | | | | | | | | | 160 |
| F. APPRAISAL UPDATE SERVICES (COORDINATE) | | | | 10 | 10 | | | | | | | 20 |
| G. APPRAISAL REVIEW UPDATE SERVICES (COORDINATE) | | | | 5 | 5 | | | | | | | 10 |
| H. RIGHT OF WAY NEGOTIATIONS (BEYOND INITIAL TERM) | 20 | | | 40 | | | | | | | 10 | 70 |
| J. RELOCATION ASSISTANCE (BEYOND INITIAL TERM) | | 40 | | | | | 500 | 400 | | 40 | | 980 |
| K. CONDEMNATION SUPPORT (BEYOND INITIAL TERM) | 80 | | | 20 | 60 | 80 | | | 252 | | 20 | 512 |
| | | | | | | | | | | | | 0 |
| HOURS SUB-TOTALS | 100 | 40 | 80 | 75 | 115 | 120 | 500 | 400 | 252 | 40 | 30 | 1752 |
| NEGOTIATED CONTRACT RATE PER HOUR | $ 274.59 | $ 258.11 | $ 219.67 | $ 219.67 | $ 137.29 | $ 137.29 | $ 219.67 | $ 137.29 | $ 137.29 | $ 109.84 | $ 54.92 | |
| DIRECT LABOR COSTS | $ 27,459.00 | $ 10,324.40 | $ 17,573.00 | $ 16,475.25 | $ 15,788.35 | $ 16,474.80 | $ 109,835.00 | $ 54,916.00 | $ 34,597.08 | $ 4,393.60 | $ 1,647.60 | |
| TOTAL LABOR COSTS | $ 27,459.00 | $ 10,324.40 | $ 17,573.50 | $ 16,475.25 | $ 15,788.35 | $ 16,474.80 | $ 109,835.00 | $ 54,915.00 | $ 34,597.08 | $ 4,393.60 | $ 1,847.30 | $ 309,484.68 |

PAGE 1 OF 2

Exhibit D-2

CR000138

HNTB.000036

587

EXHIBIT D-2
FEE SCHEDULE
METHOD OF PAYMENT: SPECIFIED RATE

PROJECT NAME/CSJ: US 290 CORRIDOR PROGRAM MANAGEMENT CONSULTANT
SUB-PROVIDER NAME: CROSSLAND ACQUISITION, INC.

| DESCRIPTION | #UNITS | COST/UNIT | UNIT | TOTAL MHR BY FC | TOTAL COSTS BY FC |
|---|---|---|---|---|---|
| RIGHT OF WAY DATA (FC 130) | | | | 1752 | $309,484.68 |
| SUBTOTAL LABOR EXPENSES | | | | 1752 | $309,484.68 |
| OTHER DIRECT EXPENSES | | | | | |
| Mileage (# of miles) (0.50) | 500 | $ 0.50 | mile | | $250.00 |
| 8 1/2" x 11" BW copies | 2,000 | $ 0.10 | sheet | | $200.00 |
| 8 1/2" x 11" Color copies | 250 | $ 0.90 | sheet | | $225.00 |
| 11" x 17" BW Copies | 500 | $ 0.20 | sheet | | $100.00 |
| 11" x 17" Color Copies | 100 | $ 1.50 | sheet | | $150.00 |
| Appraisal Update Services | | | | | |
| Appraisal (limited damages) | 6 | $ 5,000.00 | parcel | | $50,000.00 |
| Appraisal (significant acquisition/damages) | 14 | $ 10,000.00 | parcel | | $140,000.00 |
| Appraisal (specialty properties) | 1 | $ 15,000.00 | parcel | | $15,000.00 |
| Appraisal Review Update Services | | | | | |
| Appraisal Review (limited damages) | 6 | $ 2,000.00 | parcel | | $12,000.00 |
| Appraisal Review (significant acquisition/damages) | 14 | $ 3,500.00 | parcel | | $49,000.00 |
| Appraisal Review (special property) | 1 | $ 5,000.00 | parcel | | $5,000.00 |
| Overnight mail - Letter Size | 10 | $ 25.00 | each | | $250.00 |
| Overnight Mail - USPS Certified with Return Receipt | 40 | $ 20.00 | each | | $800.00 |
| SUBTOTAL OTHER DIRECT EXPENSES | | | | | $253,005.00 |

SUMMARY

| | |
|---|---|
| TOTAL LABOR COSTS FOR CROSSLAND | $309,484.68 |
| NON-SALARY (OTHER DIRECT EXPENSES) | $253,005.00 |
| GRAND TOTAL | $562,489.58 |

CR000139

HNTB.000037

588



**SUPPLEMENTAL AGREEMENT NUMBER 3**
**TO TASK ORDER NUMBER 3**
US 290/Hempstead Corridor Program Management

This Supplemental Agreement, Number 3, to TASK ORDER NUMBER 3, effective December 29, 2011, between HNTB CORPORATION (HNTB) and CROSSLAND ACQUISITION, INC. (Consultant) is for the purpose noted below and is consistent with the MASTER AGREEMENT BETWEEN HNTB AND CONSULTANT, dated July 5, 2006, amended on June 26, 2010 and April 29, 2011 (the Agreement).

**Section C. -- Compensation**

Compensation is amended to increase the maximum amount payable by HNTB to Consultant under this Task Order by $27.50 from $2,551,126.14 to $2,551,153.64, payable in accordance with Attachment E, E-1 and E-2 of the Master Agreement and the attached Exhibit D-2 fee schedule.

Except to the extent modified herein, all terms and conditions of Task Order Number 3, Task Order Number 3 Supplemental Agreement Number 1 -- 3, and the Agreement shall continue in full force and effect.

| HNTB Corporation (HNTB) | Crossland Acquisition, Inc. (Consultant) |
|---|---|
| Signature | Signature: |
| Name: Thomas D Ellis, PE | Name: JOHN K HARRISON, II |
| Title: Vice President | Title: PRESIDENT |
| Date: 1/7/12 | Date: 1-3-12 |

List of Attachments:
Attachment A:        NOT USED
Attachment B:        NOT USED
Attachment C:        NOT USED
Attachment D-3:      Contract 12-648P5013, Work Authorization #3, Fee Schedule, Crossland Acquisition, Inc.

CR000140

HNTB.000038

# ATTACHMENT D-3

## TO

Supplemental Agreement Number 3
US 290 Program Management

### For

Crossland Acquisition, Inc.

Contract 12-648P5013 -- Work Authorization Number 3
Exhibit D-2, Fee Schedule
(2 pages)

CR000141

HNTB.000039

EXHIBIT D - 2
FEE SCHEDULE
METHOD OF PAYMENT: SPECIFIED RATE

PROJECT NAME/CSJ: US 290 CORRIDOR PROGRAM MANAGEMENT CONSULTANT
SUB-PROVIDER NAME: CROSSLAND ACQUISITION, INC.

| TASK DESCRIPTION | PRINCIPAL/ ATTY | SR PROJECT MANAGER | TITLE MANAGER/ ATTY | ROW MANAGER | ROW ASST MANAGER | ROW AGENT | RELOCATION MANAGER | RELOCATION AGT | APPRAISER | IT AND/OR ACCESS DATABASE | ASSISTANT | TOTAL LABOR HRS. & COSTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIGHT OF WAY DATA (FG 100) | | | | | | | | | | | | |
| C. TITLE SERVICES (BEYOND INITIAL TERM) | | | 80 | | 40 | 40 | | | | | | 160 |
| F. APPRAISAL UPDATE SERVICES (COORDINATE) | | | | 10 | 10 | | | | | | | 20 |
| G. APPRAISAL REVIEW UPDATE SERVICES (COORDINATE) | | | | 5 | 5 | | | | | | | 10 |
| H. RIGHT OF WAY NEGOTIATIONS (BEYOND INITIAL TERM) | 20 | | | 40 | | | | | | | 10 | 70 |
| J. RELOCATION ASSISTANCE (BEYOND INITIAL TERM) | | 40 | | | | | 300 | 400 | | 40 | | 680 |
| K. CONDEMNATION SUPPORT (BEYOND INITIAL TERM) | 80 | | | 80 | 60 | 60 | | | 252 | | 20 | 512 |
| | | | | | | | | | | | | 0 |
| HOURS SUB-TOTALS | 100 | 40 | 80 | 75 | 115 | 120 | 300 | 400 | 252 | 40 | 30 | 1752 |
| NEGOTIATED CONTRACT RATE PER HOUR | $ 274.90 | $ 258.11 | $ 219.67 | $ 219.82 | $ 137.29 | $ 137.29 | $ 219.57 | $ 137.29 | $ 137.29 | $ 109.84 | $ 54.92 | |
| DIRECT LABOR COSTS | $ 27,490.00 | $ 10,324.40 | $ 17,573.64 | $ 16,476.25 | $ 15,783.35 | $ 16,474.80 | $ 109,835.00 | $ 54,916.00 | $ 34,891.93 | $ 4,393.60 | $ 1,647.60 | $ 309,484.54 |
| TOTAL LABOR COSTS | $ 27,490.00 | $ 10,324.40 | $ 17,573.64 | $ 16,476.25 | $ 15,783.35 | $ 16,474.80 | $ 109,835.00 | $ 54,916.00 | $ 34,597.08 | $ 4,393.60 | $ 1,647.60 | $ 309,484.54 |

Exhibit D-2

CR000142

HNTB.000040

592

EXHIBIT D-2
FEE SCHEDULE

METHOD OF PAYMENT: SPECIFIED RATE

PROJECT NAME/CSJ: US 290 CORRIDOR PROGRAM MANAGEMENT CONSULTANT
SUB-PROVIDER NAME: CROSSLAND ACQUISITION, INC.

| DESCRIPTION | #UNITS | COST/UNIT | UNIT | TOTAL MH BY FC | TOTAL COSTS BY FC |
|---|---|---|---|---|---|
| RIGHT OF WAY DATA (FC 130) | | | | 1763 | $305,454.88 |
| | | | | | |
| SUBTOTAL LABOR EXPENSES | | | | 1763 | $319,464.88 |
| | | | | | |
| OTHER DIRECT EXPENSES | | | | | |
| Mileage (# of miles) | 500 | $ 0.555 | mile | | $277.50 |
| 8 1/2" x 11" BW copies | 2,000 | $ 0.10 | sheet | | $200.00 |
| 8 1/2" x 11" Color copies | 250 | $ 0.90 | sheet | | $225.00 |
| 11" x 17" BW Copies | 640 | $ 0.20 | sheet | | $100.00 |
| 11" x 17" Color Copies | 100 | $ 1.50 | sheet | | $150.00 |
| Appraisal Update Services | | | | | |
| Appraisal (limited damages) | 8 | $ 5,000.00 | parcel | | $30,000.00 |
| Appraisal (significant acquisition/damages) | 14 | $ 10,000.00 | parcel | | $140,000.00 |
| Appraisal (specialty properties) | 1 | $ 15,000.00 | parcel | | $15,000.00 |
| Appraisal Review Update Services | | | | | |
| Appraisal Review (limited damages) | 6 | $ 2,000.00 | parcel | | $12,000.00 |
| Appraisal Review (significant acquisition/damages) | 14 | $ 3,500.00 | parcel | | $49,000.00 |
| Appraisal Review (specialty property) | 1 | $ 5,000.00 | parcel | | $5,000.00 |
| Overnight mail - Letter Size | 10 | $ 25.00 | each | | $250.00 |
| Overnight Mail - USPS Certified with Return Receipt | 40 | $ 20.00 | each | | $800.00 |
| SUBTOTAL OTHER DIRECT EXPENSES | | | | | $351,002.50 |

| SUMMARY | |
|---|---|
| TOTAL LABOR COSTS FOR CROSSLAND | $305,454.88 |
| NON-SALARY/OTHER DIRECT EXPENSES | $351,002.50 |
| GRAND TOTAL | $552,517.18 |

Exhibit D-2

PAGE 2 OF 2

HNTB.000041

**I**

# TASK ORDER NUMBER 4
## 38861 - US 290 Program Management

This Task Order is made as of **January 14, 2011** under the terms and conditions established in the MASTER AGREEMENT BETWEEN HNTB CORPORATION (HNTB) AND CROSSLAND ACQUISITION, INC. (CONSULTANT), dated **July 5, 2006**. This Task Order is made for the following purpose, consistent with the Project defined in the Agreement:

The Consultant shall directly support the HNTB Team in performing engineering services generally described as the program management of the US 290 corridor extending from IH 610 to FM 2920, a distance of approximately 33.5 miles which shall include such services as project/financial planning, right of way surveying/mapping, scheduling, utility coordination, locating and designating services, right of way acquisition support, geotechnical services, and design support.

## Section A. - Scope of Services
Consultant shall perform the following Services:

Reference the attached Exhibit B — Services to be Provided by the Consultant

## Section B. - Schedule
Consultant shall perform the Services and deliver the related Documents (if any) according to the following schedule:

Reference the attached Exhibit C — Work Schedule

Schedule for individual task assignment shall be as agreed with HNTB and written correspondence including electronic mail will be used to record associated established due dates.

## Section C. - Compensation
In return for the performance of the foregoing obligations, HNTB shall pay to Consultant the maximum amount of $1,079,550.74, payable in accordance with Attachment E and E-1 of the Master Agreement and the attached Exhibit D - Fee Schedule.

## Section D. - HNTB's Responsibilities
HNTB shall perform and/or provide the following:
- US 290 Program Management and US 290 Deputy Program Manager will provide daily oversight and management of the PMC Scope and Services.
- Provisions for a Project Office subject to terms of the Master Agreement between HNTB and Consultant.

This Task Order does not waive the parties' responsibilities and obligations provided under the Master Agreement between HNTB and Consultant.

IN WITNESS WHEREOF, HNTB and Consultant have executed this Task Order.

**HNTB Corporation**
(HNTB)

Signature _Deborah C. Taylor_

Name: Deborah C. Taylor, CEP

Title: Vice President

Date 2/15/2011

**Crossland Acquisition, Inc.**
(Consultant)

Signature _____

Name JOHN K HARRISON II

Title PRESIDENT

Date 2-15-11

List of Exhibits:
    Exhibit A:    NOT USED
    Exhibit B:    Contract 12-648P5013 - Services to be Provided by the Consultant
    Exhibit C:    Contract 12-648P5013 - Exhibit C, Work Schedule
    Exhibit D:    Contract 12-648P5013 - Exhibit D, Fee Schedule

## EXHIBIT B

### I. INTRODUCTION

This task order involves engineering services primarily within the Planning and Design Management Phase related to ROW Acquisition for letting the second construction project at the IH 610/US 290 Interchange, which is the Proposition 14 funded portion of Segment 3 - outbound connectors from IH 10.

The limits of the project are on US 290 from IH 610 to FM 2920, a distance of approximately 33.5 miles (approximate US 290 stationing is from Sta. 1130+00 (west of FM 2920) to Sta. 2892+50.08 at IH 610 just north of IH 10) and approximate IH 610 stationing is from Sta. 2848+00 (just east of Ella Boulevard) to Sta. 2892+50.08 (just north of IH 10).

Tasks within this scope of services occur in the following areas of focus:

US 290 Phase I (ROW Acquisition services -34 parcels):

Segment 1: Hempstead Tollway interchange with IH 610 and the Hempstead Tollway from south of Old Katy Road on IH 610 to west of Mangum Road.

Segment 2: IH 610 from East of Ella Boulevard to IH 10 including the Hempstead Tollway interchange and Direct Connectors US 290 from West 34 Street to IH 10.

Segment 3: IH 610/US 290 interchange including US 290 from W. 34th Street to north and south of US 290 on IH 610.

The Consultant is a member of the US 290/Hempstead Corridor Program Management Consultant (PMC). For the initial period of this Task Order, the Consultant will participate and/or support all tasks noted herein as the responsibility of the Program Management Consultant (PMC), and will provide the overall project supervision, management, scheduling, administration for ROW acquisition services for the Proposition 14 portion of the IH 610/US 290 Interchange Outbound Connectors project. These projects are to be brought to completion as expeditiously as possible to comply with the schedule as proposed by the Texas Department of Transportation (TxDOT), hereinafter to be included as part of any reference to the State.

The PMC shall function as an extension of the State's resources by providing qualified technical and professional personnel to perform the duties and responsibilities assigned under the terms of this Agreement. The PMC shall minimize to the maximum extent possible the need for the State to apply its own resources to work authorized by the State. The State, at its option, may elect to expand, reduce or delete the extent of each work element, provided such action does not alter the intent of this task order. The Consultant shall coordinate all services with HNTB's designated US 290 Program Manager or their designee.

### II. CONTRACT SUPPORT & SCHEDULING

The Consultant should prepare and issue monthly status reports on the Proposition 14 portion of the IH 610/US 290 Interchange ROW Acquisition and document any problems and delays encountered as well as report on all tasks within this task order.

The Consultant shall invoice in accordance with the rate schedules in Attachment E of the executed Contract including associated supplemental agreements, and the function codes authorized in Exhibit D of this Task Order and any associated supplements. The invoice package will be prepared using the Houston District Billing Procedures for "Specified Rate" method of pay. The invoice shall contain:

- Cover Letter
- US 290 Consultant Invoice Form
- Written progress report describing activities during the reporting period; activities planned for the following period; problems encountered and actions taken to remedy; list of meetings attended; and overall status.
- Consultant's Back-up as applicable.
- Time Sheets and expense receipts

### III. PROGRAM MANAGEMENT AND COMMUNICATIONS

RIGHT OF ENTRY

It shall be the responsibility of the PMC to secure permission to enter private property for purposes of ROW appraisals and other project related activities under Task Order. Documentation of all applicable permissions obtained shall be provided to the State before proceeding with any such activity on any private property. It is the stated policy of the State to make every effort to maintain positive relations with the general public. In pursuance of that policy, the PMC shall not commit acts which will result in damages to private property, and will make every effort to comply with the wishes and address the concerns of private property owners. The PMC shall also attempt to secure "Possession and Use" agreements where applicable and shall maintain documentation of all such efforts and resulting agreements.

### IV. RIGHT OF WAY COORDINATION AND UTILITY ADMINISTRATION SUPPORT

During the initial period of this Task Order, the Consultant shall support expert witness testimony in hearings, condemnation proceedings or other litigation with respect to acquisition of right of way, easements, and other forms of property interests required for parcels noted in this Task Order.

ROW Acquisition Management and Services

The Consultant shall provide management oversight and ROW Acquisition Services for all parcels indentified in Segment 3 ROW Maps east of W. 34th Street and north of US 290 as well as parcels in the Segment 2 ROW maps east of IH 610 at Minimax and at Old Katy Road and associated parcels for detention as required to construct the Segment 3 outbound connectors project as approved by the Texas Transportation Commission in October 2010 for Proposition 14 funding related to ROW acquisition/Utility relocation and Construction, CSJ 0271-14-213.

Final ROW shall be acquired in accordance with the practices, guidelines, procedures and methods currently employed by the State and TxDOT Houston District and the following, as may be amended from time to time:
a)  TxDOT Right of Way Manual (available online),
b)  TxDOT Access Management Manual (available online),
c)  TxDOT Survey Manual,
d)  TxDOT Appraisal and Review Manual,
e)  TxDOT Facility Development Process Manual, and
f)  Federal Highway Administration's (FHWA's) Right-of-Way Facility Development Guide (as contained in the Federal-Aid Policy Guide (FAPG)).

The PMC shall maintain a complete and current set of TxDOT Right of Way Manual Volumes 1 through 8 (http://manuals.dot.state.tx.us/dynaweb), TxDOT Right of Way Access Management Manual (http://manuals.dot.state.tx.us/dynaweb), TxDOT New & Revised Right of Way

CR000165

HNTB.000063

598

Acquisition Procedures, TxDOT Appraisal and Review Manual, and a current approved Final ROW map for public use.

All Final ROW activities must be completed and documented in compliance with applicable laws, including the *Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970* as amended (hereafter referred to as the Uniform Act), rules and regulations.

The PMC shall establish, implement, and maintain quality control and quality review standards for the acquisition for Final ROW.

The PMC shall maintain an up to date list of names of State approved title company(ies) to be used for title services.

### ROW Schedule

The Program Schedule shall indicate the date to begin the acquisition of the Final ROW and the anticipated completion date of acquisition activities for each parcel. In developing the Program Schedule, the PMC will recommend and give priority to the acquisition of parcels that have significant impact on the Schedule and/or affect the Critical Path as so indicated or as periodically designated by the State. The monthly status reports shall provide updated projections for the acquisition date of each parcel.

In maintaining the Schedule, the PMC shall incorporate adequate time periods for PMC Team review and approval of acquisition packages and, as applicable, the State spot check and final processing of acquisition packages. If any submitted acquisition package has a deficiency, the Consultant shall correct such deficiency and resubmit the package. An acquisition package shall be deficient, as determined by the PMC or the State, if any of its components fails to meet any of the criteria established for such component, or contains any errors or omissions.

The PMC and the State both reserve the right to seek additional review on parcels/packages that are of an unusual/questionable nature in regards to the State's standards.

### PMC's Final ROW Scope of Services

The Consultant shall complete all administrative activities and assemble all documentation sufficient for the State to acquire the Final ROW as applicable to the 34 parcels covered in this Task Order. The Consultant shall make a written recommendation to the State and obtain the State's concurrence of all appraisals, legal descriptions, acquisition documentation, purchase price, requests to acquire Final ROW, condemnation-related activities and funding/closing procedures. The State will approve and return the Final ROW acquisition documentation or provide comments for incorporation by the Consultant. Right of way acquisition procedures will not commence until released by TxDOT's right of way office. Further, the Consultant shall not commence any negotiations with landowners nor will eminent domain procedures begin until the specific acquisition package for that particular parcel has been approved and minute order issued.

If an agreed upon purchase price, acceptable to the State, cannot be negotiated with the landowner, then the Consultant shall make recommendations for proceeding with acquisition of the property through condemnation/eminent domain procedures.

### Acquisition Process Summary:

PMC's major activities with respect to the acquisition of the Final ROW include management oversight and/or preparation, as applicable of:
a) Final ROW surveying and mapping,

CR000166

HNTB.000064
599

b) Final ROW budget estimates and updates,
c) Title services,
d) Appraisal services (Billboard Identification),
e) Requests for variances to billboard ordinance
f) Appraisal review,
g) Negotiations (Billboard research and Bisection clauses),
h) Closing services,
i) Relocation assistance, (Including Billboards),
j) Condemnation support services,
k) Preparation and administration of bid documents for Clearance and Demolition of Final ROW,
l) Environmental due diligence, (PST's, Asbestos and Lead)
m) Documentation and document control, including scanning, file organization and transfer of close files to the State.
n) Progress reports,
o) Final ROW quality control review,
p) Documentation certifying that the required Final ROW acquisition is necessary and that any proposed alternatives are not feasible or are cost prohibitive, and
q) Obtaining rights of entry, as necessary.
r) Temporary Construction Easements (TCE's).
s) Certification preparation.

Documentation and Reporting
The Consultant shall provide the State with all specific reports and supporting documentation for review and approval during the acquisition process as applicable to the 34 parcels covered by this Task Order. To facilitate the State's receipt of that portion of the right of way costs to be borne by the local agencies, the Consultant shall coordinate with the State regarding accounting and approval of these costs and expenses.

All correspondence with the State and property owners relating to acquisition of real property shall include the following information (at a minimum) as a heading:

a) County,
b) Construction Control Section Job number, (Construction CSJ)
c) Highway Designation
d) Facility limits,
e) Parcel number, and
f) Name of record owner(s)
g) Right of Way Control Section Job number, (ROW CSJ)

PMC's Responsibility
During the initial period of this Task Order, the Consultant shall be responsible for management of all services and preparation of all documentation for all Final ROW acquisition, easement acquisition and related relocation assistance for all parcels identified in Segment 3 ROW Maps east of W. 34th Street and north of US 290 as well as parcels in the Segment 2 ROW maps east of IH 610 at Minimax and at Old Katy Road and associated parcels for detention as required to construct the Segment 3 outbound connectors project as approved by the Texas Transportation Commission in October 2010 for Proposition 14 funding related to ROW acquisition/Utility relocation and Construction, CSJ 0271-14-213. The Work related to Final ROW acquisition includes, but is not limited to appraisal, appraisal review, negotiation, acquisition, procurement of title insurance, clearing of title, closing of acquisitions, condemnation support, all exhibits and photos associated with condemnation services and proceedings required by the Attorney

CR000167                                          HNTB.000065
600

General's office, relocation assistance, clearance/demolition of improvements, and environmental testing and remediation, as required.

The PMC shall track all costs and payments of: agreed purchase prices or Commissioners' awards and judgments; relocation assistance payments; all legal, administrative and incidental expenses of, or related to, the ROW; and temporary easements or other interests in real property acquired for the Facility.

The PMC will provide management and oversight of all ROW tasks, coordinating the acquisition of unsecured ROW parcels as applicable to this Task Order. The ROW coordination services provided by the PMC will include:

1. Assisting the State's in the identification and prioritization of parcel acquisitions critical to private utility relocation activities.

2. Maintain a parcel status tracking system.

3. Assisting the State's East Region ROW Department in the preparation of documents requesting Right Of Entry to unsecured parcels.

4. Conducting periodic meetings as needed with the private utilities construction representatives and/or engineers to update status of the ROW acquisition and to identify potential ROW problems.

5. Preparing a monthly ROW Status and Critical Parcel Report by ROW Account.

6. Maintaining a composite ROW map with parcel status and critical parcels identified.

7. Developing Utility Agreements for reimbursement of FHWA funds (ROW accounts) and submitting to the State for further review and execution.

Final ROW Acquisition Package Approval

The PMC shall review all Acquisition packages submitted and verify a complete submittal prepared in accordance with this scope of work and the ROW section of the Program Management Plan, to include the following items prepared for each parcel:

a) A review cover sheet (Checklist) signed by the PMC verifying that the submittal packet is complete and has been reviewed.

b) A cover sheet setting forth the following information for each parcel:
   1) Parcel number and number of parts,
   2) Station number,
   3) ROW CSJ number,
   4) Location of parcel,
   5) Name of owner,
   6) County and/or other jurisdiction,
   7) Extent of acquisition (partial or whole acquisition), and
   8) Type of conveyance (fee, easement, etc.)

c) A complete legal description of the parcel adequate to effect the desired acquisition of the parcel, signed and sealed by an RPLS. A legal description and parcel plat is required for each parcel. Control of access should be addressed in all legal descriptions. All descriptions shall be in recordable form and shall be prepared in a form and manner acceptable to the State in all respects,

d) The parcel plat, as prepared by the RPLS, and a half size (11" x 17") copy of the right of way map sheet(s) pertaining to the parcel, such plat to include control of access designations.

CR000168

HNTB.000066
601

e) A title report, current within ninety (90) Days, including copies of all documents identified in the exceptions listed therein and a plot of all easements identified therein. The acquisition package shall include PMC's analysis of each preliminary title report or title commitment to determine potential problems and proposed methods to cure title deficiencies. The PMC shall perform title curative Work and provide the State with copies of all curative documents,

f) A copy of the appraisal report and all supporting documentation,

g) A copy of the environmental site assessment and all amendments as described in Appraisal Services, if any,

h) A real/personal property report detailing what items making up each parcel are classified as real estate, tenant-owned improvements or personal property. Particular attention should be paid to items that have questionable classifications. Completed ROW Form A-9 Property Classification Agreement,

i) Replacement Housing Calculations, notification of business eligibility, completed displacee interviews, all comparables used in estimating the replacement housing calculations, and letter to displacee(s) explaining replacement housing calculations. Calculations and replacement housing benefit package shall be prepared and reviewed by a qualified consultant, in conformance with the State's standard relocation procedures and applicable to State and federal laws and regulations,

j) The proposed initial offer letter, memorandum of agreement, deed, and any other documents, which shall be prepared as required or requested by the State. The State will provide the format for preparing these documents. Documents referred to in this section are standardized by the State and modification of standardized documents should be kept to a minimum, all changes shall be approved by the State in writing, at the State's sole discretion, and

k) Any other required State forms, such as record of all contacts with the property owner or any party with a compensable interest.

Upon the State's prior written approval of the acquisition package, the Consultant may proceed or direct negotiation agents to proceed with the offer to the property owner as appropriate.

### RIGHT-OF-WAY DATA (Function Code 130)

A. ROW Acquisition Management and Services

This Task Order is for services related to ROW acquisition for portions of the IH 610/US 290 Interchange as funded by Proposition 14 bond funding (Segment 3 – parcels noted in Article IV of this scope of services) approved by the Commission in October 2010 and as applicable during the initial period of Task Order. The state may also assign limited parcels that will be acquired in advance of full funding for segments along US 290 to accommodate proposed detention pond sites, hardships, or other need as determined by the state necessary to acquire prior to planned development.

1. Questions or concerns from the public shall be recorded and recommendation for follow up, as applicable, made within 24 hours.
2. Identify landowners of the subject parcels for this Task Order
   a. Prepare drafts of Acquisition Provider introduction letters.
   b. Maintain and Update property owner database including:
      * addresses
      * phone numbers
      * tax identification number
3. Make recommendations and keep a log of appraisal services assignments.
4. Weekly status meetings to identify any potential problems that could cause delays and develop approach to resolve. Weekly meetings will be held to help facilitate and avoid any delays.

CR000169

HNTB.000067

602

5. Monitor activities with respect to applicable State polices and guidelines. Monitor acquisitions and relocations to verify they are handled in compliance with Title II and III of the Uniform Act of 1970.
6. Notification of impending project to adjacent landowners
7. Make contact and stay current with brokers and real estate agents along the corridor
8. Look for early opportunities for making offers and appraisal assignments. Assess and prioritize parcels including identification of parcels critical to permit utility relocation activities, displaces requiring relocation and billboards requiring variance approval by the City of Houston or other cities.
9. Develop appraisal plan that allows prompt offers that will reduce future appraisal updates.
10. Review environmental concerns before appraisals ordered.
11. Review ROW and land use to develop potential revision to eliminate unnecessary takes and costly and lengthy negotiations.
12. Review utility easement locations to discuss their relocation with the utility coordinator.
13. File Management:
   a. Prepare warrant transmittal request utilizing State standard payment submissions forms with supporting documentation.
   b. Maintain records of all payments including warrant number, amount, and date paid, etc.
   c. Maintain copies of all incoming and outgoing correspondence and contact with property owners.
14. Final ROW Acquisition Package Review and Approval.
15. The PMC shall assess concerns or unusual circumstances identified, including parcels splits, impacts to remainder, etc., and provide appropriate research back-up and provide recommendations to the State on how to proceed for State review and approval.
16. Develop and maintain a list of priority parcels based on issues that may impact or delay the timeline for acquisition or relocation.

B. Title Services
This Task Order consists of the title services of the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services).

1. Provide management oversight and review on Title Services to accomplish the following:
   a. Secure a current title commitment. A current title commitment is considered good if less than 90 days old and must include a five-year sales data from the Title Company that will be providing title insurance.
   b. Preparation and submittal to the Region and District of a written notice to the negotiator of title issues and proposed resolutions.
   c. Secure title commitment updates in accord with insurance rules and requirements for parcel payment submissions and/or eminent domain package submission.
   d. Secure title insurance for all parcels acquired during the subject Task Order initial period, insuring acceptable title to the State. Written approval by the State required for any exception.

C. Initial Appraisal Services
This Task Order consists of the initial appraisal services for the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services).

1. Provide management oversight and review on Initial Appraisal Services to accomplish the following:
   a. Verify Appraiser selected from the State's list of state approved fee appraisers and is available to complete the assignment(s). This approved appraiser list will be available for

CR000170

HNTB.000068

603

review at the PMC office, all Region and District offices or the Right of Way Division Office at 118 E. Riverside Drive, Austin, Texas, upon request.

b. Permission secured from the owner to enter the property from which land is to be acquired. If the Acquisition Provider, after diligent effort, is unable to secure the necessary letter of permission from the property owner, a waiver must be obtained, in writing from the State. Maintain documentation with appraisal reports.

c. Prepare and conduct personal pre-appraisal contact with interest owner(s) for each parcel using acceptable State forms. Identify items such as PSTS and Water Meters and Vaults.

d. Contact property owners or their designated representative to offer opportunity to accompany the appraiser on the appraiser's inspection of subject property. Maintain record of contact in file.

e. Prepare complete appraisal report for each parcel to be acquired utilizing State forms No. ROW-A5, ROW-A6, ROW-A7, ROW-A8, as applicable. These reports shall conform to State policies and procedures along with the Uniform Standards of Professional Appraisal Practices.

f. As necessary, prepare written notification to the State of any environmental concerns associated with the right of way to be acquired which could require environmental re-mediation.

g. All completed appraisals assembled and submitted for final approval administratively by the Region Right of Way Office and packaged for forwarding with recommendation for approval by the District Engineer, Region Director, or ROW Division Director as appropriate.

h. As necessary, coordinate with the appraiser to appear and/or testify as an Expert Witness in eminent domain proceedings and be available for pre-hearing or pre-trial meetings.

i. As necessary, the appraiser will coordinate with review appraiser regarding revisions, comments, or additional information that may be required.

D. Initial Appraisal Review Services
This Task Order consists of the initial appraisal review services for the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services).

1. Provide management oversight and review on Initial Appraisal Review Services to accomplish the following:
   a. Verify Review Appraiser selected from the State's list of state approved fee appraisers.
   b. Review all appraisal reports for each parcel to determine consistency of values, supporting documentation related to the conclusion reached and compliance with State policies and procedures and the Uniform Standards of Professional Appraisal Practices.
   c. Completed State Form ROW-A10 "Tabulation of Values", for each appraisal.
2. Complete appraiser evaluations as required.

E. Appraisal Update Services
This Task Order consists of the initial appraisal update services for the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services).

1. Provide management oversight and review on Appraisal Update Services to accomplish the following:
   a. Timely complete appraisal updated for the parcel to be acquired utilizing State Form No. ROW-A5, which will be furnished to the Acquisition Provider by the State. These

CR000171

HNTB.000069

604

reports shall conform to State policies and procedures along with the Uniform Standards of Professional Appraisal Practices.

b. Written notification made to the State of any environmental concerns associated with the right of way to be acquired which could require environmental remediation. Provide completed appraisals with recommendation to the District Right of Way Office for approval by the District Engineer or his/her assigns.

c. As necessary, coordinate with the appraiser to appear and/or testify as an Expert Witness in eminent domain proceedings and be available for pre-hearing or pre-trial meetings during the initial period of this Task Order.

F. **Appraisal Review Update Services**
This Task Order consists of the initial appraisal review update services for the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services) .

1. Provide management oversight and review on Appraisal Review Update Services to accomplish the following:
   a. Verify appraiser selected from the State's list of State approved fee appraisers.
   b. Compliance with State policies and procedures and the Uniform Standards of Professional Appraisal Practices.
   c. Completed State Form ROW-A10 "Tabulation of Values", for each appraisal.

G. **Right of Way Negotiations**
This Task Order consists of right of way negotiation services for the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services).

1. Provide management oversight and review on Right of Way Negotiation Services to accomplish the following:
   a. Appraisal and appraisal review reports were analyzed and the State's approved value confirmed prior to making an offer for each parcel.
   b. Initial offer letter prepared, memorandum of agreement, instruments of conveyance, and any other documents required or requested by the State on applicable State forms.
   c. Contact made with each property owner or owner's designated representative, to present the written offer in person where practical, and deliver appraisal report and required brochures. Maintain follow-up contacts and secure the necessary instruments upon acceptance of the offer for the closing.
   d. Provide a copy of the appraisal report for the subject property exclusively to the property owner or authorized representative at the time of offer. Maintain original signed Receipt of Appraisal.
   e. Response to property owner inquiries verbally and in writing within two business days.
   f. Preparation of a separate negotiator contact report for each parcel per contact on State form ROW-N94.
   g. Parcel files maintained of original documentation related to the purchase of the real property or property interests.
   h. Property owner advised on the Administrative Settlement process. Within 30 days of initial offer (unless an additional 30 day extension is requested), transmit to the State any written counter offer from property owners including supporting documentation, and Acquisition Provider recommendation with regard to Administrative Settlements in accordance with State policy and procedures.

CR000172

HNTB.000070
605

   i. Final offer letter and documents of conveyance prepared as necessary within 30 days of initial offer.

   j. Make provision for the inclusion of Bisection Clauses of the Deed.

   k. Address access issues with Design and make recommendations to the State.

   l. Coordinate Expert Witness Testimony by Acquisition Provider as necessary.

H. **Closing Services**

This Task Order consists of Closing services for the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services) which reach closing stage during the initial period of this Task Order.

1. Provide management oversight and review on Closing Services to accomplish the following:

   a. Coordinate with the State and title Company to obtain an updated title commitment along with other Forms and certified copy of the instrument of conveyance necessary when requesting the Parcel Payment from the District. Clear necessary liens incumberances etc., before closing.

   b. Coordinate with Acquisition Provider to attend closings and provide closing services in conjunction with Title Company.

   c. Verify Acquisition Provider has recorded original instruments immediately after closing at the respective County Clerk's Office, except for donations which must be forwarded to the State for acceptance by the Commission prior to recording.

   d. Delivery of State "Property Owner Survey" and if applicable, the "Relocation Survey" to the property owner at the closing.

2. Prepare Affidavit of Inspection as required by Title Company.

I. **Relocation Assistance**

This Task Order consists relocation assistance services for the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services) as applicable during the initial period of this Task Order.

The PMC shall coordinate and perform the administrative requirements necessary in order to relocate any occupants from Final ROW. All services with respect to relocation assistance shall be performed in accordance with applicable law, including the Uniform Act and State standards, and in accordance with applicable provisions of this Agreement.

1. The PMC shall be available to all displacees for relocation services at the convenience of the displacees.

2. PMC's major activities with respect to the relocation assistance of occupants from Final ROW includes:

3. Update the "Relocation Plan" in accordance with the State's Right of Way Manual , Volume 3, Chapter 8, Section Relocation Program Planning and Construction;

   a. Monitor relocation assistance activities;

   b. Assist with all requests and be responsible for answering initial requests for, Review/Appeal Process and judicial reviews.

4. Relocation assistance shall be provided strictly in accordance with the law, and, in particular, the Uniform Act and State standards. The PMC shall provide management oversight and review on Relocation Assistance Services to accomplish the following:

   a. Personal Property Relocation Services

      1. All property owners and potential displaces notified of eligibility for relocation assistance and provide them with a Relocation Assistance Brochures at time of initial contact. The State will provide brochures to the PMC. If possible, advise displacee of preliminary relocation benefits at this time including any incentive programs.

CR000173

HNTB.000071

606

2. Completed State Form ROW-R96 (Relocation Advisory Assistance-Parcel Record) for all displacees.
3. 90-day notice provided to vacate simultaneous with the delivery of relocation benefits package.
4. Once property acquired, issue a sixty day notice if displacees have not vacated and if the parcel has been acquired, a 30-day letter issued. Notify the State's District Office immediately if displacees do not move after 30-day notice.
5. Requested moving estimates from moving companies as needed. Coordinate moves with displaced business owners and tenants in accordance with State procedures.
6. Coordinate availability of Relocation agent for any appeals or hearings.

b. Residential Relocation Services

1. Property owners and potential displacees notified of eligibility for relocation assistance and provided with a Relocation Assistance Brochure at time of initial contact. The State will provide brochures to the PMC. If possible, advise displacees of preliminary relocation benefits at this time including any incentive programs.
2. Completed State form ROW-R96 (Relocation Advisory Assistance-Parcel Record) for all displacees.
3. Located, evaluated and maintenance files on comparable available housing for State form ROW-R106
4. Calculated replacement housing supplement benefits for State form R107 (Supplement Payment Estimate-Replacement Housing).
5. Submitted completed State forms ROW-106 (original only) and ROW-R107 (original and 2 copies) to the District Right of Way Office. Include supporting photographs.
6. Provided 90-day notice to vacate simultaneous with the delivery of relocation benefits package.
7. Sixty days later if displacees have not vacated and if the parcel has been acquired, a 30-day letter issued. Notify the State's District Right of Way immediately if displacees do not move after 30-day notice.
8. Performed a decent, safe and sanitary (DSS) inspection of the replacement housing in accordance with State policy. Prepared and submitted State Form ROW –R116 to the District Right of Way Office.
9. Requested moving estimates from moving companies as needed. Coordinate moves with displaced business owners and tenants in accordance with State procedures.
10. Submitted requests for relocation payments including forms: Updated ROW-R96 (Relocation Advisory Assistance-Parcel Record) ROW-R99 (Claim for Actual Moving Expenses), ROW-R100 (Claim for Fixed Moving Expense Payment-Individual and Families ), ROW-R105 (Claim for Payment of Rent Supplement), ROW-R113 (Claim for Payment of Down Payment or Housing Supplement), ROW-RCE (Certification of Eligibility), ROW-R166 (Replacement Housing Inspection), and any other applicable forms and support documentation. Ensure owners have terminated all utilities and request all meters be removed.
11. Transmittal of memorandum and completed file to State's District Office.
12. Coordinate availability of Relocation agent for any appeals or hearings.

c. Business Relocation Services

1. All property owners and potential displacees notified of eligibility for relocation assistance and provided with a Relocation Assistance Brochure at time of initial contact. The State will provide brochures to the PMC. If possible, displace advised of preliminary relocation benefits at this time including any incentive programs.
2. Completed State Form ROW-A96 (Relocation Advisory Assistance-Parcel Record) for all displacees.

CR000174                                                      HNTB.000072
607

3. 90-day notice provided to vacate simultaneous with the delivery of relocation benefits package.
4. Once acquired, send thirty day notice to owner/tenants. Sixty days notice if displaces have not vacated and if the parcel has been acquired, 30-day letter issued. Notify State immediately if displaces do not move after 30-day notice to affect eviction process.
5. Requested moving estimates from moving companies as needed. Moves coordinated with displaced business owners and tenants in accordance with State procedures.
6. For complex business moves estimated to cost over $20,000
   a. Prepared dated, written moving plan signed by both the displacee and the relocation agent.
   b. Moving plan in compliance with State requirements and recognized moving principles. The moving plan must contain the method of move, i.e., commercial, self-move, etc.
   c. Clear descriptions of the property to be moved, date of move, appropriate photographs, appropriate sketches, and the location and distance to the replacement site.
   d. Outline of work specifications and requirements for each phase of the move detailing identification of items requiring removal, re-installation and any special handling, packing, or crating.
   e. Documented inventory of personal property to be moved for non-residential moves.
   f. Closings attended on replacement property if requested by any party involved and assurance supplement payment is properly distributed and "Relocation Survey" is delivered to displacee.
7. For non-complex business moves estimated to cost $20,000 or less
   An abbreviated written moving plan. The difference in the non-complex moving plan is that it can be prepared and signed solely by the relocation agent. Ensure owners have terminated utilities and required meters be removed.
8. Relocation agent available for any appeals or hearings.

J. Condemnation Support
This Task Order consists of condemnation support services for the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services) as applicable during the initial term of this Task Order.

The PMC shall support condemnation efforts as directed by the State as follows:

1. Make provisions for preparation of a Bisection Clause for the original set of Legal Descriptions supplied by the State if applicable.
2. Review and prepare, as applicable, Form ROW-E49 used to join all interested parties. If married, spouses of owners must also be joined unless separate property is declared.

Pre-Hearing Support
1. Notify the State of any potential condemnation and document the reason(s) for condemnation including recommendations for property closure.
2. Upon delivery of a copy of the final offer, have request made for an updated title commitment for Eminent Domain from the Title Company.
3. Upon verification of Form ROW-E49, prepare a packet containing 2 copies each of the following documents: ROW-E49 form, Commitment, Negotiator's Reports, Appraisal Acknowledgement, Pre-Appraisal Contact Sheet, signed and sealed property description, and

CR000175

HNTB.000073
608

plat, Final Offer letter, any correspondence from the land owner or representatives, along with one copy of the appraisal report. Submit packet to the District ROW Office for submission to the Right of Way Division.

4. Address 49 deficiencies as required by ROWD.

5. Upon receipt of concurrence for the Appraisal Witness, request the update of appraisal.

6. Upon receipt of packet prepared by the Attorney General's Office which will include Petition for Condemnation, Lis Pendens, Order Appointing Commissioners, Order Setting Hearing, Oath of Special Commissioner, and Notice of Hearings, coordinate with provider the filing of the original petition with the County Court at Law or other appropriate Court for a cause number to be assigned.

7. Coordinate filing the Petition and Lis Pendens including the cause number with the County with the County Clerk's Office.

8. Upon assignment of a court, coordinate filing the Order of Appointing Commissioners with the judge retaining a copy of the Order for the files.

9. Following appointment of Commissioners by the judge, secure the following documents: Oath of Commissioners signed by the Commissioners, Order Setting Hearing, 2 copies of the Notice of Hearing signed by the Commissioners.

10. File all originals with the court and send copies marked "copy" to the State's District Office and the Assistant Attorney General.

11. Send a copy of the petition to the Title Company so that the title Company can make sure the appropriate parties were joined and that no changes in title have occurred.

12. Set the Commissioners Hearing after the updated appraisal has been submitted, if there is no change in value. If there is an increase in value, PMC will make a revised offer. The PMC shall prepare a final offer letter and submit a copy of the final offer letter.

13. Coordinate a conference room or court room reservation for the hearing.

14. Coordinate the hearing date with the Assistant Attorney General, Appraiser, the State's Representative, three commissioners, and a court reporter.

15. Coordinate a pre-hearing conference prior to the hearing (the day before or earlier) to discuss the facts of the case with the Assistant Attorney General, Appraiser, and the State.

16. After the hearing is set, serve Notices of Hearing to the indicated parties at least 11 days prior to the Commissioner's hearing. If it is necessary to join the Federal Government, the Notice of Hearing must be served 60 days prior to the Hearing. Make arrangements for Citation by Publication if needed.

17. Once the notices have been served, file the original notices with the court and send copies stamped "copy" to the State and Assistant Attorney General.

18. Send a reminder letter 2 to 3 weeks in advance to the Assistant Attorney General, Appraiser, three Commissioners, Court Reporter, and the State concerning Hearing dates.

19. Depending on the market conditions or if over six months have elapsed since the date of the initial offer, contact the attorney handling the case for the State and confer about the advisability of preparing an updated appraisal. If it is determined that an updated or new appraisal is determined to be necessary or desirable, the PMC shall schedule and arrange for such appraisal with the original appraiser.

20. Coordination with the State on behalf of the Attorney General as to the need for a land planner. The land planner report should be completed and forwarded to the appraiser before the updated appraisal is completed.

21. Upon request, provide a land planner to perform a land planner report.

22. Review the updated appraisal and submit to the attorney handling the case. The State must approve any revised offer in writing prior to an offer letter being sent within ten (10) Business days of receiving the updated appraisal. If a revised offer is approved by the State, prepare a final offer letter, make the revised offer to the property owner or other holder of a compensable interest, as applicable, and submit a copy of the final offer letter to the State.

CR000176

HNTB.000074

Post Hearing Support:

1. For the hearing, prepare Form ROW-E73 and commissioners time sheets. Submit Form ROW-E73 to the State's District Office.
2. Obtain signatures of Commissioners on the Award of Commissioners and file with the court for the judge's signatures within 48 hours of the Hearing.
3. Give timesheets to the Judge. The Judge determines amount paid to Commissioners.
4. Obtain and distribute 3 certified copies of the award as follows: 1 certified copy to the title company with a request for a commitment, 1 certified copy to the Assistant Attorney General, 1 certified copy to the State with the Commitment to request the warrant in the amount of the Commissioners' Award.
5. Send the Commitment and the Award to the State's District ROW Office, along with individual commissioner's Billing Statement Form 132 requesting payment for their fees, and evaluation of appraiser's testimony and availability.
6. Deposit State warrant in the registry of the court. File a Notice of Deposit with the court and send certified copies to each defendant notifying them of the date of the deposit. The Date of the Deposit is the Date of Take.
7. Take photograph of the interest to be acquired on the day of deposit for relocation verification and coordinate jury trial and appraisal photographs with District appraisers.
8. Send written notices of the date of deposit to the State's District ROW office and all interested parties.
9. Appear or coordinate appearance of Expert Witness as requested. Sub-contractors or members of the ROWAP may also need to appear as Expert Witnesses as requested.
10. File Objections.

K. **Clearance/Demolition of Final ROW**

This Task Order consists of clearance/demolition services for the Proposition 14 funded portion of the IH 610/US 290 interchange (Segment 3 – parcels noted in Article IV of this scope of services) as applicable during the initial period of this Task Order.

Prior to demolition of any improvements, the PMC shall provide to the State, photographs of the property and all improvements, unless the Special Commissioner's Hearing has been completed and objections have not been filed. The PMC shall also have photos of personal and any other items of dispute in and of a quality suitable for presentation as evidence in court. Following acquisition or possession of any parcel of Final ROW, the PMC shall:

1. Coordinate with the owner and occupants to assure the clearance of personal property from the Final ROW, as applicable.
2. Secure Governmental Approvals required for demolition and environmental surveys or tests, and notify the State in writing of all such activities.
3. Test for Asbestos.
4. Prepare necessary documentation for disposal of improvements, fixtures and buildings in accordance with applicable laws and submit the same to the State.
5. Provide written notification to the State of any real and/or personal property remaining on the Final ROW after vacated by the occupants and not acquired as part of the acquisition.
6. Right after vacate, terminate all utility services when appropriate.
7. Process all required forms, documents and permit applications in order to proceed with the timely demolition or removal of any and all improvements, buildings and fixtures located within the Final ROW, as applicable.
8. Notify the State upon completion of the demolition and clearance of the Final ROW, as applicable.

CR000177

HNTB.000075
610

L.  Deliverables
   In administering and managing its Final ROW activities, the PMC shall:

   a.  Maintain parcel records on file of all aspects of the acquisition process covered in this Task Order in accordance with State requirements and applicable Law. Each parcel file shall include all documents required by the Contract Documents, Federal Highway Administration, and/or the State.

   b.  Provide monthly summaries of Facility expenses covered in this Task Order including amounts authorized, amounts paid and budget forecasting on a parcel-by-parcel and overall Program basis as requested by the State.

   c.  Provide budget projections and anticipated funding requirements every thirty (30) days and more frequently as requested by the State during this Task Order.

   d.  Maintain and electronically transmit to the State, in a format acceptable to the State, monthly status reports of all parcels and activities related to Schematic ROW, acquisition and disposition of Additional Properties and acquisition and disposition of temporary easements or other property interests, and provide weekly (or as requested) updates to the State during this Task Order.

   e.  Evaluate and report to the State, Acquisition Consultant's status and performance on a monthly basis or more frequently as requested during this Task Order.

   g.  Prepare and submit to the State, on a monthly basis, an electronically or a spreadsheet that contains Final ROW specific data required by the State ROW Division's Right of Way Information System (ROWIS) tracking software program or as directed by the State during this Task Order.

   h.  Input and update parcel status for parcels included in this Task Order in the Program's web based tracking system.

   i.  Provide printed copies and document record of all ROW acquisition and relocation plans and associated updates prepared during with Task Order.

   j.  Track, monitor, and report on funding by type as used for acquisition during this Task Order.

Exhibit B

CR000178

HNTB.000076

611

# EXHIBIT C

## TO

**TASK ORDER NUMBER 4**
US 290 Program Management

For

Crossland Acquisition, Inc.

**Contract 12-648P5013 - Work Authorization Number 4
Exhibit C, Work Schedule
(1 page)**

CR000179

EXHIBIT C
WORK SCHEDULE
WORK AUTHORIZATION NO. 4

| Activity Name | 2010 | | 2011 | | | | 2012 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
| US 290 CORRIDOR, IH 610 to FM 2920 | | | | | | | | | |
| US 290 PMC WA#4 SUMMARY SCHEDULE | | | | | | | | | |
| Administration | | | | | | | | | |
| Start Work Date (WA#4) | | | | | | | | | |
| Work Authorization Termination | | | | | | | | | |
| Route and Design Studies (FC 110) | | | | | | | | | |
| Geotechnical Field Investigations and Reports | | | | | | | | | |
| Geotechnical Soil Borings/Lab Testing | | | | | | | | | |
| Phase II Geotechnical Report Supplements | | | | | | | | | |
| Geotechnical Monitoring Wells | | | | | | | | | |
| Geotechnical Boring Log Data Sheets | | | | | | | | | |
| Right of Way Data (FC 130) | | | | | | | | | |
| ROW Acquisition Management and Services | | | | | | | | | |
| Title Services | | | | | | | | | |
| Initial Appraisal Services | | | | | | | | | |
| Initial Appraisal Review Services | | | | | | | | | |
| Appraisal Update Services | | | | | | | | | |
| Appraisal Review Update Services | | | | | | | | | |
| Right of Way Negotiations | | | | | | | | | |
| Closing Services | | | | | | | | | |
| Relocation Assistance | | | | | | | | | |
| Condemnation Support | | | | | | | | | |
| Clearance/Demolition of Final ROW | | | | | | | | | |
| ROW Surveying | | | | | | | | | |
| Managing Contract Advance PE Services (FC 145) | | | | | | | | | |
| Program Management/Administration | | | | | | | | | |
| Right-of-Entry Request Coordination | | | | | | | | | |
| Field Surveying and Photogrammetry (FC 150) | | | | | | | | | |
| Establish Control on North Side of US 200 (Seg 9 - Seg 12) | | | | | | | | | |
| Phase III Select Field Topo Surveys | | | | | | | | | |
| Miscellaneous (FC 163) | | | | | | | | | |
| Traffic Control Plans | | | | | | | | | |

Exhibit C

CR000180

HNTB.000078
613

# EXHIBIT D

TO

**TASK ORDER NUMBER 4**
US 290 Program Management

For

Crossland Acquisition, Inc.

**Contract 12-648P5013 - Work Authorization Number 4**
**Exhibit D, Fee Schedule**
(2 pages)

CR000181

HNTB.000079

EXHIBIT D - FEE SCHEDULE
METHOD OF PAYMENT: SPECIFIED RATE

PROJECT NAME/CSJ: US 290 CORRIDOR PROGRAM MANAGEMENT CONSULTANT
CONTRACT NUMBER: 12-648P5013 , WORK AUTHORIZATION NO. 4
SUB-PROVIDER NAME: CROSSLAND ACQUISITION, INC.

| TASK DESCRIPTION | PRINCIPAL/ ATTY | SR PROJECT MANAGER | TITLE MANAGER/ ATTY | ROW MANAGER | ROW ASST. MANAGER | ROW AGENT | ASSISTANT ROW AGT | RELOCATION MANAGER | RELOCATION AGT | IT AND/OR ACCESS DATABASE | ASSISTANT | TOTAL LABOR HRS. & COSTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIGHT OF WAY DATA (FC 130) | | | | | | | | | | | | |
| A. ROW ACQUISITION MANAGEMENT AND SERVICES | | 460 | | | 150 | | | | | 64 | 24 | 705 |
| B. TITLE CURATIVE SERVICES PROP 14 PROPERTIES | | | 68 | | 68 | 96 | | | | | | 232 |
| C. COORDINATE INITIAL APPRAISAL SERVICES PROP 14 PROPERTIES | | | | 24 | 24 | | | | | | | 48 |
| D. COORDINATE INITIAL APPRAISAL REVIEW SERVICES PROP 14 | | | | 12 | 12 | | | | | | | 24 |
| E. COORDINATE APPRAISAL UPDATE SERVICES PROP 14 PROPERTIES | | | | 24 | 24 | | | | | | | 48 |
| F. COORDINATE APPRAISAL REVIEW UPDATE SERVICES PROP 14 | | | | 12 | 12 | | | | | | | 24 |
| G. RIGHT OF WAY NEGOTIATIONS PROP 14 PROPERTIES | | | | 56 | 144 | 144 | 100 | | | | | 444 |
| H. CLOSING SERVCS PROP 14 PROPERTIES | | | | 16 | 34 | 34 | | | | | | 84 |
| I. RELOCATION SERVICE PROP 14 PROPERTIES | | | | 32 | 90 | 180 | | 720 | 1900 | | | 2412 |
| J. CONDEMNATION SUPPORT FOR PROP 14 PROPERTIES | 120 | 64 | | | | | | | | | | 402 |
| | | | | | | | | | | | | 0 |
| HOURS SUB-TOTALS | 120 | 524 | 68 | 175 | 558 | 454 | 100 | 720 | 1500 | 128 | 88 | 4445 |
| NEGOTIATED CONTRACT: RATE PER HOUR | $ 266.87 | $ 253.67 | $ 215.88 | $ 215.43 | $ 134.93 | $ 134.93 | $ 97.15 | $ 215.89 | $ 134.93 | $ 107.95 | $ 63.98 | |
| DIRECT LABOR COSTS | $32,384.40 | $132,923.08 | $14,680.62 | $37,995.64 | $73,040.24 | $61,268.22 | $9,715.00 | $155,440.90 | $202,395.00 | $13,817.60 | $4,750.24 | $742,001.74 |
| TOTAL LABOR COSTS | $332,384.40 | $132,923.08 | $14,680.52 | $37,996.64 | $73,040.24 | $61,268.22 | $9,715.00 | $165,440.90 | $202,395.00 | $13,817.60 | $4,750.24 | $742,001.74 |

WA #4

Exhibit D

CR000182

HNTB.000080
615

## EXHIBIT D - FEE SCHEDULE
## METHOD OF PAYMENT: SPECIFIED RATE

PROJECT NAME/CSJ: US 290 CORRIDOR PROGRAM MANAGEMENT CONSULTANT
CONTRACT NUMBER: 12-648P5013, WORK AUTHORIZATION NO.4
SUB-PROVIDER NAME: CROSSLAND ACQUISITION, INC.

| DESCRIPTION | #UNITS | COST/UNIT | UNIT | | | | | | | | TOTAL MH BY FC | TOTAL COSTS BY FC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIGHT OF WAY DATA (FC 130) | | | | | | | | | | | 446 | $742,001.74 |
| | | | | | | | | | | | | |
| SUBTOTAL LABOR EXPENSES | | | | | | | | | | | 446 | $742,001.74 |
| | | | | | | | | | | | | |
| OTHER DIRECT EXPENSES | | | | | | | | | | | | |
| Mileage (# of miles) (0.50) | 1,000 | $ 0.50 | mile | | | | | | | | | $500.00 |
| Meals (Overnight stay required) | 2 | $ 35.00 | day/person | | | | | | | | | $72.00 |
| Lodging (Maximum - taxes/fees not included) | 2 | $ 85.00 | day/person | | | | | | | | | $170.00 |
| Air Travel (Direct) | 1 | $ 450.00 | RC/trip/person | | | | | | | | | $450.00 |
| Rental Car (Taxes/fees not included) | 1 | $ 45.00 | day | | | | | | | | | $45.00 |
| 8 1/2" x 11" B/W copies | 10,200 | $ 0.10 | sheet | | | | | | | | | $1,020.00 |
| 8 1/2" x 11" Color copies | 685 | $ 0.50 | sheet | | | | | | | | | $912.00 |
| 11" x 17" B/W Copies | 2,040 | $ 0.20 | sheet | | | | | | | | | $408.00 |
| 11" x 17" Color Copies | 340 | $ 1.50 | sheet | | | | | | | | | $612.00 |
| Appraisal (limited damages) | 24 | $ 5,000.00 | parcel | | | | | | | | | $120,000.00 |
| Appraisal Review (limited damages) | 24 | $ 2,000.00 | parcel | | | | | | | | | $48,000.00 |
| Appraisal (significant acquisition/damages) | 6 | $ 10,000.00 | parcel | | | | | | | | | $60,000.00 |
| Appraisal Review (significant acquisition/damages) | 8 | $ 3,500.00 | parcel | | | | | | | | | $28,000.00 |
| Appraisal (specialty properties) | 2 | $ 15,000.00 | parcel | | | | | | | | | $30,000.00 |
| Appraisal Review (special property) | 2 | $ 5,000.00 | parcel | | | | | | | | | $10,000.00 |
| Title Services | 34 | $ 500.00 | file | | | | | | | | | $17,000.00 |
| Overnight mail - Letter Size | 12 | $ 25.00 | each | | | | | | | | | $300.00 |
| Overnight Mail - Box | 12 | $ 30.00 | each | | | | | | | | | $360.00 |
| SUBTOTAL OTHER DIRECT EXPENSES | | | | | | | | | | | | $337,549.00 |

| SUMMARY | |
|---|---|
| TOTAL LABOR COSTS FOR CROSSLAND | $742,001.74 |
| NON-SALARY/OTHER DIRECT EXPENSES | $337,643.00 |
| GRAND TOTAL | $1,079,580.74 |

Exhibit D

WA #4

CR000183

HNTB.000081
616

J

## SUPPLEMENTAL AGREEMENT NUMBER 1
## TO TASK ORDER NUMBER 4
US 290/Hempstead Corridor Program Management

This Supplemental Agreement, Number 1, to TASK ORDER NUMBER 4, dated January 14, 2011, between HNTB CORPORATION (HNTB) and Crossland Acquisition, Inc. (Consultant) is for the purpose noted below and is consistent with the MASTER AGREEMENT BETWEEN HNTB AND CONSULTANT, dated July 5, 2006 (the Agreement).

Section A, Scope of Services; Section B, Schedule, and Section C, Compensation are all modified to provide additional services beyond the initial term of the Task Order for support of ROW acquisition and relocation services.

### Section A. – Scope of Services
Scope of Services is amended to include the attached Exhibit B-1, Services to be Provided by the Consultant

### Section B. – Schedule
The Work Schedule is amended to include the attached Exhibit C-1, Work Schedule, and extend the termination date from <u>June 30, 2012</u>, to <u>February 28, 2013</u>.

### Section C. – Compensation
Compensation is amended to increase the maximum amount payable to the Consultant under this Task Order by **$202,550.00** from $1,079,550.74 to $1,282,100.74, payable in accordance with Attachment E, E-1, E-2, and E-3 of the Master Agreement and the attached Exhibit D-1, Fee Schedule for Crossland Acquisition.

Except to the extent modified herein, all terms and conditions of Task Order Number 4, and the Agreement shall continue in full force and effect.

**HNTB Corporation**
(HNTB)

Signature _____

Name: Thomas D. Ellis, PE

Title: Vice President

Date: 4/22/12

**Crossland Acquisition, Inc.**
(Consultant)

Signature: _____

Name: _____

Title: _____

Date: 6/21/12

CR000184

HNTB.000082

618

## EXHIBIT B-1

### · SERVICES TO BE PROVIDED BY THE CONSULTANT

Highway: US 290

Limits: From the Harris County Line near FM 2920 to the IH 610/US 290 Interchange
Station 1130+00 to Station 2892+50.08

CSJ: Various

The additional services to be performed under this supplemental agreement consists of providing
engineering services to support right-of-way acquisitions through eminent domain proceedings and
associated relocations beyond the initial period of this work authorization. The additional services
include late tenants and additional tenants identified to be eligible for relocation benefits.

### RIGHT-OF-WAY DATA  (Function Code 130)

A.  ROW Acquisition Management and Services
The PMC shall provide the following for Parcels within this work authorization proceeding
through eminent domain and requiring relocation services after the initial term:
19.  Acquisition Provider Administrative Services without project field office.
   a.  Following the initial term, the Acquisition Provider shall provide administrative services
   without project field office to include the following:
      - Monthly summaries of project segment expenses including amounts authorized,
        amounts paid, and status of acquisition and any associated relocations.
      - Participate in monthly project review meetings at the PMC office or State's East
        Region office as scheduled.
      - Maintain current status reports of all parcel and project activities and provide weekly
        updates to the PMC for transmittal to the State's East Region on forms acceptable to
        the State.
      - Review and provide updates to owner contact lists and provide to the PMC office for
        transmittal to the State's East Region.
      - Maintain a copy of all project segment records and parcel files, and working
        documents.
      - Maintain copies of correspondence and contacts with all property owners and tenants.
      - Maintain records of all payments including, but not limited to, warrant number,
        amount, and date paid.
      - Monitor all assigned project segment activities to insure all State polices and
        guidelines are followed. Monitor all acquisitions and relocations to insure they are
        handled in compliance with Title II and III of the Uniform Act of 1970.
      - Prepare warrant transmittal request utilizing State standard payment submissions
        forms with supporting documentation.
      - Prepare warrant transmittal request for each assigned parcel utilizing State standard
        payment submissions forms with supporting documentation.
   b.  Payment for Acquisition Provider Services without field office shall be based on per
   month of operation for a maximum number of months not to exceed 2 months for all
   services in this supplemental agreement, and includes all costs of administering
   acquisition, relocation, and closing services for the assigned scope of services. This shall

CR000185

HNTB.000083

619

include all administrative costs including salaries, travel, employee benefits, telephone, equipment, supplies, mailing, and deliveries.

E.    **Appraisal Update Services**
      3.  The Consultant shall provide for appraisal update services and appraiser attendance at hearings for the following parcels proceeding to eminent domain or requiring additional time for acquisition: Parcels 312, 313, 314, 324, and 326.

F.    **Appraisal Review Update Services**
      2.  The Consultant shall provide for appraisal review update services and appraiser attendance at hearings for the following parcels proceeding to eminent domain or requiring additional time for acquisition: Parcels 312, 313, 314, 324, and 326.

I.    **Relocation Assistance**
      Relocation Services shall include the submittal of a moving plan, coordination of relocations and payment claim submissions, and verification that parcel is vacated for the following noted parcels after the initial term:
      - Submittal of moving plan, coordination of relocation and payment claim submissions, and verification that parcel vacated for the following:
        o  Three (3) Business Relocations on Parcel 230
        o  One (1) Business Relocation on Parcel 310
        o  One (1) Business Relocation on Parcel 311
        o  One (1) Personal Property Relocation on Parcel 311
        c  One (1) Personal Property Relocation on Parcel 312
        c  One (1) Business Relocation on Parcel 315
        c  One (1) Business Relocation on Parcel 317
        o  One (1) Business Relocation on Parcel 321
        o  One (1) Business Relocation on Parcel 324
        o  One (1) Business Relocation on Parcel 325
        o  One (1) Outdoor Advertising Sign Relocation for Parcel 310
        o  One (1) Outdoor Advertising Sign Relocation for Parcel 311
        o  One (1) Outdoor Advertising Sign Relocation for Parcel 326
        o  One (1) Outdoor Advertising Sign Relocation for Parcel 333

      Relocation Services shall include the coordination of relocations and payment claim submissions, and verification that parcel is vacated for the following noted parcels after the initial term:

        o  Eleven (11) Business Relocations on Parcel 320
        o  One (1) Business Relocation on Parcel 327

J.    **Condemnation Support**
      The Consultant shall provide "Eminent Domain Package Preparation and Hearing Coordination" for all parcels after the initial term to include the following:

      - Parcels 230, 310, 311, 312, 313, 315, 316, 317, 318, 321, 323, 324, 325, 326, 332, 333, and 334.

**Pre-Hearing Support**

23. Provide pre-hearing support for setting the Hearing, providing notification to all parties, and coordinating a pre-hearing conference on Parcels 311, 318, and 321.

**Post-Hearing Support**

Provide post-hearing support for Parcels 230, 310, 311, 312, 313, 315, 316, 317, 318, 321, 323, 324, 325, 326, 332, 333, and 334.

K. **Clearance/Demolition of Final ROW**

The PMC shall provide "Disposal of Property Services" after the initial term for Parcels 310, 311, 312, 314, 315, 316, 324, and 325.

L. **Deliverables**

k. Appraisal updates for Parcels 230, 310, 311, 312, 313, 314, 315, 316, 317, 318, 321, 323, 324, 325, 326, 332, 333, 334 and 335.

l. Appraisal review updates for Parcels 230, 310, 311, 312, 313, 314, 315, 316, 317, 318, 321, 323, 324, 325, 326, 332, 333, 334 and 335.

m. Record of hearing notices and updated title commitments.

n. Record of notice of deposit of warrant to all parties.

o. Form E-73 and commissioner's time sheets.

p. Pictures of improvements at time of deposit of warrant.

N. **Payment Milestone**

Payment for ROW Acquisition, Relocation, Condemnation Support, and Clearance/Demolition of Final ROW Tasks shall be in accordance with the milestones in the following table:

| Items | Description | Payment Milestones |
|-------|-------------|--------------------|
| A.19 | Fee for Acquisition Provider Administrative Services without project field office (per month of completed service) | 100% |
| I-OAS | Fee for Outdoor Advertising Sign (per Displacee basis) | |
| | Providing relocation benefits package/documentation of preliminary contact with Displacee which must include the Displacee name and certificate of eligibility. A photo identification of the Displacee is not necessary.<br><br>Submit proof of providing 90-day notice to Displacee. | 45% |
| | Submit memorandum to the PMC office stating that all relocation assistance has been completed.<br><br>Submittal of completed file to the PMC office for processing to the State's East Region ROW office with documents filed by date of activity. Completed file documents must contain all contacts with the Displacee, completed claim forms, copies of all payment submissions for relocation assistance, and signed form (in checklist format, as directed by the State's East Region ROW office) by Displacee verifying move is completed and all benefits have been explained to them. | 55% |

CR000187

| Items | Description | Payment Milestones |
|---|---|---|
| L4.c | Fee for Business Relocation Assistance Service (per Displacee basis) | |
| | Providing the relocation benefits package and documentation of preliminary contact with Displacee which must include the Displacee name and certificate of eligibility.

Providing 90-day notice to Displacee. | 10% |
| | Submission of signed moving plan by business owner and certification of inventory by owner or tenant to the PMC office. | 15% |
| | Submit memorandum to the PMC office reporting the actual date the Displacee vacated the parcel. | 25% |
| | Transmittal of memorandum to the PMC office stating that all relocation assistance has been completed.

Submittal of completed file to the PMC office for processing to the State's East Region ROW office with documents filed by activity. Completed file documents must contain all contacts with the Displacee, completed claim forms and copies of all payment submissions for relocation assistance, and signed form (in checklist format, as directed by the State's East Region ROW office) by Displacee verifying move is completed and all benefits have been explained to them. | 50% |
| L4.a | Fee for Personal Property and Mini-Storage Units Relocation Assistance Service (per Displacee basis) | |
| | Providing the relocation benefits package and documentation of preliminary contact with Displacee which must include the Displacee name and certificate of eligibility.

Providing 90-day notice to Displacee. | 45% |
| | Transmittal memorandum to the PMC office stating that all relocation assistance has been completed.

Submittal of completed file to the PMC office for processing to the State's East Region ROW office with documents filed by date of activity. Completed file documents must contain all contacts with the Displacee, completed claim forms and copies of all payment submissions for relocation assistance, and signed form (in checklist format, as directed by the State's East Region ROW office) by Displacee verifying move is completed and all benefits have been explained to them. | 55% |
| J | Fee for Eminent Domain package preparation and Hearing coordination Services (per parcel basis) | |
| | Receipt of the submission of an RTE-49 acceptable to the State's East Region ROW office.

With written approval by the State's East Region ROW office, the provider may be instructed to begin the administrative preparation of the ROW-E-49 package after the initial offer letter is presented to the property owner. In all cases, to receive payment for this milestone, | 30% |

CR000188

HNTB.000086
622

| Items | Description | Payment Milestones |
|-------|-------------|--------------------|
| | the provider must complete and submit a form ROW-E-49 acceptable to the State's East Region ROW office. | |
| | Setting the date for the Special Commissioners Hearing and providing the PMC office with a copy of the completed order setting the Hearing signed by all Special Commissioners. | 45% |
| | Upon service of the notice of Hearing. | 15% |
| | Upon Notice of Deposit | 10% |
| K | Fee for Disposal of Property Services (per parcel basis) | |
| | Upon acceptance of GSD Forms 1134 and 1135 | 100% |

5 of 5                                                                     Exhibit B-1

HNTB.000087
623

EXHIBIT C-1
WORK SCHEDULE

| Activity Name | 2012 (CY) | | | | | | | | | | | 2013 (CY) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | | |
| US 290 CORRIDOR, IH 610 to FM 2920 | | | | | | | | | | | | | | | | |
| CROSSLAND SA#1 to TO#4 SUMMARY SCHEDULE | | | | | | | | | | | | | | | | |
| Administration | | | | | | | | | | | | | | | | |
| Start Work Date (SA#1 to TO#4) (Date of Execution) | | | | | | | | | | | | | | | | |
| Previous Task Order Termination (June 30, 2012) | | | | | | | | | | | | | | | | |
| Task Order Termination (February 28, 2013) | | | | | | | | | | | | | | | | |
| Right of Way Data (FC 130) | | | | | | | | | | | | | | | | |
| ROW Acquisition Management and Services | | | | | | | | | | | | | | | | |
| Administrative Services without field office (Crossland) | | | | | | | | | | | | | | | | |
| Appraisal Update Services | | | | | | | | | | | | | | | | |
| Appraisal Review Update Services | | | | | | | | | | | | | | | | |
| Relocation Assistance | | | | | | | | | | | | | | | | |
| Condemnation Support | | | | | | | | | | | | | | | | |
| Pre-Hearing Support | | | | | | | | | | | | | | | | |
| Post-Hearing Support | | | | | | | | | | | | | | | | |
| Clearance/Demolition of ROW | | | | | | | | | | | | | | | | |
| State Reviews | | | | | | | | | | | | | | | | |

NOTE: CY stands for Calendar Year

EXHIBIT C-1

Exhibit C-1

Page 1 of 1

CR000190

HNTB.000088
624

EXHIBIT D-1
FEE SCHEDULE
METHOD OF PAYMENT: UNIT COSTS

PROJECT NAME/CSJ: US 290 CORRIDOR PROGRAM MANAGEMENT CONSULTANT / VARIOUS
SUB-PROVIDER NAME: CROSSLAND ACQUISITION, INC.

| DESCRIPTION | # OF UNITS | COST/UNIT | UNIT | Milestone % | Description | TOTAL COSTS BY FC |
|---|---|---|---|---|---|---|
| UNIT COST | | | | | | |
| Acquisition Provider Administrative Services w/out field office per month of service | 2 | $ 8,000.00 | month | | | $16,000.00 |
| SUBTOTAL UNIT COSTS | | | | | | $16,000.00 |
| | | | | | | |
| | # UNITS | COST/UNIT | UNIT | Milestone % | Description | |
| OTHER DIRECT EXPENSES | | | | | | |
| Appraisal (limited damages) | 4 | $ 5,000.00 | parcel | 100% | Parcels 312, 313, 324, and 325 | $20,000.00 |
| Appraisal Review (limited damages) | 4 | $ 2,000.00 | parcel | 100% | Parcels 312, 313, 324, and 325 | $8,000.00 |
| Appraisal (significant acquisition/damages) | 1 | $ 10,000.00 | parcel | 100% | Parcel 314 | $10,000.00 |
| Appraisal Review (significant acquisition/damages) | 1 | $ 3,500.00 | parcel | 100% | Parcel 314 | $3,500.00 |
| Relocation Services for Business | 10 | $ 6,500.00 | displacee | 90% | Parcels 290, 311, 315, 317 (For last three milestones) | $58,500.00 |
| Relocation Services for Business | 12 | $ 6,500.00 | displacee | 50% | Parcels 320 and 327 (For last milestone) | $39,000.00 |
| Relocation Services for Personal Property and Mini-Storage Units | 2 | $ 2,000.00 | displacee | 55% | For second milestone on each personal property relocation | $2,200.00 |
| Relocation Services for Outdoor Advertising Sign (OAS) | 4 | $ 3,000.00 | displacee | 55% | For second milestone on each overhead advertising sign | $6,600.00 |
| Disposal of Property Services | 8 | $ 1,200.00 | parcel | 100% | Parcels 310, 311, 312, 314, 315, 316, 324, and 325 | $9,600.00 |
| Eminent Domain Package Preparation/Hearing Coordination | 3 | $ 5,500.00 | parcel | 70% | For Pre-Hearing and Post-Hearing, last three milestones | $11,550.00 |
| Eminent Domain Package Preparation/Hearing Coordination | 12 | $ 5,500.00 | parcel | 25% | For Post-Hearing Services only, last two milestones | $16,500.00 |
| Eminent Domain Package Preparation/Hearing Coordination | 2 | $ 5,500.00 | parcel | 10% | For Post-Hearing Services only, last milestone (Parcels 313 and 325) | $1,100.00 |
| | | | | | | |
| SUBTOTAL OTHER DIRECT EXPENSES | | | | | | $185,550.00 |
| | | | | | | |

SUMMARY

| | |
|---|---|
| TOTAL LABOR COSTS FOR CROSSLAND | $0.00 |
| UNIT COSTS | $16,000.00 |
| NON-SALARY(OTHER DIRECT EXPENSES) | $185,550.00 |
| GRAND TOTAL | $202,550.00 |

CR000191

HNTB.000089
625